## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: CAUSTIC SODA ANTITRUST LITIGATION | Lead Case No. 19-cv-00385 |
| | |
| THIS DOCUMENT RELATES TO: | HON. ELIZABETH A. WOLFORD |
| *All Actions* | **ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   PLAINTIFFS' ALLEGATIONS ................................................................ 4

III.  LEGAL STANDARD ............................................................................... 5

IV.  ARGUMENT .............................................................................................. 6

    A.    The Complaint Does Not Allege Direct Evidence of A Conspiracy. ................... 6

    B.    The Complaint Does Not Allege Circumstantial Evidence of A Conspiracy. ......................................................................................... 8

        1.    Plaintiffs' Allegations Do Not Show Parallel Behavior. ........................ 10

            a.    Plaintiffs do not allege parallel supply changes........................... 10

            b.    Plaintiffs' allegations about exports do not show parallel behavior and are consistent with a competitive market. .............. 13

            c.    Plaintiffs' price announcement allegations do not show parallel conduct by the Defendants............................................. 15

            d.    Plaintiffs' pricing allegations do not support Plaintiffs' allegations of conspiracy................................................................. 16

        2.    Plaintiffs' Do Not Allege the Necessary Additional Facts and Circumstances Suggesting Agreement. ................................................ 19

            a.    Attendance at industry meetings and participation in trade associations is insufficient to plausibly allege a conspiracy....... 20

            b.    Plaintiffs' allegations regarding producer supply agreements do not support their conspiracy allegations. ............. 21

            c.    The public, investor-facing statements do not support the conspiracy alleged.................................................................... 23

            d.    Plaintiffs' conclusory allegations regarding agreements to manipulate the IHS Markit lack factual support. ........................ 27

            e.    Plaintiffs ignore the effect of the "by-product" dynamic between caustic soda and chlorine. ............................................. 29

V.    CONCLUSION............................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  899 F.3d 87 (2d Cir. 2018)...........................................................................................10, 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................4, 5, 22, 29

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................. *passim*

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)...........................................................................................9

*United States ex rel. Carroll v. JFK Med. Ctr.*,
  No. 01-8158-CIV., 2002 WL 31941007 (S.D. Fla. Nov.15, 2002) .......................................19

*Cenedella v. Metro. Museum of Art*,
  348 F. Supp. 3d 346 (S.D.N.Y. 2018).......................................................................29

*Credit Bureau Servs., Inc. v. Experian Info Sols., Inc.*,
  No. 12-61360, 2012 WL 6102068 (S.D. Fla. Dec. 7, 2012)...........................................24, 25

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  733 F. Supp. 2d 1348 (N.D. Ga. 2010) .......................................................................24

*In re Domestic Airline Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.D.C. 2016) .............................................................................24

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)...........................................................................................28

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) .......................................................................12

*In re Graphics Processing Units Antitrust Litigation*
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................................20

*Grasso Enters., LLC v. Express Scripts, Inc.*,
  No. 14-1932, 2017 WL 365434 (E.D. Mo. Jan. 25, 2017) .......................................24

*Hinds Cty. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)...........................................................................23, 28

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
  231 F. Supp. 2d 1253 (N.D. Ga. 2002) .......................................................................24, 25

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..................................................................................... *passim*

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................................................5

*LaFlamme v. Societe Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ..............................................................................15

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) .................10, 21

*Liu Yao-Yi v. Wilmington Tr. Co.*,
   301 F. Supp. 3d 403 (W.D.N.Y. 2017) ..............................................................................17

*In re LTL Shipping Servs. Antitrust Litig.*,
   No. 08-1895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009)...................................................10

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004)................................................................................................18

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013).......................................................................................... *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) .........................................................................................9, 21

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
   541 F. Supp. 2d 487 (D. Conn. 2008)...................................................................................6

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) .................................................................................24

*In re Processed Eggs Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................................6

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co*
   917 F.3d 1249 (11th Cir. 2019). .......................................................................................8, 9

*Rochester Drug Co-op., Inc. v. Biogen Idec U.S., Corp.*,
   130 F. Supp. 3d 764 (W.D.N.Y. 2015) ................................................................................7

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004)..................................................................................................17

*Standard Iron Works v. ArcelorMittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009) .................................................................................24

*Starr v. Sony BMG Music Entm't.*,
   592 F.3d 314 (2d Cir. 2010).............................................................................5, 8

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*,
   738 F. Supp. 2d 505 (D. Del. 2010)........................................................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................6

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ........................................................................21, 23

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ...................................................................................30

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337, 368–69 (S.D.N.Y. 2016)...........................................7, 10, 23

**Statutes**

15 U.S.C. § 1 ................................................................................................ *passim*

# I.     PRELIMINARY STATEMENT

Plaintiffs' Consolidated Amended Complaint ("Complaint") conjures up a sprawling conspiracy from ordinary price fluctuations in the market for the commodity chemical caustic soda.  The Complaint is full of legal conclusions—speculative allegations of "secret" agreements and bare claims of "conspiracy"—but is missing the necessary foundation of factual allegations. The Complaint does not include allegations of: (1) parallel supply cuts; (2) parallel price increases; or (3) the other essential additional facts that are necessary to support a plausible inference of the conspiracy Plaintiffs claim.  The Complaint also pleads, but ignores, the basic global market realities during the Class Period that provide a commonsense, non-conspiratorial explanation for caustic soda prices—recent industry consolidation, "soar[ing]" export prices, and caustic soda's production as a co-product of chlorine.  Instead, the Complaint mixes Defendants' rational business conduct, conclusory assertions of agreement, and Plaintiffs' unsupported, speculative imaginings to declare conspiracy.  That is not enough to survive a motion to dismiss under the standard the Supreme Court set in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).[1]

Where, as here, an alleged violation of Section 1 of the Sherman Act is based on circumstantial evidence, *Twombly* requires plaintiffs to plead *both* facts suggesting parallel conduct *and* additional facts—known as "plus factors"—that lead to a plausible inference of

---

[1]     This memorandum is submitted jointly on behalf of Defendants Olin Corporation ("Olin"), K.A. Steel Chemicals, Inc. ("K.A. Steel"), Occidental Petroleum Corporation ("Occidental"), Occidental Chemical Corporation ("OxyChem"), Westlake Chemical Corporation ("Westlake"), Formosa Plastics Corporation, U.S.A. ("FPC USA" or "Formosa"), and Shintech Incorporated ("Shintech").

conspiracy.  Plaintiffs' allegations fail in both respects.[2]  Either failure warrants dismissal of the Complaint.

Plaintiffs make conclusory allegations that Defendants acted in parallel in restricting the supply of caustic soda.  Parallel conduct, by itself, cannot support a claim of conspiracy.  It is a necessary, but not sufficient, component of a conspiracy claim based on circumstantial evidence. Here, however, the alleged facts demonstrate that Plaintiffs cannot even show this basic predicate. Only two Defendants, Olin and OxyChem, are alleged to have reduced production capacity (notably, at different times and by different amounts) during the Class Period (defined below). Another, Shintech, announced a capacity increase during the Class Period.  No allegations are made that any other Defendant reduced capacity.  Plaintiffs have thus alleged divergent, non-uniform actions across the Defendants.

Plaintiffs also fail to allege parallel pricing by Defendants.  Despite the heading "History of Price Increases," Plaintiffs have only alleged that the Defendants issued price increase *announcements*—not that Defendants increased prices in parallel.  Moreover, as direct purchasers, Plaintiffs' know the prices they paid to Defendants.  The failure to plead parallel price increases negates any inference of conspiracy (and would be insufficient to give rise to the inference of conspiracy even if parallel price increases were properly pled).

