**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE CAUSTIC SODA ANTITRUST LITIGATION** | **Lead Case No.: 1:19-cv-00385-LJV** |
| **THIS DOCUMENT RELATES TO:**<br><br>**ALL ACTIONS** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

I. INTRODUCTION .......... 1

II. SUMMARY STATEMENT OF FACTS .......... 6

III. ARGUMENT .......... 12

A. Applicable Legal Standards .......... 12

1. Federal Rule of Civil Procedure 12(b)(6) .......... 12

2. Section 1 of the Sherman Act .......... 13

B. Defendants Rely On Irrelevant Authorities .......... 15

C. Plaintiffs Have Pled a Plausible Price-Fixing Conspiracy .......... 18

1. Defendants Acted in Parallel to Impose Numerous Price Increases .......... 18

2. Defendants' Parallel Price Increases Arose in a Context Strongly Suggestive of Conspiracy .......... 25

i. Motive .......... 26

ii. Actions Contrary to Economic Self-Interest .......... 29

iii. Interfirm Communications .......... 33

D. Defendants' Group Pleading Argument Does Not Support Dismissal .......... 40

E. Occidental Petroleum Corporation Is Properly Named as a Defendant .......... 45

F. Plaintiffs Have Sufficiently Alleged Occidental Is the Alter Ego of OxyChem .. 47

G. Plaintiffs Have Sufficiently Alleged OxyChem Acted As The Agent of Its Parent Occidental .......... 50

H. The Claim Against Defendant Westlake Is Properly Alleged .......... 54

I. The Claim Against Defendant Shintech Is Adequately Alleged .......... 56

J. Defendant Formosa Should Not Be Dismissed .......... 59

K. Defendants' Exhibits In Support Of Their Joint Motion Raise Factual Disputes Inappropriate For Resolution On A Motion To Dismiss .......... 62

IV. CONCLUSION .......... 64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Elec. Pension Fund v. Bank of Am.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) .... 44

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
2005 WL 2130607 (Del. Ch. Aug. 26, 2005) .... 51, 52, 54

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) .... *passim*

*Anderson News, L.L.C. v. Am. Media, Inc.*,
899 F.3d 87 (2d Cir. 2018) .... 20

*Arizona v. Maricopa Cty. Med. Soc'y*,
457 U.S. 332 (1982) .... 64

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, No. 12883,
1995 WL 376929 (Del. Ch. June 15, 1995) .... 50

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .... *passim*

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013) .... 14

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) .... 16

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) .... 23, 58, 60

*Ciuffitelli for Trustee of Ciuffitelli Revocable Trust v. Deloitte & Touche LLP*,
2017 WL 2927481 (D. Or. Apr. 10, 2017) .... 44

*Concord Assocs., L.P. v. Entm't Properties Tr.*,
817 F.3d 46 (2d Cir. 2016) .... 12

*Concord Assocs., L.P. v. Entm't Properties Tr.*,
2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) .... 40

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .... 18, 26, 47

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018) .... 40

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010) .... 63

*Dinaco, Inc. v. Time Warner, Inc.*,
346 F.3d 64 (2d Cir. 2003) .... 51

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987) .... 45

*Fisher v. Townsends, Inc.*,
695 A.2d 53 (Del. 1997) .... 50

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995) .... 47

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .... 43

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) .... 13, 25, 26, 58

*Geyer v. Ingersoll Publ'ns Co.*,
621 A.2d 784 (Del. Ch. 1992) .... 47, 49

*Grasso Enters., LLC v. Express Scripts, Inc.*,
2017 WL 365434 (E.D. Mo. Jan. 25, 2017) .... 34

*Grasty v. Michail*,
2004 WL 396388 (Del. Super. Feb. 24, 2004) .... 51

*Haley Paint Co. v. E.I. Dupont de Nemours & Co.*,
804 F. Supp. 2d 419 (D. Md. 2011) .... 26

*Hinds County, Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) .... 41, 46

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .... 24

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa 2010) .... *passim*

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .... 34, 37, 40

*In re Chocolate Confectionary Antitrust Litig.*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) .... 27

*In re Chocolate Confectionary Antitrust Litig.*,
999 F. Supp. 2d 777 (M.D. Pa. 2014) ........ 23

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........ 35, 36

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ........ 47, 49

*In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016) ........ *passim*

*In re Domestic Drywall Antitrust Litig.*,
163 F. Supp. 3d 175 (E.D. Pa. 2016) ........ 38, 58, 61

*In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*,
2014 WL 3971620 (D.N.J. Aug. 13, 2014) ........ *passim*

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ........ 26

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........ *passim*

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) ........ *passim*

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........ 38

*In re Graphics Processing Units Antitrust Litig.*,
540 F. Supp. 2d 1085 (N.D. Cal. 2007) ........ 21, 55

*In re High Fructose Corn Syrup*,
295 F.3d 651 (7th Cir. 2002) ........ 23, 24, 26

*In re Musical Instruments & Equipment Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ........ 15, 16

*In re OSB Antitrust Litig.*,
2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ........ 44

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) ........ 30

*In re Processed Egg Prods. Antitrust Litig.*,
821 F. Supp. 2d 709 (E.D. Pa. 2011) ........ 42, 44

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017)............................................................ 16, 21, 26, 55

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012)................................................................................................ 29

*In re South African Apartheid Litig.*,
617 F. Supp. 2d 228 (S.D.N.Y. 2009)........................................................................ 52, 53

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................................................. 41

*In re Text Messaging Antitrust Litig.*,
2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) ..................................................................... 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) ............................................................................ 44

*In re Tronox, Inc. Sec. Litig.*,
769 F. Supp. 2d 202 (S.D.N.Y. 2011)........................................................................ 50, 52

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016)................................................................................ 20

*Khanna v. McMinn*, No. Civ.A.,
2006 WL 1388744 (Del. Ch. May 9, 2006) ........................................................................ 50

*LaFlamme v. Societe Air France*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) ............................................................................... 21

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004)............................................................................................... 24

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)................................................................................... 14, 17, 32

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
337 F.3d 125 (2d Cir. 2003)............................................................................................... 50

*Meyer v. Kalanick*,
174 F. Supp. 3d 817 (S.D.N.Y. 2016)........................................................................ 13, 14

*MicroStrategy Inc. v. Acacia Research Corp.*,
2010 WL 5550455 (Del. Ch. Dec. 30, 2010)..................................................... 47, 48, 49

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*,
998 F.2d 1224 (3d Cir. 1993)............................................................................................. 32

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
658 F. Supp. 1061 (D.Del. 1987)........................................................................... 51

*Poller v. Columbia Broad. Sys., Inc.*,
368 U.S. 464 (1962)........................................................................................... 44

*Premium Payment Plan v. State Nat'l Ins. Co.*,
2006 WL 566474 (N.D.N.Y. Mar. 7, 2006) ............................................................ 51

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
917 F.3d 1249 (11th Cir. 2019) ...................................................................... 17, 41

*Rochester Drug Co-Op., Inc. v. Biogen Idec U.S. Corp.*,
130 F. Supp. 3d 764 (W.D.N.Y. 2015)..................................................................... 14

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ................................................................... 19, 58, 60

*Sears Mortg. Corp. v. Rose*,
634 A.2d 74 (N.J. 1993)........................................................................................ 50

*Spagnola v. Chubb Corp.*,
264 F.R.D. 76 (S.D.N.Y. 2010) .............................................................................. 47

*Spano v. V & J Nat'l Enters., LLC*,
264 F. Supp. 3d 440 (W.D.N.Y. 2017)..................................................................... 50

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)............................................................................ *passim*

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001).................................................................................. 28

*Town of Babylon v. Fed. Hous. Fin. Agency*,
699 F.3d 221 (2d Cir. 2012).................................................................................. 13

*United States v. Alcoa, Inc.*,
2001 WL 1335698 (D.D.C. June 21, 2001).............................................................. 28

*United States v. Andreas*,
216 F.3d 645 (7th Cir. 2000) ................................................................... 30, 55, 62

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015).................................................................................. 26

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)......................................................................................... 20, 64

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .......... 64

*Wacker v. JP Morgan Chase & Co*,
678 F. App'x 27 (2d Cir. 2017) .......... 12

*Wiwa v. Royal Dutch Petroleum Co.*,
2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) .......... 52, 53

**<u>Statutes</u>**

15 U.S.C. §1 .......... *passim*

**<u>Rules</u>**

Fed. R. Civ. P. 8 .......... 40, 65

Fed. R. Civ. P. 8(a) .......... 12, 18, 40, 65

Fed. R. Civ. P. 9(b) .......... 2

Fed. R. Civ. P. 12(b)(6) .......... *passim*

Fed. R. Civ. P. Rule 15(a)(2) .......... 65

Fed. R. Civ. P. 56 .......... 20

Plaintiffs[1] respectfully submit this memorandum of law in opposition to: (1) Defendants' Joint Motion To Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (ECF No. 79);[2] (2) Defendant Occidental's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint for Failure to State a Claim (ECF No. 80); (3) Defendant Westlake's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint for Failure to State a Claim (ECF No. 81); (4) Defendant Shintech Incorporated's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint for Failure to State a Claim (ECF No. 82); and (5) Defendant Formosa Plastics Corporation, U.S.A.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint for Failure to State a Claim (ECF No. 84).[3]

## I. INTRODUCTION

In seeking dismissal of the Complaint, Defendants employ a "death by a thousand cuts" strategy. They improperly slice and dice and dismember the Complaint's hundreds of detailed factual allegations and thereby disregard the totality of Plaintiffs' price-fixing claim. When considered together, the Complaint's allegations strongly support the plausibility of the existence of a conspiracy and satisfy the pleading standards applicable to claims for violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

[1] Plaintiffs are (in order of filing) Miami Products & Chemical Company, Amrex Chemical Co., Inc., Midwest Renewable Energy LLC, Main Pool and Chemical Co., Inc., Perry's Ice Cream Company, Inc., Finch Paper, LLC, and VanDeMark Chemical, Inc. (collectively, "Plaintiffs").

[2] Defendants' joint motion was filed on behalf of defendants Olin Corporation ("Olin"), K.A. Steel Chemicals, Inc. ("K.A. Steel"), Occidental Petroleum Corporation ("Occidental" or "Oxy"), Occidental Chemical Corporation ("OxyChem"), Westlake Chemical Corporation ("Westlake"), Formosa Plastics Corporation, U.S.A. ("Formosa"), and Shintech Incorporated ("Shintech") (collectively, "Defendants").

[3] Defendants' motions refer to the operative complaint as "Amended," but pursuant to the Case Management Order (Dkt No. 49 at §B¶1), the complaint is entitled the Consolidated Class Action Complaint ("Complaint"), Case 1:19-cv-00385-EAW-MJR (ECF No. 51, filed 05/22/19).

Defendants' approach to the issue of the Complaint's sufficiency is contrary to the law. The law requires that allegations supporting violations of Section 1 must be read **together** in determining whether the threshold plausibility test has been met. Compounding their error, Defendants misapply the relevant pleading standards and contest the accuracy of the facts alleged in the Complaint, even though its allegations are to be taken as true on these motions to dismiss.[4] Moreover, at this stage of the proceedings, there has been no discovery in this case, which alleges price fixing by highly sophisticated entities whose misconduct was carried out in complete secrecy. Nevertheless, Plaintiffs have unearthed and set forth significant facts which are sufficient to put each Defendant on notice of the claim of a plausible conspiracy to fix and maintain the price of Caustic Soda during the Class Period.[5] When read in context and in their totality, the Complaint's allegations plainly show the plausibility of each of the Defendants: (a) reaching an agreement or understanding to fix prices in the multi-billion dollar Caustic Soda industry; (b) carrying out their agreement through successful price increases and related conduct; and thereby (c) causing damage to Plaintiffs and the class of Caustic Soda direct purchasers they seek to represent.

After experiencing years of poor margins, overcapacity, and flat or declining prices, Defendants began working together as an industry to improve their fortunes. ¶¶43, 47-48, 52, 56-58, 61. In August 2015, the CEO of Axiall (which was acquired in 2016 by Defendant Westlake)

---

[4] By their individualized briefs, Defendants appear to suggest that there must be a heightened level of particularity in pleading because this is a conspiracy case. They are wrong. Pleading with sufficient particularity applies to fraud cases, which fall within Fed. R. Civ. P. 9(b). But this is not a fraud case.

[5] The Class Period is October 1, 2015 to the present. ¶¶1, 9. All references hereinafter to "¶__" are to paragraphs of the Complaint unless otherwise indicated.

blamed declining prices and excess supply for its poor financial results, remarking to investors that the industry needed to shut down capacity in order to improve prices, and even inviting its competitor, Defendant Olin, to cut production and remove supply from the market upon completing its acquisition of Dow's chloralkali business (which includes Caustic Soda). ¶47. Olin did just that, and announced a price increase in November 2015 that was followed almost immediately—**and in an identical amount to all customers nationwide**—by Defendants OxyChem, Westlake, Formosa, and Shintech. ¶58. This was the first time in at least four years that an increase was supported publicly by all the major U.S. producers to all customers in such a short time period. *Id*. Defendants then increased prices again and again and again in 2016, 2017, and 2018, with prices spiraling upward in an often unprecedented manner, even though industry overcapacity and relatively flat demand persisted, and despite shutdowns of capacity (both permanent and temporary) by the Defendants. ¶¶48-50, 59-73, 76-77. Indeed, after years of flat or declining prices, stagnant demand, stable input costs, and excess capacity, Defendants dramatically began to increase prices in the fourth quarter of 2015 in lockstep, and have increased prices as an industry in more than a dozen quarters from 2015 through the present. *Id*., and ¶¶43, 79, 85. These facts alone are strongly indicative that a cartel was formed, continues to exist, and was hugely successful in generating massive, record profits for its members.

Defendants' Caustic Soda prices and margins increased consistently and materially during the Class Period. ¶¶79-85. For example, Caustic Soda prices increased more than 20% between the fourth quarter of 2015 and the fourth quarter of 2016 (¶59), and **prices were more than 50% higher in 2018 than they had been in 2015**. ¶73. In late 2016, Olin had predicted—remarkably, given the unfavorable economic environment—that the **industry** was "entering a **favorable multi-year caustic soda pricing environment**[.]" ¶60 (emphasis added). Olin's

industry pricing prediction proved to be accurate: it reported a 32% increase in its "caustic soda pricing" from 2016 to 2017 (¶66), and its fourth quarter 2017 segment earnings increased 88% from the fourth quarter of 2016 "primarily due to higher pricing for caustic soda" and other products. ¶80. Similarly, Defendant OxyChem informed investors in February 2017 that Caustic Soda prices had "reversed their multi-year trend of steady decline in mid-2016[,]" and that "[p]rotracted poor financial performance in the industry [was] improving market discipline." ¶61. Defendant Occidental's chemical segment earnings (which include Defendant OxyChem's earnings) increased 44% from 2016 ($571 million) to 2017 ($822 million), a result in part due to "higher realized pricing for caustic soda," and its overall annual profit more than tripled from 2017 to 2018. ¶81. Defendant Westlake achieved record EBITDA[6] in 2018 of $2.1 billion (it had achieved $1.8 billion in 2017), and its vinyls segment's sales increased from 2017 to 2018 in part due to "higher sales prices and volumes for Caustic Soda." ¶82. Similarly, Defendants Formosa and Shintech achieved record profits in recent years: Formosa's Taiwanese parent company (defendant Formosa Plastics Corporation ("FPC"), whose financials incorporate Formosa's) reported that its consolidated operating profit increased 68.5% from 2016 to 2017 ("a record high level for the Company in the past 6 years"), and Shintech's Japanese parent (Defendant Shin-Etsu Chemical Co. Ltd., whose financials include Defendant Shintech's) trumpeted to its investors not only that its profit from price improvement in FY2018 helped it achieve **the highest profit in its history**, but also that a main factor in this unprecedented success was price improvement in its PVC/Chlor-Alkali business, which included Shintech's sales. ¶¶83-84.

