UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MIAMI PRODUCTS & CHEMICAL CO.,
On Behalf of Itself and All Others Similarly
Situated, et al.,

                    Plaintiffs,

          v.

OLIN CORPORATION, et al.,

                    Defendants.
_____

**DECISION AND ORDER**

1:19-CV-00385 EAW

AMREX CHEMICAL CO., INC.,
On Behalf of Itself and All Others Similarly
Situated,

                    Plaintiff,

          v.

OLIN CORPORATION, et al.,

                    Defendants.
_____

1:19-CV-00386 EAW

MIDWEST RENEWABLE ENERGY,
LLC, On Behalf of Itself and All Others
Similarly Situated,

                    Plaintiff,

          v.

OLIN CORPORATION, et al.,

                    Defendants.
_____

1:19-CV-00392 EAW

_____

MAIN POOL AND CHEMICAL CO.,
INC., On Behalf of Itself and All Others
Similarly Situated,

        Plaintiff,

        v.

OLIN CORPORATION, et al.,

        Defendants.

1:19-CV-00393 EAW

_____

PERRY'S ICE CREAM COMPANY, INC.,
On Behalf of Itself and All Others Similarly
Situated,

        Plaintiff,

        v.

OLIN CORPORATION, et al.,

        Defendants.

1:19-CV-00403 EAW

_____

FINCH PAPER, LLC, On Behalf of Itself
and All Others Similarly Situated,

        Plaintiff,

        v.

OLIN CORPORATION, et al.,

        Defendants.

1:19-CV-00480 EAW

_____

# INTRODUCTION

Plaintiffs Miami Products & Chemical Co., Amrex Chemical Co., Inc., Finch Paper, LLC, Main Pool and Chemical Co., Inc., Midwest Renewable Energy, LLC, Perry's Ice Cream Company, Inc., and VanDeMark Chemical, Inc. (collectively "Plaintiffs") bring these putative class actions against defendants Olin Corporation ("Olin"), K.A. Steel Chemicals, Inc. ("K.A. Steel"), Occidental Petroleum Corporation ("Oxy"), Occidental Chemical Corporation ("OxyChem"), Westlake Chemical Corporation ("Westlake"), Shin-Etsu Chemical Co. Ltd. ("Shin-Etsu"), Shintech Incorporated ("Shintech"), Formosa Plastics Corporation ("Formosa"), and Formosa Plastics Corporation, U.S.A. ("Formosa USA") (collectively, "Defendants"), alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Dkt. 51).

Presently before the Court are: (1) a joint motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim by Olin, K.A. Steel, Oxy, OxyChem, Westlake, Shintech, and Formosa USA (Dkt. 79); (2) a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim by Westlake (Dkt. 81); (3) a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim by Shintech (Dkt. 82); (4) a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim by Formosa USA (Dkt. 84); (5) a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim by Oxy (Dkt. 80); (6) a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or in the alternative pursuant to Rule 12(b)(6) for failure to state a claim, by Formosa (Dkt. 86); and (7) a motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction by Shin-Etsu (Dkt. 103).

While by no means opining as to the likelihood of Plaintiffs' ultimate success in this action, the Court finds that the allegations in the Amended Complaint, at this stage of the proceedings, are sufficient to withstand most of the pending motions to dismiss. For the following reasons, the Court denies the joint motion to dismiss (Dkt. 79), Westlake's motion to dismiss (Dkt. 81), Shintech's motion to dismiss (Dkt. 82), and Formosa USA's motion to dismiss (Dkt. 84); grants in part the motion to dismiss by Oxy (Dkt. 80); denies without prejudice and with leave to renew after the completion of jurisdictional discovery, the motions to dismiss by Formosa (Dkt. 86) and Shin-Etsu (Dkt. 103), although Plaintiffs must provide the necessary certification regarding Formosa as discussed herein on or before April 17, 2020, or their claims against Formosa will be dismissed with prejudice.

## BACKGROUND

### I.  Factual Background

The following facts are taken from the allegations in Plaintiffs' Amended Complaint (Dkt. 51), the operative pleading in this matter. As is required at this stage of the proceedings, the Court treats Plaintiffs' well-pleaded allegations as true.

Caustic soda, also known as sodium hydroxide or lye, is a commodity chemical sold in solid and liquid forms and is a co-product of chlorine produced from the electrolysis of brine or salt water. (*Id.* at ¶¶ 2, 42). It is used by customers in a variety of industries, including paper, pulp, and cellulose; chemical production; soaps and detergents; aluminum; food processing; water treatment; textiles; mineral oils; recycling; and pharmaceuticals. (*Id.*). Defendants are estimated to collectively control at least 90% of the domestic caustic soda supply (*id.*), and Plaintiffs are all direct purchasers or assignees

of direct purchasers of caustic soda (*id.* at ¶¶ 18-24). K.A. Steel is a wholly owned subsidiary of Olin that was acquired by Olin in August 2012. (*Id.* at ¶ 26). OxyChem is a wholly-owned subsidiary of Oxy (*id.* at ¶ 29), and Formosa USA is wholly owned by the Taiwanese corporation Formosa (*id.* at ¶ 34). The caustic soda industry has become more concentrated in the past few years, with Olin acquiring Dow's gulf coast chloralkali business in 2015 and Westlake acquiring the caustic soda business of Axiall Corporation of Atlanta ("Axiall") in 2016, lowering the number of U.S. producers of caustic soda from seven to five. (*Id.* at ¶¶ 30, 44).

Demand for caustic soda tends to track the demand for industrial production. (*Id.* at ¶ 46). The United States industrial production index saw slow growth from mid-2009 until a peak in November 2014 before declining through March 2016, flattening until November 2016, and then gradually increasing, reaching its November 2014 level in April 2018. (*Id.*). Plaintiffs allege that "[a]lthough Defendants' actual cost data is proprietary and uncertain, it is believed that their costs have been relatively stable since 2015," referring to the steady power costs from 2015 to 2017 as an example. (*Id.* at ¶ 43).

From 2011 through 2014, Defendants made price increase announcements that were largely unsuccessful, and average caustic soda prices over this time period tended to be flat or declining. (*Id.* at ¶¶ 3, 54). In 2014 and early 2015, before Olin announced it intended to acquire Dow's chloralkali assets, Westlake and OxyChem added new chloralkali production capacity, adding to the overcapacity of the caustic soda industry. (*Id.* at ¶ 47). Even though the domestic caustic soda supply was relatively stable or declining, in August 2015, an industry article stated that several Defendants were trying privately to increase

contract customers' prices by $40 per dry standard ton ("dst").  (*Id.* at ¶ 57).  At around the same time, Axiall's CEO told analysts that caustic soda markets were oversupplied and that he "openly hoped that Olin would cut production once the proposed acquisition [of Dow's choralkali business] was completed."  (*Id.* at ¶ 47 (alteration in original)).  Olin acquired Dow's business in October 2015, and on November 2, 2015, Olin announced it would idle or shutdown between 250,000 and 450,000 tons of caustic soda production capacity in 2016.  (*Id.* at ¶ 48).  Sometime in November 2015, the Vinyl Institute, whose only full members are Formosa USA, Shintech, Westlake, and Oxy subsidiary OxyVinyls, held a meeting.  (*Id.* at ¶ 93).  On November 19, 2015, a chemical industry news service and consultant reported that there was a new industry price increase initiative by Olin, and that U.S. producers had managed to increase prices by $40 per dst across October and November, despite the "ample supply" of caustic soda.  (*Id.* at ¶ 57).  Within days, OxyChem, Westlake, Formosa USA, and Shintech announced increased prices in the same amount to all customers nationwide.  (*Id.* at ¶ 58).

Olin idled or shut down at least 433,000 tons of annual capacity beginning in the first quarter of 2016, and around the same time, Axiall—which had started acquisition discussions with Westlake—cut production by 78,000 dst per year.  (*Id.* at ¶ 48).  In March 2016, American Fuel & Petrochemical Manufacturers ("AFPM"), in which Olin, OxyChem, Westlake, and Formosa USA are members, had an annual meeting that those Defendants' representatives attended.  (*Id.* at ¶ 91).  Additionally, The Chlorine Institute had a spring meeting in April 2016, which Olin, Oxy, Westlake, and Formosa USA attended.  (*Id.* at ¶ 92).  In April 2016, Olin, OxyChem, Westlake, Shintech, and Formosa

USA each announced $30-$40 per dst price increases, and additional increases during the quarter that totaled approximately $85 per dst. (*Id.* at ¶ 59). A May 20, 2016, article referred to the increase by producers as "the most significant increase of the past three years." (*Id.*).

The annual ICIS and Tecnon OrbiChem World Chlor-alkali Conferences took place on June 16-17, 2016, at which an Olin representative spoke. (*Id.* at ¶ 93). Later in 2016, OxyChem reduced its caustic soda output by 150,000 dst per year. (*Id.* at ¶ 48). Defendants announced increases of $40-$50 per dst in July and August 2016, and after the September 2016 meeting of the Vinyl Institute with Formosa USA, Shintech, Westlake, and Oxy subsidiary OxyVinyl (*id.* at ¶ 93), Defendants announced price increases of $60-$80 per dst (*id.* at ¶ 59). In the third quarter of 2016, Westlake completed its acquisition of Axiall. (*Id.* at ¶ 30). OxyChem, Formosa USA, and Westlake also had temporary shutdowns for plant maintenance and outages throughout 2016, reducing capacity by as much as 10% in the fourth quarter of 2016 alone. (*Id.* at ¶ 48). Also in 2016, the market was informed that a refinery of a large caustic soda purchaser would close due to bankruptcy, and that the 150,000 dst per year it had purchased was destined for the export market. (*Id.*). Defendants increased prices by $40-$65 in the fourth quarter of 2016. (*Id.* at ¶ 59). Between April 2016 and January 2017, the price of caustic soda had increased by 45% from $430 per dst to $625. (*Id.*). Additionally, the average North American undiscounted quarterly contract price per short ton increased 22% from $595.80 in the fourth quarter of 2015 to $725 in the fourth quarter of 2016. (*Id.*).

Defendants led their customers to believe that caustic soda supply was "tight" and product "scarce" or otherwise limited. (*Id.* at ¶ 53). Many customers were on "allocation" and not permitted to purchase more volume from their defendant-supplier than they had annually in the past. (*Id.*). However, Olin told investors in its 2016 Form 10-K that supply had increased, even though customers had been told just the opposite throughout 2016. (*Id.* at ¶ 62).

In February 2017, Olin, OxyChem, Westlake, Formosa USA, and Shintech announced caustic soda increases of $60-$85 per dst depending on the grade—$60 for diaphragm or $85 for membrane. (*Id.* at ¶ 63). The grade differential was justified as due to "restrained" membrane-grade production. (*Id.*). In 2017, AFPM's Annual Meeting was again in March, with Olin, OxyChem, Westlake, and Formosa USA representatives in attendance. (*Id.* at ¶ 91). An employee of a distributor of caustic soda stated in a report about the AFPM conference that "Chlor-Alkali producers seemed to all be on the same page and the general consensus was caustic was extremely tight and pricing was moving up across the board, without exception." (*Id.* at ¶ 124). In May 2017, Olin, OxyChem, Westlake, Formosa USA, and Shintech announced increases of up to $75 per dst. (*Id.* at ¶ 63). A $75-$100 increase depending on grade was announced in August and September 2017 by Olin, OxyChem, Westlake, and Shintech. (*Id.* at ¶ 64). In November 2017, the Vinyl Institute again met (*id.* at ¶ 93), and Defendants announced caustic soda price increases ranging from $70 to $115 per dst depending on grade (*id.* at ¶ 65). Defendants made calls to customers and others regarding the price increase, and OxyChem and Westlake mailed letters to customers announcing a price increase of $80-$100 and

$85-$115 respectively; just days before Olin, Formosa USA, and Shintech sent similar price increase letters. (*Id.*). The November 2017 announcements increased customers' contract prices an average of $30 per dst by January 2018. (*Id.* at ¶ 67).

After years of annual decline from 2012 to 2015, Olin's income before taxes increased 250% from 2015 to 2017. (*Id.* at ¶ 51). Additionally, export prices increased in 2016 and 2017, disrupting India's market and triggering an investigation by India's Directorate General of Anti-dumping and Allied Duties into the dumping of U.S.-manufactured and exported caustic soda in India. (*Id.*).

Defendants justified their price increases based on "strong" gross domestic product ("GDP") growth; however, the national GDP averaged 2.2% growth annually between 2011 and 2015 when caustic soda prices were flat or declining, whereas from 2016 to 2017, when caustic soda prices skyrocketed, GDP increased an average of 1.9%. (*Id.* at ¶ 52). Despite capacity shutdowns, domestic supply of caustic soda was largely flat between 2016 and 2017, and significant industry excess capacity persists. (*Id.* at ¶ 50). For example, Defendants' operating rates appear to have averaged only 80 to 85% in the 2015-2018 time period. (*Id.*). Additionally, after Hurricane Harvey hit Houston in August 2017, over one-third of domestic capacity of caustic soda was disrupted but customers could still easily buy caustic soda, albeit at higher prices. (*Id.*).

On February 13, 2018, Westlake announced a $40 per dst price increase for all grades of liquid caustic soda, and the next day Olin sent letters to customers announcing an $85 per dst increase. (*Id.* at ¶ 69). By February 26, 2018, OxyChem, Shintech, and Formosa USA also had announced increases of $85 per dst. (*Id.*). AFPM had its annual

meeting in March 2018 (*id.* at ¶ 91), and Westlake announced an additional $50 per dst increase on March 16, 2018, matching the price increase of the other companies (*id.* at ¶ 69). Additionally, Olin, OxyChem, and Westlake at the same time stopped announcing different price increase amounts for diaphragm and membrane grades. (*Id.*). In May 2018, Westlake's CEO told an investor conference that Westlake did not see a cap on caustic soda prices because demand was growing while U.S. capacity was not. (*Id.* at ¶ 70). On May 21, 2018, Olin and OxyChem sent letters to customers announcing a $40 per dst caustic soda price increase, with Formosa USA and Shintech announcing a $40 per dst increase within days and Westlake announcing a $45 per dst increase. (*Id.*). Olin announced a $50 per dst increase on August 28, 2018, and the other Defendants non-publicly implemented the same price increase. (*Id.* at ¶ 71). On November 27, 2018, Olin announced a $40 per dst increase by letters to customers. (*Id.* at ¶ 72). OxyChem, Formosa USA, and Shintech announced and implemented identical increases within days through direct, private contacts with customers. (*Id.*). Within a week of Olin's announcement, Westlake announced a $45 per dst increase. (*Id.*).