Further, the price *announcement* allegations do not support a plausible inference of conspiracy.  The Complaint carefully avoids alleging the specific dates of each individual price increase announcement, making it impossible to evaluate when exactly any alleged announcements occurred.  If anything, the allegations show that price increase announcements

---

[2]     Regarding Defendant K.A. Steel, a wholly-owned subsidiary of Olin, the Complaint alleges only that that it was acquired by Olin in 2012.  Compl. ¶ 26.  This is plainly insufficient to state a claim against K.A. Steel.

occurred in sequence as follow-the-leader behavior, up to months apart from each other. For example, the Complaint alleges that in November 2015, Olin *first* announced a price increase that was *followed* by OxyChem, Westlake, Formosa, Shintech, and Axiall.[3] Well-settled law holds that follow-the-leader pricing does not support a plausible inference of agreement.

Ultimately, each of Plaintiffs' allegations with respect to supply and pricing show the type of behavior that is lawful, and indeed expected, in a concentrated commodity market such as caustic soda.

Plaintiffs have further failed to allege any "plus factors" suggesting the additional, circumstantial evidence of conspiracy necessary to support an inference that any alleged parallel conduct by Defendants resulted from an agreement. Plaintiffs only make vague and conclusory allegations regarding (1) attendance at industry trade meetings, (2) production swap agreements, (3) public investor comments, (4) communications with IHS Markit, (5) customer and market allocation, and (6) information exchanges. These allegations, however, completely lack the specific factual detail required to support plus factor allegations and fail to distinguish the conduct alleged from normal, unilateral business activity.

*Twombly* instructs that claims like these—bare-bones allegations of conduct dressed up with nothing more than conclusions of conspiracy—are not enough to state a claim for conspiracy under the Sherman Act. Plaintiffs' Complaint should therefore be dismissed now, at the "point of minimum expenditure of time and money by the parties and the [C]ourt." *Twombly*, 550 U.S. at 558.

---

[3]     Axiall was a caustic soda producer and is not a Defendant in this case.

## II.     PLAINTIFFS' ALLEGATIONS[4]

Plaintiffs allege a "collusive and concerted restraint of trade" in the caustic soda market by a group of nine Defendants who are alleged to be leading manufacturers of caustic soda in the United States.  *See* Compl. ¶¶ 1, 25–35.  Plaintiffs seek damages during a period from October 1, 2015 to the present ("Class Period") for "artificially inflated prices for Caustic Soda."  *Id*. ¶ 1.

The crux of Plaintiffs' Complaint is their allegation that prices for caustic soda rose significantly during the Class Period, combined with conclusory allegations that the Defendant manufacturers entered into agreements to raise prices, reduce supply, restrict facility capacity, and allocate customers.  *Id*. ¶ 3.  The significant majority of the allegations in the Complaint consist of allegations as to the members of the purported class, *id*. ¶¶ 9–17, the type of market, *id*. ¶¶ 39–41, 104–26, and the participants, *id*. ¶¶ 36–38, and legal conclusions regarding the existence of such an agreement, *id*. ¶¶ 1–4.  These legal conclusions couched as factual allegations are not entitled to an assumption of truth at the motion to dismiss stage.

Plaintiffs' few actual allegations of fact are spotty and confused.  First, Plaintiffs' allegations, *id*. ¶¶ 42–103, do not offer direct evidence of the terms of, or participants in, an actual agreement.  Instead, Plaintiffs allege (1) a purported "history of price increases" from 2015 through 2019, *id*. ¶¶ 54–78, (2) an increase in "industry margins," *id*. ¶¶ 79–84, and (3) "secret anti-competitive conduct, including agreements and understandings among Defendants to stabilize or increase prices," *see, e.g.*, *id*. ¶ 86.  However, none of Plaintiffs' allegations in these areas support a plausible *inference* of conspiracy.  These and other allegations made by Plaintiffs in their Complaint are discussed in detail below.

---

[4]     The factual allegations of the Complaint are assumed to be true only because they must be for purposes of this motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires plaintiffs to plead facts demonstrating that a claimed conspiracy is not just "conceivable," but "plausible." *Twombly*, 550 U.S. at 570. Plausibility under *Twombly* requires "more than a *sheer possibility* that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678–79 (emphasis added).

To state a claim under Section 1 of the Sherman Act, Plaintiffs must plausibly allege facts suggesting that defendants were party to a "contract, combination . . . or conspiracy, in restraint of trade." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting 15 U.S.C. § 1). Plaintiffs satisfy their plausibility burden if they can plead sufficient facts on the "crucial question" of the existence of an unlawful agreement, either by alleging: (1) direct evidence of an agreement, or (2) parallel conduct combined with other circumstantial facts, or "plus factors," that plausibly suggest an agreement existed. *See Citigroup*, 709 F.3d at 135–36; *see also Starr v. Sony BMG Music Entm't.*, 592 F.3d 314, 321 (2d Cir. 2010); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323–24 & nn.22–23 (3d Cir. 2010). Both approaches require Plaintiffs to plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Mere allegations that there was an "agreement" among Defendants or that Defendants participated in a "conspiracy" are legal conclusions—that is to say, they are labels, not facts, and can be disregarded. *See Starr*, 592 F.3d at 321; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) ("To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove" the defendants entered into an illegal conspiracy.).

The need for factual allegations is critical to the Court's gate-keeper role on Rule 12(b)(6) motions, particularly in antitrust cases. As the Second Circuit recognized in *Citigroup*: "If we

5

permit antitrust plaintiffs to overcome a motion to dismiss simply by alleging parallel conduct, we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy."  709 F.3d at 136–37.

In addition, Plaintiffs cannot meet their burden through vague "group pleading"—that is, general, sweeping allegations attributing awareness, conduct, and motivations to unidentified "Defendants."  *See In re Processed Eggs Antitrust Litig.*, 821 F. Supp. 2d 709, 719-20 (E.D. Pa. 2011) (collecting cases).  Because "the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it," Plaintiffs must plead facts specific to *each* Defendant showing that it was aware of, and committed to, the agreement alleged.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008); *see also In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008) (dismissing Section 1 clam where "complaint alleges general conspiratorial activity without reference to specific actions by a particular defendant at a particular time").  Here, however, Plaintiffs hide behind impermissible "group pleading"—i.e., alleging that unspecific "Defendants" engaged in certain conduct related to the alleged conspiracy – and fail to plead such facts specific to each of the individual Defendants.

## IV.    ARGUMENT

### A.    The Complaint Does Not Allege Direct Evidence of A Conspiracy.

Direct evidence of an anticompetitive agreement must be explicit and requires no inference to establish that the agreement "actually existed."  *Citigroup*, 709 F.3d at 136.  The paradigmatic example of such "smoking gun" direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Id.*

Plaintiffs have alleged no direct evidence of a conspiracy. The Complaint fails to plead a single factual allegation identifying a specific communication, meeting, or document in which Defendants purportedly agreed to fix caustic soda prices or constrain its supply, nor any first-hand statements from eyewitnesses supporting a concerted scheme. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 368–69 (S.D.N.Y. 2016); *see also Rochester Drug Co-op., Inc. v. Biogen Idec U.S., Corp.*, 130 F. Supp. 3d 764, 769 n.2 (W.D.N.Y. 2015) (Wolford, J.) (explaining that direct evidence of an agreement requires allegations as to "time, place, or person" of a claimed agreement).[5] Instead of facts, Plaintiffs merely rely on conclusory statements, like the following:

- "Defendants entered into an agreement or understanding to increase prices of Caustic Soda and not to compete on price," *see, e.g.*, Compl. ¶ 3.

- "Defendants, as alleged, have formed a cartel and are cooperating as an industry, having reached an agreement or understanding to limit and manage production and supply…" *id.* ¶ 4.

- Defendants "reach[ed] an agreement or understanding to end genuine price competition among themselves," *id.* ¶ 103.