The enormous price and profit increases attained by Defendants in recent years are

[6] Earnings before interest, tax, depreciation and amortization.

wholly consistent with the Complaint's factual allegations describing their alleged unlawful conduct. Defendants' price increases routinely coincided with their trade association meetings and industry conferences, both domestically and abroad. ¶¶76, 91-93. For example, Defendants sent representatives to a trade conference in March 2016 when North American prices were "firming," and only a few weeks later, they announced a new price increase described by the press as "the most significant increase of the past three years." ¶¶59, 91. Defendants also routinely readied the market to accept—and publicly and privately indicated their support for—price increases, often announcing increases within days of each other, or even on the same day, within hours of one another. ¶¶57-58, 65, 70, 72. An example occurred on May 1, 2018, when Olin, while boasting about its first quarter 2018 financial results, stated its Caustic Soda pricing had "improved approximately 40% from first quarter 2017" and that it expected "additional improvements in caustic soda pricing in the second quarter." ¶70. Shortly thereafter, Westlake's CEO told an investor conference that "Westlake did not see any cap on Caustic Soda prices." *Id*. And then on May 21, 2018, both Defendants Olin and OxyChem sent nonpublic letters to customers announcing an **identical** $40 per ton price increase, and within days, Defendants Formosa, Shintech, and Westlake announced either an identical increase (Formosa and Shintech) or a slightly higher increase (Westlake). *Id*. These facts give rise to a strong inference of collusion, not competition, and plainly support the plausibility that a conspiracy was afoot.

Defendants also, as alleged, engaged in practices indicative of a cartelized industry. Throughout the Class Period, Defendants agreed to and did temporarily or permanently shut down capacity, seemingly in a coordinated fashion, both publicly and privately through consultants or others (¶¶48-50, 75); routinely used false or misleading justifications for their numerous price increases (¶¶62, 87, 96, 99); assisted each other with supply rather than using it

to compete against each other (¶94); manipulated a price index relied on by many customers and managed by an industry consultant (¶¶77, 95-98); failed to compete aggressively for the business of each other's customers, in effect allocating them and keeping customer turnover low, maintaining market shares, and stabilizing or increasing prices (¶99); and exchanged non-public, commercially sensitive information (including concerning supply and pricing) directly and indirectly through industry consultants and others. ¶¶100, 124-126. Indeed, the fact that Defendants' efforts to stabilize and increase prices and limit domestic supply in 2016 were so successful after years and years of poor financial performance in the Caustic Soda industry is particularly extraordinary given the presence of "world overcapacity" and a "downturn of demand" in the first quarter of 2016. ¶¶50-51, 62.

In sum, when the Complaint's factual allegations are considered as a whole, they compellingly portray unlawful, anticompetitive conduct. The Complaint identifies the "setting suggesting the agreement" or understanding among the Defendants, as well as the characteristics and effects of their anti-competitive agreement, and thus sufficient "factual enhancement" to "nudge[] [Plaintiffs' claim] across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs have alleged what is required to state a plausible claim of Defendants' illegal agreement to fix prices in the Caustic Soda industry. None of Defendants' arguments warrants dismissal. Accordingly, Defendants' motions should be denied.

## II. SUMMARY STATEMENT OF FACTS

The Complaint alleges in great detail a price-fixing conspiracy and cartel practices in the multi-billion-dollar Caustic Soda industry.[7] Caustic Soda is a commodity chemical sold by

[7] This factual summary is not intended to substitute for all of the specific facts set forth in the 56-page Complaint. *See also* Plaintiffs' Exhibit 1 (Examples of Statements of Fact Alleged in the

Defendants primarily in liquid form in two grades, membrane and diaphragm, to customers in both the United States and abroad, for use in a variety of industries (including, *e.g.*, paper, pulp, and cellulose; water treatment; aluminum and chemical). ¶¶42, 113. A by-product of the production of chlorine, Caustic Soda is manufactured by the Defendants in chloralkali plants located throughout the United States and the world. ¶¶25, 28-35, 42.

Years of significant excess capacity and flat or declining Caustic Soda prices and margins—as well as "poor financial performance in the industry"—motivated Defendants to conspire. *See, e.g.*, ¶¶55-56, 61-62. For example, prices declined about 6% from 4Q2012 to 3Q2015 (¶5), as Defendants' price increase announcements were largely unsuccessful in increasing prices during the 2011-2014 period. ¶54. Defendants' margins declined approximately 25-30% between 2012 and 2014, and stabilized in 2015.[8] In 3Q2015, upset about industry overcapacity, the CEO of Axiall—acquired in 2016 by Defendant Westlake—called on Defendant Olin to shut down capacity after its acquisition of Dow's chloralkali assets (including Dow's Caustic Soda business) in October 2015. ¶47. Olin announced in early November 2015 that it would shut down hundreds of thousands of tons of capacity, and shortly thereafter announced a price increase that was almost immediately followed by Defendants OxyChem, Westlake, Formosa, and Shintech. ¶¶48, 57-58. Their quick and firm support for this increase (which became effective for most customers in 2016) was remarkable in that it "appears to have been the first time in at least four years" that the largest Caustic Soda producers had publicly supported a price increase within only a few days. ¶58.

---

Complaint), attached to the Declaration of Marco Cercone in Support of Plaintiffs' Opposition to Defendants' Motions to Dismiss ("Cercone Decl."), filed herewith.

[8] Caustic Soda margins can only be estimated, because they are blended with other products in Defendants' financials. ¶79.

Defendants' many Caustic Soda price increases since 4Q2015 have been successful in increasing prices paid by customers (Class members) and in materially improving Defendants' margins. The following chart illustrates the lockstep, parallel movement of Defendants' price increase announcements during the Class Period:

**Publicly Known Caustic Soda Industry Price Increase Announcements (Dollars Per Dry Standard Ton, Total Per Quarter)**

| | OLIN | OXYCHEM | WESTLAKE | FORMOSA | SHINTECH |
|---|---|---|---|---|---|
| Q4 2015 | 40 | 40 | 40 | 40 | 40 |
| Q2 2016 | 85 | 75 | 75 | 75 | 70 |
| Q3 2016 | 170 | 170 | 165 | 150 | 170 |
| Q4 2016 | 40 | 40 | 45 | 65 | 40 |
| Q1 2017[9] | 60/85 | 60/85 | 60/85 | 85 | 60 |
| Q2 2017 | 70/70 | 60/75 | 55/75 | 75 | 70 |
| Q3 2017 | 80/100 | 80/100 | 75/95 | | 100 |
| Q4 2017 | 70/100 | 80/100 | 85/115 | 100 | 100 |
| Q1 2018 | 85 | 85 | 40+50 | 85 | 85 |
| Q2 2018 | 40 | 40 | 45 | 40 | 40 |
| Q3 2018 | 50 | 50 | 50 | 50 | 50 |
| Q4 2018 | 40 | 40 | 45 | 40 | 40 |
| Q1 2019 | 50 | 80 | 75 | 70 | 80 |

¶76.

Caustic Soda prices have increased more than 50% since 2015. ¶¶5, 73, 77, 85. Price increases were announced both privately to customers (via calls and letters/emails) and publicly to the market through third parties. They typically did not take effect until the beginning of the month following the month in which all or most Defendants had supported an increase with their own announcement. *See, e.g.*, ¶¶ 58, 65, 69-72, 75, 98. They occurred around the times of Defendants' contacts and meetings with each other—including at industry events—and with

[9] During 2017, Olin, OxyChem, and Westlake announced separate increase amounts for membrane and diaphragm grades. They stopped doing so at approximately the same time in early 2018. ¶69.

intermediaries as well, who acted as conduits of information between them. *See, e.g.*, ¶¶90-94, 100, 124-126. Customers often received identical or very similar increases from different Defendants within minutes or hours or days of each other. *See, e.g.*, ¶¶58, 65, 70, 72.

By priming customers and other market participants for industry price increases (*e.g.*, ¶¶58, 65), Defendants not only conditioned the market to accept a price increase in some amount by legitimizing each other's increases, but also confirmed their intention to increase prices to each other through their customers, consistent with the agreement or understanding they had reached either directly or through industry consultants or others.[10] Such conduct is literally anti-competitive, as Defendants showed little if any interest to customers in competing for business based on price, and helped create "a favorable multi-year caustic soda pricing environment"—as Olin boasted to investors in 2016—throughout the Class Period. ¶60. Further, because increases generally took effect either with the next invoice to the customer or in the month following the month in which all Defendants had confirmed support of an increase, the Defendants were generally unified on their price increases, thereby discouraging a customer from even trying to avoid or minimize the increase by playing one Defendant against another. *See, e.g.*, ¶¶58, 63, 65, 67, 70-72. In other words, upon seeing the Defendants united yet again in increasing prices, customers were discouraged from "shopping around" for a lower price from another Defendant-supplier, realizing that such an effort would be futile. Indeed, those who tried to do so were often disappointed—assuming a Defendant was willing to sell to them at all—as they were told supply was purportedly "tight" or "snug," or that customers were on "allocation" because product was "scarce." Such pretexts were often used by Defendants as an excuse not to sell to a (new)

[10] This type of conduct among cartelists is often referred to as "policing" an agreement, in order to make sure no one "cheats" on it by "stealing" market share.

customer. *See, e.g.*, ¶¶49, 53, 62-63, 67, 98-99, 119. This conduct helped Defendants not only keep prices level (if not increasing), but also allocate customers and maintain their respective market shares, which have been essentially stable since 2015. ¶¶3, 94, 99, 100.

Defendants allegedly engaged in other forms of conduct that show cartelization of the Caustic Soda industry. For example, they entered into co-producer transactions domestically and internationally (¶94), and manipulated and artificially inflated a Caustic Soda price index managed by a third party (IHS), the integrity of which was relied on by many customers. ¶¶95-98. That price index—which had reflected price "valleys" prior to 2016—stabilized and increased dramatically over the course of 2015-2017, and became so inflated it substantially dropped in value at the beginning of 2018, purportedly as the result of a "non-market adjustment." *Id.*, and ¶77. Those administering the index were misled by the Defendants and their agents, who wanted to keep it artificially high to legitimize their repeated market price increases and keep pressure on customers to pay them. ¶99. Defendants also exchanged commercially sensitive, confidential, non-public business information (*e.g.*, concerning prices and supply) not only directly with each other, but also indirectly through industry consultants and other third parties, like IHS. *See, e.g.*, ¶¶87, 100, 122.

In light of such conduct, it is unsurprising that Defendants' numerous price increases were successfully implemented and very profitable for them. *See, e.g.*, ¶¶43, 46, 59, 62, 66-67, 78. Because Defendants combine their proprietary financial data about Caustic Soda with their other chloralkali businesses, it is unclear precisely how much the Defendants' Caustic Soda revenues and profits have increased since 2015. ¶¶78-80. However, for example, Olin's full year adjusted EBITDA more than doubled between 2015 ($479 million) and 2018 ($1.27 billion), whereas by comparison it had increased only 28% between 2012 and 2015. ¶80. Defendant

Occidental's chemical segment earnings, which include OxyChem's, increased more than 40% from 2017 ($822 million) to 2018 ($1.16 billion). The income of Defendant Westlake's vinyls segment (which includes its Caustic Soda business) increased over 270% from 2016 ($174 million) to 2017 ($647 million). ¶82. The profit of Defendant Formosa's Taiwanese parent, FPC, which includes Formosa's profit, increased 68.5% from 2016 to 2017, which was "a record high level for the Company in the past 6 years" (according to a shareholders' meeting handbook); also, "equity investment income" from Formosa in 2017 had helped FPC reach the "highest level [of consolidated pretax profit] in the past 63 years since [FPC] was established." ¶83. Defendant Shin-Etsu informed shareholders that it had achieved the highest profit in its history in FY2018 (which ended March 31, 2018), and that a main factor in achieving this was price improvement in its PVC/Chloralkali business (which includes Caustic Soda). ¶84.

Defendants' profit increases during the Class Period are especially remarkable when it is considered that real annual U.S. GDP growth between 2011 and 2015 averaged 2.2% annually, a period when Defendants' profits were poor and Caustic Soda prices were flat or even declining. In marked contrast, from 2016-2017, GDP growth averaged only 1.9% annually, yet Defendants' prices and profits skyrocketed. ¶¶52, 54, 61, 76-84. Indeed, Defendants' ability to successfully impose across-the-board price increases and attain record profits is fundamentally inconsistent with the existence of flat or declining demand from customers (¶¶43, 46, 62, 75, 85), decreasing or stable costs for raw materials (¶¶43, 62, 85), and excess production capacity in a mature industry. *See, e.g.*, ¶¶47-50, 62, 85, 88-89, 99. In addition, even though Defendants shut down or idled hundreds of thousands of tons of capacity in the year following Olin's acquisition of Dow's chloralkali product assets, excess capacity persisted. For example, a brochure advertising a March 2016 industry conference remarked on the "world overcapacity of caustic soda and

downturn of demand"; after Hurricane Harvey hit Houston in August 2017, purportedly disrupting over one-third of domestic production capacity for a brief time, customers were still able to buy Caustic Soda without delay; and (as alleged) Defendants' operating rates averaged only 80-85% in the 2015-2018 time period. ¶¶50, 62.

Based on these economic factors, Defendants' many successful price increases and substantial profits cannot legitimately be explained other than as a product of an unlawful agreement or understanding to fix prices and restrain trade in the Caustic Soda industry, as alleged. Defendants' alleged cartel and illegal conspiracy artificially inflated the price of Caustic Soda, and Defendants' customers—members of the proposed Class of direct purchasers—were overcharged and damaged at least in the hundreds of millions of dollars. ¶¶78, 102, 129.

## III. ARGUMENT

### A. Applicable Legal Standards

#### 1. Federal Rule of Civil Procedure 12(b)(6)

Defendants have moved to dismiss pursuant to Rule 12(b)(6)[11] for failure to state a claim for relief. "[T]here is no heightened pleading standard in antitrust cases, and the facts alleged are subject to Rule 8(a)'s general requirement of a 'short plain statement' of facts supporting a plausible claim." *Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). *Accord Wacker v. JP Morgan Chase & Co*, 678 F. App'x 27, 29 (2d Cir. 2017) (reversing dismissal of antitrust claims in part because district court "demanded a level of detail not required to withstand a motion to dismiss" and "engaged in impermissible fact-finding"). On a motion to dismiss, the court accepts as true the factual allegations in the complaint and draws all

[11] All references to "Rule __" are to the Federal Rules of Civil Procedure unless otherwise indicated.

reasonable inferences in favor of the plaintiff. *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). Application of these standards to the detailed allegations of the Complaint compels denial of Defendants' motions.