In late January 2019, the industry analyst IHS Markit, which is in routine contact with Defendants, forecasted non-publicly to clients that 2019 caustic soda prices would increase by the second quarter. (*Id.* at ¶ 75). Olin informed investors on February 5, 2019, and February 12, 2019, that prices would increase in 2019 given strong demand and "industry maintenance turnaround" by Defendants in North America. (*Id.*). On February 19, 2019, Westlake's CEO told investors that prices would increase in 2019. (*Id.*). On February 20, 2019, Olin announced a $50 per dst increase of its caustic soda by letters to

customers.  (*Id.* at ¶ 74).  Almost immediately thereafter, OxyChem announced an $80 per dst increase and Formosa USA announced a $70 per dst increase non-publicly through direct, private contacts with customers.  (*Id.*).  Shortly thereafter, Westlake announced a $75 per dst increase, and Shintech announced an $80 per dst increase.  (*Id.*).  Defendants' costs are believed to still be stable, industry excess capacity still exists, and demand continues to be flat.  (*Id.* at ¶ 75).

From 2016 to 2019, Defendants have had temporary planned and unplanned outages of production, including shutdowns for maintenance at around the same times, and those production outages were used in part to explain tightening supply and justify frequent price increases.  (*Id.* at ¶ 49).  For example, Westlake's and Formosa USA's plants experienced both planned and unplanned outages, and Olin and OxyChem stated they reduced their operating rates for various reasons.  (*Id.*).  In February 2018, Olin informed investors during a presentation that in addition to the capacity reductions in North America, no capacity additions were expected within the next two to three years.  (*Id.*).  Although this presentation was made three months after Shintech had filed a permit to say it was considering expanding its capacity, and Shintech announced in July 2018 that it was developing a new production facility, any new caustic soda production capacity would not be operational for years, and it is not clear if the new production will be sold in the United States' market.  (*Id.*).

Since the beginning of the Class Period, October 2015, Defendants have earned billions of dollars in net income from sales of caustic soda, and their profit margins have increased dramatically.  (*Id.* at ¶ 80).  Prices of Olin's other products, including chlorine,

have not increased nearly as much as caustic soda prices since 2015, and Olin's EBITDA (full year adjusted earnings before interest, tax, depreciation, and amortization) more than doubled between 2015 ($479 million) and 2018 ($1.27 billion), as compared to between 2012 and 2015 when it only increased 28%. (*Id.*). Oxy's chemical segment earnings, which include OxyChem's earnings, increased 44% from 2016 ($571 million) to 2017 ($822 million), and over 40% from 2017 ($822 million) to 2018 ($1.16 billion) in part due to "higher realized pricing for caustic soda." (*Id.* at ¶ 81). Westlake's Vinyls segment, which includes its caustic soda business, increased over 270% from 2016 ($174 million) to 2017 ($647 million). (*Id.* at ¶ 82). Formosa and Formosa USA also experienced significant increases in net income, with Formosa experiencing a consolidated operating profit that was "a record high level for the Company in the past 6 years." (*Id.* at ¶ 83). Shin-Etsu informed shareholders that a main factor in achieving its highest profit ever in fiscal year 2018 was price improvement in its PVC/Chlor-Alkali business. (*Id.* at ¶ 84).

From October 2015 to the present, Defendants entered into sales agreements and swap agreements with each other. (*Id.* at ¶ 94). For example, when Hurricane Harvey temporarily idled facilities owned by OxyChem and Formosa USA, those defendants were assisted with caustic soda supply by other producers. (*Id.*). Additionally, Olin, Oxy, and OxyChem have extensive secret co-producer supply agreements and contact with each other. (*Id.*). These swaps reward exchanges of commercially sensitive information among Defendants, and keep caustic soda market shares stable and increasing. (*Id.*).

Many of Defendants' customers purchase caustic soda under contracts, and the price of the product agreed to in those contracts is at times determined by a pricing index

managed by the industry analyst IHS Markit (the "Index"). (*Id.* at ¶ 95). Before 2016, prices in the Index varied up and down, sometimes significantly, but after Olin's purchase of Dow's chloralkali business in 2015, caustic soda prices have tended to consistently increase. (*Id.*). Plaintiffs contend Defendants selectively provide information to IHS Markit or provide false information to ensure that the Index reflects the highest average contract price level practicable. (*Id.* at ¶ 96). Defendants also provide false or misleading information to try to maintain a trend of increasing market pricing. (*Id.*). At least one IHS Markit employee left sometime in 2016-2017 in part because of the Index's lack of integrity. (*Id.* at ¶ 97).

Customers have noticed differences with Defendants since October 2015. (*Id.* at ¶ 99). Customer turnover is lower, Defendants' market shares have been relatively stable, Defendants refrain from bidding competitively for business, and Defendants exercise "market disciple," *i.e.*, refusing to agree to lower prices, raising prices in accord with each other's price increases, and not taking business from each other at a lower price. (*Id.*).

Plaintiffs contend "that Defendants have formed a cartel and reached an understanding or agreement to concertedly fix prices and limit the supply of Caustic Soda." (*Id.* at ¶ 101).

## II.    **Procedural Background**

The instant action and related cases were filed in the Western District of New York on March 22, 2019 (Dkt. 1), and reassigned to the undersigned on May 8, 2019 (Dkt. 40). The cases were referred for the handling of non-dispositive pretrial matters to United States Magistrate Judge Michael J. Roemer (Dkt. 42), who entered a scheduling and case

management order on May 17, 2019, consolidating the cases for pretrial purposes (Dkt. 49).  Plaintiffs filed an Amended Complaint on May 22, 2019.  (Dkt. 51).

On July 8, 2019, the joint motion to dismiss for failure to state a claim was filed (Dkt. 79), along with motions to dismiss by Oxy (Dkt. 80), Westlake (Dkt. 81), Shintech (Dkt. 82), and Formosa USA (Dkt. 84).  Plaintiffs filed a memorandum in opposition to all of the July 8, 2019, motions to dismiss on August 7, 2019.  (Dkt. 91).  Replies were filed on August 27, 2019.  (Dkt. 94; Dkt. 95; Dkt. 96; Dkt. 97; Dkt. 98).

On July 22, 2019, Formosa filed its motion to dismiss.  (Dkt. 86).  Plaintiffs responded on August 21, 2019 (Dkt. 93), and Formosa filed its reply on September 10, 2019 (Dkt. 101).

On October 28, 2019, Shin-Etsu filed its motion to dismiss for lack of jurisdiction.  (Dkt. 103).  Plaintiffs responded on November 1, 2019 (Dkt. 109), and Shin-Etsu replied on November 21, 2019 (Dkt. 110).  Oral argument took place before the undersigned on December 6, 2019, and decision was reserved.  (Dkt. 116; Dkt. 117).

## DISCUSSION

## I.    Motions to Dismiss for Failure to State a Claim

### A.    Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all

reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

**B.  Sherman Act § 1**

Plaintiffs' claims arise out of § 1 of the Sherman Act. "Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a 'contract, combination . . ., or conspiracy, in restraint of trade or commerce.'" *Twombly*, 550 U.S. at 548 (quoting 15 U.S.C. § 1). "Because § 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question

is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id.* at 553 (alterations in original) (quotations and citation omitted). "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. This standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* (footnote omitted).

"The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation." *Mayor and City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013). "[A] plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.* at 136. However, "plaintiffs [are] not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010). "[A] complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136 (emphasis in original). "[A] horizontal agreement, such as the one alleged in the case before us, may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* (quotation omitted). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (quotation and footnote omitted).

Generally, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57. The allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* The Second Circuit has stated:

> Examples of parallel conduct allegations that might be sufficient under *Twombly*'s standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."

*Citigroup*, 709 F.3d at 137 (quoting *Twombly*, 550 U.S. at 556 n.4 (quotation omitted)). "[A]t the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016). "Skepticism of a conspiracy's existence is insufficient to warrant dismissal; 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* at 781 (quoting *Twombly*, 550 U.S. at 556 (internal quotation omitted)).

In the Joint Motion to Dismiss, Defendants collectively argue that Plaintiffs have failed to allege parallel conduct, and that even if parallel conduct is sufficiently alleged, Plaintiffs have also failed to include allegations of the plus factors necessary to implicate

a conspiracy. Additionally, Defendants Oxy, Westlake, Shintech, and Formosa USA argue that Plaintiffs' Amended Complaint does not adequately implicate them individually in the alleged conspiracy.[1] The Court addresses each argument in turn.

### C.    <u>Joint Motion</u>

Defendants contend that Plaintiffs allege no direct evidence of a conspiracy and that the circumstantial evidence alleged by Plaintiffs is not sufficient to rise to the level of a conspiracy under § 1 of the Sherman Act. (Dkt. 79-1 at 11-35). Plaintiffs do not contend to be able to allege direct evidence of a conspiracy[2] (*see* Dkt. 51 at ¶¶ 55, 89, 100), and instead argue that the circumstantial evidence they have alleged supports the inference of a conspiracy (Dkt. 91 at 18-40).

---

[1]    The Joint Motion to Dismiss and Joint Reply each include a short footnote contending that Plaintiffs' allegations are "plainly insufficient to state a claim against K.A. Steel." (Dkt. 79-1 at 7 n.2; Dkt. 95 at 7 n.2). "[C]ourts 'routinely decline[ ] to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised.'" *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 CIV. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) (alterations in original) (quoting *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14 Civ. 10104, 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sept. 7, 2017)). Accordingly, the Court does not separately address the sufficiency of the claims against K.A. Steel.

[2]    To the extent that allegations of a direct conspiracy are included in the Amended Complaint, the Court agrees with Defendants that they are insufficiently conclusory. (Dkt. 79-1 at 11-12; *see, e.g.*, Dkt. 51 at ¶ 103 ("Defendants intended to restrain trade, and did restrain trade, in Caustic Soda by reaching an agreement or understanding to end genuine price competition among themselves by supporting industry price increases and customer allocations; by manipulating a price index; by assisting each other with supply; by limiting domestic supply and exporting and selling Caustic Soda abroad (to keep it off the domestic market); and by concertedly fixing, raising, maintaining, or stabilizing the prices for Caustic Soda by other secret means and methods.")).

Plaintiffs allege that Defendants Olin, OxyChem, Formosa USA, Westlake, and Shintech announced approximately 13 times over a three-year period similar price increases of caustic soda at around the same time. (*See, e.g.*, Dkt. 51 at ¶ 76). The announcements were made within days of each other, sometimes through private means such as letters or phone calls to customers. (Dkt. 51 at ¶ 65). Additionally, defendants Olin, OxyChem, Formosa USA, Westlake, and Shintech allegedly began announcing grade-differentiated price increases instead of a single price increase at approximately the same time, and they stopped differentiating between grades for their price increase announcements on a similar date. (*Id.* at ¶ 63).

Plaintiffs have also alleged that these announced price increases were unprecedented—prior to the end of 2015, caustic soda prices had been stable if not declining, and there was an oversaturated supply of the product. (*Id.* at ¶ 77). Further, Plaintiffs allege that after Axiall's CEO told market analysts that he "openly hoped that Olin would cut production" (*id.* at ¶ 47), Olin—the largest producer of caustic soda at that time—cut its production amounts, and that OxyChem, another large caustic soda producer, also cut its production amounts (*id.* at ¶ 48). Plaintiffs allege that although these production cuts were made, the supply of caustic soda remained oversaturated. (*Id.* at ¶ 50). However, the production cuts gave Defendants a ruse under which they could collectively raise prices, and that despite the oversaturated supply, Defendants led their customers to believe that caustic soda was scarce or otherwise limited. (*Id.* at ¶¶ 53, 62). The Amended Complaint alleges that Defendants also justified the price increases based on "strong" GDP

growth but the GDP was lower the year that caustic soda prices skyrocketed than the average GDP for the previous five years. (*Id.* at ¶ 52).

Plaintiffs further allege that Defendants were all members of various trade associations and had the opportunity to discuss the alleged scheme at trade association meetings. (*Id.* at ¶¶ 90-93). In particular, the meetings of the Vinyl Institute trade association—in which Formosa USA, Shintech, Westlake, and Oxy subsidiary OxyVinyls are the sole members—coincided with the price increase announcements in November 2015, September 2016, and November 2017. (*Id.* at ¶¶ 57-59, 65 93).

Defendants argue that Plaintiffs' allegations do not show parallel behavior, and even if they do, Defendants' actions are explainable as normal responses to market forces. Defendants also contend that the Court should not consider various aspects of Plaintiffs' allegations when determining whether the conspiracy claim is plausible.

The Court is not persuaded by Defendants' arguments, and instead finds that taken together, Plaintiffs' allegations "plausibly suggest an inference" that Defendants conspired to artificially raise the prices of caustic soda. *Gelboim*, 823 F.3d at 782. The Court addresses each of Defendants' arguments below.

## 1.    <u>Parallel Conduct</u>

Defendants argue that Plaintiffs have not properly alleged parallel conduct through price announcements. (Dkt. 79-1 at 15-24). For the following reasons, the Court finds that Plaintiffs have sufficiently alleged that Defendants engaged in parallel conduct.

Defendants argue that in concentrated commodity industries with a small number of firms like caustic soda (oligopolies), follow-the-leader conduct is expected. (Dkt. 79-1

at 13). "Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries." *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001). "In an oligopolistic market, however, 'conscious parallelism' or 'tacit collusion' to raise or maintain prices is not *per se* unlawful because it could be the result of permissible, independent parallel conduct." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 166 (D. Conn. 2009) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)); *see Twombly*, 550 U.S. at 553-54 ("Even 'conscious parallelism,' a common reaction of firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." (alterations in original) (quotation omitted)). "At the motion to dismiss stage, however, plaintiffs need not 'offer evidence that tend[s] to rule out the possibility that the defendants were acting independently.' Instead, plaintiffs 'need only allege enough factual matter (taken as true) to suggest that an agreement was made.'" *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 721 (S.D.N.Y. 2017) (citation omitted) (quoting *Starr*, 592 F.3d at 320).

Plaintiffs have alleged facts that support more than "conscious parallelism" and "follow-the-leader pricing." Defendants argue that the alleged circumstances surrounding the price announcements show that Defendants were reacting to public information, not pursuant to a conspiracy, pointing to the fact that Olin first announced a price increase which was followed by OxyChem, Westlake, Formosa USA, and Shintech. (Dkt. 79-1 at 21-24). However, Plaintiffs allege that on at least three occasions Defendants made their price increase announcements privately through letters and phone calls to customers (Dkt.

51 at ¶¶ 65, 72, 74), meaning that at least in those instances, there was no public announcement of a "leader" price to follow. Moreover, the Amended Complaint alleges Defendants cut production to no effect on the surplus supply of caustic soda, which allowed Defendants to make misrepresentations about the supply of caustic soda as an explanation for the drastic and unprecedented price increases of the product. (*Id.* at ¶¶ 53, 62). In other words, Plaintiffs allege Defendants took concerted action to work against what the market would otherwise dictate.