It is well settled that bare, conclusory allegations like these are insufficient as a matter of law to state a plausible claim for conspiracy. *Twombly*, 550 U.S. at 555; *Citigroup*, 709 F.3d at 136. In the absence of direct evidence, the Complaint "leaves no doubt" that Plaintiffs seek to rest their Section 1 claim on allegations of parallel conduct combined with circumstantial "plus factors," discussed *infra*, "and not on any independent allegation of actual agreement among" Defendants. *Twombly*, 550 U.S. at 564.

---

[5]     The Complaint *acknowledges* the lack of sufficient factual allegations as to the "who, when, where" of the alleged agreement, and instead tries to fill in the gap with excuses and contentions that conspiracies are "self-concealing" and cannot be proven absent discovery. *See* Compl. ¶¶ 55, 89, 100.

B.   The Complaint Does Not Adequately Allege Circumstantial Evidence of
A Conspiracy.

Absent direct evidence, Plaintiffs can state a claim premised on circumstantial evidence only by plausibly alleging two essential features, each of which is required to survive a motion to dismiss: (1) parallel conduct on the part of Defendants, and (2) facts that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Starr*, 592 F.3d at 322 (quoting *Twombly*, 550 U.S. at 557).  This dual requirement is essential because, while parallel conduct may be "consistent with conspiracy," it is "just as much in line with *a wide swath of rational and competitive business strategy* unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S. at 554 (emphasis added).  As a result, parallel conduct, by itself, is insufficient to state an antitrust conspiracy claim.  *Id*.

Courts have routinely recognized that in a concentrated, commodity industry with a small number of large firms—precisely the type of market Plaintiffs allege exists here, *see* Compl. ¶ 2— follow-the-leader conduct in supply, export, and pricing is exactly what is expected of companies acting in their unilateral self-interest and does not suggest an unlawful agreement.  For example, in *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co*., the *en banc* Eleventh Circuit recently confirmed that "[f]ollowing the example set by a competitor, without agreeing to do so in advance, *is textbook 'price leadership'*—a practice we have repeatedly stated is insufficient to establish the existence of an agreement."  917 F.3d 1249, 1264 (11th Cir. 2019) (emphasis added).  The Eleventh Circuit block quoted from "the leading antitrust treatise" to explain the underlying basis for economic rationality:

> The first firm in a five-firm oligopoly, Alpha, may be eager to lower its price somewhat in order to expand its sales.  However, it knows that the other four firms would probably respond to a price cut by reducing their prices to maintain their previous market shares.  Unless Alpha believes that it can conceal its price reduction for a time or otherwise gain a substantial advantage from being the first

to move, the price reduction would merely reduce Alpha's profits and the profits of the other firms as well.

Such "oligopolistic rationality" cannot only forestall rivalrous price reductions, it can also provide for price increases through, for example, price leadership. If the price had for some reason been less than X [the price a monopolist would charge to maximize profits], firm Beta might announce its decision to raise its price to X effective immediately, or in several days, or next season. The other four firms may each choose to follow Beta's lead; if they do not increase their prices to Beta's level, Beta may be forced to reduce its price to their level. Because each of the other firms knows this, each will consider whether it is better off when all are charging the old price or price X. They will obviously choose X when they believe that it will maximize industry profits.

*Id.* at 1264-65 (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1429b (4th ed. 2017)). In other words, non-collusive oligopolistic markets are already defined by market behavior that is interdependent and characterized by conscious parallelism. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322.

This fundamental economic principle is borne out repeatedly in federal court decisions. The Ninth Circuit, in *In re Musical Instruments & Equipment Antitrust Litigation*, wrote that "[s]o long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its original price *is* followed, all firms will benefit." 798 F.3d 1186, 1195 (9th Cir. 2015). That other firms would follow a competitor's decision to issue a price increase announcement is expected in a concentrated industry, and is not sufficient to demonstrate an anticompetitive agreement. *Id.* (affirming dismissal of complaint that alleged "follow the leader" pricing was against defendants' self-interest); *see also Citigroup*, 709 F.3d at 139–40; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226–27 (3d Cir. 2011) (affirming grant of motion to dismiss and holding that "Conscious parallelism, 'a common reaction of firms in a concentrated market [that] recognize their shared economic interests and their interdependence with respect to price and output decisions' does not suffice as an agreement under Section 1."

(quoting *Twombly*, 550 U.S. at 553–54)); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962-63 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.,* 738 F. Supp. 2d 505, 514-15 (D. Del. 2010); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-1895, 2009 WL 323219, at *18 (N.D. Ga. Jan. 28, 2009).

Therefore, to plausibly allege an agreement in violation of Section 1, even if Plaintiffs can plead facts suggesting parallel conduct, they must also plead additional facts that place the alleged parallel conduct "in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557; *see also Citigroup*, 709 F.3d at 136–37. Here, Plaintiffs have failed on both fronts. The Complaint's allegations demonstrate neither parallel conduct nor sufficient additional facts suggesting that such conduct resulted from a preceding agreement.

### 1.    *Plaintiffs' Allegations Do Not Show Parallel Behavior.*

Plaintiffs fail to plead acts suggesting that there was in fact "parallel" conduct by Defendants. *Citigroup*, 709 F.3d at 136–37. Courts determine whether conduct is "parallel" by considering whether the conduct was (1) uniform; and (2) occurred within a close time-frame. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018). Plaintiffs thus must allege that each Defendant has engaged in the same type of behavior and did so close in time in order to plausibly allege parallel conduct. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 371–72 (analyzing whether conduct occurred close in time).

### a.    **Plaintiffs do not allege parallel supply changes**.

Plaintiffs allege in conclusory terms that Defendants conspired to engage in "collective, coordinated capacity rationalization efforts," that is, to reduce the supply of caustic soda. Compl. ¶ 51, *see also id*. ¶¶ 3, 48, 133. Yet the Complaint presents factual allegations showing the opposite:  that Defendants engaged in varied, non-uniform, and unilateral action with respect to the capacity and supply of caustic soda.

As an initial matter, Plaintiffs only allege specifically that two (of the nine) Defendants reduced capacity during the damages period:

- Plaintiffs allege that in November 2015 Olin "announced that it would idle or shutdown between 250,000 and 450,000 tons of Caustic Soda production capacity" and then "proceeded to idle or shut down at least 433,000 tons of annual capacity beginning in the first quarter of 2016." *Id*. ¶ 48.

- Plaintiffs allege that at some undefined point "later in 2016" OxyChem reduced its caustic soda "output by 150,000 dst/year." *Id*. Plaintiffs thus allege that Olin's cut was *more than two times* greater than OxyChem's, and that OxyChem's announcement occurred *months* after Olin announced its production changes.

That is it. Importantly, Plaintiffs do not allege any specific output reductions by Westlake[6] or Formosa. Moreover, they allege that Shintech actually took steps to *increase* production capacity by planning to build a new plant. *See Id.* ¶¶ 49, 100. In other words, the Complaint alleges that two of five caustic soda producers made isolated production cuts of entirely different and disproportional amounts, at relatively unspecified but different times, while two others made no capacity reductions, and Defendant Shintech announced that it would expand production significantly. The few factual allegations in the Complaint thus demonstrate a complete lack of uniformity—indeed, a significant divergence—in the Defendants' capacity and supply decisions, a far cry from "parallel" (let alone coordinated) behavior.

Furthermore, given the significant time lapse between the alleged reduction in production capacity by Olin in early 2016 and the alleged subsequent (much smaller) reduction in production capacity by OxyChem "later in 2016," Plaintiffs at best have asserted "follow-the-leader" behavior by OxyChem, in what they allege to be an "oligopoly" market. As explained in detail in Section IV.B., *infra*, "[o]ne would ordinarily *expect* parallel" conduct in an oligopolistic market in which

---

[6]     Plaintiffs allege that Axiall—again, not a Defendant here—cut production by 78,000 dry standard tons per year "around" Q1 2016. Compl. ¶ 48.

firms can observe each other's conduct before acting.  *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1310 n.15 (S.D. Fla. 2010).  Plaintiffs' capacity change allegations are thus consistent with a competitive market and not plausibly suggestive of an unlawful agreement.