### 2. Section 1 of the Sherman Act

The test on a motion to dismiss a claim under Section 1 of the Sherman Act, 15 U.S.C. §1, is whether an unlawful agreement has been plausibly alleged. *Twombly,* 550 U.S. at 570.[12] Plaintiffs have done so here.

"[S]tating a claim under Section 1 of the Sherman Act 'requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 820 (S.D.N.Y. 2016) (quoting *Twombly*, 550 U.S. at 556)*; Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (to plead a plausible claim "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages"); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016) ("at the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even *if* the facts are susceptible to an equally likely interpretation") (emphasis in original).

The "crucial question" is whether the allegedly anticompetitive conduct "stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*,

---

[12] Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States." 15 U.S. C. § 1.

592 F.3d 314, 321 (2d Cir. 2010). To state a claim under § 1, a plaintiff must show (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013). An agreement between horizontal competitors to fix prices, as alleged here, is *per se* unreasonable. *Meyer*, 174 F. Supp. 3d at 822.

To plead a plausible price-fixing conspiracy, Plaintiffs are "not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr*, 592 F.3d at 325; s*ee also Rochester Drug Co-Op., Inc. v. Biogen Idec U.S. Corp.*, 130 F. Supp. 3d 764, 769 n.2 (W.D.N.Y. 2015) (Wolford, J.) (allegations identifying the "specific time, place, or person" of an anticompetitive agreement are not required in a "case premised upon circumstantial evidence"). "[E]ven in the absence of direct 'smoking gun' evidence, a horizontal agreement . . . may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013) (internal citations omitted). As one district court in this Circuit has held:

> [I]t is well to remember that a Sherman Act conspiracy is but one form of conspiracy, a concept that is as ancient as it is broad. It is fundamental to the law of conspiracy that the agreements that form the essence of the misconduct are not to be judged by technical niceties but by practical realities. Sophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit.

*Meyer*, 174 F. Supp. 3d at 825.

Placing parallel conduct in a context that suggests agreement suffices. *See, e.g.*, *Anderson News*, 680 F.3d at 186-87. For example, in *Twombly*, the Supreme Court provided two examples of contexts that plausibly suggest agreement: (i) "parallel behavior that would probably not result

from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[;]" or (ii) "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly,* 550 U.S. at 556 n.4. A plaintiff may state a § 1 claim by alleging conduct "that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals." *Starr,* 592 F.3d at 327 (citation omitted).

### B. Defendants Rely On Irrelevant Authorities

As discussed below, the allegations of the Complaint present a strong circumstantial case of an unlawful price-fixing conspiracy under the well-established law of the Second Circuit. Nonetheless, Defendants suggest the Court should follow the precedents of other circuits rather than Second Circuit authorities. As a part of this effort, Defendants characterize their thirteen lockstep price increases (¶76) as mere "conscious parallelism" or "follow-the-leader" conduct (Def. Br. at 8-10),[13] which is legal behavior **only in the absence of other market characteristics and circumstances such as those alleged in the Complaint indicating they made collusive or coordinated increases**. This is why Defendants' cases are easily distinguishable on both the facts in the Complaint and the controlling law of this Circuit.

For example, Defendants rely on *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015), in which the Ninth Circuit found the plaintiffs' allegations of circumstantial evidence insufficient to render a horizontal price-fixing claim plausible. But *Musical Instruments* was not a traditional horizontal price-fixing conspiracy case involving coordinated increases at the expense of customers. It was about the adoption of a minimum

---

[13] All references to "Def. Br." are to Defendants' Joint Memorandum in Support of Their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint.

advertised pricing policy by a group of manufacturers, each of which was independently **pressured** by their largest common customer to adopt that policy (*i.e.*, it was in each manufacturer's independent self-interest to accede to the request of a major customer). *Id.* at 1189. The Ninth Circuit summarized the key issue as follows: "Where a large musical-instrument retailer pressures individual guitar manufacturers to set the lowest prices at which the manufacturers will permit any retailer to advertise the manufacturers' products—and each manufacturer acquiesces—can we infer the manufacturers conspired among themselves to fix prices?" Of course, this bears no resemblance to the allegations of the case at bar, which involve a commodity chemical product in a mature industry where **price** should be the main distinguishing characteristic among the producers who sell the exact same product. *Accord In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 720 (S.D.N.Y. 2017) ("This situation distinguishes the present case from *Musical Instruments* . . . where the complaint[] alleged that each defendant engaged in a single instance of anticompetitive activity and clearly set forth the common impetus for each defendant's conduct."). *Musical Instruments* is inapposite to a traditional horizontal price-fixing case such as this one, involving multiple instances of parallel price increases that were imposed on customers. ¶76.

Nor is *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) germane. In *Burtch*, the Third Circuit considered a claim brought by a bankrupt retailer that alleged defendants had driven it out of business by refusing to grant it credit. The appellate court found defendants' conduct to be perfectly within their own individual self-interest since plaintiff's financial condition was deteriorating (*i.e.*, it was a poor credit risk). *Id.* at 229. Here, Defendants' refusal

to compete for business or to react competitively to another Defendant's supply cutbacks is clearly contrary to any manufacturer's individual self-interest absent agreement.[14]

Defendants also rely heavily on a single Second Circuit case that is similarly based on inapposite and unusual facts. *Mayor & City Council of Baltimore*, 709 F.3d 129, arose out of the collapse of the market for auction rate securities ("ARS") in early 2008. *Id.* at 131-32. There, the plaintiffs alleged that the defendant banks "triggered the market's collapse by conspiring with each other to simultaneously stop buying auction rate securities for their own proprietary accounts." *Id*. The court observed that plaintiffs had pled contrary facts, finding that the **complaints themselves** "vividly demonstrate" that "the market as a whole was essentially holding its breath waiting for the inevitable death spiral of ARS auctions" and that it was expected that "once failures reached a critical mass . . . abandoning bad investments was not just *a* rational business decision, but the *only* rational business decision." *Id.* at 138. (emphasis in original). Thus, plaintiffs' complaints asserted facts inconsistent with conspiracy and—unsurprisingly—the Second Circuit held the complaints insufficient to support an inference of conspiracy. Here, no such inevitable alternative explanation for Defendants' numerous price increases—which were successful and dramatically increased Defendants' profits, even in the face of excess capacity—has been pleaded or exists.[15]

---

[14] The Eleventh Circuit's decision in *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249, 1256, 1266 (11th Cir. 2019) is even further afield. It addresses a purported conspiracy among insurance companies to pressure auto repair shops to *lower* prices based on little more than allegations that non-State Farm insurance companies openly told the repair shops that they would pay rates no higher than State Farm's publicly available rates.

[15] Defendants refer to rising prices in the export market as an explanation for directing some supply abroad. But this argument raises a factual issue inappropriate for resolution on a motion to dismiss (export prices may have been raised in concert unlawfully as well), and ignores the

Tellingly, Defendants come up short in citing analogous cases that might support dismissal on a Rule 12(b)(6) motion in the face of the Complaint's allegations. These include a traditional price-fixing claim among manufacturers of a commodity product who—after years of experiencing stagnant pricing, excess capacity, poor margins, and flat demand—successfully raised prices in a seemingly coordinated fashion year after year after year, achieving record profits. Cases supporting dismissal based on such factual allegations simply do not exist.

### C. <u>Plaintiffs Have Pled a Plausible Price-Fixing Conspiracy</u>

To adequately state a claim based on a price-fixing conspiracy, Plaintiffs need only allege parallel conduct plus sufficient context (known as "plus factors") to allow their claim to rise "above the speculative level." *Twombly*, 550 U.S. at 555. Further, as the Supreme Court has counseled, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962).

Viewing Plaintiffs' allegations as a whole, and construing all inferences in Plaintiffs' favor, the allegations of the Complaint satisfy all requirements of Rule 8(a) and *Twombly*.

#### 1. <u>Defendants Acted in Parallel to Impose Numerous Price Increases</u>

Plaintiffs allege thirteen (13) instances of near lockstep price increases that Defendants imposed over the course of about three and a half years. ¶76. Defendants increased prices after many years of flat or declining prices, sluggish demand, shrinking end-user markets, overcapacity, and poor financial performance in the industry. *See*, *e.g.*, ¶¶47-48.

---

facts (as alleged) that Defendants permanently **shut down** or idled domestic capacity while repeatedly and successfully increasing domestic prices, even though excess capacity persisted.

These increases are startling in both their frequency and amounts when juxtaposed with the stark economic realities that the industry faced at the time. *See* Section II, *supra*, and Cercone Decl. Ex. 1 (generally). These same economic conditions caused Axiall's CEO to predict (just three months before the first increase) that he could see no improvement to Caustic Soda pricing without a change in both supply and demand. *See* ECF No. 79-10 (Def. Ex. 8) at 9 ("[W]e expect the ECU [electrochemical unit] pricing environment to remain challenging as Caustic Soda price declines are likely to more than offset any chlorine increases."); *id.* at 11 ("[W]e think that the market is oversupplied. . . .I think what's going to need to happen to really change things is it's going to need to be a combination of increased demand as well as capacity shut downs[.]").

Defendants ask the Court to focus not on the obvious pattern presented by Defendants' lockstep price increase announcements, but rather on small variations in the announced increases and in the amounts actually paid by Plaintiffs and other customers. But "[a] plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015). Sophisticated participants in an anticompetitive scheme will very rarely act in perfect unison (lest they make it obvious to customers and governmental authorities that they are price fixing), and such a showing is not necessary to plead parallel conduct. *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa 2010) ("[p]laintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.…Nor are they required to plead with specificity the price by which each [product] was increased at a particular time"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *United*

*States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ("Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible.").

Defendants do not cite a single case holding that parallel conduct based on price increase announcements requires uniformity in timing or amount. They cannot do so because that is not the law. Reliance by Defendants on the Second Circuit's opinion in *Anderson News*, issued on summary judgment, is unavailing. The Second Circuit in **the history of that same case** elucidated the difference between evaluating a claim on a Rule 12(b)(6) motion versus a Rule 56 motion. *Compare Anderson News*, 680 F.3d at 191 (on a Rule 12(b)(6) motion, variability in the timing of defendants' conduct did not defeat an allegation of parallel, anticompetitive conduct where defendants ultimately all acted to boycott plaintiff) with *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) (dismissing same claim on summary judgment). At summary judgment, plaintiffs must present evidence that "tends to exclude" the possibility that defendants acted independently. *Anderson*, 899 F. 3d at 98. Following discovery, after evaluating the summary judgment record, the Second Circuit decided that defendants had presented sufficient evidence to undercut inferences resolved in plaintiff's favor earlier on a 12(b)(6) motion. *Id.* at 105.[16] This case is not at the summary judgment stage.

Defendants also argue that Plaintiffs' reliance on allegations of parallel quarterly increases is improper, and that Plaintiffs are required to plead the exact dates on which each Defendant raised prices in order to demonstrate parallelism. But this ignores the fact that

---

[16] In contending that the plaintiffs' price announcements are not parallel, Defendants also cite a case involving a scheme to manipulate the trading market for a commodity sold on the London Metal Exchange, *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016). There, the court found that the alleged conduct (including warehousing) by different types of market participants occurred at "vastly different times" over a five-year class period rendering "causation hard to assess." *Id.* at 371-72. This is vastly different from the case at bar. ¶76.

parallelism is more than adequately alleged and shown by the consistent and historically anomalous pattern of frequent price increases—in similar intervals and similar amounts—which began suddenly after years of no such increases. *Propranolol*, 249 F. Supp. 3d at 721 ("Furthermore, while it is true that defendants' price increases did not always align on a monthly basis, defendants consistently raised prices on a bi-monthly and quarterly basis, which is consistent with an illegal agreement.") (emphasis in original). *Accord In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1095 (N.D. Cal. 2007) ( "absolute lockstep behavior" need not be shown where plaintiffs can point to a distinct shift in behavior among defendants after the start of the alleged conspiracy); *In re Text Messaging Antitrust Litig*., No. 08C7082, 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (finding price increases occurring within a 10-month period were sufficiently parallel to permit the plaintiffs' price-fixing claim to withstand motion to dismiss).

Against this well-established authority, Defendants cite only *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151–52 (E.D.N.Y. 2010), which is not even a case dismissed for a supposed lack of parallelism. Indeed, the *LaFlamme* court agreed that "illegal price fixing need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *Id.* at 151 (citing cases). After acknowledging this authority, the *LaFlamme* court declined to decide whether or not the price increases alleged there were sufficiently parallel, as it disposed of the case on other grounds.

Here, Plaintiffs specifically allege that Defendants made the first announcement at issue within **days** of one another. ¶58. The swiftness with which Olin, OxyChem, Westlake, Formosa, Shintech, and Axiall announced their lockstep increases is striking because there had been no similar event in at least four years. This is strongly suggestive of a sudden pivot which implies

prior knowledge as well as coordination.[17] Plaintiffs have similarly alleged that Defendants acted within days of one another on other occasions throughout the Class Period. ¶¶65, 70-72, 74 (announcements made within days).

Defendants also contend that Plaintiffs have simply pled "follow-the-leader" pricing based on one another's public announcements. This is incorrect. The Complaint does **not** allege that all announcements were "public."[18] To the contrary, Plaintiffs have pled that often announcements were made by private customer contacts, and on at least one of these occasions multiple announcements were issued by private customer letters from different Defendants increasing prices in identical amounts on the same day, a result hard to fathom absent collusion.[19] Regardless, at the motion to dismiss stage the issue is whether these announcements reflect actionable parallel conduct under the prevailing Second Circuit standard. To make that

---

[17] ¶54 (From at least 2011 through 2014, Defendants' price increase announcements were largely unsuccessful, and average Caustic Soda prices over this time period tended to be flat or declining in the United States); ¶58 (November 2015 increase was "the first time in at least four years that a Caustic Soda price increase was supported publicly by every producer within only a few days.").

[18] Defendants take issue with the Complaint's chart stating that their price increase announcements (as alleged) were "publicly known" at the time they were issued. Def. Br. at 15. Defendants mischaracterize the Complaint's price increase allegations. ¶¶55-75. The chart in ¶76 entitled "Publicly Known Caustic Soda Industry Price Increase Announcements" sets forth all increases that Plaintiffs have been able to identify through *publicly available sources* (and not privately through market participants). There may exist additional price increases by each Defendant during the Class Period, *e.g.* by Formosa in 3Q2017. Plaintiffs do not concede the chart in ¶76 lists every price increase announced by Defendants since 2015 (either privately or publicly, as press releases could not be located for every increase). Announcements were issued by Defendants via private communications to customers (¶¶65, 72, 74) and their market-wide details raise factual questions inappropriate to resolve on a motion to dismiss.

[19] *See* ¶65 (announcement made by customer calls and letters); ¶72 (increase implemented through direct, private contacts with customers); ¶74 (announcements made by customer letter and direct, private contacts).

showing Plaintiffs are not required to shoot down every possible alternative explanation for the conduct alleged. *Anderson News*, 680 F.3d at 190 ("[A]lthough an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible.").