The Court does not find the cases cited by Defendants to be dispositive. The cases involve situations where the defendants made rational and lawful decisions with a natural explanation. *See Citigroup*, 709 F.3d at 138 (holding plaintiffs failed to allege a conspiracy because "*en masse* flight from a collapsing market in which [defendants] had significant downside exposure—made perfect business sense"); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226-28 (3d Cir. 2011) (noting a conspiracy is not properly pleaded when "defendants' parallel conduct 'was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior'" (quoting *Iqbal*, 556 U.S. at 680)); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007) ("Given these 'natural explanations' for the increases in late fees, those increases do not support any inference of conspiracy."), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 515 (D. Del. 2010) ("The reported facts are consistent with lawful, interdependent business behavior among oligopolists."), *order amended on reconsideration*, No. 1:09-CV-00438-LDD, 2010 WL 11470613 (D. Del. Dec. 1, 2010); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-

01895-WSD, 2009 WL 323219, at *18 (N.D. Ga. Jan. 28, 2009) ("What the allegations show instead is that all LTL service providers had the same incentives to charge the same shipping rates, and that over time they eventually each did so.").  Additionally, some of the cases relied on by Defendants involve pressure by one of the alleged conspirators to *lower* prices.  *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1263-66 (11th Cir. 2019) (finding no conspiracy where plaintiffs were auto body shops claiming that insurance companies were pressuring them to lower their prices and alleging that non-State Farm insurance companies would not pay rates higher than State Farm's publicly available rates); *In re Musical Instruments and Equipment Antitrust Litig.*, 798 F.3d 1186, 1189-90, 1198 (9th Cir. 2015) (finding no conspiracy where plaintiffs were purchasers from Guitar Center who claimed Guitar Center conspired with guitar manufacturers by pressuring the manufacturers to implement and enforce a minimum price because "[s]uch conduct may be anticompetitive—and perhaps even violate the antitrust laws—but it does not suggest the manufacturers illegally agreed among themselves to restrain competition").

Here, on the other hand, Plaintiffs have not alleged that the increased prices announced and set by Defendants are a result of a "natural explanation" such as outside market forces, entities, or customers; instead, they have alleged that after years of market stability, Defendants increased the price of caustic soda in similar amounts without always publicly communicating what those price hikes would be, and made misrepresentations about why the prices were increasing.  *See In re Propranolol*, 249 F. Supp. 3d at 720-21 (distinguishing *In re Musical Instruments*, finding that the "pleadings here allege a pattern

of price fixing spanning several years and no clear mechanism through which the defendants could legitimately and consistently monitor each other's pricing activity"). Courts have recognized that pretextual explanations for price increases can support an inference that defendants were not acting independently. *See DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1514 (11th Cir. 1989) ("[E]vidence of pretext, if believed by a jury, would disprove the likelihood of independent action[.]" (quotation omitted)); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480 (9th Cir. 1986) ("A jury reasonably could conclude that [the defendant]'s stated reason for refusing to sell to [the plaintiff] was a mere pretext. Thus, [the plaintiff] has presented evidence that tends to support an inference of concerted action by [the defendants] and tends to exclude the possibility of independent action."), *opinion modified on other grounds on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53 (E.D. Pa. 2007) ("The Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator." (quoting *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985))). Additionally, courts have recognized that "price increases which occur in times of surplus or when the natural expectation would be a general market decline, must be viewed with suspicion." *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 133 (D.D.C. 2006) (quoting *C-O-Two Fire Equip. Co. v. United States*, 197 F.2d 489, 497 (9th Cir. 1952)). While Plaintiffs' allegations may not rule out the possibility that Defendants acted independently, they do at least plausibly suggest that Defendants made an agreement. *See id.*

- 24 -

("Defendants' additional explanations for their price increases, albeit more grounded in the pleadings, do not render plaintiffs' allegations implausible.").

Defendants also contend that Plaintiffs' allegations regarding price increase announcements are collapsed into general allegations that price increases were announced within a given quarter, which is not sufficient to show that the price increase announcements were parallel. (Dkt. 79-1 at 20). However, Plaintiffs make several allegations that Defendants made their announcements within days of each other. (Dkt. 51 at ¶¶ 58, 65, 70-72, 74). Moreover, it is adequate at the motion to dismiss stage to plead parallelism through a pattern of frequent price increases in similar intervals and amounts. *In re Propranolol*, 249 F. Supp. 3d at 721 ("Furthermore, while it is true that defendants' price increases did not always align on a monthly basis, defendants consistently raised prices on a *bi-monthly* and *quarterly* basis, which is consistent with an illegal agreement.").

Defendants further argue that the price announcement allegations are insufficient because the announcement amounts "varied widely from Defendant to Defendant." (Dkt. 79-1 at 20). First, Defendants mischaracterize Plaintiffs' allegations—the price increase announcements were substantially similar, as is demonstrated by the chart of price increase announcements in Plaintiffs' Amended Complaint. (Dkt. 51 at ¶ 76). For the 13 quarters where price increase announcements are listed, the price announcements for Olin, OxyChem, Westlake, Formosa USA, and Shintech were almost always within $5 to $10 per dst of each other for a product that costs hundreds of dollars. (*Id.* at ¶¶ 59, 76). Additionally, Plaintiffs are not required to allege that Defendants acted uniformly, only that they acted similarly, *see North Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*, 296

F. Supp. 3d 442, 460 n.26 (E.D.N.Y. 2017) ("'Parallel conduct' refers to the same or substantially similar actions taken by actors on the same level."), *aff'd*, 883 F.3d 32 (2d Cir. 2018); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"), *as amended on reh'g in part*, No. 14-1746, Dkt. 100 (4th Cir. Oct. 29, 2015); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) ("[P]arallel pricing does not require 'uniform prices,' and permits prices within an agreed upon range.") (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940)), and "the presence of some divergent conduct does not negate the allegations of other, parallel conduct," *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 320 (S.D.N.Y. 2018).

Defendants cite *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136 (E.D.N.Y. 2010), to support their position that Plaintiffs have not sufficiently alleged parallel conduct due to variability in the price and timing of the announcements. However, the *LaFlamme* court did not reach the issue of whether the plaintiffs alleged parallel conduct, *see id.* at 152 ("[T]he court need not decide whether plaintiffs have sufficiently alleged parallel conduct[.]"), and even agreed "that illegal price fixing need not be exactly simultaneous and identical in order to give rise to an inference of agreement," *id.* at 151. In any event, the facts in *LaFlamme* are distinguishable. The *LaFlamme* court noted that "the surcharges alleged in the Complaint are divergent (in some instances varying by a factor of three), not parallel and were not imposed in tandem, but in some instances weeks apart." *Id.* In the instant matter, no announcement of a price increase among Defendants varied by even

close to a factor of three, in most instances the announced prices were the same, and were often announced days apart. At this stage of the proceedings, the allegations sufficiently allege parallel behavior.

Defendants also submit additional data, which purportedly comes from the same publication Plaintiffs used to compose their price announcement table, and represents how the prices of contracts actually changed in response to the price announcements. (Dkt. 79-1 at 22). Defendants argue the data shows the price increases that were announced were not fully realized and that prices even decreased at some times, undercutting Plaintiffs' conspiracy allegations. (*Id.*). However, even if the Court could consider this data at this stage of the proceedings, Defendants' argument does not undercut Plaintiffs' allegations. The data is the average quarterly price per dst in contracts for caustic soda. (Dkt. 79-3). It does not break down what the contract prices were among the different Defendants, and is certainly not a number that the Court could use to determine "whether there is consciously parallel pricing in the final price consumers pay," as Defendants suggest. *Lum v. Bank of Am.*, 361 F.3d 217, 232 (3d Cir. 2004), *abrogated on other grounds*, *Twombly*, 550 U.S. 544. Additionally, whether the price announcements consistently resulted in price increases in the same amount as the announcements is not dispositive of parallel conduct, *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("[W]e have held agreements to be unlawful *per se* that had substantially less direct impact on price than the agreement alleged in this case."); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004) ("An agreement to fix prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices." (quoting *In re High*

*Fructose Corn Syrup Litig.*, 295 F.3d 651, 656 (7th Cir. 2002)); *see also In re High Fructose Corn Syrup Litig.*, 295 F.3d at 655 ("[P]rice-fixing agreements are illegal even if the parties were completely unrealistic in supposing they could influence the market price."), especially in light of Plaintiffs' allegations that the overall price of caustic soda increased dramatically from 2015 to 2019 (Dkt. 51 at ¶ 85).[3]

### 2. Supply Restrictions

Defendants argue Plaintiffs' allegations regarding supply reductions are not sufficient to demonstrate parallel conduct. (Dkt. 79-1 at 15-18). Plaintiffs allege that two Defendants cut production capacity during the damages period, Olin and OxyChem, as well as Axiall, which was later acquired by defendant Westlake. (Dkt. 51 at ¶¶ 48-49). Additionally, Plaintiffs contend that temporary shutdowns by Olin, OxyChem, Formosa USA, and Westlake reduced their capacity in late 2016 by an additional 10% (*id.* at ¶¶ 50-51), and that in July 2018 Shintech formally announced the development of a new production facility (*id.* at ¶ 49). Defendants contend that because the Amended Complaint alleges "that Defendants engaged in varied, non-uniform, and unilateral action with respect to the capacity and supply of caustic soda," Plaintiffs have failed to allege parallel conduct. (Dkt. 79-1 at 15).

---

[3] Defendants also argue that Plaintiffs included misleading information in their Amended Complaint because they excluded the 2018 and 2019 average price information, which reflects decreased prices, from their price announcement graph. (Dkt. 79-1 at 24; *see* Dkt. 79-3). Even if Plaintiffs had included those data points, as discussed above, it does not undercut their allegations that Defendants *attempted* to increase the prices by making announcements of price increases. Additionally, the pricing figures still show an overall increase of 73% between the first quarter of 2016 and the first quarter of 2019. (Dkt. 79-3; *see* Dkt. 91 at 34 n.22).

However, the parallel conduct element of Plaintiffs' conspiracy does not rely on all Defendants having cut production at the same time; rather, as discussed above, it relies on Defendants allegedly coordinating price increases. The production cuts alleged in the Amended Complaint are a "plus factor": the cuts allegedly allowed Defendants to fabricate an excuse for their parallel price increases. In other words, the conspiracy alleged by Plaintiffs does not rely on how many Defendants actually cut production—just that production was cut, Defendants knew supply was still oversaturated after the production cuts, Defendants still raised their prices, and Defendants misrepresented to their customers why the prices were increasing. Similarly, it does not matter that the timing of the production cuts was staggered or that some production losses were due to temporary plant shutdowns, only that the supply *appeared* to become increasingly more constrained over time, giving Defendants an excuse to simultaneously raise their prices. (*See, e.g.*, Dkt. 51 at ¶ 100 ("[I]n both 2016 and 2017, Defendants conducted 'plant maintenance' and (in effect) limited supply to customers more or less at the same times . . . and these circumstances were used as a pretext to show market 'tightness' to justify their price increases."); *id.* at ¶ 101 ("Defendants continue to increase prices successfully in concert as an industry, despite sluggish demand, stable or declining costs, and excess capacity (even after accounting for Defendants' limiting of domestic supply and capacity during the Class Period).").  In this context, Shintech's announcement about building a new production facility could contribute to the illusion of constrained supply—*i.e.*, the supply is so constricted that Shintech must build a new facility to keep up with demand, even though Shintech and the other Defendants allegedly knew that supply was actually in

excess.  Additionally, as Plaintiffs allege, "it is unclear to what extent the new Shintech Caustic Soda production [from the new facility] will be used captively by Shintech or sold to U.S. customers." (*Id.* at ¶ 49).

Defendants also argue that the allegations regarding their facilities' less-than-full-capacity operating rates reflect an average of all their operating rates, not their individual operating rates, and that an average operating rate cannot show parallel behavior.[4] (Dkt. 79-1 at 18).  Once again, the parallel behavior the conspiracy is concerned with is price hiking, not the production capacity of each Defendant.  The lower average operating rate supports the conspiracy by creating the illusion of decreased caustic soda supply and giving the suppliers an excuse for their price increases.  Additionally, because caustic soda operating capacity rate data does not exist publicly, alleging the individual operating rate for each Defendant would be pure speculation.  (Dkt. 91 at 40 n.24).

Defendants also contend Plaintiffs' allegations that Defendants, particularly Olin, began exporting caustic soda in an attempt to further reduce the supply are undercut by other allegations in the Amended Complaint, namely that "export prices soared in 2016 and 2017 in particular." (Dkt. 79-1; *see* Dkt. 51 at ¶ 51).  However, the export allegations can support Plaintiffs' conspiracy claim because even though Defendants represented to domestic customers that supply was constrained, there were apparently sufficient amounts of caustic soda for Olin to export abroad and to still have a surplus large enough to further cut its production.  An increase in export prices may explain why Defendants began

---

[4]     Defendants also argue that Plaintiffs point to no authority for the alleged operating rate data; but Plaintiffs are not required to do so at this stage of the proceedings.

exporting caustic soda, but it does not render implausible Plaintiffs' allegations that the supply of caustic soda was restrained.[5]  The Court finds Plaintiffs' version of events is plausible, and that is all that is required at this stage of the proceedings.  *See Gelboim*, 823 F.3d at 782 ("[A]t the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation.").

### 3.    <u>Trade Association Meetings</u>

Defendants contend Plaintiffs' allegations that price increases generally followed trade association meetings are not sufficient to allege conspiracy.  (Dkt. 79-1 at 25-26).  Courts have held that, when examined on its own, a "defendant's membership in a trade association hardly renders plausible the conclusion that entity and certain other members are functioning as an ongoing, organized, structured enterprise in conducting their business." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 n.4 (E.D.N.Y. 2017); *see In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (same).  However, courts have also held that "participation in a trade association, where Defendants had opportunities to exchange information or make agreements, coupled with allegations of parallel conduct (*i.e.*, imposing the same inflated

---

[5]    Plaintiffs further contend that it does not make economic sense that export prices soared even though Olin had entered the export market for the first time because economic theory predicts decreased export prices with new market entrants.  (Dkt. 91 at 40).

surcharges), are sufficient to tie these defendants to the conspiracies." *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42 JG VVP, 2013 WL 6481195, at *33 (E.D.N.Y. Sept. 20, 2013) (quotation and citation omitted), *report and recommendation_adopted*, No. 08-CV-00042 JG VVP, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014).