Notably, as the Complaint recognizes, something else fundamentally changed in 2015 and 2016:  the number of significant caustic soda producers decreased from 7 to 5—by nearly 30%— with Olin acquiring Dow's chlor-alkali assets and Westlake acquiring Axiall.  *See* Compl. ¶¶ 55, 58.  And Plaintiffs also allege that Olin and OxyChem decided to make capacity cuts in the face of "excess industry capacity."  *Id*. ¶ 59.  These allegations support rational, non-conspiratorial justifications for capacity changes.  And more notably, according to the Complaint, no other Defendant idled or cut any capacity during the damages period.  *See id*. ¶ 48.  Indeed, as explained above, Shintech in 2017 "filed a permit to say that it was considering expanding its capacity to make various products, including Caustic Soda, at its [Louisiana facility]."  *Id*. ¶ 49.

Plaintiffs plead no other facts that could support their allegation of a "coordinated" effort to restrict supply, much less an inference of conspiracy.  The only other allegations Plaintiffs offer relating to supply are that "[t]here were also temporary shutdowns for plant maintenance and outages throughout 2016" and "[a]t times during the last three years," *id*. ¶¶ 48–50, and that "several Defendants shut down capacity," *see id*. ¶¶ 48–50.  These vague and conclusory allegations cannot salvage their claim.  With respect to "temporary shutdowns," Plaintiffs plead no facts whatsoever suggesting when such shutdowns occurred, whether the shutdowns were simultaneous, or even proximate, and whether the shutdowns had anything more than a transient impact on supply.  Likewise, the Complaint does not identify which Defendants allegedly "shut down capacity," *id*. ¶ 50, when that occurred, or in what amount.  The Complaint thus provides no

basis to find the requisite uniform conduct among Defendants with respect to supply or capacity to support an inference of agreement.  That alone is sufficient to dismiss the Complaint's claim that Defendants conspired to restrict the output of caustic soda.  *See Anderson News*, 680 F.3d at 112 (concluding allegations of actual parallel conduct are required to survive a motion to dismiss).

Further, Plaintiffs emphasize throughout the Complaint that "excess" industry capacity persists.  *See, e.g.*, Compl. ¶ 85.  Plaintiffs complain, with only a bare, unsupported allegation, *see* Compl. ¶ 59, that Defendants' facilities' operating rates together only averaged between 80–84% during 2016, across all Defendants.  Yet Plaintiffs point to no authority for this alleged operating rate data, despite the fact that operating rate information is reported in the same IHS Markit reports on which Plaintiffs rely for their pricing allegations.  Nor do Plaintiffs offer any allegation about what operating rate *each* Defendant had, in order to allege that the operating rates were similar across the group.  A simple average does not and cannot show parallel behavior.

Plaintiffs' allegations regarding supply show divergent, non-uniform actions over Plaintiffs' claimed damages period—allegations that are not consistent with an unlawful agreement and suggest Defendants were making independent decisions with respect to supply and capacity management.

    b. **Plaintiffs' allegations about exports do not show parallel behavior and are consistent with a competitive global market**.

Plaintiffs' allegations with respect to exports fare no better.  Plaintiffs make the conclusory allegation that Defendants engaged in "coordinated limitation of domestic supply in favor of export sales of Caustic Soda."  *See* Compl. ¶¶ 48, 50-51.  But Plaintiffs plead no facts suggesting any Defendant's export decisions were the product of an unlawful agreement—indeed, Plaintiffs' own allegations provide a rational, non-conspiratorial explanation for a Defendant's unilateral decision

to export caustic soda:  export prices were increasing.  *See id.* ¶ 109 (acknowledging the "global" nature of the Caustic Soda industry).

Plaintiffs allege only that (1) Olin made the decision to start exporting "for the first time" after acquiring Dow's chlor-alkali assets in 2015, exporting "up to 25% of its U.S. production in 2017," *Id.* ¶¶ 50, 68, and (2) that certain other unnamed Defendants at unspecified times may have sold caustic soda abroad.  *See, e.g.*, *id.* ¶ 88.  In essence, Plaintiffs' allegations regarding exports amount to an objection that any Defendant chose to export caustic soda "rather than using it to compete with each other domestically."  *Id.* ¶ 50.  Such a decision would not be unlawful.

And Plaintiffs' own allegations offer an explanation as to why a Defendant would unilaterally opt to export caustic soda:  "export prices soared in 2016 and 2017 in particular."  *Id.* ¶ 51.  The Complaint itself thus makes it plain that a decision by any Defendant to export under those circumstances was the result of rational, independent decision making, not the result of a conspiracy.  As the *Citigroup* court explained, such actions make "perfect business sense."  *See Citigroup*, 709 F.3d at 138.  Viewing the Complaint in the context of "common economic experience," the forces of supply and demand suggest that caustic soda suppliers would independently increase their sales to the export market as export prices "soared," as Plaintiffs have alleged they did. Compl. ¶ 51; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 326 (explaining that *Twombly* requires dismissal of a claim "if 'common economic experience'…show[s] that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior"); *see also Twombly,* 550 U.S. at 565.  Stated simply, it is not an antitrust violation for Defendants to react to external market forces that drove up demand globally and prices for domestically manufactured caustic soda.

### c. Plaintiffs' price announcement allegations do not show parallel conduct by the Defendants.

Plaintiffs allege that Defendants made a series of "successful" parallel price increases beginning in November 2015 that "materially increased" caustic soda prices, and evidence a collusive agreement. *See* Compl. ¶¶ 76–77, 90. But Plaintiffs do not plead facts suggesting that parallel price increases in fact occurred—and, even if Plaintiffs were able to plausibly allege that Defendants engaged in parallel pricing conduct, such conduct is expected and lawful in a market where pricing information is "publicly" available. *Id* ¶ 76.

First, many of Plaintiffs' allegations regarding price increase announcements are collapsed into general allegations that Defendants announced price increases at some point within a given quarter. *See* Compl. ¶ 76 (table information is "summarized" on a quarterly basis, omitting entirely Q1 2016). It is therefore unclear when during that three-month quarter any Defendant issued a price increase announcement. But the exact dates of these alleged price increase announcements are surely known to Plaintiffs—indeed, the Complaint states that they are "publicly known," and yet Plaintiffs largely do not include that information in their Complaint. These non-specific allegations cannot be used to plausibly show that Defendants issued price increase announcements in "parallel." And Plaintiffs' allegations regarding price increase announcements show that, on multiple occasions, the increases—whenever they were announced—varied widely from Defendant to Defendant. *See LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (granting motion to dismiss where it was "dubious at the outset as to whether the conduct alleged in the Complaint can accurately be characterized as 'parallel'" because prices diverged by as much as a factor of three at times and were "not imposed in tandem, but in some instances weeks apart").

15

Further, although Plaintiffs are caustic soda customers who allegedly purchased from the Defendants, the Complaint does not allege any facts regarding what prices any Defendant *actually* charged its customers, or what these Plaintiffs *actually* paid during the Class Period.  If price increases were indeed uniform, why would Plaintiffs leave these out?  Instead, Plaintiffs mask that deficiency by relying on quarterly North American average prices from 2015 to 2017 reported in the IHS Markit index.  *See* Compl. ¶ 77.  But aggregated data from the entire market over the course of a quarter only shows general market trends—not parallel pricing.

As pleaded, Plaintiffs' factual allegations fail to show parallel—that is, uniform, temporally close—price increases by Defendants.