Defendants further argue that their own price increase announcements are unreliable indicia of whether they actually raised prices, claiming that other data shows that the increases were not fully realized or that there were price declines in portions of the relevant period. Def. Br. at 22. Even if true (a factual question), this is a red herring. The effectiveness of a conspiracy and the damages that flow from it are issues separate from the fact of its existence *vel non*. The issuance of parallel price announcements is circumstantial evidence of a conspiracy's **existence**, which is *per se* illegal under the Sherman Act regardless of its effectiveness. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004) (rejecting similar argument on summary judgment and holding that "[a]n agreement to fix prices is ... a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices") (quoting *In re High Fructose Corn Syrup,* 295 F.3d 651, 656 (7th Cir. 2002)); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 788 (M.D. Pa. 2014), *amended,* No. 2:08-CV-00414, 2014 WL 4104474 (M.D. Pa. Aug. 19, 2014), *aff'd,* 801 F.3d 383 (3d Cir. 2015) (applying reasoning of *Flat Glass* and *High Fructose* on a Rule 12(b)(6) motion to reject defendants' argument that "price increases were not truly parallel because each defendant's trade spend discounting practice varied, resulting in markedly different 'net' transaction prices."). Simply put, coordination of list price increases is *per se* illegal because they are the starting point for price negotiations, even if transaction prices are lower. *See, e.g., Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647

(1980) (any horizontal agreement among competitors made for the purpose of raising the price of a commodity is *per se* illegal regardless of the mechanism or "machinery" employed).

Defendants cite one case for the proposition that announcements are insufficient to plead parallel conduct, *Lum v. Bank of Am.*, 361 F.3d 217, 232 (3d Cir. 2004), a case that the Third Circuit later recognized was abrogated by *Twombly*. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010). *Lum* was based on a then-viable theory that a case based on allegations of conscious parallelism need not plead plus factors at all. *See Lum*, 361 F.3d at 230 ("Since conscious parallelism is an evidentiary rule that relates to how a plaintiff may prove the existence of an agreement, a plaintiff need not allege the existence of these plus factors in order to plead an antitrust cause of action."). The *Lum* decision thus evaluated a complaint's allegations using an approach that is no longer proper, and no longer good law, after *Twombly*.[20]

As the Third and Seventh Circuits have explained, there would be little reason for defendants to issue price increase announcements if they did not expect an effect on transaction prices. *Flat Glass*, 385 F.3d at 362; *High Fructose*, 295 F.3d at 656. *Accord In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *53 (E.D.N.Y. Oct. 15, 2014), adopted in its entirety, 2015 WL 5093503 (Jul. 10, 2015) (Rejecting same argument at class certification stage: "This argument strains common sense. Why would the defendants post surcharge announcements if they did not have 'any connection' to actual prices?"). Here, Defendants announced and implemented numerous price increases over just a few years. ¶¶55-76. Moreover, Defendants' public statements to investors and analysts proudly

[20] Notably, the Third Circuit in *Lum* declined to "decide whether an actual agreement to artificially raise a base price violates antitrust laws[,]" *Lum*, 361 F.3d at 231. The more recently decided *Flat Glass* opinion answered this question in the affirmative.

represented that prices were rising as their announcements were being made, contradicting Defendants' self-serving, argumentative interpretation of the proprietary IHS Markit data.[21,22]

### 2. Defendants' Parallel Price Increases Arose in a Context Strongly Suggestive of Conspiracy

In evaluating the plausibility of price-fixing allegations, the Second Circuit recognizes the following "plus factors": (1) a common motive to conspire; (2) parallel acts against the apparent individual economic self-interest of the conspirators; and (3) a high level of interfirm communications. *Gelboim, 823 F.3d at 781.* These factors are "neither exhaustive nor exclusive," but suggest conspiracy when combined with allegations of parallel conduct. *Id.* "Plus factors" thus constitute a surrounding context that makes **plausible** an inference that defendants' parallel conduct arose from a conspiracy.

Although each plus factor is addressed individually below, the Court should weigh Plaintiffs' allegations in their totality to determine if, taken as a whole, they combine in creating

---

[21] *See, e.g.*, ¶60 (Late 2016: "Within the Olin system, the average domestic caustic soda price increased 5% from the third quarter of 2016 to the fourth quarter of 2016…Olin continues to believe chor-alkali industry pricing is entering a favorable multi-year caustic soda pricing environment"); ¶61 (February 2017: "Caustic [S]oda prices [had] reversed their multi-year trend of steady decline in mid-2016"); ¶66 (2017: "'caustic soda pricing …increased approximately 32%' from 2016 to 2017"); ¶70 (May 2018: "Our first quarter 2018 caustic soda pricing improved approximately $40 from first quarter 2017[.]").

[22] Defendants contend that the Complaint contains "misleading" information (Def. Br. at 16-19) about the spectacular increase of the IHS Markit price index since 2015. But defendant Westlake has been publicly reporting IHS's (quarterly) undiscounted North American Caustic Soda contract price per ton to investors for years. *See, e.g.*, Cercone Decl., Exs. 2-3. Those figures show for example that the IHS-reported price increased 54% from 9/30/2015 ($563.3) to 12/31/2017 ($868.3). *Id.* Moreover, Defendants' IHS pricing exhibit shows **an increase of 73%** in the IHS price between 1Q2016 ($410) and 1Q2019 ($710), consistent with Plaintiffs' allegations. *See* ECF No. 79-3 (Def. Ex. 1). Defendants' contentions that Plaintiffs should have cited their own—confidential—Caustic Soda pricing data, and should have more prominently alleged 2018-2019 industry pricing, are odd, as no authority requires this and IHS changed the index in 2018 diminishing its integrity in any event. ¶97.

a plausible inference of an anticompetitive conspiracy. *See United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) ("[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (citing *Cont'l Ore*, 370 U.S. at 699); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012) (applying *Continental Ore* on a 12(b)(6) motion).

**i. <u>Motive</u>**

To determine whether Plaintiffs have adequately pleaded a motive to conspire, Second Circuit courts look for "facts, specific to the market at issue, suggesting that the defendants had an incentive to manipulate prices." *Propranolol*, 249 F. Supp. 3d at 719. *Accord Gelboim*, 823 F.3d at 782 (sufficient motive to conspire is "increased profits and the projection of financial soundness" by banks reeling from the 2007 financial crisis).

Motive may be plead with allegations suggesting "that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion." *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig., Civ.* No. 12-711, 2014 WL 3971620, at *7 (D.N.J. Aug. 13, 2014). In other words, Plaintiffs must plead sufficient allegations to suggest "that the structure of the market was such as to make secret price fixing feasible.'" *Id.* (citing *High Fructose*, 295 F.3d at 655).

Here, Plaintiffs allege in considerable detail not only that Defendants were motivated to conspire and increase prices because of years of decreasing prices, stagnant demand, shrinking end-user markets, excess capacity, and poor industry financial performance (*e.g.*, ¶¶46-58), but also that the structure of the Caustic Soda industry is such that it is conducive to secret price-fixing agreements. ¶¶104-126. *See, e.g., Haley Paint Co. v. E.I. Dupont de Nemours & Co.*, 804 F. Supp. 2d 419, 423 (D. Md. 2011) ("Of crucial importance to Plaintiffs' case is the fact that

these price increases were implemented in the midst of market conditions, such as declining demand, decreasing manufacturing costs, and excess production capacity, that Plaintiffs allege are completely incompatible with across the board price increases among the market leaders of a product."); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576–77 (M.D. Pa. 2009) ("In a saturated, declining market, defendants faced stagnant or decreasing demand with limited capacity for market growth. Plaintiffs' contention that defendants sought to increase revenue through non-competitive means is a plausible reaction to harsh market realities.").[23]

Even setting aside the remarkable start to the alleged conspiracy (where Defendant Olin purchased a competitor's chloralkali business for billions of dollars only to promptly shut down capacity—rather than use it to compete for new business—and increase prices in an unprecedented manner), structural factors in the Caustic Soda industry made collusion by Defendants a viable option. Industries conducive to collusion include those that are highly concentrated, contain high barriers to entry, have inelastic demand, and involve a commodity product for sale that lacks affordable substitutes. *Blood Reagents*, 756 F. Supp. 2d at 631–32; *see also Chocolate*, 602 F. Supp. 2d at 576 (industry conducive to collusion where there are

---

[23] Defendants argue that Plaintiffs should have ignored certain statements about the Caustic Soda market and instead focused on what Defendants claim is "the (equally and more plausible) explanation that decisions regarding Caustic Soda pricing and manufacture were driven by factors related to *chlorine* supply and demand." Def. Br. at 30 (emphasis in original). Setting aside that this contention raises factual questions inappropriate to resolve on a motion to dismiss, the Court should reject Defendants' invitation that it weigh competing explanations concerning circumstantial evidence pled in a complaint, as doing so is contrary to Second Circuit law. *Anderson News*, 680 F.3d at 184 ("to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages"). In addition, Defendants rely upon a single article (Def. Br. at 30) that reveals nothing adverse to Plaintiffs' claim, but rather confirms (as alleged in the Complaint) that Defendants Olin and OxyChem announced identical price increases of Caustic Soda within 24 hours of each other in an industry plagued by excess capacity—citing an operating rate of 76%—and after "months of sinking prices and [a] market sentiment of long supply." ECF No. 79-11 (Def. Ex. 9).

"[oligopolistic] sellers, diffuse buyers, prohibitive entry barriers, and standardized products."); *United States v. Alcoa, Inc.*, No. CIV. A. 2000–954, 2001 WL 1335698, at *1-2 (D.D.C. June 21, 2001) (describing product homogeneity and inelastic demand as conductive to anticompetitive coordination). These factors are present here:

Highly Concentrated Market. Defendants control at least 90% of the U.S. Caustic Soda market, a level of concentration found by the Second Circuit to be a factor that facilitates collusion. ¶105; *Starr*, 592 F.3d at 322–24; *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is the most realistic in concentrated industries."). In a concentrated market, it is both easier to coordinate and police co-conspirator behavior and harder for customers to avoid the impact of anticompetitive conduct, because alternative competitively priced sources of supply may be hard to find. ¶¶106-107. Here, the first anticompetitive price increase alleged to be anticompetitive occurred only weeks after Olin completed its acquisition of Dow's Caustic Soda business (¶¶57-58), shrinking an already small world, and then further industry consolidation occurred in 2016 with Westlake's purchase of Axiall. ¶30. As one industry article noted, the change in the U.S. industry from seven producers to five "greatly increased the pricing power of" the Defendants. ¶44.

High Barriers to Entry. Costs for a new entrant seeking to build Caustic Soda production facilities would total in the billions of dollars. ¶¶108-112. As Olin conceded in its 2015 SEC Form 10-K, "while the technologies to manufacture and transport chlorine and caustic soda are widely available, the production facilities require large capital investments, and are subject to significant regulatory requirements." ¶110. *See also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1139, 1142 (N.D. Cal. 2009) ("In addition, there are significant barriers to entry, as the cost to develop a modern NAND flash memory production facility can range from $4 to

$5 billion."). A new entrant also would be required to secure chain commitments for raw materials, including salt, for which Defendants (all large, multi-national corporations) have superior access. ¶109. For example, Olin can meet its salt requirements internally, while Westlake has long-term leases on salt domes, and produces electricity and steam internally. *Id.* Unsurprisingly, given these barriers, there has been no new Caustic Soda manufacturer in many years, despite the dramatically increasing prices and purported supply constraints. ¶112.

Commodity Product with Few or No Substitutes. Caustic Soda is a commodity chemical product, and similar grades and forms sold by different defendants are interchangeable. ¶¶113-114. Defendants therefore compete primarily on price, a factor making collusion more feasible. *See, e.g., In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) (on summary judgment, considering structural factors favoring price fixing of "a commodity product with few substitutes"). Although soda ash is a possible substitute for some end-use applications of Caustic Soda, no viable economic substitute for Caustic Soda exists for most purchasers and applications. ¶116. Defendants could rely on the fact that their coordinated price increases would not be undermined by most customers switching to another product. ¶117.

**ii. Actions Contrary to Economic Self-Interest**

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *DIPF*, 2014 WL 3971620, at *8 (quoting *Flat Glass*, 385 F.3d at 360–361). "In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Starr*, 592 F.3d at 324 (quoting *Flat Glass*, 385 F.3d at 360–61).

Apart from their allegations that Defendants engaged in 13 lockstep price increases in a stagnant commodity market in which Defendants compete largely on price (*see* Section II above), Plaintiffs have alleged two other ways in which Defendants put their collective interest as an industry ahead of their own individual economic self-interest: (i) the collective imposition of artificial supply constraints; and (ii) a refusal to compete on price for each other's customers.

Artificial Supply Constraints. Beginning in late 2015, Defendants cooperated to shut down or idle hundreds of thousands of tons of production capacity in tandem with their price increases. On November 2, 2015, shortly before announcing its first price increase, Olin announced that it would shut down between 250,000 and 450,000 tons of capacity in 2016, and then kept its word by shutting down 433,000 tons of capacity in the first quarter of 2016. ¶¶48-49. At the same time, Axiall joined it by cutting production by 78,000 tons per year. Instead of taking advantage of the higher prices and supply cuts of its competitors, OxyChem joined them by reducing output by 150,000 dst/year. *Id.* Other temporary shutdowns by Olin, OxyChem, Formosa, and Westlake further reduced late 2016 capacity by 10%. *Id.* Moreover, the remaining domestic supply was artificially limited because defendants began to shift supply abroad to such an extent that India commenced an anti-dumping investigation. ¶¶50-51.

In a competitive market, "supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011). But reducing supply market-wide keeps prices high, and—in this case—supports the stream of lockstep price increases imposed by the supposed competitors. *See, e.g., United States v. Andreas,* 216 F.3d 645, 667 (7th Cir. 2000) ("A prototypical output restriction raises prices by reducing supply below demand."). Olin's 2016 shutdown of capacity and price increases could have led the other

Defendants to "steal" Olin's market share, but instead they immediately increased prices and also announced production cuts, consistent with collusion, not competition. Similarly, while it was against one Defendant's self-interest to shut down capacity if its rivals were well-positioned to step into the void, it was in the collective interest of all Defendants to reach an agreement or understanding to keep domestic supply low and stabilize and increase prices in concert.

Defendants argue that Plaintiffs have undercut their allegations by pleading that export prices were soaring, because this would have incentivized Defendants to increase exports. But export prices do not explain why Defendants **shut down** domestic capacity that under Defendants' argument could have produced product to be profitably sold elsewhere(even if domestic prices had remained flat rather than increased), and—as alleged—export prices were soaring *even though Olin had entered the export market for the first time*, which economic theory predicts would have decreased export prices, because new market entrants typically decrease market prices to gain market share. In other words, a plausible basis for why export prices were soaring (as alleged) is because the Defendants were working together as a cartel for the first time to increase *both* domestic *and* export prices by cutting domestic supply. And Plaintiffs allege that Defendants continued to operate at only 80-85% capacity between 2015 and 2018, while proclaiming to customers that price increases were due to supply shortages. ¶¶50, 62.[24] In any event, Plaintiffs' allegations show that the restrictions on domestic capacity fostered domestic price increases, even if they may also have fostered export price increases and a limit on supply

[24] Defendants ask the Court to disregard these allegations because Plaintiffs do not cite a source for their alleged operating rates, but no law requires that Plaintiffs identify each source of their well-pleaded allegations, and Caustic Soda operating capacity rate data (proprietary to Defendants) does not exist publicly. For example, Defendants submit an article in connection with their Joint Motion that cites an even **lower** operating rate than alleged, implying that Plaintiffs' figures may have been generous. *See n.* 23 above.

available for exports. *Compare Anderson News*, 680 F.3d at 185 (setting forth standard for review of a Rule 12(b)(6) motion and holding that "[a] court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.") *with Mayor & City Council of Baltimore,* 709 F.3d at 138 ("once failures reached a critical mass . . . abandoning bad investments was not just a rational business decision, but *the only* rational business decision.").