In the instant matter, Plaintiffs' allegations tie the trade association meetings into the conspiracy as a whole. The Amended Complaint does not merely allege that Defendants were part of a conspiracy because they were members of trade associations, but rather alleges that the timing of the trade association meetings often coincided with the announcement of price increases by Defendants, thus suggesting a plausible inference that the trade association meetings allowed Defendants to coordinate the price increases. (*See, e.g.*, Dkt. 51 at ¶¶ 59, 91-92 (trade association meetings in March and April 2016 followed by price increase announcements in April 2016)). In particular, Plaintiffs' allegations illustrate that the meetings of the Vinyl Institute, in which the only full members are defendants Formosa USA, Shintech, and Westlake, as well as Oxy's subsidiary OxyVinyls, coincided with the price increase announcements in November 2015, September 2016, and November 2017, and additionally that the price increase announcements made by Defendants in November 2017 were done via private contact. (*Id.* at ¶¶ 57-59, 65, 93). In other words, Plaintiffs do not just allege that Defendants' membership in trade associations *could* have been a means for them to make an agreement; they allege facts sufficient to infer that Defendants *did* use trade association meetings to make an agreement. (*See id.* at ¶ 92 ("Defendants have been increasing U.S. prices during most of the months in which

each of [The Chlorine Institute's] meetings occurred.")); *see also In re Propranolol*, 249 F. Supp. 3d at 722-23 (finding trade association meetings contributed to conspiracy claim because plaintiffs "have alleged far more than the 'mere opportunity to conspire,' and so have shown a high level of interfirm communications"). Moreover, Plaintiffs' trade association allegations are just one among several "plus factors" that the Court has considered to evaluate the plausibility of the conspiracy as pleaded in the Amended Complaint as a whole.

### 4. Producer Supply Agreements

The Amended Complaint alleges that the relationship between Defendants was fostered by confidential swap and sales agreements. (Dkt. 51 at ¶¶ 94, 122). Defendants contend these allegations are conclusory and should not be credited at the motion to dismiss stage, and at most amount to opportunities to conspire not sufficient to give rise to a plausible inference of an anticompetitive agreement. (Dkt. 79-1 at 27-28). The Court recognizes that Plaintiffs' allegations about swap and sale agreements in general would not be sufficient in the absence of other "plus factors." *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement[.]"); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("An allegation that Joint Defendants had the opportunity to interact and make an agreement does not nudge [Named Plaintiffs' claims across the line from conceivable to plausible[.]" (quotation and alterations omitted)). Accordingly, on their own, the swap and sale agreement allegations do not influence the result here.

### 5. Public Investor Statements

Defendants argue the public statements that they allegedly made lack the characteristics necessary to support a conspiracy claim. (Dkt. 79-1 at 28-32). Defendants assert that the following types of public statements may be considered: statements that reflect a back and forth dialogue leading to an agreed-upon position or an exchange of assurances preceding the conduct at issue; statements with a level of specificity regarding Defendants' planned conduct as opposed to general statements regarding industry conditions; and statements that lack a public purpose. (*Id.* at 29). The Court finds that Plaintiffs' allegations address specific statements by Defendants about planned conduct, as well as statements that allegedly lack a public purpose.

Plaintiffs allege Olin announced on November 2, 2015, that it would idle between 250,000 and 450,000 tons of caustic soda capacity (Dkt. 51 at ¶ 48), and later in November, an industry consultant publicly reported Olin was leading a new industry price increase (*id.* at ¶ 57). These statements, particularly the first statement, allege with specificity future actions Olin planned on taking, and Plaintiffs use the statements to support the inference that Defendants used the production cuts as a pretext to raise prices. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) ("Plaintiffs do not allege mere price announcements; they allege that each Defendant signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert.").

Defendants argue the public statements included in Plaintiffs' allegations reflect limited knowledge of other Defendants' plans, referring specifically to Olin's statement

that no capacity additions were expected within the next two to three years, even though Shintech by that time had planned a capacity expansion without announcing it. (Dkt. 79-1 at 30). However, as previously discussed, coordination with respect to supply cuts is not the key parallel conduct for the alleged conspiracy, the price increase announcements are; and Shintech's planned expansion could contribute to Plaintiffs' conspiracy allegations in that it adds to the alleged illusion that there was an oversupply of caustic soda.

Defendants also argue that the statement by Axiall's CEO telling analysts that caustic soda markets were oversupplied and that he "openly hoped that Olin would cut production once the proposed acquisition [of Dow's choralkali business] was completed" (*id.* at ¶ 47 (alteration in original)), does not support the conspiracy allegations in the Amended Complaint. (Dkt. 79-1 at 31-32). They contend Plaintiffs cite to an article written about a phone call with Axiall's CEO, not the transcript of the call itself. (*Id.* at 31). However, the Court cannot consider the transcript at this stage of the litigation— Defendants provide no explanation as to how Plaintiffs would have had a copy of that transcript to rely on when drafting the Amended Compliant in lieu of a publicly available article. Defendants further argue that Plaintiffs do not and could not allege that Olin made supply restriction decisions in response to the statement by Axiall's CEO because Olin was already evaluating the closure of some of its capacity after its acquisition of Dow's business. (*Id.*). However, the statement by the CEO of Axiall was allegedly made in August 2015, and Olin's acquisition of Dow was not completed until October 2015. (Dkt. 51 at ¶¶ 25, 47-48). In other words, even if Olin was considering production cuts right

after its Dow acquisition as Defendants contend, that would still have been after the statements by Axiall's CEO.

### 6.  Manipulation of IHS Markit

Defendants argue Plaintiffs' allegations regarding IHS Markit and the Index should not be considered because they are conclusory assertions of an agreement.  (Dkt. 79-1 at 32-34).  Plaintiffs allege that IHS Markit relies heavily on confidential input from Defendants, and that Defendants "gamed" the index to support their price increases using the loyal and friendly relationships IHS Markit's executives have with Defendants.  (Dkt. 51 at ¶¶ 95-98).  Plaintiffs further allege that "[o]ne or more IHS Markit employees left IHS Markit in approximately 2016-2017 at least in part because of the index's lack of integrity."  (*Id.* at ¶ 97).  While on their own these allegations would be insufficient to establish a conspiracy claim, Plaintiffs allege them in combination with other "plus factors," and the Court finds that although this factor in particular may be entitled to little weight, the totality of Plaintiffs' allegations make the conspiracy claim plausible.

### 7.  Chlorine By-Product

Defendants argue that in the Complaint, "Plaintiffs choose to be willfully blind to [a] fundamental aspect of the chlor-alkali process"—how much chlorine can be produced, sold, stored, or otherwise utilized.  (Dkt. 79-1 at 34-35).  Defendants cite no authority supporting that the Court can consider this argument on a motion to dismiss pursuant to Rule 12(b)(6), and, as stated several times previously in this Decision and Order, the Second Circuit has held that "at the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts

are susceptible to an equally likely interpretation." *Gelboim*, 823 F.3d at 782; *see In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) ("'[A] well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and . . . a recovery is very remote and unlikely' as long as the complaint presents *a* plausible interpretation of wrongdoing." (alterations in original) (quoting *Twombly*, 550 U.S. at 556)).

In any event, the Amended Complaint alleges that at various times throughout the Class Period, Defendants made announcements as to why the prices of caustic soda were increasing and noted, misleadingly, that the supply of caustic soda was restricted, and the allegations do not indicate that Defendants referred to chlorine production in their remarks (*see, e.g.*, Dkt. 51 at ¶¶ 52, 70, 75, 124), nor do Defendants contend that they did so. That *Defendants* did not acknowledge the market relationship between chlorine and caustic soda when discussing the price increases or supply cuts undercuts their characterization of Plaintiffs as "willfully blind to this fundamental aspect of the chlor-alkali process." (Dkt. 79-1 at 35).

### D. Westlake's Motion

Westlake separately argues the claims against it should be dismissed because Plaintiffs have failed to allege sufficient specific facts demonstrating that Westlake was involved in the conspiracy. The Court finds the allegations against Westlake are sufficient at this stage of the proceedings.

"Plaintiffs must allege a factual connection between each Defendant and the alleged conspiracy[.]" *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 316; *see Hinds County*, 620

F. Supp. 2d at 513 ("To state a claim against each Defendant, Named Plaintiffs must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." (quotation omitted)). "Group pleading, by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P.* v. *Entm't Prop. Tr.*, No. 12 Civ. 1667 (ER), 2014 WL 1396524, at \*24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). "To provide reasonable notice to defendant of the claims against it, a complaint must plausibly suggest that the individual defendant 'actually joined and participated in the conspiracy.'" *Id.* at \*23 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011)).

The Amended Complaint alleges the following as to Westlake: Westlake made a series of price increase announcements in 2017 at or around the same time as the other Defendants and in similar amounts (Dkt. 51 at ¶¶ 63-65, 69-70, 72, 74, 76); Westlake decided at the same time as Olin and OxyChem to stop announcing different price increase amounts for different grades of caustic soda (*id.* at ¶ 69); Westlake mailed letters to customers announcing a price increase when other Defendants also privately announced a price increase to their customers (*id.* at ¶ 65); Westlake's CEO told investors that Westlake did not see any cap on caustic soda prices because demand was growing but no industry capacity additions were planned and U.S. capacity was not growing (*id.* at ¶¶ 70, 100); Westlake was a member of The Chlorine Institute (*id.* at ¶ 92), the Vinyl Institute (*id.* at ¶ 93), and of AFPM, which represented that "caustic was extremely tight and pricing was moving up across the board, without exception" (*id.* at ¶ 124); and Westlake temporarily

shut down its plant for maintenance and outages throughout 2016 (*id.* at ¶¶ 48-49). These allegations, taken as true, illustrate that Westlake engaged or participated in most if not all of the conduct that makes the conspiracy plausible—Westlake made price increase announcements in similar amounts, at similar times, and with the same breakdown in grade as the other Defendants; Westlake sometimes made its announcements about price increases privately when other Defendants made announcements privately; Westlake misrepresented that the supply of caustic soda was tight; and Westlake was a member of a trade group in which the only members were other Defendants and a related affiliate, and which allegedly held three meetings during the Class Period that always coincided with price increase announcements.

Westlake argues[6] that Plaintiffs do not allege it reduced its caustic soda capacity during the Class Period, and that Plaintiffs did not include specific allegations about Westlake's operating rates, Westlake's exports, statements made by Westlake containing conflicting representations, Westlake's influence on the IHS Markit Index, or Westlake's communications with the other Defendants. (Dkt. 81-1 at 8-14). The Court is not persuaded by these arguments.

---

[6]     As for the arguments made by Westlake, Shintech, and Formosa USA that the Court already addressed in the discussion of the joint motion to dismiss (*see, e.g.*, Dkt. 81-1 at 8-14 (arguing that Plaintiffs do not allege the price increase announcements resulted in the prices actually increasing for Westlake's contracts, that Westlake was engaging in follow-the-leader pricing behavior, that Plaintiffs fail to acknowledge exporting caustic soda made "perfect business sense" during the Class Period, and that the article regarding statements made by Axiall's CEO does not reflect the transcript of the phone call itself)), the Court will not repeat its discussion of those arguments in its discussion of the individual motions.

As discussed above, Plaintiffs' conspiracy does not rely on all Defendants having cut production but on Defendants announcing similar price increases and misrepresenting that those price increases were a result of reduced supply in general. The absence of allegations regarding Westlake's caustic soda capacity, operating rates, and exports does not render Westlake's alleged involvement in the conspiracy merely conceivable as opposed to plausible because the Amended Complaint alleges other Defendants, such as Olin and OxyChem, cut their production capacity (Dkt. 51 at ¶ 48), giving Westlake a scapegoat for the "supply restrictions." Additionally, Axiall, which Westlake later acquired, allegedly cut production capacity (*id.*), and Westlake temporarily shut down its plants for maintenance (*id.* at ¶ 49), creating more excuses to increase prices even though the supply of caustic soda was allegedly still in surplus. Moreover, the Amended Complaint contends that Westlake's statements are misrepresentations, not just statements about industry conditions, which undercuts Westlake's argument that "generic statements . . . do not make allegations of a conspiracy more plausible." (Dkt. 81-1 at 13 (quotation omitted)). The cases cited by Westlake finding generic statements to be insufficient to state a claim do not address situations where the statements are pretextual, *see Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1276 (N.D. Ga. 2002); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011), and as discussed above, courts have found pretextual statements to be a viable plus factor, *DeLong Equip. Co.*, 887 F.2d at 1514; *Dimidowich*, 803 F.2d at 1480; *Dill*, 760 F.2d at 474.

As far as Plaintiffs' allegations regarding IHS Markit and co-producer agreements, *no* Defendant was singled out as having personally influenced the IHS Markit (*id.* at ¶¶ 95-98) or having provided supply assistance to other producers (*id.* at ¶¶ 87-94). As previously discussed, the Court does not accord the IHS Markit or co-producer allegations much weight as plus factors for any Defendant due to their general nature, but instead finds the other alleged plus factors push the conspiracy from the realm of conceivability to plausibility.

Moreover, the allegations regarding Westlake's communications with other Defendants, combined with the other plus factors, are sufficient to plausibly allege that Westlake was involved in a price-fixing conspiracy. Although Plaintiffs do not identify specific communications by Westlake in their allegations, that is not necessary at this stage of the litigation. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017 WL 3600425, at *10 (S.D.N.Y. Aug. 18, 2017) ("It is true that plaintiffs have failed to identify any specific interbank communications between or among defendants regarding the alleged manipulation. However, plaintiffs need not allege this type of 'smoking gun' evidence to survive a motion to dismiss."). Westlake argues that its membership in industry organizations alone does not plausibly suggest a conspiracy. However, as previously discussed, Plaintiffs' allegations do not merely allege Westlake's membership in trade associations, but tie the timing of the trade association meetings with the announcement of price increases by Defendants, including Westlake. Additionally, Westlake is a member of the Vinyl Institute, in which the only other members are defendants Formosa USA and Shintech, as well as Oxy subsidiary OxyVinyls, and which

allegedly held three meetings during the Class Period that always coincided with price increase announcements. In particular, the Amended Complaint alleges that the Vinyl Institute met in November 2017, the same month Westlake and the other Defendants allegedly issued price increase announcements to customers privately. (Dkt. 51 at ¶¶ 65, 93).

The Court does not find Westlake's citation to *Gelboim*, 823 F.3d 759, to be dispositive. In *Gelboim*, the Second Circuit found allegations based on emails from a defendant that it had advance knowledge of the other defendants' confidential individual communications sufficiently demonstrated a high level of interfirm communications sufficient to make a conspiracy plausible, specifically noting that "[c]lose cases abound on this issue, but this is not one of them." *Id.* at 781-82. While the instant matter may present a closer case than that in *Gelboim* due to the absence of a "smoking gun" showing interfirm communications, like an email from Westlake to the other Defendants, the Amended Complaint's allegations that Westlake privately announced unprecedented similar price increases to those of the private announcements of other Defendants after attending trade association meetings with those Defendants are still sufficient to make Plaintiffs' conspiracy allegations plausible, particularly in light of the other "plus factors" presented by the Amended Complaint.