### d. Plaintiffs' pricing allegations do not support Plaintiffs' allegations of conspiracy.

Where Plaintiffs do plead facts as to the timing and sequence of price increases, those allegations make it clear that the price increase announcements did not occur at the same time, but rather in succession and, at best, in response to public information.  For example, in paragraph 58 of their Complaint, Plaintiffs allege that in November 2015, Olin *first* announced a price increase and then was *followed* by OxyChem, Westlake, Formosa, and Shintech.  In paragraphs 68–69, Plaintiffs allege that in February 2018, Westlake announced a $40 per dry standard ton ("dst") increase, then Olin followed by announcing an $85/dst increase (more than double), and certain other Defendants weeks later followed Olin's announced price change.  As explained in Section IV.B., infra, this makes sense, since Plaintiffs allege that Defendants *reacted to publicly available information regarding price*.  *See id.* ¶¶ 69–70.  Such "follow the leader" pricing is expected and lawful in a concentrated, commoditized industry.  *See infra* IV.B.

Further, Plaintiffs allegations regarding pricing suggest competition, not coordination. While relying on IHS Markit data to show a purported price increase trend (*see* Compl. ¶ 77),

16

Plaintiffs conspicuously chose to *omit* the same IHS Markit contract price data appearing in the same volume of the same publication used for their table in paragraph 76 that purports to "summarize[] Defendants' price increase announcements."   When that same IHS Markit index data is also included in the table, as seen in the yellow column below, the pattern of price movements confirms that Defendants' conduct was not uniform and that, even when price increases of similar amounts may have been announced, they were *not fully realized* (or, in some cases, they actually resulted in a price *decline*):

| | | | | | | |
|---|---|---|---|---|---|---|
| **Quarterly Price Increase Announcements Versus Quarterly Price Changes** | | | | | | |
| *Westlake Complaint, filed 5-22-2019 (p. 28)* | | | | | | |
| | **OLIN** | **OXYCHEM** | **WESTLAKE** | **FORMOSA** | **SHINTECH** | **IHS Contract Liquid Index (USGC-CSL) Published Price Changes** |
| Q4 2015 | 40 | 40 | 40 | 40 | 40 | 43 |
| Q1 2016 | | | | | | (25) |
| Q2 2016 | 85 | 75 | 75 | 75 | 70 | 48 |
| Q3 2016 | 170 | 170 | 165 | 150 | 170 | 58 |
| Q4 2016 | 40 | 40 | 45 | 65 | 40 | 48 |
| Q1 2017 | 60/85 | 60/85 | 60/85 | 85 | 60 | 10 |
| Q2 2017 | 70/70 | 60/75 | 55/75 | 75 | 70 | 50 |
| Q3 2017 | 80/100 | 80/100 | 75/95 | | 100 | 35 |
| Q4 2017 | 70/100 | 80/100 | 85/115 | 100 | 100 | 45 |
| Q1 2018 | 85 | 85 | 40+50 | 85 | 85 | 55 |
| Q2 2018 | 40 | 40 | 45 | 40 | 40 | 35 |
| Q3 2018 | 50 | 50 | 50 | 50 | 50 | (25) |
| Q4 2018 | 40 | 40 | 45 | 40 | 40 | (25) |
| Q1 2019 | 50 | 80 | 75 | 70 | 80 | (35) |

Note: Plaintiffs' chart does not include a line for Q1 2016.

*See* Ex.1 to the Declaration of Steven Bizar ("Bizar Decl."), submitted by Defendants in support of this motion (IHS Pricing Data).[7]

---

[7]      Contract prices for caustic soda in North America published by IHS Markit are incorporated by reference in the Complaint.  A complaint incorporates materials by reference when it explicitly refers to and relies upon the documents in question.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  Specifically, to incorporate a document by reference, "the complaint must make a clear, definite, and substantial reference to the documents."  *Liu Yao-Yi v. Wilmington Tr. Co.*,

For example, Plaintiffs allege that all Defendants announced price increases of $40/dst in Q4 2015, and the reported index shows an average $43/dst price change.  Compl. ¶ 76.  Yet Plaintiffs confusingly omit any data in their table for the next quarter—Q1 2016—perhaps because, directly contrary to Plaintiffs' conspiracy theory, caustic soda prices actually *fell* by an average $25/dst, according to the IHS Markit index.  *See* Bizar Decl. Ex.1.  In the next quarter, Q2 2016, Plaintiffs allege that Defendants announced non-parallel increases ranging from $70 to $85/dst, yet IHS Markit reported *average* increases of just $48/dst—approximately half of that allegedly announced.  *Id.*  In Q3 2016, non-parallel increases of $150 to $170/dst were announced, yet average increases of only $58/dst were reported, only a little more than a third.  *Id.*

Quarter after quarter, the alleged price increases were met in reality with smaller, incremental average changes.  The only logical explanation, considering how averages work, is that the increases alleged in Plaintiffs' paragraph 76 chart did not and could not have taken place uniformly across the board.  These facts suggest pricing competition, not unlawful coordination. *See Lum v. Bank of Am.*, 361 F.3d 217, 232 (3d Cir. 2004) ("[T]he relevant inquiry for purposes of determining if an agreement to inflate prices can be inferred from consciously parallel pricing is whether there is consciously parallel pricing in *the final price consumers pay* . . . ."  (emphasis added)).

Moreover, the actual IHS Markit published price changes in the most recent three quarters (Q3 2018 through Q1 2019) have all been negative, reflecting decreased prices, even though Plaintiffs' Class Period runs through today, and Plaintiffs allege there were conspiratorial price

---

301 F. Supp. 3d 403, 413 (W.D.N.Y. 2017) (quoting *Mosdoz Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011)).  Here, Plaintiffs have explicitly referred to and relied upon IHS Markit contract prices for caustic soda in North America to create the graph contained in paragraph 77 of the Complaint.

increases at the same time.  *Compare* Compl. ¶ 77 *with id.* ¶¶ 71–72.  Although this average price information is available in the same IHS Markit reports Plaintiffs rely on for other allegations, Plaintiffs' Complaint attempts to avoid this inconsistency by completely *excluding* 2018 and 2019 data points from their paragraph 77 graph, choosing to stop reporting data in the fourth quarter of 2017.

This is not a fact issue warranting discovery:  this is a clear inconsistency within Plaintiffs' own allegations that necessitates dismissal of the claim.  *See United States ex rel. Carroll v. JFK Med. Ctr.*, No. 01–8158–CIV. 2002 WL 31941007, at *2 (S.D. Fla. Nov.15, 2002) (court not required to credit "internally inconsistent" allegations).

2.  *Plaintiffs Do Not Allege the Necessary Additional Facts and Circumstances Suggesting Agreement.*

Even if Plaintiffs had alleged parallel conduct—and, as explained above, they have not— the analysis does not end there.  To plausibly allege a conspiracy, Plaintiffs must also allege *additional* facts that could constitute "traditional" circumstantial evidence from which a preceding agreement can plausibly be inferred.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322.  Such "'[e]vidence implying a traditional conspiracy consists of non-economic evidence that there was an actual, manifest agreement not to compete.'"  *Id.* (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004).  Plaintiffs here have failed to do so.

The few factual allegations Plaintiffs *do* offer—regarding attendance at certain trade association meetings by certain Defendants; the existence of supply and swap agreements among Defendants; statements made by certain Defendants to investors; and a change in the IHS Markit index—do nothing "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 545.

          a.      **Attendance at industry meetings and participation in trade associations is insufficient to plausibly allege a conspiracy**.

First, Plaintiffs ask the Court to infer the existence of illicit communications based on their allegations that certain Defendants merely attended certain trade association events. *See* Compl. ¶¶ 90–93. But apart from the conclusory assertion that unnamed representatives from unidentified Defendants had "contacts" at unspecified points in time, *id*. ¶ 93, Plaintiffs plead no facts in support of their allegations that Defendants used trade organization meetings to further the alleged conspiracy.