Refusal to Compete on Price: Contemporaneous with their price increases, Defendants changed their behavior to avoid competing on price for each other's customers. ¶99. Since the start of the Class Period, customers have found that Defendants who were previously receptive to bid requests now (i) ignore or refuse to place bids (even if they had been prior customers of that Defendant), (ii) place bids that are plainly too high to be competitive, (iii) decline to bid because the product is purportedly "scarce" or supply is "tight" or "snug," or (iv) decline to bid because the product has been placed on "allocation" (and the Defendant will not increase the amount it sells to any of its customers). *Id.* In a commodity industry where excess capacity exists, and where competition is primarily based on price such behavior is inconsistent with an individual defendant-firm's economic self-interest in a competitive market. However, such conduct is consistent with, and indicative of, an agreement or understanding among the Defendant-firms to support each other's price increases, *e.g.*, by refusing to undercut another Defendant's pricing in return for the same consideration. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1245 (3d Cir. 1993) (on summary judgment and in the context of evaluating plus factors, explaining why a refusal to place competitive bids—absent supply problems—is treated as an action against self-interest).

**iii. Interfirm Communications**

"Plaintiffs need not allege the existence of collusive communications in 'smoke-filled rooms' in order to state a § 1 Sherman Act claim. Rather, such collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways." *Domestic Airline Travel*, 221 F. Supp. 3d at 67. Here, the Complaint alleges that Defendants coordinated their price increases at least through the following mechanisms: (i) public signals; (ii) industry meetings; (iii) information sharing through co-producer supply agreements; and (iv) coordination through third-party analysists and consultants.

Public Signals: Defendants coordinated their conspiracy in part by signaling the need for supply cutbacks and price increases in their public statements. For example, in August 2015, Axiall's CEO publicly signaled to the Defendants through the investment community that industry-wide supply cutbacks would be needed before prices could be raised, and suggested that Olin's acquisition of Dow's chloralkali product assets (including its Caustic Soda business) was a "catalyst" for such a change.[25] ECF No. 79-10 (Def. Ex. 8) at 17. On November 2, 2015, Olin announced that it would in fact idle between 250,000 and 450,000 tons of Caustic Soda capacity. ¶48. That same month, ICIS, an industry consultant, publicly reported that Olin was leading a "new" industry price increase. ¶57. Such public broadcasting of business plans is considered a

[25] Defendants criticize Plaintiffs' citation to an article authored by an industry observer. But commentators specializing in specific industries are well-positioned to interpret public statements of industry insiders. Significantly, the Second Circuit agrees, and has relied on such educated observations. For example, in *Starr*, the Second Circuit found that plaintiffs had adequately alleged actions against self-interest where "one industry commentator noted that 'nobody in their right mind' would want to use MusicNet or Pressplay, suggesting that some form of agreement among [them] would have been needed to render [their] enterprises profitable." *Starr*, 592 F.3d at 324.

plus factor because in a competitive environment, Defendants would not want to signal opportunities for competitors to undercut them in price or to fill gaps left by a capacity reduction with a competitive product. *Grasso Enters., LLC v. Express Scripts, Inc.*, No. 4:14CV1932 HEA, 2017 WL 365434, at *5 (E.D. Mo. Jan. 25, 2017); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 798 (N.D. Ill. 2017) ("In an industry where history has shown unilateral production cuts to be ineffective at moving prices, the announcement of production cuts soon after demands by other producers for such cuts is indicative of agreement."). Simply put, as alleged, Olin's competitors (the other Defendants) did not try to undercut it or fill gaps with their own supply. Instead, they reacted with their own supply cuts and by matching the price increase, consistent with conspiracy and collusion.

As alleged, Olin's competitors (the other Defendants) did not try to undercut it or fill gaps with their own supply. Instead they reacted with their own supply cuts and by matching the price increase, consistent with conspiracy and collusion.

Defendants also made frequent statements about future industry pricing and capacity, which served as both public signals to their competitors and indications that they were privy to the future plans of others. For example, in a 2016 fourth quarter conference call with investors, Olin stated that it believed the chloralkali **industry** was "entering a favorable multi-year caustic soda pricing environment." ¶60. And in February 2018, Olin was able to inform investors that there were "no capacity additions expected within the next two or three years."[26] *See, e.g.,*

[26] Defendants raise a factual question in arguing that Shintech's late-2017 filing of a permit to expand production capacity of various products in Louisiana (¶¶49, 100) means that Olin could not have had advance knowledge of its competitor's plans. But the Complaint does not allege that public notice of that permit-filing was made, and in any event Defendants knew—and a formal Shintech announcement in mid-2018 of its capacity expansion indicated—that its new capacity would not be operational for years, consistent with Olin's statement in early 2018 that "no capacity additions were expected within the next two to three years," (¶49), a remark that

*Domestic Airline Travel*, 221 F. Supp. 3d at 62 ("Defendants' discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct."); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) ("Plaintiffs do not allege mere price announcements; they allege that each Defendant signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert.").

These public signals were intended to affect and did affect the behavior of the co-conspirators. For example, on May 1, 2018, Olin announced that it expected "additional improvements in Caustic Soda pricing in the second quarter." ¶70. Shortly thereafter, Westlake's CEO told an investor conference that "Westlake did not see any cap on Caustic Soda prices." *Id.* On May 21, 2018, both Defendants Olin and OxyChem sent letters to customers announcing an identical $40 per ton price increase, and within days, Defendants Formosa and Shintech announced increases at the same amount, while Defendant Westlake announced a $45 per ton increase. *Id.* This is a straightforward example of successful coordination through public signals. Such conduct is anticompetitive, and suggests collusion, not competition.

Defendants offer strained interpretations of cases involving public signaling to avoid the plausible conclusion that Defendants were using their public statements to send signals that were acted upon by their competitors. For example, they characterize the public statements in *Delta/AirTran Baggage Fee*, 733. Supp. 2d at 1361-62, as reflecting a "back-and-forth dialogue leading to an agreed-upon position or exchange of assurances." Def. Br. at 24. But that case finds that an invitation to collude and an acceptance can be made through public statements—such as

---

also acknowledges that none of the industry capacity shut down in 2016 would be brought back online to possibly undercut the domestic price increases in 2018-2019.

earnings calls—where defendants discussed their "own plans to reduce capacity, increase prices, and set expectations as to what the others needed to do to increase prices." *Id.* That these statements were also alleged to have been followed by changed business practices among competitors supported a "plausible inference of a conspiracy to restrain trade." *Id.*

Nor is there any difference in the "level of specificity" (Def. Br. at 24) in the statements at issue here as compared to those at issue in *Delta/AirTran Baggage Fee* and in *Domestic Airline Travel*, 221 F. Supp. 3d at 60-62. Defendants in *Domestic Airline Travel* made public statements about "their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry." 221 F. Supp. 3d at 62. As that court reasoned:

> Defendants' discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F.Supp.2d 1348, 1362 (N.D. Ga. 2010) (discussing at the motion to dismiss stage that plaintiffs alleged more than mere price announcements because the executives' statements related to the allegation that "each Defendant signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert"). Second, Defendants' statements concerning the focus on exercising capacity discipline commenced in 2009 and were a deviation from past business practices. *See id.* at 1360 ("Courts have ... found that unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices, such as new pricing practices.").

*Id.* at 62-63. Here too, Defendants' public statements focused on the need for industry capacity cutbacks and expressed the expectation that **industry-wide** capacity and market discipline would continue in the future. *See, e.g.*, ¶¶ 60, 61, 68, 70, 75, 125. Defendants' predictions about what would happen in the future—or what needed to happen in the future—to boost pricing were followed closely by supporting actions by supposed competitors.

Nor is it important to distinguish between statements with a "public purpose" and those statements whose purpose can only be anticompetitive. Public statements can be intended to have

different "purposes or meanings [when] directed at different audiences." *Broiler Chicken*, 290 F. Supp. 3d at 799. For example, Olin's statements to investors on February 5 and 12, 2019, that prices would increase in 2019 were echoed by Westlake's CEO to its investors on February 19, 2019, the day before Olin sent a price increase letter to its customers. ¶75. Olin's statements were unquestionably aimed at competitors, as well as investors.[27]

Industry Meetings. The frequency with which Defendants raised prices between November 2015 and early 2019 is matched only by the frequency with which Defendants' employees with relevant responsibilities met at industry events. These meetings provided fertile ground to reach and police an anticompetitive agreement and, as alleged, they coincided throughout the Class Period with the months in which Defendants were implementing quarterly price increases. For example, The Vinyl Institute has only four members (Formosa, Shintech, Westlake, and Occidental subsidiary OxyVinyls). Starting in November 2015 and through November 2017, its annual meetings took place in months in which Defendants were increasing prices. ¶93. Defendants Olin, OxyChem, Westlake, and Formosa were members of the American Fuel & Petrochemical Manufacturers ("AFPM"), which held its major meetings and conferences in March of each year, just as price increases were being implemented, as at least one industry observer has noted. ¶91. Price increases also coincided with meetings of the Chlorine Institute, in which Defendants Olin, Occidental, Westlake, and Formosa are members. ¶92.

[27] Defendants blur the timing of certain public statements, arguing that they did not signal anything to competitors, *e.g.*, "*[T]he very article* Plaintiffs cite reports that Olin was *already* evaluating the closure of certain capacity following the acquisition. . . . In other words, what Plaintiffs characterize as an 'invit[ation]…was reported to investors contemporaneously with Olin's existing plans." Def. Br. at 26-27 (internal citations omitted). But Axiall's signal is alleged to have been made in August 2015, whereas Olin's acquisition of Dow was not completed until October 2015 and the article reporting both the signal and Olin's decision to cut capacity was written in November 2015. ¶¶ 25, 47, 48, ECF Nos. 79-9, 79-10 (Def. Exs. 7-8).

While membership in trade associations is not **alone** enough to confer plausibility, common memberships are "another feature of the market that is suggestive of an inference of an agreement." *DIPF*, 2014 WL 3971620, at *7 (quoting *Blood Reagents*, 756 F. Supp. 2d at 632). In particular, "opportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records." *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 197 (E.D. Pa. 2016). In addition, "such participation demonstrates *how* and *when* Defendants had opportunities to exchange information or make agreements." *Flash Memory*, 643 F. Supp. 2d at 1148 (emphasis in original). *Accord Blood Reagents*, 756 F. Supp. 2d at 632.[28]

Here, the relevance of these meetings is enhanced because Plaintiffs have specifically pled that Defendants discussed pricing and supply at certain meetings. For example, on May 19, 2017, an AFPM conference was held as the Defendants were increasing prices, and a report of the conference stated that "Chlor-Alkali producers seemed to all be on the same page and the general consensus was caustic was extremely tight and pricing was moving up across the board, without exception." ¶124. This is not simply an "opportunity contact," but an example of an industry meeting allegedly being used to affirm support for an industry price increase among the Defendant-producers.

[28] Defendants cite cases that stand for a different proposition than they imply. In *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007), the plaintiffs attempted to plead direct evidence of a conspiracy based on suspiciously timed trade association meetings alone. Here, trade association meetings are used as one among several plus factors to allege a claim based (at present) on circumstantial evidence. Defendants' remaining cases also stand for the uncontroversial (and undisputed) proposition that trade association attendance is not alone is insufficient by itself to confer plausibility of a market-wide price-fixing conspiracy.

Co-Producer Supply Agreements: Plaintiffs allege that the collegial relationship between co-conspirators was fostered by (confidential) swap and sales agreements that bound them together in a web of mutually dependent relationships. ¶¶94, 122. Such agreements, while not anticompetitive by themselves, assisted the conspiracy in two ways: they allowed Defendants to create artificial supply constraints by idling and shutting down capacity without bearing any risk that their manipulations would actually leave them short of the supply needed to run their businesses; and they provided yet another means for the exchange of commercially sensitive information. *See e.g.*, *Flash Memory*, 643 F. Supp. 2d at 1147 (considering on a motion to dismiss allegations that joint venture agreements were "used as the means to maintain and achieve the end result of the conspiracy by controlling the supply, and thereby permitting increases in the price for the products.").

Coordination Through Third-Party Analysts and Consultants. Defendants allegedly reached an understanding or agreement to manipulate the IHS Markit price index, which purports to reflect the average undiscounted contract price paid for Caustic Soda, and is relied on by many customers to determine whether or not they were paying a competitive price. ¶¶95-98. As alleged, IHS relies heavily on confidential input from the Defendants (who are paying clients), who in effect game the index to keep it increasing regularly or, at worst, remain stable (or nominally decreasing), in order to support increase after increase. *Id.* IHS's executives have a loyal and friendly relationship with Defendants and served as a conduit of information among them. *Id.* Defendants' manipulations of the index began dramatically impacting the index after Olin's 2015 acquisition of Dow's chloralkali product assets, as the historic peaks in valleys in the index price line gave way to a consistent and dramatic rise after 2015. ¶¶77, 95. Defendants also used IHS, as well as other consultants and analysts, to exchange confidential, commercially

sensitive business information with each other, particularly information concerning capacity and supply (*e.g.* anticipated production outages), so as to facilitate the conspiracy. ¶98. For example, Defendants coordinated temporary shutdowns to create illusory market-wide supply "tightness" used to justify their price increases. *Id.* These allegations are similar to those that were found suggestive of conspiracy in other cases. *See, e.g.*, *Broiler Chicken*, 290 F. Supp. 3d at 786, 809.

In summary, the Complaint's allegations meet the Supreme Court's plausibility test with regard to the allegations of an unlawful agreement together with plus factors.

### D. <u>Defendants' Group Pleading Argument Does Not Support Dismissal</u>

Defendants contend that Plaintiffs improperly rely on "group pleading" such that they lack sufficient notice of the claims against them. Defendants are wrong. The Complaint adequately alleges facts sufficient to establish each Defendant's liability under Section 1 and in accord with the pleading standards of Rule 8 and Rule 12(b)(6).

The Court in *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018), set forth the pertinent analysis in rejecting a similar group pleading argument:

> Plaintiffs respond, and the Court agrees, that the Amended Complaint specifically alleges that each Defendant agreed to participate in the conspiracy. (Pl. Opp. 29). In contrast, group pleading is "insufficient to withstand review on a motion to dismiss ... [where there are] no factual allegations in the complaint to connect each, or any, of the group defendants, directly to the conspiracy[.]" [*Concord Assocs., L.P. v. Entm't Properties Tr.*, No. 12 CIV. 1667 ER, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016).] Because the Amended Complaint alleges each Defendant's participation separately, it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as "the Prime Broker Defendants."

*Id.* at 317 (footnote omitted).

Such is the case here where the Complaint plausibly alleges each Defendant's participation in the unlawful conspiracy separately, while elsewhere referring to their collective actions.[29] In *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (quoting *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008)), the court held that "[t]o state a claim against each Defendant, Named Plaintiffs must 'make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.'" Thus, as long as a plaintiff alleges that each named defendant "participated in the alleged conspiracy," *Hinds Cty.*, 620 F. Supp. 2d at 513, the pleading is sufficient to "give fair notice to each named defendant of the claims against it." *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1274 (2d Cir. 2019).