Accordingly, the Court denies Westlake's motion to dismiss.

### E.     Motions by Formosa USA and Shintech

Formosa USA and Shintech each separately also contend that Plaintiffs have failed to allege sufficient facts to personally implicate them in the conspiracy. (Dkt. 82-1; Dkt. 84-1). The Amended Complaint contains the following allegations specific to Formosa USA: Formosa USA made a series of price increase announcements at or around the same time as the other Defendants and in similar amounts (Dkt. 51 at ¶¶ 58-59, 63, 65, 69-70, 72, 74); Formosa USA mailed price increase letters to customers at or around the same time as other Defendants were privately contacting their customers about price increase announcements (*id.* at ¶¶ 65, 72); Formosa USA's sales and net income increased significantly from 2015 to 2017 (*id.* at ¶ 83); Formosa USA is a member of AFPM, The Chlorine Institute, and the Vinyl Institute, whose meetings coincided with price increase announcements (*id.* at ¶¶ 91-93, 124); Formosa USA temporarily shut down its plants for maintenance and outages throughout 2016 (*id.* at ¶¶ 48-49); and when Formosa USA's capacity at some facilities was temporarily idled by Hurricane Harvey, Formosa USA's caustic soda supply was assisted by other producers believed to be other Defendants (*id.* at ¶ 94).

The Amended Complaint contains the following allegations specific to Shintech: Shintech made a series of price increase announcements at or around the same time as the other Defendants and in similar amounts (*id.* at ¶¶ 58-59, 63-65, 69-70, 72, 74); Shintech mailed price increase letters to customers at or around the same time as other Defendants were privately contacting their customers about price increase announcements (*id.* at ¶¶ 65, 72); Shintech's profits increased in fiscal year 2017 despite the decline of its sales from

2016 to 2017 (*id.* at ¶ 84); Shintech is a member of the Vinyl Institute, whose meetings coincided with price increase announcements, which sometimes were private price increase announcements (*id.* at ¶¶ 91-93, 124); and Shintech announced in July 2018 that it is developing a new production facility (*id.* at ¶ 49).

The Court finds that Plaintiffs' allegations plausibly implicate Formosa USA and Shintech as part of the conspiracy. Like the allegations against Westlake, Plaintiffs allege that the price increases announced by Formosa USA and Shintech were similar to the price increase announcements made by the other Defendants. The Amended Complaint also alleges that on at least one occasion, Formosa USA and Shintech privately announced similar price increases to those of the private announcements made by other Defendants, and that at least one private announcement was made after a meeting of the Vinyl Institute, in which only Formosa USA, Shintech, Westlake, and Oxy subsidiary OxyVinyls are members. As previously discussed, the timing of the trade association meeting combined with the close timing and private means of communicating the price announcements make Plaintiffs' allegations more than an "averment of [an] agreement made at some unidentified place and time." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *see Precision Assocs., Inc.*, 2013 WL 6481195, at *33 ("[P]articipation in a trade association, where 'Defendants had opportunities to exchange information or make agreements,' coupled with allegations of parallel conduct (*i.e.*, imposing the same inflated surcharges), are sufficient to tie these defendants to the conspiracies." (citation omitted)). Additionally, the plant shutdowns by Formosa USA and the announcement by Shintech that it planned

on building another facility to increase production capacity contribute to the alleged illusion that supply of caustic soda was scarce.

That the Amended Complaint does not specifically allege that Formosa USA and Shintech made misrepresentations is not dispositive; the allegations discussed above are sufficient to plausibly allege that Formosa USA and Shintech knew about the conspiracy and participated in it. *See Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 285 ("Not every member of a conspiracy needs to issue the same threats for the conspiracy to exist. Plaintiffs have adequately pleaded that these Defendants' failures to invest in or support new market entrants was part of a conspiracy to reduce competition in the market."); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *9 (S.D.N.Y. June 5, 2014) ("Through its participation in an illegal conspiracy to fix the prices of e-books Apple violated . . . the Sherman Act[.]").

### F.    Oxy's Motion

In a separate motion to dismiss, Oxy, the parent corporation of OxyChem, contends the claims against it should be dismissed with prejudice because Plaintiffs have not sufficiently alleged that Oxy personally participated in the conspiracy, that the corporate veil was pierced, or that OxyChem was acting as the agent of Oxy. (Dkt. 80-1). For the following reasons, the Court dismisses the claims against Oxy, but without prejudice.

The Court finds the Amended Complaint does not adequately allege that Oxy personally participated in the conspiracy. Plaintiffs allege that Oxy was a member of the Chlorine Institute, had increased earnings during the Class Period, and entered into secret co-producer supply agreements with Olin. (*See* Dkt. 91 at 55). However, these allegations

do not plausibly allege that Oxy participated in the conspiracy—they do not suggest that Oxy helped execute the conspiracy by manipulating prices or supply because Oxy itself does not manufacture, sell, or distribute caustic soda.  (Dkt. 51 at ¶ 29).  Unlike the allegations of price hikes, misrepresentations, and communications against other Defendants, the only allegations against Oxy are general claims without specific facts as to how Oxy specifically contributed to the conspiracy.  *See Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) ("[I]n the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary.").

Additionally, Plaintiffs have failed to adequately allege that the corporate veil should be pierced.  "As a general matter . . ., a corporate relationship alone is not sufficient to bind a parent corporation for the actions of its subsidiary." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (alteration and quotation omitted); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (quotation omitted)).  "But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes[.]" *Id.* at 62.

"Under New York choice-of-law principles, the issue of whether the corporate veil may be pierced is determined under the law of the state of incorporation." *In re Digital*

*Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011). Because Oxy's

subsidiary OxyChem is alleged to be a New York corporation, New York law applies.[7] In

New York, "piercing the corporate veil requires a showing that: (1) the owners exercised

complete domination of the corporation in respect to the transaction attacked; and (2) that

such domination was used to commit a fraud or wrong against the plaintiff which resulted

in plaintiff's injury." *Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141

(1993).

The Second Circuit has identified the following factors as useful for determining

whether one company has dominated another under New York law:

> (1) the absence of the formalities and paraphernalia that are part and parcel
> of the corporate existence, *i.e.*, issuance of stock, election of directors,
> keeping of corporate records and the like, (2) inadequate capitalization, (3)
> whether funds are put in and taken out of the corporation for personal rather
> than corporate purposes, (4) overlap in ownership, officers, directors, and
> personnel, (5) common office space, address and telephone numbers of
> corporate entities, (6) the amount of business discretion displayed by the

---

[7] The parties dispute whether New York's choice-of-law rule applies the veil-piercing standard from the state of incorporation of the subsidiary or the parent corporation. (Dkt. 91 at 56; Dkt. 94 at 9). Courts have found that New York's choice-of-law rule applies the law of the subsidiary's state of incorporation. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("Because [subsidiary] was a Delaware corporation, Delaware law determines whether the corporate veil can be pierced in this instance."); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013) ("CPS, the subsidiary, is a Delaware-based corporation, and Cummins, the parent, is an Indiana-based corporation. Because Plaintiff seeks to disregard the subsidiary's (CPS's) corporate form and hold the parent (Cummins) liable, Delaware law governs Plaintiff's veil-piercing attack."). The case cited by Plaintiffs is not dispositive—the court did not reach the issue of which state's law governs because it determined that the corporate veil was not pierced under either New York or Delaware law. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011) ("In determining whether to pierce the corporate veil in either state, courts consider allegations of disregarding corporate formalities, siphoning or intermingling of funds, inadequate capitalization, or that the corporation is a mere sham acting for the shareholder, among others.").

allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). "[T]he corporation's separate identity is generally respected, and the proponent of disregarding a corporation's separate identity bears a heavy burden." *In re Digital Music*, 812 F. Supp. 2d at 418 (citing *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998) ("Those seeking to pierce a corporate veil of course bear a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences.")).

In the instant matter, the only factual allegations Plaintiffs make regarding Oxy's "domination" over OxyChem are that "Oxy manufactures, sells, and distributes Caustic Soda through its wholly-owned and controlled subsidiary and chemicals business, defendant Occidental Chemical Corporation" (Dkt. 51 at ¶ 28), and that "OxyChem is a wholly-owned subsidiary of defendant Oxy" that "manufactures, sells, and distributes Caustic Soda to customers throughout the United States" (*id.* at ¶ 29). These allegations are insufficient to allege a basis to pierce the corporate veil. *See In re Digital Music*, 812 F. Supp. 2d at 419 ("It is clear that simply owning, even wholly owning, a subsidiary is insufficient to pierce the corporate veil."); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 87 (S.D.N.Y. 2010) ("[C]ourts routinely refuse to pierce the corporate veil based on

allegations limited to the existence of shared office space or overlapping management, allegations that one company is the wholly-owned subsidiary of another, or that companies are to be considered as a whole." (quotation omitted)).

Plaintiffs contend the allegations that Oxy "proudly noted in a February 2017 investor presentation that 'Caustic soda prices [had] reversed their multi-year trend of steady decline in mid-2016,'" and Oxy's increased profits demonstrate domination. (Dkt. 91 at 57-58; *see* Dkt. 51 at ¶ 61). The Court disagrees. Announcements made to the general public regarding increased profits due to present market conditions on their own are insufficient to infer direction of a subsidiary by a parent. *See Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) ("[I]n determining whether 'complete control' exists, we have considered such factors as . . . whether the corporations are treated as independent profit centers. . . . No one factor is decisive."); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 110 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1375 (2019) ("These statements are as consistent with legitimate assessment of industry conditions . . . as with an illegal antitrust conspiracy[.]").

Plaintiffs also argue they sufficiently allege that OxyChem acted as the agent of Oxy. (Dkt. 91 at 59-63). "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (quotations and citation omitted); *Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47, 58 (2d Dep't 2013). "Essential to the agency relationship is the notion that the agent acts subject to the principal's direction

and control." *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 301 (S.D.N.Y. 2005); *see Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146 (2d Dep't 1993) ("The agent is a party who acts on behalf of the principal with the latter's express, implied, or apparent authority."). "A *full showing* of agency supported by an accepted theory of agency or contract law is required, and generalized allegations of affiliation are insufficient." *Masefield AG v. Colonial Oil Indus., Inc.*, No. 05 Civ 2231 (PKL), 2005 WL 911770, at *5 (S.D.N.Y. Apr. 18, 2005) (emphasis added). "Anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 780 (2d Cir. 1995).

As discussed above, Plaintiffs have failed to adequately allege OxyChem was subject to the direction or control of Oxy. *See, e.g.*, *Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 14-CV-01568 JPO, 2015 WL 5091170, at *6 (S.D.N.Y. Aug. 28, 2015) ("Cortlandt's allegation that DBSI is a wholly owned subsidiary is insufficient to show that DBSI does all the business DBAG could do."). In addition to the allegations discussed in the veil-piercing section, Plaintiffs rely on their allegation that "[t]he anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, which actively engaged in the management, direction, or control of Defendants' businesses or affairs." (Dkt. 91 at 61). This generalized and conclusory allegation is not sufficient to plausibly allege an agency relationship so as to withstand a motion to dismiss. *See Alco Int'l, E.C. v. Merrill Lynch*

& *Co.*, 98 F. App'x 44, 46-47 (2d Cir. 2004) ("[C]onclusory allegations of a general agency relationship between a signatory and non-signatory do not suffice to compel . . . unwilling non-signatories to arbitrate under that theory." (citing *Merrill Lynch*, 337 F.3d at 130-31)).

Accordingly, the Court finds it appropriate to dismiss the claims as to Oxy; however, the Court also finds it is conceivable that Plaintiffs could obtain the facts necessary through discovery to allege a claim against Oxy under a veil-piercing or agency theory. *See Parfitt Way Mgmt. Corp. v. GSM by Nomad, LLC*, No. 817CV0299GTSCFH, 2018 WL 3118264, at *9 (N.D.N.Y. June 25, 2018) ("[B]ecause it is conceivable to the Court that Plaintiff already possesses (or can obtain through discovery) the facts necessary to allege grounds to pierce the corporate veil, the Court will dismiss Plaintiff's Third Claim only without prejudice."). One of Oxy's subsidiaries, OxyVinyl, was a member of the Vinyl Institute, in which the only other members are Westlake, Formosa USA, and Shintech, and the meetings of which corresponded to three price increase announcements by Westlake, Formosa USA, Shintech, and OxyChem. Additionally, Oxy allegedly acknowledged that "Caustic soda prices [had] reversed their multi-year trend of steady decline in mid-2016" (Dkt. 51 at ¶ 61) and Oxy's increased profits (Dkt. 91 at 57-58). Although these allegations do not sufficiently establish Oxy's involvement in the alleged conspiracy to withstand a motion to dismiss, the Court is not prepared to conclude that discovery could not reveal information that would allow Plaintiffs to successfully implicate Oxy in a conspiracy. Accordingly, the dismissal of the claims against Oxy is without prejudice.

## II. Motions to Dismiss for Lack of Personal Jurisdiction

Formosa and Shin-Etsu, foreign parent corporations to Formosa USA and Shintech, respectively, both move to dismiss the allegations against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. (Dkt. 86; Dkt. 103). The Court addresses each motion in turn.

### A. Legal Standard

"On a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, [the] plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). "A plaintiff may meet this burden 'by pleading in good faith . . . legally sufficient allegations of jurisdiction, *i.e.*, by making a 'prima facie showing' of jurisdiction.'" *Gaymar Indus., Inc. v. FirstMerit Bank, N.A.*, No. 06-CV-70S, 2007 WL 894217, at *3 (W.D.N.Y. Mar. 21, 2007) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998)). "A plaintiff can make such a prima facie showing through affidavits and supporting material containing sufficient facts which, if credited, would establish personal jurisdiction over the defendant." *Id.* (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

"The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. . . . It represents a restriction on judicial power not as a

matter of sovereignty, but as a matter of individual liberty." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). "Federal courts must satisfy three requirements in order to exercise personal jurisdiction over an entity: (1) the entity must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process." *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2018 WL 4830087, at *6 (S.D.N.Y. Oct. 4, 2018).