Absent any factual allegations suggesting an alleged agreement between Defendants, the Complaint relies instead on the general pronouncement that "most, if not all" Defendants may have attended various trade association events and that "successful price increases during the Class Period *coincided* with known industry meetings in the United States and abroad." *Id.* ¶¶ 90–93 (emphasis added). Plaintiffs do not allege any actual communications (or agreement) regarding caustic soda pricing, supply, or customers that occurred during these industry meetings. *Id.* At best, therefore, Plaintiffs are alleging that industry events offered Defendants opportunities to conspire.[8]

Plaintiffs' approach—relying on conclusory allegations of opportunities to conspire rather than alleging specific facts of inter-firm communications—is not enough to provide a plausible inference of conspiracy. As the court in *In re Graphics Processing Units Antitrust Litigation* held:

> Plaintiffs have not pleaded that defendants ever met and agreed to fix prices; they plead at most that defendants *had the opportunity to do so because they attended*

---

[8]     Plaintiffs' conclusory claim that "[a]dditional contacts among Defendants" occurred "while traveling together en route to industry meetings and in other private circumstances . . . domestically and abroad," Compl. ¶ 93, is similarly no more than an allegation that Defendants may have had the opportunity to conspire. Absent is any detail about even which Defendants "travel[ed] together en route" to these industry meeting. *Id.* ¶ 93.

> *many of the same meetings*.  They then attempt to correlate the release of products with those meetings.  Given the sheer number of meetings attended by both defendants, every product release will follow on the heels of a meeting.

527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (emphasis added).  The same is true here:  Plaintiffs allege price increase announcements occurred quarterly, *see* Compl. ¶ 76, and Plaintiffs also allege that Defendants attended annual and bi-annual meetings of a least five different industry organizations, which take place in each quarter of every year.  *See id.* ¶¶ 90–93.  Given the "sheer number" of these meetings, and without any further attempt by Plaintiffs to link price increase announcements with specific attendance at meetings, it is not plausible to assume that the price increase announcements are necessarily linked to the meetings.

It is well settled across the federal courts that membership in trade associations, without more, does not violate the antitrust laws.  *Twombly*, 550 U.S. at 567 n.12 (rejecting the notion that a defendant should be forced to "devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy[,] all this just because he belonged to the same trade guild as one of his competitors"); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (same).  Rather, Defendants' "presence at such trade meetings is more likely explained by their lawful, free-market behavior."  *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009).  This Court should follow those other "courts [that] have consistently refused to infer the existence of a conspiracy" from averments of "membership in industry-wide trade associations."  *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d at 963-64 (collecting cases).

      **b.**     **Plaintiffs' allegations regarding producer supply agreements do not support their conspiracy allegations**.

Plaintiffs also allege that the purported conspiracy was "facilitated by secret co-producer supply agreements," Compl. ¶ 4, and "swap agreements" for caustic soda with each other in North America and abroad, the details of which are "confidential" and "believed to be known only to a limited number of employees at Defendants' companies," *id.* ¶ 94.  As an initial matter, Plaintiffs do not allege that the supply and swap agreements are themselves unlawful agreements in restraint of trade, and acknowledge that these agreements are "widespread" among these Defendants, and affiliates abroad.  Compl. ¶ 94.

Rather, Plaintiffs attempt a different tack, suggesting that supply and/or swap agreements may "inspire and reward exchanges of commercially sensitive information among the Defendants, and not only help to foster Caustic Soda industry cooperation rather than competition, but also to keep Caustic Soda market shares stable and prices stable-to-increasing."  *Id.*

Plaintiffs, however, plead no specific facts as to any occasion where the existence of a "co-producer agreement" resulted in the exchange of "commercially sensitive information" (let alone any agreement), nor how, exactly, any such unnamed agreement would "keep Caustic Soda market shares stable and prices stable-to-increasing."  *See id*.  Plaintiffs similarly fail to allege *any instance* of *any Defendant* in fact engaging in any such exchange.  *Id.*  Nor do Plaintiffs even explain why a supply agreement between two producers would result in the exchange of "commercially sensitive information," or identify any terms in any supply agreement through which such information might be exchanged.  *Id*.

In short, Plaintiffs' allegations regarding supply agreements are nothing more than conclusions and speculative guesswork that cannot be credited at the motion to dismiss stage.  *See Iqbal*, 556 U.S. at 679-79.  At most, Plaintiffs' allegations amount only to another mere "opportunity to conspire" which, as described above in Section IV.B.2.a., is not sufficient to create

a plausible inference of an anticompetitive agreement.  *See, e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement . . . ."); *Hinds Cty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("An allegation that [the defendants] had the opportunity to interact and make an agreement does not 'nudge[] [the plaintiffs'] claims across the line from conceivable to plausible.'"  (quoting *Twombly*, 550 U.S. at 570)).

The void is striking but not surprising as swap agreements involving the exchange between Defendants of specific quantities of caustic soda on a pound-for-pound, ton-for-ton basis have nothing to do with the pricing to or identity of customers.  Further, Plaintiffs identify only a single instance of two Defendants purchasing caustic supply from one other Defendant:  after Hurricane Harvey "idled some capacity at facilities owned by defendants OxyChem and Formosa . . . those defendants were assisted with Caustic Soda supply by other (unknown) producers," believed to be Westlake.  Compl. ¶ 94.  Plaintiffs allege that when Hurricane Harvey hit Houston in August 2017, it disrupted "over one-third of domestic capacity" for the supply of caustic soda, *id.* ¶ 50, and "temporarily idled some capacity at facilities owned by defendants OxyChem and Formosa[,] creating logistical problems." *Id.* ¶ 94.  The only factual allegations in the Complaint regarding Defendants' use of "supply assistance" agreements thus suggest that, far from being nefarious, such agreements are output-neutral, increase efficiency, and are procompetitive.  *Id.* ¶ 87; *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 368-69, 373-74 (dismissing Section 1 claim where allegedly anticompetitive agreement was "output neutral (or even enhancing)").

### c.   The public, investor-facing statements do not support the conspiracy alleged.

Plaintiffs also suggest that certain Defendants' statements to investors during earnings calls and conferences constituted "information exchanges" in furtherance of a conspiracy.  *See* Compl.

23

¶¶ 100, 125. However, the cases involving antitrust claims based on public, investor-directed statements demonstrate that they can only support antitrust liability where the statements possess certain specific characteristics that are not alleged here:

- The statements reflect a back-and-forth dialogue leading to an agreed-upon position or an exchange of assurances preceding the conduct that is the claimed subject matter of the conspiracy. *Compare In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1361-62 (N.D. Ga. 2010) *with Credit Bureau Servs., Inc. v. Experian Info Sols., Inc.*, No. 12-61360, 2012 WL 6102068, at *17 (S.D. Fla. Dec. 7, 2012) (distinguishing Delta/AirTran because, in that case, "both AirTran and Delta each indicated what the agreed upon position was before either party engaged in the agreed-upon activity.").

- The statements have a level of specificity regarding the Defendants' planned conduct, as opposed to general statements regarding industry conditions. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 60-61 (D.D.C. 2016); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d at 1362; *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) ("It is difficult to imagine how these generic statements [regarding the] industry render the conspiracy allegation more than plausible.").

- The statements lack a public purpose. Statements reflecting "typical industry reporting on strategy" during an earnings call cannot support claims of conspiracy. *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1275 (N.D. Ga. 2002); *see also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 887 (N.D. Ill. 2009); *see also Grasso Enters., LLC v. Express Scripts, Inc.*, No. 14-1932, 2017 WL 365434, at *5 (E.D. Mo. Jan. 25, 2017).

The statements Plaintiffs challenge here lack these characteristics, and therefore do not support a conspiracy.