Defendants Westlake, Formosa, and Occidental argue that Plaintiffs have improperly relied on "group pleading," in alleging claims against them. Westlake Br. at 10; Formosa Br. at 3; Occidental Br. at 2-3. Their arguments are not well taken. Consistent with the standards set forth in *Hinds Cty.*, Plaintiffs have sufficiently alleged that Defendants Westlake and Formosa ***specifically*** "participated in the alleged conspiracy." *Hinds Cty.*, 620 F. Supp. 2d at 513.

For example, Plaintiffs allege that Westlake participated in the conspiracy by engaging in agreed upon "temporary shutdowns for plant maintenance and outages throughout 2016 . . ." (¶¶48-49); that Westlake made a series of coordinated price increase announcements in 2017, which "resulted in increased prices paid by customers" (¶¶63, 76); that "defendants Olin,

[29] *See, e.g.*, ¶¶25-26, 42, 44, 47-51, 55-60, 62-66, 68-76, 80, 87, 91-95, 99-100, 102, 109, 110, 119, 124-125 (Olin and K.A. Steel); ¶¶28-29, 42, 47-49, 56-59, 61, 63-65, 69-70, 72, 74, 76, 81, 91-94, 124 (Occidental and OxyChem); ¶¶30, 42, 44, 47-49, 56, 58-59, 63-65, 69-70, 72-76, 82, 91-94, 99-100, 109, 124-125 (Westlake); ¶¶34-35, 42, 48-49, 58-59, 63, 65, 69-70, 72, 74, 76, 83, 91-94, 124 (Formosa); ¶¶31-33, 42, 49, 58-59, 63-65, 69-70, 72, 74, 76, 84, 93-94, 100, 124 (Shintech); Cercone Decl., Ex. 1 (generally).

OxyChem, and Westlake . . . decided—at the same time—to stop announcing different price increase amounts for diaphragm and membrane grades" (¶69); that "at least defendants Olin and Westlake told investors and others that no industry capacity additions were planned and that U.S. capacity was not growing" (¶100); and that "defendants Formosa, Olin, Oxy, and Westlake are members" of AFPM, and that "a report dated May 19, 2017, written by an employee of a distributor of Caustic Soda about the market, stated that at an AFPM conference . . . 'Chlor-Alkali producers [including Westlake and Formosa] seemed to all be on the same page and the general consensus was caustic was extremely tight and pricing was moving up across the board, without exception.'" ¶124.

With respect to Defendant Formosa, in addition to several coordinated price increase announcements it made, the Complaint likewise includes several specific allegations showing Formosa's participation in the conspiracy, including that it agreed upon "temporary shutdowns for plant maintenance and outages throughout 2016" (¶¶48-49); that "in May 2017 … Formosa … announced [coordinated price] increases of up to $75/dst [which] resulted in increased prices paid by customers" (¶63); and that at an industry conference, Formosa was "on the same page" as the other producers regarding pricing. ¶124. Similarly specific allegations are included in the Complaint as to Defendants Olin and K.A. Steel (*see, e.g.*, ¶¶48, 49, 50, 59, 62, 63, 64, 65, 68, 69, 70, 71, 72, 73, 74, 75, 92, 94, 100, 119, 124, 125); Occidental (*see, e.g.*, ¶¶61, 81, 92, 94, 124; OxyChem (*see, e.g.*, ¶¶48, 49, 58, 59, 63, 64, 65, 69, 70, 72, 74); and Shintech (*see, e.g.*, ¶¶58, 59, 63, 64, 65, 69, 70, 72, 74).

To the extent Plaintiffs also "must plausibly suggest that the individual defendant actually joined . . . the conspiracy," Plaintiffs have clearly so alleged. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011). In addition to the allegations

supporting Westlake's and Formosa's agreement to participate in the conspiracy, Plaintiffs have also alleged that they (and the other Defendants) "actually joined" it. In addition to price increases implemented by Defendants in concert (*see, e.g.*, ¶76), the Complaint alleges that "Defendants entered into an agreement or understanding to increase prices of Caustic Soda and not to compete on price for the business of each other's customers." ¶3; *see also*, *e.g.*, ¶99 ("Defendants have entered into an agreement or understanding not to genuinely compete on price for the business of each other's customers."); ¶101 ("Defendants have formed a cartel and reached an understanding or agreement to concertedly fix prices and limit the supply of Caustic Soda."); ¶102 ("Defendants are . . . believed to have formed a cartel in or about the fourth quarter of 2015."); ¶103 ("Defendants intended to restrain trade, and did restrain trade, in Caustic Soda by reaching an agreement or understanding to end genuine price competition among themselves . . . "); ¶131 ("Beginning at least as early as October 1, 2015, the exact date being unknown to Plaintiffs and the Class and exclusively within the knowledge of Defendants, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of Caustic Soda directly sold to purchasers in the United States and elsewhere.").

In sum, the "group pleading" allegations in the Complaint regarding Defendants' agreement to and participation in the conspiracy are sufficiently specific to give them "fair notice" of the claims against them.

Antitrust conspiracies, such as the one alleged here, have been repeatedly regarded as covert, secret, and self-concealing. *See, e.g.*, *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263 (AKH), 2017 WL 3600425, at *13 (S.D.N.Y. Aug. 18, 2017)

("plaintiffs have plausibly alleged that the alleged conspiracy was inherently self-concealing, for by its very nature, the conspiracy could not succeed unless kept a secret"); *Alaska Elec. Pension Fund v. Bank of Am.*, 175 F. Supp. 3d 44, 66 (S.D.N.Y. 2016) ("the alleged conspiracy in these cases was secretive and covert by its very nature – it was an agreement that was 'designed to endure over a period of time' and, '[i]n order to endure, it [had to] remain concealed' from the market.") (citation omitted). Even post-*Twombly*, group pleading remains permissible in antitrust actions and "[a]ntitrust conspiracy allegations need not be detailed defendant by defendant." *In re OSB Antitrust Litig.*, No. No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) (emphasis added). Further, "'in complex antitrust litigation,' 'motive and intent play leading roles,' and 'the proof is largely in the hands of the alleged conspirators.'" *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962)). This is why in such cases, "elaborate fact pleading" is not required. *In re TFT-LCD.*, 599 F. Supp. 2d at 1184. *See also In re Processed Egg Prods.*, 821 F. Supp. 2d at 719 ("[i]ndividual defendants must have reasonable, not exhaustive, notice of the allegations, and such notice is achieved when the plaintiff states a plausible claim for relief against [them]").

As explained in *Ciuffitelli for Trustee of Ciuffitelli Revocable Trust v. Deloitte & Touche LLP*, No. 3:16-cv-580-AC, 2017 WL 2927481, at *13 (D. Or. Apr. 10, 2017), "[t]he group pleading doctrine allows a plaintiff to allege wrongdoing against a group of individuals or entities jointly engaging in fraudulent or conspiratorial conduct." Explaining that because "much of the factual information needed to fill out plaintiff's complaint lies peculiarly with the opposing parties' knowledge," the court "conclude[d] that these defects are not fatal with respect to plaintiff's claims against certain of the [ ] defendants . . . ." Furthermore, "[g]roup pleading

***remains*** a way to allege joint participation in a venture where a plaintiff cannot know the specifics of individual involvement." *Id.* (emphasis added). *See also DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247-48 (2d Cir. 1987).

Here, the Complaint discusses the self-concealing nature of the Defendants' alleged price-fixing conspiracy, rendering an allegation of a Caustic Soda industry cartel especially appropriate for group pleading:

> The alleged conspiracy was furthered and facilitated by a course of secret anticompetitive conduct, including agreements and understandings among Defendants to stabilize or increase prices (e.g., as described below, by manipulating a price index managed by a third party, IHS Markit, and used to set contract prices for many customers); to idle or shut down domestic capacity and limit the supply of Caustic Soda sold in the U.S.; and to maintain and effectively allocate customers and domestic market shares (e.g., by refusing to bid (or bidding high) for the business of customers being served by others, so as not to take business from a competitor).

¶86; "Defendants' agreements or understandings in violation of the Sherman Act, as alleged herein, are inherently self-concealing, and precise details concerning them can only be obtained through discovery." ¶89.

Plaintiffs' use of "Defendants," "conspirators," "co-conspirators," and similar identifiers in the Complaint to refer collectively to the alleged conspiracy's participants is thus entirely appropriate given the conspiracy's "inherently self-concealing" nature, as proof of the conspiracy is—at this time—largely in the Defendants' hands. In any event, the Complaint pleads details of each Defendant's participation in the conspiracy sufficient to give them notice.

### E. <u>Occidental Petroleum Corporation Is Properly Named as a Defendant</u>

Defendant Occidental argues that it cannot be liable for the alleged antitrust violations of its subsidiary, OxyChem, which is the entity that directly sold Caustic Soda to Class members, absent legally sufficient allegations of involvement in anticompetitive conduct by Occidental

itself. As discussed above, allegations against Occidental are sufficient under the Second Circuit pleading standards. *Hinds Cty.*, 620 F. Supp. 2d at 513.

Plaintiffs allege, for example, that "Defendants Olin and Oxy (and OxyChem) in particular have extensive (secret) co-producer supply agreements and contacts with each other." ¶94. The Complaint also alleges that Occidental, together with its co-defendants, is a member of the AFPM, The Chlorine Institute, and The Vinyl Institute, allowing for opportunities to exchange confidential pricing and capacity information. ¶¶91, 92, 124. In other words, Occidental entered into secret co-producer supply agreements with Defendant Olin, was a member of various trade associations which met at times when price increases were discussed, implemented, or were occurring, and was a member of a trade association where a "general consensus" was reached that prices would be moving up "without exception."[30]

Notwithstanding Occidental's characterization, Plaintiffs thus have specifically and sufficiently alleged the parent entity's direct involvement and participation in the alleged conspiracy impacting the Caustic Soda industry, in accordance with the teachings of *Hinds County*. Occidental's analytical strategy—to isolate each separate allegation against it, and then

[30] The allegation concerning the reaching of a "general consensus" at an AFPM meeting must be considered in the context of other allegations, for example: Defendants are alleged and estimated (including the Occidental-related Defendants) "to control at least 90% of the domestic supply of Caustic Soda." ¶¶2, 40, 105; "Defendants' market shares have been relatively stable in recent years, despite the disruption one would have expected to see in a (competitive) mature, commodity industry with excess capacity, particularly after two large acquisitions resulted in only five major producers, down from seven within only 10 months." ¶99. When these allegations are considered together, it is implausible to contend that when the author of the May 19, 2017, report asserted that a "general consensus" had been reached and prices were "moving up across the board *without exception*" (emphasis added) that such a market-wide increase was occurring ***without the participation of AFPM member Occidental and its OxyChem business.***

contend such allegations are insufficient—is improper, and disregards *Continental Ore*'s guidance that a Complaint's allegations are to be considered in their totality.

**F. <u>Plaintiffs Have Sufficiently Alleged Occidental Is the Alter Ego of OxyChem</u>**

Ignoring the allegations concerning Occidental and OxyChem, Defendant Oxy concludes that "the allegations against Occidental Petroleum fall woefully short of what is required to pierce the corporate veil." Defendant Occidental's Br. at 11. Occidental is incorrect. The Complaint adequately alleges that Occidental is liable for the acts of its subsidiary, OxyChem.

Initially, Occidental has misstated New York's choice-of-law rule for considering whether allegations are sufficient to pierce the corporate veil. *See* Def. Occidental's Br. at 9 ("the veil-piercing standard is determined by the law of the state of the ***subsidiary's*** incorporation") (emphasis added). In *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011), the Court explained in that antitrust case that "'[u]nder New York choice-of-law principles . . . whether the corporate veil may be pierced is determined under the law of the state of incorporation.' *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 85 n.10 (S.D.N.Y. 2010) (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))." The Court then based its veil piercing state law analysis on the state of incorporation of the ***parent*** entities: "Here, Time Warner and Bertelsmann are Delaware corporations, and SCA is a New York Corporation." *Id. See also id.* at 417 (designating SCA, Bertelsmann, and Time Warner as "the 'Parent Companies'"). Occidental is alleged to be "a Delaware corporation," thus Delaware law applies. ¶28.

*Digital Music* laid out the Delaware standard: "In Delaware, 'a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner.'" *Id.* at 418 (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)). In *MicroStrategy Inc. v. Acacia Research Corp.*, Civ. A.

No. 5735, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010), the Delaware Chancery Court enumerated the following veil-piercing supporting factors:

> Specific facts a court may consider when being asked to disregard the corporate form include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." A decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them, and "an overall element of injustice or unfairness must always be present, as well."

*Id.* at *11 (footnotes and citations omitted).

Plaintiffs allege that "Oxy manufactures, sells, and distributes Caustic Soda through its wholly-owned and controlled subsidiary and chemicals business, defendant Occidental Chemical Corporation." ¶28. In the next paragraph, Plaintiffs similarly allege that Defendant "OxyChem is a wholly-owned subsidiary of defendant Oxy [and] manufactures, sells, and distributes Caustic Soda to customers throughout the United States." ¶29. Plaintiffs sufficiently allege Occidental's control over OxyChem for purposes of alter-ego theory.

Multiple *MicroStrategy* factors directly relate to the corporate owner's (Oxy's or Occidental's) financial control and domination over its subsidiary (OxyChem), and several of Plaintiffs' allegations directly address these factors. For example, in addition to the subsidiary's "wholly-owned" status (¶¶28-29), Plaintiffs allege that "Defendant Oxy proudly noted in a February 2017 investor presentation that 'Caustic [S]oda prices [had] reversed their multi-year trend of steady decline in mid-2016[,]'" and that "'market discipline'" was improving. ¶61. The Complaint also suggests that Oxy (which did not on its own manufacture, sell, or distribute Caustic Soda) had the power to insist that its subsidiary adhere to "market discipline." ¶61.

Plaintiffs also allege that "Oxy's chemical segment earnings (which include Defendant OxyChem's earnings) increased 44% from 2016 ($571 million) to 2017 ($822 million), a result

in part due to 'higher realized pricing for caustic soda,' and its overall annual profit more than tripled from 2017 to 2018. Oxy's chemical segment earnings increased over 40% from 2017 ($822 million) to 2018 ($1.16 billion)." ¶81. In addition, Oxy and/or OxyChem participated in AFPM meetings where discussions about Caustic Soda pricing occurred. ¶¶91-93, 124. These allegations support the conclusion that Defendant Oxy directly "sent" or directed its subsidiary, OxyChem, to send "one or more representatives to AFPM's meetings and conferences." ¶¶91, 124. Further, the Complaint infers that Occidental dictated the existence and contours of the relationship between OxyChem and Olin. As specifically alleged, "Defendants Olin and Oxy (and OxyChem) in particular have extensive (secret) co-producer supply agreements and contacts with each other." ¶94. Stated alternatively, Defendant Occidental had the power to use OxyChem's property (Caustic Soda) to supply others, including Defendant Olin.

Finally, as alleged, application of the *MicroStrategy* factors demonstrate that OxyChem, under Delaware veil-piercing law, was a "mere instrumentality" of its owner, Occidental. *Geyer*, 621 A.2d at 793. As supported by Plaintiffs' allegations, Defendant Occidental exercised domination over OxyChem with respect to transactions with co-producer and Defendant Olin, and in requiring OxyChem to adhere to "market discipline." Occidental also took full advantage and benefit from the (inflated) earnings of OxyChem, and sent or required representatives of OxyChem to attend trade association conferences and meetings. Defendant Occidental also used "such domination . . . to commit a fraud or wrong against the plaintiff, which resulted in plaintiff's injury," namely, "Plaintiffs and members [of] the Class have been injured in their business and property in that they have paid more for the Caustic Soda they purchased during the Class Period than they otherwise would have paid in the absence of Defendants' conduct." *Digital Music,* 812 F. Supp. 2d at 418; ¶139.