"Due process permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not 'offend traditional notions of fair play and substantial justice.'" *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted)). To determine whether exercising personal jurisdiction comports with due process, "we ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction." *Id.* "The constitutional minimum contacts inquiry for personal jurisdiction requires us to distinguish between two forms of jurisdiction." *Id.* "Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state. General jurisdiction, in contrast, permits a court to adjudicate any cause of action against the . . . defendant, wherever arising, and whoever the plaintiff." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016). "If the defendant has sufficient minimum contacts, we proceed to the second stage of the due process inquiry, and consider whether the assertion of personal jurisdiction is

reasonable under the circumstances of the particular case." *Porina*, 521 F.3d at 127 (quotation omitted).

## B. Formosa

Formosa is a Taiwanese company that moves to dismiss Plaintiffs' Amended Complaint for lack of personal jurisdiction. (Dkt. 86). The parties do not dispute that service was properly effectuated, and Plaintiffs concede that the Court does not have general jurisdiction over their claims. Thus, the disputes before the Court are whether there is a statutory basis for personal jurisdiction and whether the Court's exercise of personal jurisdiction would comport with due process. Plaintiffs contend there are two statutes that render its service of process effective: (1) Section 12 of the Clayton Act, 15 U.S.C. § 22, and (2) Federal Rule of Civil Procedure 4(k)(2).

### 1. Clayton Act

Plaintiffs contend that § 12 of the Clayton Act provides a statutory basis for jurisdiction. (Dkt. 93 at 20). "The Clayton Act provides for nationwide service of process of a corporation for any action under the antitrust laws." *FrontPoint*, 2018 WL 4830087, at *6; *see* 15 U.S.C. § 22. However, the "service of process provision can properly confer personal jurisdiction over a defendant only when the action is brought in the district where the defendant resides, is found, or transacts business, that is, the district where Section 12 venue lies." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 427 (2d Cir. 2005) (quotation omitted). In the instant matter, Plaintiffs do not dispute that Formosa does not reside or transact business in the Western District of New York. (Dkt. 93 at 19). Accordingly, Section 12 does not provide a basis for personal jurisdiction over Formosa.

Plaintiffs argue the relevant geographic area for assessing minimum contacts under § 12 of the Clayton Act is the United States, not New York. (Dkt. 93 at 20); *see FrontPoint*, 2018 WL 4830087, at *6 ("Where a civil action arises under a federal law that provides for nationwide service of process, the relevant geographic area for assessing minimum contacts is the United States as a whole, not just New York."); *In re Magnetic Audiotape*, 334 F.3d at 207-08 (overruling dismissal of defendant where district court denied motion for limited discovery regarding whether defendant had "sufficient minimum contacts with the United States to satisfy due process"). However, the cases Plaintiffs cite speak to the third part of the personal jurisdiction analysis—whether exercising personal jurisdiction under § 12 would comport with constitutional due process—not whether there is a statutory basis for jurisdiction, and Second Circuit precedent clearly establishes that the Clayton Act only confers personal jurisdiction over a defendant when the action is brought in the district where the defendant resides, is found, or transacts business. *Daniel*, 428 F.3d at 427.

### 2. Federal Rule of Civil Procedure 4(k)(2)

Rule 4(k)(2) provides that for claims arising under federal law, "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). "Rule 4(k)(2) . . . allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state's courts of general jurisdiction; and (3) the exercise of jurisdiction must be consistent with the United States

Constitution and laws." *Porina*, 521 F.3d at 127 (quotations omitted). "Rule 4(k)(2) was specifically designed to 'correct[ ] a gap' in the enforcement of federal law in international cases. The gap arose from the general rule that a federal district court's personal jurisdiction extends only as far as that of a state court in the state where the federal court sits." *Porina*, 521 F.3d at 126 (citation omitted) (quoting Fed. R. Civ. P. 4 advisory committee's note, 1993 Amendments).

It is undisputed that Plaintiffs' claims arise under federal law: Sherman Act § 1. Accordingly, the Court addresses whether Plaintiffs have shown that Formosa is not subject to jurisdiction in any state's courts of general jurisdiction, and whether the Court's exercise of jurisdiction is consistent with the Constitution.

### a.   <u>"Subject to Jurisdiction"</u>

There is some question as to whether Plaintiffs have met their burden of establishing that Formosa is not subject to jurisdiction in any state's courts of general jurisdiction. "In this Circuit, plaintiffs need to certify that the foreign defendants are not subject to jurisdiction in any other state to meet the second requirement of Fed. R. Civ. P. 4(k)(2)." *In re SSA Bonds Antitrust Litig.*, __ F. Supp. 3d __, No. 16 CIV. 3711 (ER), 2019 WL 4917608, at *12 (S.D.N.Y. Oct. 4, 2019). At oral argument, counsel for Plaintiffs argued that the Supreme Court's holding in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), moots the certification's necessity. (Dkt. 117 at 83-85). In *Daimler*, the Supreme Court found it was improper for a California court to assert general personal jurisdiction over a German corporation after determining that the German corporation's "slim contacts" with California did not render it at home in the state. *Id.* at 136-37. In *Daimler*'s wake, Plaintiffs

have not alleged here that Formosa is at home in any U.S. state, but instead allege Formosa is at home in Taiwan. (Dkt. 51 at ¶ 34). Plaintiffs argue that no U.S. state can assert general jurisdiction over Formosa because Formosa is not at home in any U.S. state, and as a result requiring Plaintiffs to submit a certification would be superfluous.

The Court is not persuaded by Plaintiffs' argument. Plaintiffs cite no case law to support their contentions, and the Court notes that several courts in this Circuit have required a certification post-*Daimler*. *See In re SSA Bonds Antitrust Litig.*, 2019 WL 4917608, at *12; *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 CIV. 981 PGG, 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019). Plaintiffs' position assumes that *Daimler* eviscerated the possibility of a court finding general jurisdiction with regards to foreign parent corporations. This contention misreads *Daimler*'s holding. While *Daimler* significantly limited the factual scenarios where general jurisdiction could be asserted over a foreign parent corporation, it did not eliminate the possibility. 571 U.S. at 138-39 (holding that to assert general jurisdiction over a foreign corporation, it must be found that the "corporation's affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." (alteration in original) (quotations omitted)).

Stated differently, if a state court could find that Formosa had affiliations with the forum state that were so continuous and systematic that it was rendered essentially at home in the state, Rule 4(k)(2) would not apply. That Plaintiffs allege Formosa is at home in Taiwan does not mean that Formosa is not at home in any state; the certification requires Plaintiffs to go a step further and state that, to the best of their knowledge, Formosa would

not be subject to suit in courts of general jurisdiction of any state. Moreover, the certification requirement is a blanket requirement that is not applied on a case-by-case basis, and the Court agrees with other courts in this Circuit that not requiring a certification "would encourage similarly-situated plaintiffs—those suing foreign corporations under federal law—to omit any allegations tying defendants to a specific state, in hopes of engaging the broader minimum contacts analysis of Rule 4(k)(2), which only requires contacts with the United States as a whole." *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 CIV. 981 PGG, 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019).

However, as discussed below, the Court finds it appropriate to allow for limited jurisdictional discovery to establish whether Formosa had sufficient minimum contacts with the United States. Accordingly, the Court will give Plaintiffs an opportunity to submit a certification before jurisdictional discovery commences.

**b.** **"Consistent with the United States Constitution and Laws"**

At this stage, Plaintiffs have not met their burden of establishing that the Court's exercise of personal jurisdiction would comport with the requirements of the Constitution.[8] "Due process permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not 'offend traditional notions of fair play and substantial justice.'" *Porina*, 521 F.3d at 127 (quoting *Int'l Shoe Co.*, 326 U.S. at 316 (internal

---

[8] This requirement under Rule 4(k)(2) that the exercise of jurisdiction be consistent with the United States Constitution and laws, necessarily overlaps with the requirement that a Court may only exercise personal jurisdiction if it comports with constitutional due process.

quotation omitted)).  As previously discussed, courts in this Circuit apply a two-step analysis when determining whether a court's exercise of personal jurisdiction comports with due process:

> First, we ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction. . . .  If the defendant has sufficient minimum contacts, we proceed to the second stage of the due process inquiry, and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case.

*Id.* (citations and quotation omitted).

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (quotation and original alteration omitted).  The parties do not dispute that Plaintiffs must establish minimum contacts with the United States as whole, not New York in particular.  *See Dardana Ltd. v. Yugraskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) ("Under [Rule 4(k)(2)], a defendant sued under federal law may be subject to jurisdiction based on its contacts with the United States as a whole[.]"); *S.E.C. v. Softpoint, Inc.*, No. 95 CIV. 2951 GEL, 2001 WL 43611, at *3 (S.D.N.Y. Jan. 18, 2001) ("[W]here, as here, the United States, and not the State of New York, is the only sovereign whose power to adjudicate is in question, it logically follows that the relevant 'minimum contacts' . . . should be the defendant's contacts with the United States, and not his contacts with the State of New York.").

Plaintiffs argue that their allegations as to Formosa's direct participation in the conspiracy are sufficient to establish specific jurisdiction.  However, Plaintiffs' allegations

against Formosa are general and conclusory. Plaintiffs do not allege specifics as to how Formosa assisted with either raising prices or contributing to the appearance of a constrained supply, but instead allege that Formosa was a member of various trade organizations and that its profits increased as a result of the pricing increases. (Dkt. 51 at ¶¶ 34, 124). These general allegations do not establish contacts sufficient for specific jurisdiction. *See In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 435 (S.D.N.Y. 2009) ("Periodic appearances at trade shows or investors' conferences do not constitute continuous and systematic business contacts necessary to establish general jurisdiction."); *see also In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

Plaintiffs also submit an affidavit and data from a third-party website suggesting that Formosa exported caustic soda to the United States to three different customers during the class period.[9] (*See* Dkt. 93-7). "Single acts of commercial activity, when forming the basis of a plaintiff's claims, can satisfy the constitutional requirements of Due Process." *FrontPoint*, 2018 WL 4830087, at *7 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010)). Defendants contend that the information is hearsay and

---

[9]     In its reply, Formosa provided documentation illustrating that those shipments were caustic soda that Formosa USA purchased from Formosa and then subsequently sold to Formosa USA's customers, and that Formosa shipped the caustic soda to those customers at Formosa USA's behest. (Dkt. 101-2 at ¶¶ 4-9; Dkt. 101-3; Dkt. 101-4; Dkt. 101-5). However, prior to an evidentiary hearing or trial, "where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc.*, 989 F.2d at 79-80.

should not be considered by the Court for purposes of this motion, and that even if the Court did consider the documents, Formosa's export of caustic soda is "diametrically opposed to one of the central theories of Plaintiffs' case," and as a result such allegations are not "suit-related" and cannot support specific jurisdiction over Formosa. (Dkt. 101 at 8). "While it is proper for a court to rely on affidavits to establish jurisdictional facts, hearsay evidence submitted by a plaintiff is not sufficient to defeat a motion to dismiss for lack of personal jurisdiction." *Gosain v. State Bank of India*, 689 F. Supp. 2d 571, 582 (S.D.N.Y. 2010), *vacated in part on other grounds*, 414 F. App'x 311 (2d Cir. 2011); *see also J.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004) ("We may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on conclusory or hearsay statements contained in the affidavits."). The Court agrees that the documents from the third-party website submitted by Plaintiffs are inadmissible hearsay, and does not consider them for purposes of the personal jurisdiction analysis. *See DeLorenzo v. Ricketts & Assocs., Ltd.*, No. 15-CV-2506 (VSB), 2017 WL 4277177, at *7 n.13 (S.D.N.Y. Sept. 25, 2017) ("Plaintiff may not rely on a LinkedIn profile to establish jurisdiction, as such an online profile is hearsay and does not qualify as admissible evidence."), *aff'd sub nom. DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018).[10]

---

[10]     Plaintiffs also to refer to "over thirty U.S. patents" held by Formosa and Formosa USA. (Dkt. 93 at 15). However, holding patents is insufficient to establish specific jurisdiction because the allegations in the Amended Complaint bear no relation to patents. *See Am. Wave Machs., Inc. v. Surf Lagoons, Inc.*, No. 13-cv-3204-CAB (NLS), 2014 WL 10475281, at *8 (S.D. Cal. Nov. 12, 2014) ("[A]lthough the patent does constitute

Plaintiffs further argue they have established minimum contacts by demonstrating that Formosa USA was an agent of Formosa. "For purposes of alleging presence within the judicial district sufficient to satisfy the Due Process Clause, a parent-subsidiary relationship does not itself create jurisdiction over the person unless the subsidiary is the alter ego of the parent or a mere agent acting at the parent's directions." *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 489 (S.D.N.Y. 2011) (quotation omitted), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012). "Agency is a legal concept that depends on the existence of three elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; *and* (3) the understanding of the parties that the principal is to be in control of the undertaking." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (quotations omitted). Although *Daimler* prevents Plaintiffs from asserting an agency relationship as the basis for general jurisdiction over Formosa, the Supreme Court also recognized that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction." 571 U.S. at 135 n.13. "As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Id.*

The parties do not raise the issue of what body of agency law should apply when the minimum contacts analysis pertains to the United States as a whole and not just New York, but instead base their arguments on New York agency law. "As 'there is no discernable difference between federal common law principles of agency and New York

---

purposeful direction of activities at the United States, AWM's infringement claims do not arise out of or relate to the Klimaschewski/ATV patent.").

agency law,'" the Court need not address whether the application of New York law is inappropriate here. *Young-Wolff v. John Wiley & Sons, Inc.*, No. 12-CV-5230 (JPO), 2016 WL 154115, at *6 n.5 (S.D.N.Y. Jan. 12, 2016) (quoting *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 122 (S.D.N.Y. 2009)); *see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) ("[W]here we have found personal jurisdiction based on an agent's contacts, we have never suggested that due process requires something more than New York law."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 687 (S.D.N.Y. 2006) ("The plaintiffs seek to apply New York or federal common law principles of agency law, observing that they are identical."), *judgment entered sub nom. Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 CIV.9882(DLC), 2006 WL 3469542 (S.D.N.Y. Dec. 1, 2006), and *aff'd*, 582 F.3d 244 (2d Cir. 2009); *see also Int'l Bus. Mach. Corp., v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict.").