Plaintiffs highlight portions of routine, investor-directed communications reporting on the financial success and outlook for only certain Defendants' caustic soda businesses. *See* Compl. ¶ 60 (citing Olin's February 1, 2017 Q4 2016 earnings call, Bizar Decl. Ex. 2) (providing investors "[a] few points of reference" regarding its 2017 expected "EBITDA in the Chlor Alkali Products and Vinyls segment" and explaining its perceived reasons behind pricing trends); *id*. ¶ 61 (citing Occidental Petroleum's February 2017 investor presentation, Bizar Decl. Ex. 3); *id*. ¶ 62 (citing Form-10K Reports offering historical statements on supply); *id*. ¶ 70 (citing Olin's May 1, 2018

24

First Quarter 2018 Earnings, Bizar Decl. Ex. 4) (reporting to investors on Q1 2018 earnings and noting that Olin expected additional improvements in caustic soda pricing); *id.* (citing Westlake's Q1 2018 Results – Earnings Call Transcript, Bizar Decl. Ex. 5) (reporting on caustic soda pricing and noting that "demand is strong globally and our industry is enjoying the benefit" and, in response to a question, noting that price increases were expected to be successful); *id.* ¶ 75 (citing Olin and Westlake investor-directed statements regarding pricing).[9]

None of the investor-directed statements on which Plaintiffs rely reflect a "back and forth" dialogue involving non-public information, or involve an exchange of assurances, or show intentions to proceed in a specific manner. *See Credit Bureau*, 2012 WL 6102068, at *16-17. Consequently, these statements do not plausibly suggest they contributed to the formation of the conspiracy Plaintiffs allege, especially since Plaintiffs cite statements of only three of the alleged conspirators. Nor do they otherwise reflect the existence of the conspiracy alleged. Rather, each reflects nothing more than a publicly traded company fulfilling its obligations to report to investors on past and expected company finances, precisely the type of industry reporting courts have found *not* suggestive of conspiracy. *See, e.g.*, *Holiday Wholesale Grocery*, 231 F. Supp. 2d at 1276.

Further, the public statements Plaintiffs challenge reflect limited knowledge of other Defendants' plans and therefore refute the claimed conspiracy. For example, Plaintiffs challenge Olin's statement to investors that "no capacity additions [were] expected within the next two to three years," by alleging that Shintech at the time had indeed planned a capacity expansion, *see* Compl. ¶ 49 (quoting Olin February 7, 2018 Fourth Quarter Earnings Presentation, Bizar Decl. Ex. 6). But that statement demonstrates, if anything, that Olin was *not aware* of Shintech's

---

[9]     Plaintiffs were selective—self-servingly so—in their citations to Defendants' investor-directed statements. Notably, Plaintiffs omitted all mention of Defendants' discussions in those same statements of the industry-wide dynamics contributing to pricing trends.

capacity plans.  It does not show that Olin and Shintech were coordinating with respect to output.

Olin's presentation also offers Olin investors additional insights into the caustic soda market and

the reasons for "favorable chlor-akali industry conditions," noting that:  (1) the European ban on

the use of mercury cells in caustic soda production resulted in "net capacity closure" of ".6 million

tons in 2017" and "1.2 million tons over the last 5 years"; (2) China had decreased its exports of

caustic soda; and (3) North American exports of caustic soda had increased with the North

American export price of caustic soda increasing 64.4% since 2015.  *See* Bizar Decl. Ex. 6.

Finally, Plaintiffs' allegations regarding Axiall's alleged public statement regarding Olin's

supply post-Dow acquisition utterly fail to support the claimed conspiracy.  *See* Compl. ¶ 47 (citing

Nov. 11, 2015 ICIS Explore article, "INSIGHT: Olin works to avoid Dowgestion," Bizar Decl.

Ex. 7).  Contrary to Plaintiffs' conclusory statements, Axiall's statement does not plausibly suggest

an "invitation" to Olin regarding supply.  First, Plaintiffs cite not to the transcript of Axiall's

August 6, 2015 Earnings Call, but rather to a separate article written more than three months later

that purports to relay the content of the earnings call.  *See id.*; *see also* Bizar Decl. Ex. 8).  Yet

nothing in the earnings call transcript to which the cited article refers says anything about Axiall

"hoping" that Olin would cut its caustic soda production.  *See* Bizar Decl. Ex. 8.  In fact, the

earnings call makes no mention of Olin whatsoever, instead discussing Axiall's financial

performance and its impending sale.  *See id.*  Plaintiffs' claim that Axiall's CEO had publicly

called on Olin to cut production," Compl. ¶ 48, is a gross mischaracterization of the record.  *See*

*id.*

Even if the statement were accurate (which it is not), nowhere in the Complaint do Plaintiffs

allege that Olin actually made its decisions with respect to the integration of the Dow business in

response to the statement by Axiall.  Nor could they, *as the very article* Plaintiffs cite reports that

Olin was *already* evaluating the closure of certain capacity following the acquisition. *See* Bizar Decl. Ex. 7. In other words, what Plaintiffs characterize as an "invit[ation]," *see* Compl. ¶ 102, was reported to investors contemporaneously with Olin's existing plans, *see* Bizar Decl. Ex. 8. Thus, Plaintiffs have not and cannot allege the requisite "back and forth" exchange necessary to infer agreement. And, even if a *reporter's characterization* of Axiall's statement did suggest agreement—and it does not—it offers no support for the multi-year, multi-faceted, and multi-Defendant conspiracy Plaintiffs purport to allege in their Complaint.

### d.   Plaintiffs' conclusory allegations regarding agreements to manipulate the IHS Markit lack factual support.

Finally, Plaintiffs allege that Defendants at some unspecified point "reached an understanding or agreement" to "manipulate the IHS Markit price index" by providing IHS Markit with selective or false information to ensure that the index reflects "the highest average contract price level practicable." Compl. ¶ 96. Plaintiffs, yet again, plead no facts whatsoever in support of this conclusory assertion of "agreement."

The Complaint alleges that IHS Markit, a third-party service, modified its index in the first quarter of 2018, changing its benchmark from the average "North American Caustic Soda undiscounted contract price" to the average "North American United States Gulf Coast undiscounted contract price" amid questions about its integrity. *Id.* ¶ 97. The Complaint goes on to suggest in purely conclusory terms that IHS Markit is a "source of market information" and also acts as a "conduit" among the Defendants, even while it acknowledges that IHS Markit operates confidentially and non-publicly and interacts with Defendants' customers. *Id.* ¶ 98. True to form, Plaintiffs offer no facts whatsoever to support these conclusory claims, nor do they offer any factual allegations to support the bald legal conclusion that "Defendants reached an understanding or agreement to manipulate the IHS Markit price index." *Id.* ¶ 96.

Plaintiffs concede that IHS Markit is an independent industry analyst and consultant that publishes a pricing index for caustic soda for which it "solicits and receives feedback from sales and marketing executives of at least the Defendants and other market participants," including purchasers of caustic soda in the putative class.  *Id.* ¶ 95.  Plaintiffs claim that although "IHS Markit operates confidentially and non-publicly," it allegedly nevertheless "is heavily influenced and manipulated by the Defendants."  *Id.* ¶ 98.  According to Plaintiffs, IHS Markit changed how it calculated the index "at least partly in light of doubts about its integrity," and an employee left the company "at least in part because of the index's lack of integrity."  *Id.* ¶ 97.  Notably, however, the Complaint alleges no facts suggesting that an *agreement by Defendants* played any *role* at all in those decisions or in general "doubts" about the integrity of the index.  Merely claiming in a conclusory manner that an "agreement" existed with respect to IHS Markit does not make it so, and does nothing to "nudge" Plaintiffs claim "across the line from conceivable to plausible" for purposes of this motion.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (internal quotations marks and citation omitted).