The Complaint's detailed conspiracy allegations thus support a finding of Defendant Occidental's disregard for the corporate separateness of its subsidiary, OxyChem.

### G. Plaintiffs Have Sufficiently Alleged OxyChem Acted As The Agent of Its Parent Occidental

Plaintiffs' allegations also support an agency relationship between OxyChem and Occidental for purposes of supporting Occidental's liability. As described by this Court, "'[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Spano v. V & J Nat'l Enters., LLC*, 264 F. Supp. 3d 440, 451 (W.D.N.Y. 2017) (Wolford, J.) (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003)) (other citations omitted). Occidental has ignored this legally recognized means of showing Occidental's liability through the acts of its agent and subsidiary, Defendant OxyChem.

With respect to the "principal-agent relationship," "[b]ecause Delaware is the state of [Occidental's] incorporation," this Court must "apply Delaware law to determine whether [the parent, Defendant Occidental] may be held liable for the acts of its subsidiary [Defendant OxyChem]." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 n.15 (S.D.N.Y. 2011); ¶28.

Under Delaware law, "'[*r*]*espondeat superior* imposes liability upon a principal for the torts of his agent committed within the scope of their agency relationship.'" *Khanna v. McMinn*, No. Civ.A. 20545-NC, 2006 WL 1388744, at *28 (Del. Ch. May 9, 2006) (citing, in part, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, No. 12883, 1995 WL 376929, at *8 (Del. Ch. June 15, 1995)). According to the Delaware Supreme Court, "'[a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent.'" *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57 (Del. 1997) (quoting *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993)). "[N]o fraud or inequity" is required for a "parent

corporation [to] be held liable for its subsidiary's actions when the subsidiary is acting as the agent for the principal parent corporation[.]" *Grasty v. Michail*, No. Civ.A. 02C-05-89 CLS, 2004 WL 396388, at *2 (Del. Super. Feb. 24, 2004) (citing *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D.Del. 1987)). Under a "restricted agency relationship" theory, "***total*** domination or general alter ego criteria need ***not*** be proven." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 2130607, at *9 (Del. Ch. Aug. 26, 2005) (emphases added). Also, agency can be shown based on actual or apparent authority:

> Under the rubric of agency liability, there are two main theories – actual authority and apparent authority. . . . [¶] Actual authority is that authority which a principal expressly or implicitly grants to an agent. . . . [¶] Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing. In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.

*Id.* at *10.[31] Delaware agency law focuses on "'the amount of control the parent corporation exercises over the actions of the subsidiary,'" determining that "'[t]he parent corporation will be held liable for the activities of the subsidiary only if the parent dominates those activities.'" *Grasty*, 2004 WL 396388, at *2 (quoting *Phoenix Canada Oil*, 658 F. Supp. at 1084). Although share ownership alone is insufficient, appropriate control can be shown when an entity "assume[s] the role of the second corporation's agent in the course of one or more specific

[31] The two aspects of agency are similar in New York: "New York's agency law distinguishes between actual and apparent authority." *Premium Payment Plan v. State Nat'l Ins. Co.*, No. 1:02-CV-502(GLS), 2006 WL 566474, at *2 (N.D.N.Y. Mar. 7, 2006) (footnote omitted). Actual authority "'is the power of the agent to do an act or to conduct a transaction on account of the principal [and] he is privileged to do so because of the principal's manifestations to him.'" *Id.* (quoting *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003)). Apparent authority "'arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him.'" *Id.* (quoting *Dinaco, Inc.*, 346 F.3d at 69).

transactions." *Albert*, 2005 WL 2130607, at *9. And although the agency "'inquiry is inherently fact-specific,'" agency "need not be directly proven" and "'[c]ircumstantial evidence of a principal-agent relationship includes the exclusive dedication of a subsidiary to assisting the parent company, payment of the subsidiary's expenses by the parent company, and request for approval of the parent company for important decisions by the subsidiary." *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 272-73 (S.D.N.Y. 2009) (internal citations omitted). As discussed in *Tronox,* allegations are sufficient to show agency that depict a defendant/parent "involving themselves directly in [their subsidiary's] activities, and by directing these activities, [the parent-defendants] made [the subsidiary] their agent . . . ." *Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386, 2002 WL 319887, at *13 n.14 (S.D.N.Y. Feb. 28, 2002); *see also Tronox,* 769 F. Supp. 2d at 215 n. 78.

Plaintiffs have successfully alleged that Defendant Occidental is liable for the acts of its agent, OxyChem. First, the Complaint alleges: "The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs." ¶36.[32] Second, Plaintiffs have included many allegations from which it is reasonable to infer that Defendant Occidental had sufficient control over OxyChem to support a finding that the acts of the agent, OxyChem, are attributable to its principal, Occidental. For example, Plaintiffs allege that "Oxy manufactures, sells, and distributes Caustic Soda through its wholly-owned and controlled subsidiary and chemicals business, Defendant Occidental Chemical Corporation." ¶28;

[32] It is also alleged that "Each Defendant acted as the principal, agent, or joint venture of, or for, [the] other Defendants with respect to the acts, violations, and [ ] conduct alleged herein." ¶38.

"OxyChem is a wholly-owned subsidiary of defendant Oxy. OxyChem manufactures, sells, and distributes Caustic Soda to customers throughout the United States." ¶29; and "Defendant Oxy proudly noted in a February 2017 investor presentation" that there was "'improving market discipline.'" ¶61.[33] Supporting such control over OxyChem and showing OxyChem's "dedication . . . to assisting the parent company" under *Apartheid*, 617 F. Supp. 2d at 272-73, the Complaint alleges that "Defendant Oxy's chemical segment earnings (which include defendant OxyChem's earnings) increased 44% from 2016 ($571 million) to 2017 ($822 million), a result in part due to 'higher realized pricing for caustic soda,' and its overall annual profit more than tripled from 2017 to 2018." *Id*. The Complaint also bolsters OxyChem's "dedication" to Occidental by alleging that OxyChem's contributions resulted in part in "Oxy's chemical segment earnings increas[ing] over 40% from 2017 ($822 million) to 2018 ($1.16 billion)." ¶81. Strongly suggesting that Defendant Occidental "involv[ed] [itself] directly in [the subsidiary's] activities" under *Wiwa*, 2002 WL 319887, at *13 n.14, the Complaint alleges both Occidental's and OxyChem's participation in Caustic Soda industry meetings and conferences through their representatives around the time of industry price increases (which, at the very least, shows Occidental's involvement in OxyChem's conspiratorial affairs, per *Wiwa*). ¶¶90-93, 124.

Lastly, in support of at least apparent authority, if not actual authority, as well as showing Occidental's "involve[ment]" in the affairs of its subsidiary under *Wiwa*, Plaintiffs allege that "Defendants Olin and Oxy (and OxyChem) in particular have extensive (secret) co-producer supply agreements and contacts with each other." ¶94. In other words, as alleged, Occidental and

---

[33] As Defendant OxyChem was the only entity through which Defendant Occidental sold Caustic Soda, the public statement within this allegation makes sense only if Occidental was privy to competitor information and Occidental had the power to direct OxyChem's acts. ¶28.

OxyChem were essentially the same entity as far as Olin was concerned, with OxyChem as Occidental's agent for purposes of entering into or implementing "co-producer supply agreements," and OxyChem having the authority to act for Occidental as its agent "in the course of one or more specific transactions[.]"*Albert*, 2005 WL 2130607, at *9; ¶94. Plaintiffs thus have plausibly alleged that Defendant OxyChem acted as Defendant Occidental's agent and that its acts are directly attributable to Occidental, and that Occidental is properly named as a defendant in the Complaint as it is liable for OxyChem's acts.

### H. <u>The Claim Against Defendant Westlake Is Properly Alleged</u>

Defendant Westlake spends twelve pages recycling an already stated argument, to wit, that Plaintiffs' 56-page Complaint has not sufficiently specified its involvement in the conspiracy. But *Twombly* requires only that Plaintiffs' allegations show at the pleading stage that the existence of the alleged anticompetitive agreement is "plausible." *Twombly*, 550 U.S. at 570. The allegations of the Complaint as to Westlake are more than sufficient to satisfy *Twombly*.

For example, Plaintiffs allege Westlake's direct participation in the conspiracy. Westlake's pricing went up in virtual lockstep with Defendants Olin, Oxychem, Formosa, and Shintech, and "defendants Olin, OxyChem, and Westlake also apparently decided—at the same time—to stop announcing different price increase amounts for diaphragm and membrane grades . . . ." *See, e.g.*., ¶¶ 69, 70, 76. Plaintiffs' allegations show Westlake engaging in "parallel conduct" as to Caustic Soda pricing in accordance with *Blood Reagents*, 756 F. Supp. 2d at 630.

Westlake also asserts that Plaintiffs have not sufficiently alleged that it reduced capacity or operated at improperly low rates so as to show "parallel action." Westlake Br. at 4-5. However, Plaintiffs assert that in Q1 2016 Axiall—while in acquisition discussions with Westlake—"cut production" "around the same time" as Olin announced that it would "idle or shutdown" capacity. ¶48. Further, Westlake engaged in "temporary shutdowns for plant

maintenance and outages throughout 2016" and (as alleged) Defendants "appear[ed] to have averaged only 80-85% capacity in the 2015-2018 time period." ¶¶48, 50. Plaintiffs further allege that this strategy was successful: "Westlake . . . told investors that their second quarter operating income was higher in 2018 as compared with 2017 because of higher Caustic Soda prices." ¶73. Rather than competitors rushing-in to supply the market (by, for example, increasing operating rates), there was an improper "output restriction" that "raise[d] prices by reducing supply below demand." *Andreas*, 216 F.3d at 667. Plaintiffs' "parallel conduct" allegations also go beyond production cuts. Plaintiffs show that "the defendants acted 'similarly'" with respect to Westlake's price increases (*see, e.g.*, ¶¶59, 63, 64, 65, 69, 70, 72, 75, 76, 77, 78) and decision to stop announcing different prices for diaphragm and membrane grades "at the same time" as Defendants Olin and OxyChem. ¶69. Simply put, Plaintiffs need not show that Westlake reduced Caustic Soda capacity or operated at low rates "in exactly the same way" to "adequately allege parallel conduct." *Domestic Airline Travel*, 221 F. Supp. 3d at 69.

Westlake claims that Plaintiffs' price increase-related allegations do not equate to actually raising prices and that the IHS Markit data show price increase attempts to be unsuccessful. Westlake Br. at 6. But, as also noted, *supra*, at §III.C.1, Plaintiffs need not "plead simultaneous price increases [. . .] to demonstrate parallel conduct [. . .] Nor are they required to plead with specificity the price by which each [product] increased at a particular time." *Blood Reagents*, 756 F. Supp. 2d at 630. *See also Propranolol*, 249 F. Supp. 3d at 721 (prices "consistently raised on a bi-monthly and quarterly basis" found to be "consistent with an illegal agreement"); *Graphics Processing Units*, 540 F. Supp. 2d at 1095.

Westlake also claims that Plaintiffs fail to allege that it "engaged in a 'high level' of inter-firm communications." Westlake Br. at 8. But setting aside the allegations of Defendants'

communications at trade association meetings and conferences and information exchanges directly and indirectly,[34] Plaintiffs also allege, for example, that Westlake CEO Albert Chao "told an investor conference that Westlake did not see any cap on Caustic Soda prices, because demand was growing while U.S. Capacity was not." ¶70. Even assuming Chao never made this or any similar statement privately to any other Defendants, it was clearly designed to (and did) influence the future pricing and supply of Caustic Soda and the conduct of Westlake's competitors. *See also* ¶73 ("Westlake . . . told investors that their second quarter operating income was higher in 2018 as compared with 2017 because of higher Caustic Soda prices"); ¶47 ("Axial's CEO told analysts in August 2015 that Caustic Soda markets were 'oversupplied' and (according to an article) 'openly hoped that Olin would cut production . . .'"); ¶75 ("Westlake's CEO echoed the sentiment that prices would increase in 2019 to its investors . . . the day before Olin's $50 per dst increase announcement was sent to customers"). Westlake even makes a factual argument inappropriate at this stage, claiming that the Axiall earnings call transcript from 2015 does not show Axiall (now merged into Westlake) encouraging Olin to cut supply. Westlake Br. at 8-9. This is mistaken, as discussed *infra* at §III.K., but regardless, an industry commentator interpreted Axiall's CEO to have said—consistent with other factual allegations in the Complaint—"that Caustic Soda markets were 'oversupplied' and [. . .] 'openly hoped that Olin would cut production[.]'" ¶47. The claim against Westlake is thus sufficiently alleged.

**I. <u>The Claim Against Defendant Shintech Is Adequately Alleged</u>**

Shintech contends that its alleged conduct demonstrates it acted in its own self-interest, and it is implausible that it participated in the alleged conspiracy, because it filed permits in late

[34] Westlake argues that alleging the "mere opportunity" to collude is insufficient. Westlake Br. at 8. But this is a red herring, as Plaintiffs do not simply allege Westlake's trade association membership and meeting attendance. *See, e.g.*, ¶¶76, 91-93, 100, 124-26.

2017 for an expansion of its Louisiana plant and, in 2018, announced formally that it would expand production at that plant. Shintech Br. at 4-7, 10-11. But Shintech's permit filing and public announcement do not show "evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *DIPF*, 2014 WL 3971620, at *8.[35] Instead, the Complaint alleges specific facts that, assuming they are true, show that Shintech participated in the alleged conspiracy by, *e.g.*, issuing price increase announcements in a manner strikingly similar to the other Defendants thirteen (13) known times from 2015 until the first quarter of 2019, and engaging in other conduct. ¶¶31-33, 42, 49, 58-59, 63-65, 69-70, 72, 74, 76, 84, 93-94, 100, 124. The allegations identified by Shintech about filing permits and announcing capacity expansion are consistent with a "self-concealing" conspiracy where, for example, the Defendants' public statements contradict their internal actions. *See, e.g.*, ¶87 ("reasons given to customers by the Defendants for their price increase announcements" were "misleading, yet had the effect of stabilizing or increasing prices"); ¶89 ("[p]rice-fixing conspiracies necessarily must be conducted in secret . . . and are inherently self-concealing . . ."); ¶100 ("Olin and Westlake told investors and others that no industry capacity additions were planned and the U.S. was not growing" while "Shintech's late-2017 filing of permits . . . included a potential increase of its Caustic Soda production capacity . . . .").