"A parent corporation may be sued in [the venue] when the relationship between the foreign parent and the local subsidiary validly suggests the existence of an agency relationship or the parent controls the subsidiary so completely that the subsidiary may be said to be simply a department of the parent." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996). "[T]here is jurisdiction over a principal based on the acts of an agent where the alleged agent acted in [the venue] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab*, 883 F.3d at 85 (quotation omitted). "A plaintiff attempting to establish personal

jurisdiction over a defendant who has never been present in the [venue] and only acted through subsidiaries or agents need only show that the subsidiary 'engaged in purposeful activities in this [venue],' that those activities were 'for the benefit of and with the knowledge and consent of' the defendant, and that the defendant 'exercised some control over' the subsidiary in the matter that is the subject of the lawsuit." *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Plaintiffs allege that Formosa USA's ownership is shared among Formosa and members of the Wang family (Dkt. 51 at ¶ 34), and that Formosa treats Formosa USA's Livingston, New Jersey offices as its headquarters[11] (Dkt. 93-2 at 27; Dkt. 93-3 at 3; Dkt. 93-7 at 44-49). Plaintiffs also submitted Formosa's audited financial statements which, translated, characterize Formosa as the "main sale target" for Formosa USA's raw material production. (Dkt. 93-4 at 30). Further, the Amended Complaint alleges that Formosa USA's activities increased Formosa's operating profit by 68.5% from 2016 to 2017. (Dkt. 51 at ¶ 34). Plaintiffs also contend that Formosa produces caustic soda in Asia (Dkt. 93 at 24), which counsel for Formosa confirmed at oral argument (Dkt. 117 at 49).

The allegations and supplemental materials submitted by Plaintiffs are not sufficient to demonstrate an agency relationship for purposes of specific jurisdiction because they do not sufficiently tie Formosa into the caustic soda conspiracy. "[S]pecific jurisdiction cases are limited to those involving issues deriving from, or connected with, the very controversy

---

[11] Formosa contests the characterization of the New Jersey offices as its headquarters. (Dkt. 101 at 11 n.10).

that establishes jurisdiction." *In re Hoosick Falls PFOA Cases*, __ F. Supp. 3d __, No. 1:19-CV-215, 2020 WL 33409, at *5 (N.D.N.Y. Jan. 2, 2020)); *see Daimler*, 571 U.S. at 138 ("[J]urisdiction can be asserted where a corporation's in-state activities are not only continuous and systematic but also give rise to the liabilities sued on." (quotation omitted)).

Agency law does provide that "[w]here the parent is not involved in the day-to-day operations of its subsidiary, or, where the entities observe corporate formalities, the subsidiary and parent can nonetheless have an agency relationship because they are engaged in a 'common business enterprise.'" *Yousef v. Al Jazeera Media Network*, No. 16-CV-6416 (CM), 2018 WL 1665239, at *9 (S.D.N.Y. Mar. 22, 2018) (citing *Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99 Civ. 10496 (CSH), 2002 WL 14363, at *10 (S.D.N.Y. Jan. 3, 2002)). However, while the documents produced by Plaintiffs may be indicative of an agency relationship, *see Palmieri v. Estefan*, 793 F. Supp. 1182, 1194 (S.D.N.Y. 1992) ("[W]hen two corporations have common ownership and their activities are interrelated as here, they may have an agency relationship for jurisdictional purposes, even if the resident corporation is not controlled by the nonresident entity."), they are not indicative of an agency relationship specifically related to caustic soda.

Plaintiffs also point to another "indicator of agency," which "is whether the parent would be obliged to enter the market directly if the subsidiary was absent because the market is too important to the parent's welfare." *Gurvey v. Cowan, Liebowitz & Latman, PC*, No. 06CIV.1202, 2009 WL 691056, at *3-4 (S.D.N.Y. Mar. 17, 2009) (citing *Ginsberg v. Gov't Props Trust, Inc.*, No. 07 Civ. 365, 2007 WL 2981683, at *7 (S.D.N.Y. Oct. 10, 2007)); *see Dorfman*, 2002 WL 14363, at *8 ("Where a subsidiary's business is dependent

on the parent's business, or vice versa, an inference may often be drawn that the parent controls the subsidiary as it would a department.").  Again, while Plaintiffs have provided documents showing that Formosa also produces caustic soda and that Formosa USA contributed to 68.5% of Formosa's overall profits, Plaintiffs have failed to provide support for the proposition that the profits are a result of caustic soda sales and not one of the other industries in which Formosa USA participates.  Accordingly, Plaintiffs' allegations and documents do not sufficiently establish specific jurisdiction on the basis of an agency theory.

For the forgoing reasons, the Court finds Plaintiffs have not made a *prima facie* showing of personal jurisdiction as to Formosa.

## C.    <u>Shin-Etsu</u>

Shin-Etsu also moves for the Court to dismiss the claims against it for lack of personal jurisdiction.  (Dkt. 103).  Shin-Etsu is a Japanese corporation with a principal place of business in Tokyo, and U.S-based Shintech is one of its wholly-owned subsidiaries.  (Dkt. 103 at 6).  Plaintiffs argue the Court has jurisdiction over Shin-Etsu pursuant to Rule 4(k)(2),[12] and contend that they have alleged sufficient minimum contacts regarding Shin-Etsu to establish specific jurisdiction through direct contact, an alter ego theory, and an agency theory.  (Dkt. 109).  Shin-Etsu contends that Plaintiffs have failed to

---

[12]    Plaintiffs also argue the Court has jurisdiction under the Clayton Act (Dkt. 109 at 16-19), but for the same reasons that it does not provide a basis for jurisdiction over Formosa, the Clayton Act does not provide a basis to assert personal jurisdiction over Shin-Etsu.

demonstrate Shin-Etsu had sufficient minimum contacts with the United States (Dkt. 110 at 7-10).

The Court finds that Plaintiffs have sufficiently established that their claims arise under federal law.   Additionally, Plaintiffs also certify that "they are unaware of any U.S. district court where Shin-Etsu would be subject to general jurisdiction."  (Dkt. 109 at 16-17).   Accordingly, the Court must address whether Plaintiffs have alleged sufficient minimum contacts with the United States.

## 1.   <u>Direct Contact</u>

Plaintiffs point to the following as evidence of Shin-Etsu's minimum contacts with the United States: Shin-Etsu has imported millions of pounds of products to Shintech and U.S.-based customers; earned billions of dollars from sales to U.S. customers; holds thousands of U.S. patents; benefitted in the hundreds of millions of dollars from recent changes to U.S. tax laws; brought unrelated suits in federal courts; and has its proprietary information protected by a federal court's order.  (Dkt. 109 at 20).

However, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction," and "[w]hen there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1780-81 (2017).  None of these "contacts" connects Shin-Etsu to the alleged price-fixing scheme, nor do Plaintiffs argue that they do; they merely demonstrate that Shin-Etsu generally engages in business in the United States. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 931 (2011) ("[E]ven

regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales.").

Similarly, Shin-Etsu's prior federal court litigation does not provide a basis for this Court to find jurisdiction in this case. The cases Plaintiffs cite regarding prior litigation are not dispositive. *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015), was decided two years before the Supreme Court's decision in *Bristol-Myers*. Additionally, the *Gucci* court noted that the contacts had to be at least a "but-for" cause of the plaintiff's injury, *id.* at 98, which Plaintiffs have not established here. Similarly, the Ninth Circuit in *Mattel, Inc. v. Greiner and Hausser GmbH*, 354 F.3d 857 (9th Cir. 2003), found there was a "clear relationship" between the 1961 lawsuit and the "current" lawsuit because of the similarity in claims between the two lawsuits. Plaintiffs have made no such showing here regarding the prior lawsuits brought by Shin-Etsu.

Plaintiffs also argue that Shin-Etsu participated directly in the price-fixing conspiracy through manipulation of the caustic soda price index. (Dkt. 109 at 21). However, nowhere does the Amended Complaint or the opposition to the motion to dismiss point to a specific instance where Shin-Etsu announced that Shintech would be increasing prices, or any other specific acts committed by Shin-Etsu. Instead, Plaintiffs make generalizations that Shin-Etsu engaged in such behavior. These generalizations, along with the generalized allegations that Shin-Etsu engaged in co-producer transactions and exchanges of competitively sensitive information, are not sufficient to establish personal jurisdiction, and the cases cited by Plaintiffs support that more specific allegations are necessary. *See Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 339 ("[T]he Amended

Complaint alleges not merely that Defendants used EquiLend meetings as a forum to plot the conspiracy, but also that EquiLend engaged in active conduct in furtherance of the conspiracy, namely purchasing SL-x's intellectual property to shelve its enabling technology and launching DataLend to underprice and block the development of Data Explorers."); *FrontPoint*, 2018 WL 4830087, at *8 ("FrontPoint has adequately alleged "suit-related conduct" in the United States, namely the trading of SIBOR-based derivatives in the U.S. between FrontPoint and certain Panel Members."); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 597 (S.D.N.Y. 2017) ("[D]ocuments produced by JPMorgan as part of its settlement with plaintiffs now make clear that RBS colluded with a JPMorgan trader in New York to manipulate CHF LIBOR.").

### 2.  Alter Ego

Plaintiffs argue that Shin-Etsu and Shintech are alter egos so that the corporate veil was pierced.  For purposes of asserting personal jurisdiction with regards to piercing the corporate veil, the Second Circuit has yet to address whether to apply the law of the subsidiary's state of incorporation, federal common law, or the law of the forum.  *See In re Lyondell Chem. Co.*, 543 B.R. 127, 139 n.38 (S.D.N.Y. 2016) ("Some federal courts have engaged in a choice of law analysis to decide which law to apply to an alter ego theory of *jurisdiction*, usually finding that the law of the corporation's state of incorporation governs.  Other courts have disagreed, distinguishing the analysis for 'alter ego' *liability* and for 'alter ego' *jurisdiction*, and finding that because 'alter ego' jurisdiction is either a construction of the statute providing jurisdiction or is part of due process (or both), for a

*jurisdictional* veil piercing analysis, courts should apply either the law governing the interpretation of the jurisdictional statute or federal due process jurisprudence, or both." (collecting cases)). In the instant matter, Shin-Etsu's subsidiary Shintech is incorporated under the laws of Delaware (Dkt. 51 at ¶ 32), and the law of the forum is that of New York. Both New York and federal common law apply a substantially similar "relaxed" standard when assessing an alter ego theory for jurisdictional purposes as opposed to liability. *See In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391-GHW, 2017 WL 1169626, at *47 (S.D.N.Y. Mar. 28, 2017) (collecting cases holding that federal common law applies a "relaxed" standard "where the *alter ego* theory is used not to impose liability, but merely to establish jurisdiction"); *In re Lyondell Chem. Co.*, 543 B.R. at 143 ("Under New York law, '[e]stablishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability.'" (quoting *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009)). Because Plaintiffs have failed to establish the corporate veil was pierced even pursuant to this more relaxed standard utilized for jurisdictional purposes under New York and federal common law, at this time the Court need not reach the issue of whether New York, Delaware, or federal common law applies, and instead will analyze the issue using New York law.

"[U]nder New York law, a court may pierce the corporate veil where '1) the owner exercised complete domination over the corporation with respect to the transaction at issue, *and* 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (quoting

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC,* 268 F.3d 58, 63 (2d Cir. 2001)). As previously discussed, "[t]his standard is relaxed where the alter ego theory is used not to impose liability, but merely to establish jurisdiction. In the jurisdictional context, a plaintiff need only show that the allegedly controlled entity was a shell for the allegedly controlling party." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 681 (S.D.N.Y. 2016) (citation and quotations omitted).

When applying this less onerous standard, "the factors to be considered in determining whether a corporation is a 'shell' are: the failure to observe corporate formality; inadequate capitalization; intermingling of personal and corporate funds; the sharing of common office space, address and telephone numbers of the alleged dominating entity and the subject corporation; an overlap of ownership, directors, officers or personnel; the use of the corporation as a means to perpetrate the wrongful act against the plaintiff; as well as any other evidence tending to show that the company is being used as a mere shell." *Miramax Film Corp. v. Abraham*, No. 01 CV 5202 (GBD), 2003 WL 22832384, at *8 (S.D.N.Y. Nov. 25, 2003); *see In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *48 (using same factors when applying federal common law); *see also Jazini*, 148 F.3d at 184-85 ("In determining whether the subsidiary is a mere department of the parent . . . the court must consider four factors . . . first, common ownership—which is essential—; second, financial dependency of the subsidiary on the parent corporation; third, the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and fourth, the degree of control over the marketing and operational policies of the subsidiary exercised

by the parent." (quotations omitted)). "These factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative. Rather, a finding that a corporation is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax Film Corp.*, 2003 WL 22832384, at *8.

Plaintiffs have alleged and submitted documents in support of the following: (1) Shintech is a wholly-owned subsidiary of Shin-Etsu; (2) Shin-Etsu's president and board chairman are also the president and board chairmen of Shintech; (3) the president of Shin-Etsu and Shintech has been assigned to work at Shintech since 1983 and owns a home in Houston; (4) Shin-Etsu and Shintech share the same vision and mission; (5) the "Headquarters" portion of Shintech's website only refers by name to Shin-Etsu's President and Chairman; (6) Shin-Etsu's Chairman routinely highlights Shintech in his messages to shareholders in annual reports; (7) Shin-Etsu lists Shintech first among its subsidiary corporations; (8) Shin-Etsu considered whether and by how much Shintech should expand its caustic soda production capacity in the United States, and implemented the plan; (9) Shin-Etsu has exported millions of pounds of products to New York and other U.S. ports, including to Shintech and another Shin-Etsu subsidiary, Shintech Louisiana LLC; and (10) the Shintech website Headquarters page states, "When Shintech became a wholly owned subsidiary of Shin-Etsu, Chairman Kanagawa took full authority for the management of the subsidiary." (Dkt. 109 at 26-27).

Plaintiffs cannot establish that Shintech is the alter ego of Shin-Etsu by showing Shintech is wholly owned by Shin-Etsu. *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 342 F. Supp. 2d 207, 214-15 (S.D.N.Y. 2004) ("[E]ven a wholly owned

subsidiary is presumed to be a separate entity in the absence of 'clear evidence' that it is controlled by the parent."); *Cali v. E. Coast Aviation Servs., Ltd.*, 178 F. Supp. 2d 276, 287 (E.D.N.Y. 2001) ("[C]ourts have found that ownership of a subsidiary's stock is not determinative of an alter-ego relationship[.]").  In that same vein, it is not sufficient to establish one company is the alter ego of another for jurisdictional purposes by alleging that their corporate leadership overlaps.  *See Jazini*, 148 F.3d at 185 ("The Jazinis asserted that one of Nissan Japan's four 'managing executive directors' is the chairman of Nissan U.S.A..  That fact does not establish that the American subsidiary is a 'mere department' of the Japanese parent.").  Moreover, regarding the submissions from Shintech's website, "the Court is not persuaded that a failure to distinguish between parent and subsidiary on a web page is sufficient to show that the parent controls the subsidiary's marketing and operational policies.  An advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary relationship is not equivalent to a showing that the parent corporation exercises any control over its subsidiary's operational or marketing activities." *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001).