Plaintiffs' final allegation that the price index "acts as a conduit of information among the Defendants," Compl. ¶ 98, is similarly conclusory.  Plaintiffs do not allege any facts identifying *any* specific interfirm communications conveyed through the "conduit" of IHS Markit, nor any facts regarding the speakers, authors, or content of the information exchanged, or any actions taken in response.  Again, an allegation that Defendants may have had the opportunity to communicate, even if true, does not "nudge [Plaintiffs'] claims across the line from conceivable to plausible." *See Wachovia Bank N.A.*, 620 F. Supp. 2d at 513 (internal quotation marks omitted).

In short, Plaintiffs' claims with respect to IHS Markit suffer from the same deficiencies as each of their other claims:  Plaintiffs hang their hopes on conclusory statements of agreement, not

factual allegations suggesting such an agreement existed.  That is insufficient to survive a motion to dismiss.  *See Citigroup*, 709 F.3d at 136 (at pleading stage, plaintiff must "allege enough facts to support the inference that a conspiracy actually existed"); *see also Twombly*, 550 U.S. at 556-57 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (granting motion to dismiss Section 1 claim where "amended complaint provides nothing more than conclusory allegations").

> **e.** **Plaintiffs ignore the effect of the "by-product" dynamic between caustic soda and chlorine**.

Plaintiffs' allegations of parallel conduct and their theory of anticompetitive behavior rely on a fundamentally misleading presentation of the caustic soda market.  Although the Complaint does plead that caustic soda is a "co-product" and "by-product" from the production of chlorine in the "Chlor-alkali" process, *see* Compl. ¶¶ 2, 42, the Complaint fails to consider any impact of the demand chlorine on the pricing and production decisions for caustic soda.  This is a gross oversimplification of the market.  Simply put, you cannot evaluate supply and demand for caustic soda without factoring chlorine into the analysis.  *See Iqbal*, 556 U.S. at 679 (determining whether a complaint contains sufficient facts to state a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

The Complaint acknowledges that the chlor-alkali process results in two main products: (1) chlorine gas, and (2) caustic soda.  *See* Compl. ¶¶ 2, 42.  These two products are created in proportionate measure, as a true "co-product" relationship; *i.e.*, *you do not produce one without producing the other*.  Chlorine, as a stand-alone gaseous product, is an unstable and hazardous product that is difficult to store and maintain over periods of time.  Therefore, the amount of caustic

soda that a producer can generate at any given time is also a function of how much chlorine can be produced, sold, stored, or otherwise utilized.

This dynamic is not a secret, nor one that Plaintiffs can reasonably dispute. Plaintiffs in their Complaint repeatedly reference and rely on industry articles that describe the "chlor-alkali" market and the relationship between chlorine, caustic soda, and vinyl. *See, e.g.*, Compl ¶ 57 (citing Nov. 20, 2015 ICIS Explore article, "Olin Assumes US caustic leadership role," Bizar Decl. Ex. 9.) Yet in their Complaint, Plaintiffs choose to be willfully blind to this fundamental aspect of the chlor-alkali process. Plaintiffs' bare allegations that Defendants have conspiratorially restricted production or artificially raised prices fail to address the (equally and more plausible) explanation that decisions regarding caustic soda pricing and manufacture were driven by factors related to *chlorine* supply and demand. *See William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (plaintiffs must plead a conspiracy that is "plausible in light of basic economic principles.") (internal citations omitted).

Notwithstanding the other arguments above, on this basis alone, Plaintiffs' allegations fail to support the inference of an anticompetitive agreement.

## V.  CONCLUSION

"[A]t bottom, [*Twombly*'s] prime concern, like all cases interpreting Rule 12(b)(6), is isolating those cases that assert a plausible antitrust conspiracy (and thus warrant discovery to determine whether, in fact, such a conspiracy exists) from those that *merely presume a conspiracy from parallel action*." *Citigroup*, 709 F.3d at 140 (emphasis added). Plaintiffs' Complaint here is even worse—it seeks to presume conspiracy from conduct that, based on Plaintiffs' own allegations, is not even parallel.

For the reasons stated herein, Defendants respectfully request that the Court dismiss the Complaint pursuant to Federal Rule of Procedure 12(b)(6).

Dated:  July 8, 2019

Respectfully submitted,

| | |
|---|---|
| /s/ John Lavelle | /s/ Steven E. Bizar |
| Alan Unger | Steven E. Bizar |
| John Lavelle | George G. Gordon |
| Tom A. Paskowitz | Julia Chapman |
| Peter J. Mardian | John McClam |
| SILEY AUSTIN LLP | DECHERT LLP |
| 787 Seventh Ave. | 2929 Arch Street |
| New York, NY 10019 | Philadelphia, PA  19104 |
| Tel: (212) 839-5300 | Tel: (215) 994-4000 |
| aunger@sidley.com | steven.bizar@dechert.com |
| jlavelle@sidley.com | george.gordon@dechert.com |
| tpaskowitz@sidley.com | julia.chapman@dechert.com |
| pmardian@sidley.com | john.mcclam@dechert.com |

*Counsel for Defendants Formosa Plastics
    Corp. and Formosa Plastics Corp., USA*

Timothy J. Graber
Brian P. Crosby
Melissa M. Morton
GIBSON, MCASKILL & CROSBY, LLP
69 Delaware Avenue, Suite 900
Buffalo, NY 14202
Tel: (716) 856-4200
tgraber@gmclaw.com
bcrosby@gmclaw.com
mmorton@gmclaw.com

*Counsel for Defendants Occidental Petroleum
    Corp. and Occidental Chemical Corp.*

/s/ Paul C. Cuomo

Paul C. Cuomo
Joseph A. Ostoyich
William C. Lavery
Jeffrey S. Oliver
Caroline L. Jones
BAKER BOTTS
The Warner
1299 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 639-7700
paul.cuomo@bakerbotts.com
joseph.ostoyich@bakerbotts.com
william.lavery@bakerbotts.com
jeffrey.oliver@bakerbotts.com
caroline.jones@bakerbotts.com

Stephen A. Sharkey
BOND, SCHOENECK & KING PLLC
200 Delaware Ave., Suite 900
Buffalo, NY  14202-2107
Tel: (716)416-7051
ssharkey.bsk.com

*Counsel for Defendants K.A. Steel Chemicals, Inc. and Olin Corp.*

/s/ Daniel S. Bitton

Daniel S. Bitton
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA  94105
Tel: (415) 490-1486
dbitton@axinn.com

/s/ John DeQ. Briggs

John DeQ. Briggs
Steven C. Lavender
AXINN, VELTROP & HARKRIDER LLP
950 F Street, NW
Washington, DC  20004
Tel: (202) 912-4700
jbriggs@axinn.com
dbitton@axinn.com

Randall D. White
Caitlin M. Higgins
CONNORS LLP
1000 Liberty Building
424 Main Street
Buffalo, NY 14202
Tel: (716) 852-5533
rdw@connorsllp.com
cmh@connorsllp.com

*Counsel for Defendant Shintech Incorporated*

/s/  *William R. H. Merrill*
William R. H. Merrill
James T. Southwick
Abigail C. Noebels
Burton S. Dewitt
SUSMAN GODFREY LLP
1000 Louisiana St., Suite 5100
Houston, TX  77002-5096
Tel: (713) 651-9366
bmerrill@susmangodfrey.com
jsouthwick@susmangodfrey.com
anoebels@susmangodfrey.com
bdewitt@susmangodfrey.com

/s/*Terrence P. Flynn*
Terrence P. Flynn
HARRIS BEACH PLLC
Larkin at Exchange
726 Exchange St., Suite 1000
Buffalo, New York 14210
Tel.: (716) 200-5050
tflynn@harrisbeach.com

*Counsel for Defendant Westlake Chemical
    Corporation*