Shintech also argues that the Complaint fails to allege that Shintech's conduct paralleled that of other Defendants, *e.g.*, in cutting supply or actually implementing price increases. Shintech Br. at 7-9. This is mistaken. As alleged, Defendants acted in a coordinated manner to "idle or shut down (or 'rationalize') hundreds of thousands of tons of capacity" (¶49) and to run

---

[35] The Complaint notes that (assuming Shintech's announcement was true) "any new Caustic Soda production capacity would not be operational for years, and it is unclear" whether the additional production would "be used captively by Shintech or sold to U.S. customers." ¶49.

their plants at "only 80-85%" operational rates. ¶50. Shintech, and the other Defendants, also idled capacity at times temporarily and in concert. ¶¶49, 98, 100. In any event, Plaintiffs need not rely on production restrictions to support their parallel conduct allegations, as Shintech and the other Defendants acted "similarly" with respect to price increases. ¶¶58, 59, 63, 64, 65, 69, 70, 72, 74, 76, 77, 78. Plaintiffs thus sufficiently allege "parallel action" by Shintech with respect to pricing, *SD3*, 801 F.3d at 427, and Shintech's issuance of similar—and similarly timed—price increases as the other Defendants' increases provides circumstantial evidence of the conspiracy's existence and Shintech's participation in it, even assuming actual price increases were not identical. *See, e.g.*, *Flat Glass*, 385 F.3d at 362; *Catalano*, 446 U.S. at 647.

Shintech also asserts that "Plaintiffs have not alleged any plus factors against Shintech" and argues the facts concerning its trade association membership and meeting attendance. Shintech Br. at 10-12. This is plainly incorrect, as discussed *supra* at §III.C.2.iii, and under *Gelboim*, 823 F.3d at 781. Assuming Plaintiffs' allegations are true and viewing them as a whole, Plaintiffs have alleged (1) a common motive to conspire; (2) parallel acts against the economic self-interest of the conspirators; and (3) a high level of interfirm communications. *See, e.g.*, Cercone Decl., Ex. 1 (generally); and ¶¶31-33, 42, 49, 58-59, 63-65, 69-70, 72, 74, 76, 84, 93-94, 100, 124 (Shintech's participation and acts). For example, Shintech was a member of a host of trade associations, and its representatives allegedly attended meetings around the times of industry price increases. ¶¶76, 93, 124. As price increases were alleged to have occurred simultaneous with industry meetings, allegations concerning those meetings "may be probative of a conspiracy[.]" *Domestic Drywall*, 163 F. Supp. 3d at 197.

Defendant Shintech attempts to downplay as a "plus-factor" the significance of co-producer supply agreements and their relationship to providing "precursor chemicals used to

manufacture PVC[.]" Shintech Br. at 13-14; ¶94. Plaintiffs allege that Defendant Olin, which does not itself make PVC, "supplies one or more of the other Defendants or their affiliates" with chemicals for making PVC products, listing "defendants Formosa, Westlake, Shintech, and defendant Oxy's subsidiary OxyVinyls" as PVC manufacturers. *Id*. But because (confidential) co-producer supply agreements have multiple purposes—which may or may not be entirely benign, as they often are cartel practices—Plaintiffs' allegations here, at minimum, reflect yet another opportunity for improper information exchanges, bolstering the plausibility of conspiracy. *See, e.g., In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1148 (joint venture agreements were "used as the means to maintain and achieve the end result of the conspiracy by controlling the supply, and thereby permitting increases in the price for the products").

Finally, Shintech argues that Plaintiffs "provide no facts as to Shintech" concerning the allegations of manipulation by the Defendants of the IHS Markit price index, Defendants' customer and market allocation, and Defendants' information exchanges. Shintech Br. at 14-15. As discussed *supra* at §III.C.D., there is no absolute prohibition against referring to co-conspirators using collective terms, especially in the context of a "self-concealing" conspiracy where most if not all of the evidence is in the possession (and control of) the Defendants. In any event, the allegations found at ¶¶95-103 include factual details and provide further indicia of a plausible conspiracy, in which Shintech participated. *See also, e.g.*, ¶¶31-33, 42, 49, 58-59, 63-65, 69-70, 72, 74, 76, 84, 93-94, 124. The Complaint therefore properly alleges a plausible price-fixing claim against Shintech and gives Shintech sufficient notice of it.

**J. <u>Defendant Formosa Should Not Be Dismissed</u>**

Defendant Formosa asserts that Plaintiffs fail to specify its involvement or participation in the alleged conspiracy, including with respect to issuing public statements, restraining supply,

or manipulating the IHS Markit price index for Caustic Soda. Formosa Br. at 3-4. Plaintiffs have elsewhere addressed the propriety of group pleading when alleging a "self-concealing" conspiracy and where most if not all of the critical evidence in the case is non-public and lies within the possession and control of the Defendants. *See supra* at §III.D. Even if Formosa is not separately identified specifically, the details in Plaintiffs' allegations strongly show that the conspiracy allegation against Formosa is plausible. *See, e.g.*, ¶¶34-35, 42, 48-49, 58-59, 63, 65, 69-70, 72, 74, 76, 83, 91-94, 124; Cercone Decl., Ex. 1 (generally).

Formosa claims that its announced price increases, participation in trade association meetings, and implementation of temporary capacity shutdowns were unilateral and "lawful conduct," and do not show a violation of Section 1 of the Sherman Act. Formosa Br. at 4-8. First, as discussed above, conduct that standing alone may appear to be lawful nonetheless may provide support—along with other factual allegations, viewed as a whole—for finding the plausibility of a Sherman Act violation. A unilateral announcement of a price increase by a competitor in a market behaving competitively is not unlawful. But Plaintiffs do not allege unilateral action by Formosa and its competitors. The Defendants (including Formosa) made thirteen known, seemingly coordinated price increase announcements—which were effective in actually increasing prices despite the existence of excess capacity, flat demand, and flat or declining costs—indicating the existence of a *per se* anticompetitive agreement. *See, e.g.,* ¶¶43, 46-53, 58-77, 119. Formosa announced price increases along with the other Defendants. ¶¶58, 59, 63, 65, 69, 70, 72, 74, 76. As alleged, the other Defendants acted "similarly" and in concert with respect to Formosa's price increase announcements, both in amount and timing, meaning that "parallel action" on Formosa's part is sufficiently alleged. *SD3*, 801 F.3d at 427; *Flat Glass,* 385 F.3d at 362; *Catalano,* 446 U.S. at 647.

Like the other Defendants, Formosa argues that mere membership in trade associations and participation in their meetings is insufficient to show plausibility (Formosa Br. at 6), but Plaintiffs allege not only that Formosa is a member of various trade associations (e.g., AFPM, The Chlorine Institute, and The Vinyl Institute), but also that industry meetings occurred around the times that "Defendants were in process of increasing prices to their U.S. customers." ¶¶91-93. This is a market feature "suggestive of an inference of an agreement." *DIPF*, 2014 WL 3971620, at *7; *In re Domestic Drywall*, 163 F. Supp.3d at 197.

Formosa also argues that Plaintiffs' factual allegations about it decreasing production capacity in association with "temporary shutdowns for plant maintenance and outages," as well in relation to Hurricane Harvey, do not plausibly support an anticompetitive agreement. But Plaintiffs allege that "Defendants in a coordinated fashion . . . began to idle or shut down (or 'rationalize') hundreds of thousands of tons of capacity" and that "[t]here were also temporary shutdowns for plant maintenance and outages throughout 2016, including by defendants Olin, OxyChem, Formosa, and Westlake, and maintenance issues may even have reduced capacity by as much as 10% in the fourth quarter of 2016 alone." ¶48. *See also* ¶49 ("both planned and unplanned outages purportedly occurred at . . . Formosa's Point Comfort, Texas plant"); ¶50 ("Defendants' operating rates appear to have averaged only 80-85% in the 2015-2018 time period."); and ¶50 (Hurricane Harvey "disrupt[ed] over one-third of domestic capacity for a brief time"). Assuming such allegations are true, the plausibility of Formosa's participation in the conspiracy is further buttressed by the allegations that its parent company, Defendant FPC, announced in its 2018 shareholders' meeting handbook that its "consolidated operating profit increased 68.5% from 2016 to 2017 ('a record high level for the Company in the past 6 years'); and that 'equity investment income' from defendant Formosa in 2017 had helped defendant FPC

reach the 'highest level [of consolidated pretax profit] in the past 63 years since [FPC] was established.'" ¶83. In other words, by helping participate in industry capacity limitations and by not seizing the opportunity to take market share when its competitors shut down or idled capacity, Formosa allegedly participated in improper "output restriction" that artificially "raise[d] prices by reducing supply below demand." *United States v. Andreas*, 216 F.3d at 667. Such conduct supports the plausibility of Formosa's participation in the alleged conspiracy.

Defendant Formosa also asserts that co-producer supply agreements "are output neutral and procompetitive" and merely "provide an 'opportunity' to conspire [and do not] support a plausible inference of an anticompetitive agreement." Formosa Br. at 7-8. But the Complaint alleges far more than just co-producer transactions, which should not be viewed on their own but as indicative—along with numerous detailed other factual allegations—of a cartel. *See, e.g.*, Cercone Decl., Ex. 1 (generally). Further, Plaintiffs allege that Formosa acquires precursor chemicals for making PVC from Defendant Olin, and also participated in a co-producer supply agreement "when Hurricane Harvey temporarily idled some capacity" at Formosa's facilities. ¶94. Plaintiffs' specific allegations about these co-producer transactions are thus not "speculative" at all, but show—at minimum—opportunities for Formosa and other Defendants to participate in improper information exchanges, bolstering the plausibility of the alleged conspiracy. *Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1148. When considered in their totality, the allegations against Formosa are thus sufficient to state a claim against Formosa, and give it notice that it participated in a violation of Section 1 of the Sherman Act.

### K. Defendants' Exhibits In Support Of Their Joint Motion Raise Factual Disputes Inappropriate For Resolution On A Motion To Dismiss

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by

reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). If a document is submitted for such consideration, as Defendants do here, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* Defendants have submitted a number of exhibits for the court's consideration. ECF No. 79-3 – 79-11 (Def. Exs. 1-9). Assuming for purposes of resolving this Motion that each is authentic and accurate (although as explained below, at least one Exhibit is inaccurate), they are either immaterial to the question at hand—*i.e.*, do the Complaint's factual allegations (when viewed as a whole) plausibly state a price-fixing claim and fairly give Defendants' notice of it?—or they buttress certain of the Complaint's factual allegations.

For example, Defendants challenge Plaintiffs' reference in the Complaint to an industry article: "Axiall's CEO told analysts in August 2015 that Caustic Soda markets were 'oversupplied' and (according to an article) 'openly hoped that Olin would cut production once the proposed acquisition [of Dow's chloralkali business] was completed.'" ¶47; Def. Br. at 26-27. Defendants contend that Axiall never invited Olin to cut production in 2015, arguing that "the earnings call transcript" cited in the article "makes no mention of Olin whatsoever[.]" Def. Br. at 26. But this is incorrect. On the call, and as accurately reflected in Defendants' Exhibit 8 and in the Complaint, Axiall's CEO called the market "oversupplied" in 2015 and suggested that "capacity shut downs" were needed. ECF No. 79-10 (Def. Ex. 8) at 11 ("[W]e think that the market is oversupplied. . . .I think what's going to need to happen to really change things is it's going to need to be a combination of increased demand as well as capacity shut downs[.]"). Then, in response to an analyst's question about that statement, the transcript states that Axiall's CEO replied, in pertinent part, as follows:

> When we say that we think there are some capacity needs to come out of the market. We really say that in the context of what's going to be some of the catalysts that drives things to get better over the next 12 months to 36 months . . .
>
> So the supply side and the demand side and we obviously ***there's a big transaction that's getting ready to close here in the next several months in the Daolin thing*** and so that's another potential catalyst; and around that we'll remain focused on improving our operational reliability and stick into that and that makes us optimistic over the long term.

ECF No. 79-10 (Def. Ex. 8) at 17 (emphasis added). "Daolin" is a city in China; it has no relevance to the Caustic Soda "big transaction that [was] getting ready to close" in August 2015. That "big transaction"—that the entire industry was watching unfold—was Olin's acquisition of Dow's chloralkali business, a Dow-Olin transaction, in other words, that would give Olin control of one-third of the industry's capacity, as pointed out in another exhibit attached by Defendants. *See* ECF No. 79-11 (Def. Ex. 9). The industry even referred to that transaction as the "Dow-Olin" or "Olin-Dow" transaction. *See* Cercone Decl., Ex. 4 (selected pages of a Sept. 2015 conference call transcript in which Westlake's SVP Steve Bender refers to the "Olin Dow" transaction and the "Dow-Olin" assets). An industry commentator listening to the audio would have properly heard "Dow Olin," and understood and reported on the significance of the reference, whereas a third-party transcription service incorrectly heard "Daolin." *Id.*

## IV. CONCLUSION

Price-fixing is "the supreme evil of antitrust," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004), and cartels such as the one alleged in the Complaint have been condemned for many decades. *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 342 (1982); *Socony-Vacuum Oil*, 310 U.S. at 224 n.59. The Complaint alleges in detail that starting from at least October 1, 2015, rather than competing for market share, Defendants have been adept cartelists: announcing price increase after price increase with false and misleading justifications; temporarily or permanently shutting down capacity and limiting

supply; not genuinely competing for the business of each other's customers; engaging in transactions with each other and cooperating in other ways (*e.g.*, by exchanging commercially sensitive business information) instead of competing; and successfully keeping prices stable-to-increasing year after year, despite industry overcapacity, flat or declining costs, and relatively flat demand in a mature industry.

For the foregoing reasons, the Complaint pleads a plausible conspiracy in violation of Section 1 of the Sherman Act, and provides Defendants with fair notice of the price-fixing claim against them, as required by Rule 8 and *Twombly*. Accordingly, Defendants' motions to dismiss should be denied.[36]

[36] If the Court grants any part of any Defendant's motion to dismiss, Plaintiffs will seek leave to amend pursuant to Rule 15(a)(2), and proffer a proposed amended complaint.

DATED: AUGUST 7, 2019

RESPECTFULLY SUBMITTED,

By: /s/ *Marco Cercone*
RUPP BAASE PFALZGRAF CUNNINGHAM LLC
Marco Cercone, Esq.
R. Anthony Rupp III, Esq.
Arthur N. Bailey, Esq.
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
Telephone: (716) 854-3400
Facsimile: (716) 332-0336
Email: cercone@ruppbaase.com
Email: rupp@ruppbaase.com
Email: bailey@ruppbaase.com

*Attorneys for Individual and Representative Plaintiffs and Interim Liaison Class Counsel*

By: /s/ *Solomon B. Cera*
CERA LLP
Solomon B. Cera, Esq. (*admitted pro hac vice*)
Pamela A. Markert, Esq. *(pro hac vice pending)*
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

C. Andrew Dirksen, Esq. (*admitted pro hac vice*)
800 Boylston St., 16th Floor
Boston, MA 02199
Telephone: (857) 453-6555
Email: cdirksen@cerallp.com

*Attorneys for Individual and Representative Plaintiff Miami Products & Chemical Company and Interim Co-Lead Class Counsel*

By: /s/ *Robert N. Kaplan*
KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan, Esq.
Jeffrey P. Campisi, Esq.
Elana Katcher, Esq.
Matthew P. McCahill, Esq.
850 Third Ave., 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: jcampisi@kaplanfox.com
Email: ekatcher@kaplanfox.com
Email: mmccahill@kaplanfox.com

Gary L. Specks, Esq. (*admitted pro hac vice*)
681 Prestwick Lane
Wheeling, Illinois 60090
Telephone: (847) 831-1585
Email: gspecks@kaplanfox.com

*Attorneys for Individual and Representative Plaintiff Amrex Chemical Co., Inc. and Interim Co-Lead Class Counsel*