Additionally, Plaintiffs do not address whether Shintech's funds were intermingled with Shin-Etsu's or if Shintech observed corporate formalities.  *See In re Platinum*, 2017 WL 1169626, at *48 (holding plaintiffs failed to make a *prima facie* showing that the court could exercise personal jurisdiction under the alter ego theory where the complaint did not address whether the subsidiary observed corporate formalities, if funds were intermingled, or whether office space and addresses were shared).  Moreover, Plaintiffs do not plead or present any fact suggesting that Shintech is financially dependent on Shin-Etsu.  *See In re*

*Commodity Exchange, Inc.*, 213 F. Supp. 3d at 681 (finding alter ego relationship where plaintiffs plausibly alleged the parent corporation engaged in the conspiracy, subsidiary corporation had no corporate headquarters or separate mailing address, and subsidiary corporation was financially dependent on parent corporation). Quite the opposite— Plaintiffs' allegations indicate Shintech generates significant income on its own. (*See* Dkt. 51 at ¶¶ 32, 49); *see also J.L.B. Equities, Inc.*, 131 F. Supp. 2d at 549 (holding all the factors aside from common ownership "counsel against the exercise of personal jurisdiction" where "the plaintiff cannot, and does not, adequately demonstrate that the [subsidiary] is dependent upon [the parent corporation] for funds. To the contrary, the facts alleged suggest that the [subsidiary] generates the bulk of [the parent corporation]'s income").

### 3. Agency

The Court also finds that while the law allows for Plaintiffs to establish specific jurisdiction under an agency theory, Plaintiffs have failed to do so here. Shin-Etsu accuses Plaintiffs of "grossly" misstating the agency theory in *Daimler* (Dkt. 110 at 12); however, it is Shin-Etsu that misapplies *Daimler*'s holding. *Daimler* largely rejected the use of an agency theory to establish *general* jurisdiction.[13] The Supreme Court included an

---

[13] The quotation from *Daimler* that Shin-Etsu includes in its reply papers is an excerpt from the Court's discussion of agency as it pertains to general jurisdiction. (Dkt. 110 at 12); *see Daimler*, 571 U.S. at 135-36 ("The Ninth Circuit's agency finding rested primarily on its observation that [the subsidiary]'s services were 'important' to Daimler, as gauged by Daimler's hypothetical readiness to perform those services itself if MBUSA did not exist. . . . The Ninth Circuit's agency theory thus appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the "sprawling view of general jurisdiction" we rejected in *Goodyear*.").

extensive discussion of how *International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement*, 326 U.S. 310 (1945), resulted in the "rapid expansion of tribunals' ability to hear claims against out-of-state defendants" through the use of specific jurisdiction, as well as the "reduced role" of general jurisdiction. *Daimler*, 571 U.S. at 125-28. *Daimler* specifically stated that *International Shoe* used the words "continuous and systematic" to "describe instances in which the exercise of *specific* jurisdiction would be appropriate," *id.* at 128, and that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction, *id.* at 135 n.13; *see Yousef*, 2018 WL 1665239, at *14 ("Specific jurisdiction was not the subject of *Daimler*, so there is no reason to believe that *Daimler* changed pre-existing law on that subject."). Additionally, at least one post-*Daimler* case has recognized "common business enterprise" allegations showing that the "reason for the subsidiary's existence is to perform services in furtherance of its parent's business that would otherwise have to be performed by the parent" can be sufficient to establish specific jurisdiction. *See id.* at *9-11, *13.

However, Plaintiffs have failed to make the showing necessary to establish specific jurisdiction pursuant to an agency theory. Although agency for jurisdictional purposes may be demonstrated "[w]here a subsidiary's business is dependent on the parent's business, or vice versa," *Dorfman*, 2002 WL 14363, at *8, Plaintiffs have not demonstrated that Shin-Etsu is dependent on Shintech's caustic soda business. Plaintiffs have submitted documents purporting to show that Shintech is a wholly-owned subsidiary of Shin-Etsu, Shintech is the primary U.S. importer and distributor of Shin-Etsu's products, Shin-Etsu's president and board chairman are also the president and board chairmen of Shintech, and

the president of Shin-Etsu and Shintech has been assigned to work at Shintech since 1983 and owns a home in Houston where Shintech is located. (Dkt. 109 at 26-27). Additionally, Shin-Etsu is a producer of caustic soda. (Dkt. 117 at 50). However, the documents submitted by Plaintiff, which include Shin-Etsu's annual reports, repeatedly highlight the contributions Shintech has made to Shin-Etsu's profits through PVC production, not from caustic soda. (*See, e.g.*, Dkt. 109-2 ("Shintech . . . forms the core of our PVC operations[.]"); Dkt. 109-3 at 7 (noting PVC as a "core business," not caustic soda); *id.* at 8 ("Shintech has achieved remarkable profitability in the PVC industry and stable profit growth."); Dkt. 109-4 at 13 ("Shintech has grown into the world's largest manufacturer of PVC[.]")). In other words, Plaintiffs may have demonstrated that Shin-Etsu would step into the American PVC market if Shintech stopped producing PVC, but they have not made the same showing with regards to caustic soda. Because it is caustic soda, not PVC, that is at issue in this lawsuit, Plaintiffs' allegations are not sufficient for specific jurisdictional purposes. *See Daimler*, 571 U.S. at 138; *In re Hoosick Falls PFOA Cases*, 2020 WL 33409, at *5.

For the reasons stated above, the Court finds Plaintiffs have failed to make a *prima facie* showing of personal jurisdiction as to Shin-Etsu.

### D. Jurisdictional Discovery

Plaintiffs request that, in the event the Court finds they did not make a *prima facie* showing of personal jurisdiction as to either Formosa or Shin-Etsu, they be allowed to pursue jurisdictional discovery. (Dkt. 93 at 27-28; Dkt. 109 at 29-31). "It is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of

personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014). In this Circuit, jurisdictional discovery is permitted where a plaintiff has "made a sufficient start toward establishing personal jurisdiction," such that it appears there may be a colorable jurisdictional claim. *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 70 (E.D.N.Y. 2006) (quotation omitted). The Court finds jurisdictional discovery is warranted here as to both Formosa and Shin-Etsu.

Plaintiffs have submitted documents that support Formosa's dependence on Formosa USA and that Formosa may have some involvement with the caustic soda sales by Formosa USA. Plaintiffs have shown significant overlap in ownership between Formosa and Formosa USA, that Formosa is the "main sale target" for Formosa USA's raw material production, and that Formosa USA increased Formosa's operating profit by 68.5%. (Dkt. 51 at ¶ 34; Dkt. 93-4 at 30). In addition, Plaintiffs have submitted documents purporting to show that both Formosa and Formosa USA produce significant amounts of caustic soda, and that Formosa USA's caustic soda capacity is a selling point for Formosa to its investors. (Dkt. 93-2 at 21 (listing Formosa's caustic soda capacity); *id.* at 16 ("[Formosa] USA is now a major U.S. supplier of . . . caustic soda."); *id.* at 23 (listing caustic soda as major product of Formosa USA)).

Plaintiffs have also produced some evidence that Shin-Etsu is dependent on Shintech and that Shin-Etsu may be involved with Shintech's caustic soda business. The overlap in corporate leadership between Shintech and Shin-Etsu, Shintech's status as the

"core" of Shin-Etsu's Chor-Alkali business, and Shintech's status as the only subsidiary corporation repeatedly touted by Shin-Etsu in its annual reports, all are indicators of Shin-Etsu's dependence on Shintech. Additionally, Shin-Etsu is a caustic soda producer and Shin-Etsu's annual reports from the Class Period submitted by Plaintiffs refer to Shintech's caustic soda business as having undergone significant growth. (*See* Dkt. 109-3 at 13 (Shin-Etsu 2018 Annual Report noting "the supply and demand relationship with respect to caustic soda improved, resulting in significant growth," as well as a 21.8% increase in net sales and 75.3% increase in operating income for the PVC/Chlor-Alkali Business); Dkt. 109-2 at 13 (Shin-Etsu 2019 Annual Report noting "Shintech Inc. in the U.S. continued its shipments of both PVC and caustic soda at a high level, backed by advantageous raw material procurement in the country, which resulted in its business performance growing")). Additionally, taking Plaintiffs' allegations in the Amended Complaint as true, the explanations for the caustic soda price increases could be construed as an attempt to cover up the alleged conspiracy. Moreover, Plaintiffs have submitted evidence that Shin-Etsu was heavily involved in the decision to build a new manufacturing plant for Shintech, which could also be a way of misleading customers into thinking supply of caustic soda is tight.

It is not clear from the submissions how much of Formosa USA's and Shintech's success in increasing the caustic soda prices is attributable to Formosa and Shin-Etsu or how involved Formosa and Shin-Etsu were, if at all, with the decisions surrounding the increased prices. However, "the Second Circuit distinguishes between allegations that are 'insufficiently developed' warranting discovery and those that are 'sparse' and

'conclusory' requiring dismissal," *Hollins*, 469 F. Supp. 2d at 71-72; *see Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 F. App'x 738, 739 (2d Cir. 2002) ("[P]laintiffs' jurisdictional allegations are neither sparse nor insufficiently specific; they are simply insufficiently developed at this time to permit judgment as to whether personal jurisdiction is appropriate."), and the allegations and submissions discussed above are neither sparse nor conclusory. "Based upon these and the other allegations in the [Amended C]omplaint, the Court concludes, in its discretion, that [P]laintiffs' contentions of personal jurisdiction are colorable and that they should have the opportunity to engage in limited discovery as to the jurisdictional questions." *Leon*, 992 F. Supp. 2d at 195.

Formosa and Shin-Etsu cite to *Jazini*, 148 F.3d 181, to support their position that the Court should deny jurisdictional discovery. (Dkt. 110 at 14).[14] However, the *Jazini* court emphasized that the plaintiffs had not made any showing that the subsidiary company was an agent of the parent corporation because their allegations were conclusory. 148 F.3d at 185 ("The conclusory statements—without any supporting facts—that Nissan U.S.A. is "wholly controlled" by Nissan Japan and "wholly dependent" on Nissan Japan "for its business plan and financing," are but a restatement of two of the factors to be

---

[14] Formosa cited two other cases that stand for the same proposition as *Jazini* with regards to conclusory and general allegations. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2019 WL 1331830, at *9 (S.D.N.Y. Mar. 25, 2019) ("TCEH's conclusory allegations of corporate ownership, combined marketing, [and] shared board membership were insufficient to establish a principal-agent relationship between corporate entities." (alteration in original) (quotations and footnote omitted)); *Gurvey*, 2009 WL 691056, at *4 (finding plaintiff failed to establish personal jurisdiction on an agency theory where plaintiff only cited "statements made in Defendants' Form 10-Ks describing the business activities of various subsidiaries").

considered[.]"). The *Jazini* court also noted the statements submitted by plaintiffs from the parent corporation's president that he wanted "each part of our global operations . . . to focus on contributing to the company as a whole" were not material for purposes of showing pervasive control. *Id.* Here, as previously discussed, Plaintiffs have submitted multiple pieces of evidence that support their allegations. Even though that evidence is not sufficient for a *prima facie* showing of personal jurisdiction as to Formosa or Shin-Etsu, the Court finds it is a sufficient enough start to make jurisdictional discovery appropriate. *See World Vision, Inc.*, No. 2:08-CV-221, 2009 WL 2230919, at *16 (D. Vt. July 24, 2009) ("[T]he Circuit has . . . suggested that district courts may be obligated to order jurisdictional discovery based on a lesser showing [than a *prima facie* case], in particular when the plaintiff fails to allege legally sufficient facts to establish jurisdiction, but nonetheless asserts specific, non-conclusory facts that, if further developed, could demonstrate substantial state contacts." (citing *Texas Int'l Magnetics, Inc.*, 31 F. App'x at 739)); *Hollins*, 469 F. Supp. 2d at 71 ("[T]he Second Circuit has ordered jurisdictional discovery where plaintiffs allege more than conclusory statements but without supporting facts.").

Accordingly, the Court denies Shin-Etsu's motion to dismiss pursuant to 12(b)(2), and denies Formosa's motion to dismiss pursuant to 12(b)(2) conditional on Plaintiffs submitting a certification as set forth above. If Plaintiffs do not submit the certification on or before April 17, 2020, the claims against Formosa will be dismissed with prejudice without further order of the Court. The motions to dismiss are denied without prejudice and with leave to renew after the completion of jurisdictional discovery. Consistent with

the Court's referral of this matter to Judge Roemer for the supervision of all non-dispositive pretrial matters, the Court will not set forth specific parameters regarding the conduct of jurisdictional discovery; instead, Judge Roemer will manage that aspect of the case.

Formosa has also moved in the alternative for the Court to dismiss the claims against it pursuant to Rule 12(b)(6). Because the grounds for moving for Rule 12(b)(6) dismissal overlap with the issues raised by Formosa's Rule 12(b)(2) motion, and because any dismissal of the claims against Formosa under Rule 12(b)(6) would be without prejudice for the same reasons that the claims against Oxy are dismissed without prejudice, the Court also denies Formosa's motion under Rule 12(b)(6) without prejudice and with leave to renew after the completion of jurisdictional discovery. *New York v. Mountain Tobacco Co.*, 55 F. Supp. 3d 301, 315 (E.D.N.Y. 2014) ("[T]he Court is of the view that jurisdictional discovery as to [the defendant] may shed light on the State's substantive allegations against him. In that event, the State may seek leave to amend the amended complaint to cure the admitted deficiencies. Therefore, the Court denies [the defendant]'s motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) without prejudice with leave to renew after the conclusion of jurisdictional discovery[.]"); *see also Seema Gems, Inc. v. Shelgem, Ltd.*, No. 93 CIV. 4473 (KMW), 1994 WL 86381, at *3 (S.D.N.Y. Mar. 16, 1994) (denying Rule 12(b)(6) motion without prejudice to renewal after close of jurisdictional discovery regarding alter ego theory because "[t]he adequacy of plaintiff's complaint" is "bound up" with "the same issue on which the court grants jurisdictional discovery").

## CONCLUSION

For the reasons set forth above, the Court denies the joint motion to dismiss (Dkt. 79), Westlake's motion to dismiss (Dkt. 81), Shintech's motion to dismiss (Dkt. 82), and Formosa USA's motion to dismiss (Dkt. 84); grants in part the motion to dismiss by Oxy dismissing those claims without prejudice (Dkt. 80); denies without prejudice the motion to dismiss by Formosa (Dkt. 86) conditional on Plaintiffs submitting a certification on or before April 17, 2020; denies without prejudice Shin-Etsu's motion to dismiss (Dkt. 103); and finds limited jurisdictional discovery as to Formosa and Shin-Etsu is appropriate, after which Formosa and Shin-Etsu may, if appropriate, renew their motions to dismiss. If Plaintiffs do not submit the certification on or before April 17, 2020, the claims against Formosa will be dismissed with prejudice without further order of the Court.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: March 27, 2020
Rochester, New York