**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE CAUSTIC SODA ANTITRUST LITIGATION** | **Lead Case No.: 1:19-cv-00385-EAW-MJR** |
| **THIS DOCUMENT RELATES TO:**<br><br>**INDIRECT PURCHASER ACTIONS** | |

**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

I.  INTRODUCTION ........................................................................................... 1

II.  THE CLASSES .............................................................................................. 2

III.  FACTUAL BACKGROUND ........................................................................... 3

 A. Defendants Conspired to Raise Prices and Injured IPPs. ............................... 3

 B. IPPs Across Industries Share the Same Overcharge Harm. ........................... 4

IV.  THE COURT SHOULD CERTIFY THE INDIRECT PURCHASER CLASSES UNDER RULE 23(B)(3). .................................................................. 5

 A. Standards for Class Certification ................................................................ 5

 B. The Classes Satisfy Rule 23(a) .................................................................. 7

  1. The Classes are so numerous that joinder is impracticable. ................ 7

  2. IPPs' claims present common issues of law and fact. ......................... 7

  3. IPPs' claims are typical of the claims of the classes. ......................... 8

  4. IPPs are adequate class representatives. ........................................... 9

 C. The Classes Satisfy Rule 23(b)(3) ............................................................. 11

  1. *State Antitrust Class*: IPPs will use common proof to demonstrate that Defendants violated state antitrust statutes. ................................... 12

  2. *Colorado Consumer Protection Class*: IPPs will use common proof to demonstrate that Defendants violated the Colorado Consumer Protection Act.... 15

  3. IPPs will demonstrate impact with common proof using a standard methodology. ............................................................................... 16

  4. IPPs will establish aggregate damages with common proof. .............. 20

  5. A class action is the superior method of adjudicating the claims of the Classes.. 21

V.  THE COURT SHOULD CERTIFY THE UNJUST ENRICHMENT CLASS .................... 23

VI.  THE INDIRECT PURCHASER CLASS DEFINITIONS ARE BASED ON OBJECTIVE CRITERIA AND THE CLASSES ARE THEREFORE ASCERTAINABLE ................ 24

VII.  CONCLUSION ............................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*In re Air Cargo Shipping Serv. Antitrust Litig.*,
   MDL No. 1775, 2014 WL7882100 (E.D.N.Y. Oct. 15, 2014) ........................................ *passim*

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ...........................................................................................................6, 16

*B & R Supermarket, Inc. v. Mastercard Int'l Inc.*,
   No. 17-CV-02738 (MKB) (JO), 2021 WL 234550 (E.D.N.Y. Jan. 19, 2021) .......................24

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2013)....................................................................................12

*In re Broiler Chicken Antitrust Litig.*,
   No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) .................................................11

*Bunker's Glass Co. v. Pilkington PLC*,
   75 P.3d 99 (Ariz. 2003).........................................................................................................12

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ..............................................................................................................14

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons*,
   502 F.3d 91 (2d Cir. 2007).................................................................................9, 11, 12, 16

*Crowe v. Tull*,
   126 P.3d 196 (Colo. 2006) ....................................................................................................15

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   317 F.R.D. 675 (N.D. Ga. 2016)............................................................................................20

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015) ...........................................................................................13

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) ...............................................................................................8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   No. M 02-1486-PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ........................................17

*In re Elec. Books Antitrust Litig.*,
   No. 11 MD 2293(DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ...................................6

*Four Corners Nephrology Associates, P.C. v. Mercy Med. Ctr. Of Durango*,
   464 F. Supp. 2d 1095 (D. Colo. 2006)....................................................................................15

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948)........................................................................................13

*Hickory Sec. Ltd. v. Republic of Argentina*,
    493 Fed. Appx. 156 (2d. Cir. 2012)...............................................................20

*In re IndyMac Mort.-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ......................................................................7

*Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    No. 17CIV6221(KPF)(SLC), 2022 WL 2829880 (S.D.N.Y. June 30, 2022)...........8

*Johnson v. Nextel Commc'ns, Inc.*,
    780 F.3d 128 (2d Cir. 2015)..........................................................................5, 7

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) ......................................................................5

*Lea v. Tal Educ. Grp.*,
    No. 18-CV-5480 (KHP), 2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ................7

*In re Lidoderm Antitrust Litig.*,
    14-md-2521-WHO (N.D. Cal. Nov. 13, 2017), ECF No. 912...............................22

*In re Lidoderm Antitrust Litig.*,
    No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ........15, 23

*Marisol A. by Forbes v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)............................................................................8

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    338 F.R.D. 527 (S.D.N.Y. 2021) ........................................................... *passim*

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    297 F.R.D. 168 (D. Mass. 2013)....................................................................14

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    309 F.R.D. 107 (D. Mass. 2015)....................................................................23

*In re Opana Antitrust Litig.*,
    14-cv-10150 (N.D. Ill. April 21, 2022), ECF No. 793 ........................................22

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)................................................................. *passim*

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ...............................................................9

*In re Polyurethane Foam Antitrust Litig.*,
No. 1:10 MD 2196, 2015 WL 4459636 (N.D. Ohio July 21, 2015) ........................................20

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012) ....................................................................................14

*In re Relafen Antitrust Litig.*,
221 F.R.D. 260 (D. Mass. 2004) ............................................................................................12

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
335 F.R.D. 1 (E.D.N.Y. 2020) ..................................................................................7, 22, 24

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) .....................................................................................................6

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ...........................................................................................17

*Shabazz v. Morgan Funding Corp.*,
269 F.R.D. 245 (S.D.N.Y. 2010) ..............................................................................................5

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-MD-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) ..........................................23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ...........................................................................................21

*Sykes v. Mel. S. Harris & Associates LLC*,
780 F.3d 70 (2d Cir. 2015) .....................................................................................................11

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004) .........................................................................................9, 12

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ...........................................................................................................11

*Umbrino v. L.A.R.E Partners Network, Inc.*,
6:19-cv-06559 EAW, 2022 WL 452702 (W.D.N.Y. Feb. 15, 2022)
(Wolford, J.) ..............................................................................................................................6

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) .........................................................................................13, 17

*In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States*,
280 F.3d 124 (2d Cir. 2001) .....................................................................................................5

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012) ..............................................................................................13

iv

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  No. 18-MD-2836, 2020 WL 5778756 (E.D. Va. Aug. 13, 2020).....................................15, 23

**Statutes**

15 U.S.C. § 45(a)(1)...........................................................................................................13, 14

Colo. Rev. Stat. Ann. § 6-1-105.................................................................................................15

Fla. Stat. § 501.204(2)................................................................................................................13

Florida Deceptive and Unfair Trade Practices Act ............................................................2, 13, 14

15 U.S.C. § 1..............................................................................................................................14

**Other Authorities**

Case Management Order No. 2, Case No. 19-cv-00975, Dkt. No. 11.........................................10

Rule 23(a).........................................................................................................................6, 7, 23

Rule 23(a)(2)........................................................................................................................7, 8

Rule 23(a)(3)................................................................................................................................8

Rule 23(a)(4)................................................................................................................................9

Rule 23(b)(3) .................................................................................................................... *passim*

7AA Wright & Miller, *Federal Practice & Procedure* § 1781 (3d Ed. 2014).............................14

## I.    INTRODUCTION

Indirect Purchaser Plaintiffs Tripp Plating Works, Inc. and Finch Paper LLC ("IPPs") allege that Defendants[1] conspired to fix the price of caustic soda in the United States, forcing them to pay supracompetitive prices. ████████████████████████████████ ████████████████████████████████████████████████████████.[2] To recover these damages, IPPs are prepared to fight as the "voice for all" indirect purchasers "exposed to fixed pricing." Hart Decl., Ex. 2, Cherie Jagielo Tr., 153:14-16. Consequently, IPPs seek to certify three classes: a State Antitrust Class, a Colorado Consumer Protection Class, and an Unjust Enrichment Class (the "Classes").

This Court should certify IPPs' Classes under Federal Rule of Civil Procedure 23 because all putative class members must prove Defendants' unlawful price-fixing conspiracy. The causes of action asserted by the three Classes require virtually identical elements of proof, and the same documents, witnesses, and expert testimony will support the claims of all three Classes. In other words, common evidence and questions are overwhelming.

IPPs will also rely on common evidence of class-wide impact. In his accompanying Declaration, Dr. Gareth Macartney analyzes the effects of Defendants' anticompetitive conduct on indirect purchasers of caustic soda. Dr. Macartney demonstrates that Defendants' coordinated price increases were the product of anticompetitive conduct, not innocent or legitimate reactions to changes in caustic soda's supply and demand. Using a regression analysis, Dr. Macartney further

---

[1] "Defendants" refer to Olin Corporation, K.A. Steel Chemicals, Inc., Occidental Petroleum Corporation, Occidental Chemical Corporation (d/b/a OxyChem), Westlake Chemical Corporation, Shintech Incorporated, and Formosa Plastics Corporation, U.S.A.

[2] In support of their Motion, IPPs file the Declaration of Barbara Hart, dated September 26, 2022 ("Hart Decl."). Attached as Ex. 1 to this Declaration is the Declaration of Dr. Gareth Macartney, Ph.D., in Support of Indirect Purchaser Plaintiffs' Mot. for Class Cert. ("Macartney Decl."), dated September 26, 2022, at ¶ 136.

shows that distributors passed on their higher prices to IPPs, resulting in substantial damages to the Classes. Dr. Macartney uses inputs and evidence that any putative class member would use to prove their case—Defendants' transactional data, transactional data produced by the leading domestic distributors of caustic soda, party and non-party deposition testimony, contemporaneous business documents, and economic literature.

IPPs respectfully request that the Court certify the Classes, appoint the named plaintiffs as Class Representatives, and, pursuant to Rule 23(e), appoint the undersigned firms as Co-Lead Class Counsel and Liaison Counsel.

## II.    THE CLASSES

IPPs move to certify the following Classes under Rule 23(a) and (b)(3):

*State Antitrust Class*: All persons and entities who indirectly purchased from a distributor, and did not resell, liquid forms of membrane or diaphragm grade caustic soda in Arizona, California, Connecticut, Florida,[3] Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of Columbia manufactured by one or more of the Defendants or their co-conspirators (or any of Defendants' or their co-conspirators' parents, predecessors, subsidiaries or affiliates) at any time between October 1, 2015 and December 31, 2019.

*Colorado Consumer Protection Class*: All persons and entities who indirectly purchased from a distributor, and did not resell, liquid forms of membrane or diaphragm grade caustic soda in Colorado manufactured by one or more of the Defendants or their co-conspirators (or any of Defendants' or their co-conspirators' parents, predecessors, subsidiaries or affiliates) at any time between October 1, 2015 and December 31, 2019.

*Unjust Enrichment Class*: All persons and entities who indirectly purchased from a distributor, and did not resell, liquid forms of membrane or diaphragm grade caustic soda in Arizona, Hawaii, Illinois, Iowa, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin manufactured by one or more of the Defendants or their co-

---

[3] Although IPPs originally pleaded their claim under Florida law as a consumer protection claim, as explained *infra*, several courts have recognized antitrust violations as a violation of the Florida Deceptive and Unfair Trade Practices Act. Thus, IPPs have included their claim under Florida law in the State Antitrust Class.

conspirators (or any of Defendants' or their co-conspirators' parents, predecessors, subsidiaries or affiliates) at any time between October 1, 2015 and December 31, 2019.

The following groups are excluded from all three Classes: Defendants, their co-conspirators, parents, predecessors, subsidiaries, and affiliates, and all federal government entities and instrumentalities of the federal government.

## III.    FACTUAL BACKGROUND

### A.    Defendants Conspired to Raise Prices and Injured IPPs.

For efficiency and the Court's convenience, IPPs incorporate the factual background set forth by the direct purchaser plaintiffs ("DPPs") in their motion for class certification. *See* Ex. A to Affidavit of Marco Cercone in Supp. of Notice of Mot. and Mot. to Seal, Case No. 19-cv-00385, Dkt. No. 475-2 (filed under seal). As set forth in detail by DPPs, Defendants routinely (and in their ordinary course of business) communicated with each other directly to artificially inflate the price of caustic soda, maintained stable market shares through caustic soda exchanges, and manipulated the price of caustic soda through IHS Markit . *Id.* at 3-17. Major caustic soda distributors also facilitated Defendants' conspiracy by sending them pricing information[4] and policing the sales of other downstream sellers.[5] As Defendants themselves point out in their opposition to DPPs' motion

---

[4] *See, e.g.,* **Hart Decl., Ex. 3,  IPPs' Univar Ex. 18** (███████████████████████████
███████████████████████████████████████); **Hart Decl., Ex. 4, IPP-Brenntag Ex. 11** (███████████████████████████████████████████████████████████████████████████); **Hart Decl., Ex. 5, IPP-Brenntag Ex. 12** (██████████████); **Hart Decl., Ex. 6, Daniel Green Ex. 20** (Formosa employee stating, "FYI, just talked to Dan Green [of Tricon Energy, Inc. ("Tricon")], he called Oxy, Axiall, Olin and IHS that there is no one confirm the 1500 DMT, $300 deal."); **Hart Decl., Ex. 7, Daniel Green Ex. 24** (Kelvin Wu of Formosa asking, "Dan, how about the indications from other USG [United States Gulf] membrane suppliers? 250?" Daniel Green responding, "We have not discussed pricing. Right now Olin is tight on balance. We have seen offer of $230 currently but market seems on bullish projection").
[5] *See, e.g.,* **Hart Decl., Ex. 8, IPP-Brenntag-16** (████████████████████████████████████████████████████████████████████████████████████████████.

3

for class certification, some major distributors were eager to help out, "actively support[ing] price increase announcements" and "work[ing] to raise the price of caustic soda." *See* Defs.' Opp. to Pls.' Motion for Class Cert., Case No. 19-cv-00385, at 20-21 (filed under seal). For those that might defect from their scheme, Defendants reprimanded distributors for low-priced sales and affirmed the need for "price discipline" from distributors to keep collecting premiums from their artificially inflated caustic soda prices.[6]

### B.    IPPs Across Industries Share the Same Overcharge Harm.

Caustic soda is a crucial end-use input for many industrial applications, including (but not limited to) water treatment, de-inking and lignin removal in pulp and paper manufacturing, alumina extraction, and fat saponification in soap making. *See* Macartney Decl., at ¶ 40, Figure 6. Regardless of industry, liquid caustic soda is essentially interchangeable for purchasers, and even though its liquid form comes in two different grades (diaphragm and membrane), those differences are minor and prices for both grades rose in sync during the class period. *Id.* at ¶¶ 18, 57-62, 105. Caustic soda demand is also inelastic because manufacturers and other purchasers lack economically viable substitutes. *Id.* at ¶¶ 54-56. Soda ash, for instance, often requires additional handling equipment, lacks the same base as caustic soda, and acts as a slower reactant. *Id.* at ¶ 55.



[sic]                                                                          ;  **Hart Decl., Ex. 9, IPP-Brenntag-17**

);

**Hart Decl., Ex. 10, OCC_00296177 (**

).

[6] *See, e.g.*, **Hart Decl., Ex. 11, Daniel Green Ex. 22** (Tim Hillsley of Oxy stating to Daniel Green of Tricon, "Let's show a little price discipline that is the kind of partner we have to have reselling caustic soda."); **Hart Decl., Ex. 12, PX 2922** (Tim Hillsley of Oxy stating to Daniel Green of Tricon, "Someone talked either from Tricon or from where you have been selling it. The bottom line is business you have done trashed the price. What you did was way worse than what Mitsubishi did at least they were selling the product $50 dmt higher than Tricon was.").

As explained *infra* (Section IV.C.3.), Dr. Macartney demonstrates these market dynamics allowed Defendants to coordinate price increases that IPPs were forced to pay. And the results were dramatic: caustic soda prices, which had declined for indirect purchasers for years, quickly reversed and spiked during the Class period.

## IV. THE COURT SHOULD CERTIFY THE INDIRECT PURCHASER CLASSES UNDER RULE 23(B)(3).

### A. Standards for Class Certification

Courts in the Second Circuit should give Rule 23 a liberal construction. *In re Air Cargo Shipping Serv. Antitrust Litig.*, MDL No. 1775, 2014 WL7882100, at *29 (E.D.N.Y. Oct. 15, 2014). "The general preference of the Court of Appeals for the Second Circuit is *granting* rather than denying class certification." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 528 (E.D.N.Y. 2017) (internal quotation marks and citation omitted) (emphasis in original).

A class will be certified where a movant satisfies the four requirements of Fed. R. Civ. P. 23(a): (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation – plus the requirements of one of the subparts of Fed. R. Civ. 23(b), *In re Petrobras Sec. Litig.*, 862 F.3d 250, 260 (2d Cir. 2017), by a preponderance of the evidence. *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). As the Second Circuit has directed, "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Shabazz v. Morgan Funding Corp.,* 269 F.R.D. 245, 249 (S.D.N.Y. 2010) *(quoting Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir. 1968)). There are also powerful policy considerations that favor certification of antitrust class actions. *See In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States,* 280 F.3d 124, 132-33 (2d Cir. 2001).

In addition to the Rule 23(a) prerequisites, the Second Circuit recognizes an implied "ascertainability" requirement that "a class be defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 264; *see also Umbrino v. L.A.R.E Partners Network, Inc.*, 6:19-cv-06559 EAW, 2022 WL 452702, at *13 (W.D.N.Y. Feb. 15, 2022) (Wolford, J.) ("[W]hile it is not expressly required by Rule 23(a), courts have imposed an implied requirement of ascertainability in considering motions for class certification.").

Although Rule 23(b)(3) requires that common questions "predominate over any questions affecting only individual members," Rule 23(b)(3) does not require that *every* question of law and fact be common to the class. *See In re Elec. Books Antitrust Litig.*, No. 11 MD 2293(DLC), 2014 WL 1282293, at *11 (S.D.N.Y. Mar. 28, 2014). Predominance is satisfied as long as "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)).

While courts may also consider merits questions to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied[,]" Rule 23 does not grant courts a license "to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Merits questions may be considered "only to the extent" they are relevant to Rule 23's prerequisites. *Id.* "This is because the underlying purpose of [the court's] 'rigorous analysis' is 'not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently.'" *Air Cargo*, 2014 WL 7882100, at *29 (citation omitted).

B.      **The Classes Satisfy Rule 23(a)**

1.      **The Classes are so numerous that joinder is impracticable.**

Rule 23(a)(1) requires a class to be so numerous that joinder is impracticable, and in the Second Circuit, courts should presume numerosity for classes of 40 or more. *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 11 (E.D.N.Y. 2020) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Courts may also rely on "common sense" when determining numerosity. *Lea v. Tal Educ. Grp.*, No. 18-CV-5480 (KHP), 2021 WL 5578665, at *5 (S.D.N.Y. Nov. 30, 2021) (citation omitted).

The proposed Classes likely contain hundreds, if not thousands, of members. Macartney Decl., ¶ 53. The Classes are thus so numerous that joinder is impracticable.

2.      **IPPs' claims present common issues of law and fact.**

Rule 23(a)(2) simply requires "questions of law or fact common to the class." "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Nextel Commc'ns Inc.*, 780 F.3d at 137 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). The Rule does not require that *all* questions be common to the class. Even a single common question of fact or law will suffice. *In re IndyMac Mort.-Backed Sec. Litig.*, 286 F.R.D. 226, 233 (S.D.N.Y. 2012) ("Commonality is satisfied where a single issue of law or fact is common to the class.") (citing *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2556 (2011) ("[E]ven a single common question will do.")).

The central driving issue of this case is whether Defendants conspired to fix the price of caustic soda in the United States.[7] Questions of liability and fact stemming from the conspiracy

---

[7] Additional common questions include: (1) whether Defendants' conduct caused the price of caustic soda to be artificially fixed, raised, maintained, or stabilized at non-competitive prices; (2)

are identical for members of each Class, and IPPs and class members will answer these questions with common evidence. Given commonality is low hurdle easily surmounted, IPPs satisfy Rule 23(a)(2).[8]

### 3.    IPPs' claims are typical of the claims of the classes.

Rule 23(a)(3) is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Courts have "liberally construed" the typicality requirement under Rule 23(a)(3), *Digital Music*, 321 F.R.D. at 87, finding the requirement "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotation marks and citation omitted). "'[M]inor variations in the fact patterns underlying individual claims' will not derail the typicality requirement so long as plaintiffs 'alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented.'" *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 547 (S.D.N.Y. 2021) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).

---

whether Defendants' conduct violated state antitrust and consumer protection statutes; and (3) the aggregate amount of damages incurred by the Classes.

[8] *See Air Cargo,* 2014 WL 7882100, at *30 (explaining that common questions are "often present where there are legal or factual disputes pertaining to defendants' 'unitary course of conduct'" (citation omitted)); *Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, No. 17CIV6221(KPF)(SLC), 2022 WL 2829880, at *16 (S.D.N.Y. June 30, 2022) ("The Court finds that Plaintiffs have shown that, at a minimum, the question whether Defendants engaged in an antitrust conspiracy that caused class-wide impact and damages is a question common to the class and capable of resolution through common proof[.]" (internal quotation marks and citation omitted)); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 86 (S.D.N.Y. 2017) (finding commonality satisfied where "Plaintiffs' alleged injuries derive[d] from a uniform course of conduct by the Defendants").

Here, the claims of IPPs and the Classes arise out of the same alleged facts and concern the same conspiracy. *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (explaining that "typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants" (citation omitted)); *see also In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 687 (S.D. Fla. 2004) (finding typicality satisfied where plaintiffs "allege that the same unlawful conduct affected both the class representatives and the class itself."). Thus, the IPPs' claims are typical of the claims of each Class.

### 4.     IPPs are adequate class representatives.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons*, 502 F.3d 91, 96 (2d Cir. 2007). To determine if this requirement is met, courts must inquire engage in a two-part inquiry: (1) whether plaintiffs' interests are antagonistic to the interests of other putative class members and (2) whether plaintiffs' attorneys "are qualified, experienced and able to conduct the litigation." *Id.* at 99 (internal quotation marks omitted). Adequacy serves to "uncover conflicts of interest between named parties" and the represented class, *Air Cargo*, 2014 WL 7882100, at *33 (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)), although "to defeat certification, a conflict must be 'fundamental' and go 'to the very heart of the litigation.'" *Namenda*, 338 F.R.D. 527, 548 (S.D.N.Y. 2021) (quoting *Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013)).

Here, there are no conflicts—let alone fundamental ones—between IPPs and proposed members of each Class. IPPs' claims are the same as those of the proposed Classes, and IPPs and the Classes are fully aligned in redressing Defendants' antitrust violation and recovering overcharges on purchases of caustic soda. Because they share the same interests as the Classes, IPPs are adequate representatives.

The Tripp Plating Works, Inc. Tripp Plating is a family-owned business that provides electroplating services, which is a process used to deposit finished coats on certain metal products such as valves, bonnets, and other parts. Hart Decl., Ex. 2, Cherie Jagielo Tr., 19:1-19; 131:24-25, 132:1-2.[9] Tripp Plating's customers range from the medical to aviation fields. *Id.* at 20:11-20. During the Class period, Tripp Plating purchased caustic soda from distributor ████. *Id.* at 24:6-15; 37-2-8; 41:3-25. At the same time, Amrex purchased its caustic soda from Olin's subsidiary K.A. Steel. Hart Decl., Ex. 13, P. Rexer 30(b)(6) Tr. 46:13-16; Ex. 14, W. Rexer Tr. at 15:13-15:19; 29:7-29:21; 73:21-76:24; 166:2-166:5. Amrex also purchased from distributors Univar and Connection Chemical. Ex. 14, W. Rexer Tr. at 31:23-25, 32:15-23, 75:14-15, 78:2-8.

Finch Paper LLC. Finch Paper is a company that produces paper products and uses membrane grade caustic soda for its manufacture of those paper products. Hart Decl., Ex. 15, Tybor Tr., at 50:5-16, 68:1-7. ██████████████████████████████████ ████████████████████. *Id.* at 109:14-18.

Further, IPPs have already and will continue to vigorously prosecute the Classes' interest through qualified counsel. During the course of this case, IPPs have propounded and responded to discovery, taken and given depositions, and worked closely with IPPs' expert, Dr. Macartney. On September 9, 2019, the Court appointed Barbara J. Hart of Grant & Eisenhofer P.A. and Kenneth A. Wexler of Wexler Boley & Elgersma LLP to serve as Interim Co-Lead Class Counsel, and Colucci & Gallaher to serve as Interim Liaison Counsel. *See* Case Management Order No. 2, Case No. 19-cv-00975, Dkt. No. 11.[10] In requesting appointment to serve as Interim Co-Lead Counsel and Interim Liaison Counsel, counsel submitted sufficient information for the Court to determine

---

[9] *See also* http://www.trippplating.com/about.htm.
[10] In January 2021, Ms. Hart transitioned from the firm Lowey Dannenberg, P.C. to Grant & Eisenhofer P.A. *See* Case No. 19-cv-00975, Dkt. No. 43.

their experience and qualifications to represent the proposed Classes. *See* Case No. 19-cv-00975, Dkt. No. 7. These firms have substantial experience in antitrust litigation and are well-qualified to continue representing the proposed Classes.

### C.   The Classes Satisfy Rule 23(b)(3)

Under Rule 23(b)(3), the predominance inquiry tests whether "common questions '***predominate*** over any questions affecting only individual [class] members.'" *Petrobras,* 862 F.3d at 268 (quoting *Amgen Inc.*, 568 U.S. at 469) (emphasis in original). In other words, Rule 23(b)(3) "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotation marks omitted). Plaintiffs need not show "that each element of [their] claim is susceptible to classwide proof." *Petrobras*, 862 F.3d at 268 (quoting *Amgen*, 568 U.S. at 469 (emphasis in original)). In addition, "[t]he mere existence of individual issues will not be sufficient to defeat certification." *Sykes v. Mel. S. Harris & Associates LLC.*, 780 F.3d 70, 87 (2d Cir. 2015). As here, predominance is "readily met in certain cases alleging . . . violations of the antitrust laws." *Cordes*, 502 F.3d at 108 (quoting *Amchem*, 521 U.S. at 625). This is because "allegations of the existence of a price-fixing conspiracy are susceptible to common proof." *Id.* at 105.

Common issues predominate here because the "two primary common questions are: (1) whether Defendants engaged in a conspiracy to . . . increase price; and (2) whether this conspiracy caused Plaintiffs to suffer injury." *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *6 (N.D. Ill. May 27, 2022). IPPs will rely on class-wide evidence to establish that Defendants violated state antitrust and consumer protections statutes. Common evidence will also demonstrate that Defendants' conduct forced each Class members to pay overcharges on caustic soda, as well as the aggregate amount of damages each Class suffered as a result.

1.    *State Antitrust Class*: **IPPs will use common proof to demonstrate that Defendants violated state antitrust statutes.**

Antitrust claims require three elements: "(1) a violation of antitrust law; (2) injury and causation; and (3) damages[.]" *Cordes*, 502 F.3d at 105; *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 275 (D. Mass. 2004) ("Under both federal and state law, the essential elements of a private antitrust action are the same[.]").[11] To establish an unlawful conspiracy in restraint of trade, IPPs must prove: (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013).

The existence, nature, and duration of the alleged price-fixing conspiracy will be the central issue at trial. IPPs will offer evidence common to the State Antitrust Class—including Defendants' internal documents, testimony from Defendants' employees, and expert testimony—demonstrating that Defendants conspired to fix the price of caustic soda in the United States, thus establishing the first element of their antitrust claims.

The evidence that IPPs will use to prove Defendants' antitrust violation "is indisputably 'common' because it focuses on the allegedly unlawful actions of the defendants, not the actions of individual plaintiffs." *Air Cargo*, 2014 WL 7882100 at *38 (citation omitted); *see also Cordes*,

---

[11] IPPs have compiled the relevant portions of each state antitrust statute asserted in this litigation. Each of the applicable state antitrust statutes mirrors the federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law. Hart Decl., Appendix A. *See Namenda*, 338 F.R.D. at 572-74 (explaining that "an analysis of the [state antitrust] statutes reveal no significant variations that preclude a finding of predominance."); *Terazosin*, 220 F.R.D. at 700 n.45 (explaining that state antitrust statutes are "virtually identical in their required elements"); *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 106 (Ariz. 2003) ("The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct." (quoting *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002)).

502 F.3d at 105 ("[A]llegations of the existence of a price-fixing conspiracy are susceptible to common proof and, if proven true, would satisfy the first element of the plaintiffs' antitrust cause of action."). Spurred by years of disappointing industry returns, Defendants perpetrated the price-fixing conspiracy through a web of inter-firm contacts that allowed them to monitor market conditions and each other's pricing behavior, which led to the announcement (and imposition) of several conspiratorial prices increases throughout the Class period. The evidence upon which IPPs will rely at trial to prove the existence of a price-fixing conspiracy will be common to members of each Class. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) ("[C]ourts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class."). "[I]f each class member pursued its claims individually, the class member would have to prove the same antitrust violations using the same documents, witnesses, and other evidence." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015).

Furthermore, IPPs' evidence establishing a traditional antitrust violation will similarly establish a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). "It is the intent of the Legislature that, in construing subsection (1) [of FDUTPA], due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)[.]" Fla. Stat. § 501.204(2). The Federal Trade Commission has interpreted the FTC Act as encompassing violations of the antitrust laws. *See FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948)

("[A]ll conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act[.]"); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 762 n.3 (1999) ("The FTC Act's prohibition of unfair competition and deceptive acts or practices, 15 U.S.C. § 45(a)(1), overlaps the scope of § 1 of the Sherman Act, 15 U.S.C. § 1, aimed at prohibiting restraint of trade[.]" (citing *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 454-455 (1986)). As such, evidence that Defendants violated the antitrust laws will also establish IPPs' claim under FDUTPA. *See, e.g., Namenda*, 338 F.R.D. at 575 ("[A]ny conduct that would qualify as 'unfair' under the FTC Act – which violations of the antitrust laws certainly would – would also violate the [Florida] provision[ ] at issue."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 175 (D. Mass. 2013) (explaining "courts have held that the violation of traditional antitrust elements constitutes a violation of the [Florida] consumer protection statute." (citing, *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996))); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 900 (E.D. Pa. 2012) (explaining that "Florida law recognizes that a FDUTPA claim may arise from a violation of antitrust laws such as the Sherman Act and other state antitrust laws because such a violation in and of itself is an unfair method of competition.").

The evidence that Defendants committed an antitrust violation is common to the State Antitrust Class, which is "a compelling reason to find that predominance is satisfied overall." *Air Cargo*, 2014 WL 7882100, at *40; *see also* 7AA Wright & Miller, *Federal Practice & Procedure* § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).").

**2.** ***Colorado Consumer Protection Class*: IPPs will use common proof to demonstrate that Defendants violated the Colorado Consumer Protection Act.**

The Colorado Consumer Protection Act ("CCPA") prohibits unfair or deceptive trade practices. Colo. Rev. Stat. Ann. § 6-1-105. "[I]n determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct." *Crowe v. Tull*, 126 P.3d 196, 202 (Colo. 2006) (quotation marks and citation omitted). Allegations of anticompetitive conduct have supported claims under the CCPA. *See e.g., Four Corners Nephrology Associates, P.C. v. Mercy Med. Ctr. Of Durango*, 464 F. Supp. 2d 1095, 1097 (D. Colo. 2006). Relevant here, the CCPA prohibits any person from "[m]ak[ing] false or misleading statements of fact concerning the price of goods . . . or the reasons for, existence of, or amounts of price reductions." Colo. Rev. Stat. Ann. §§ 6-1-105(l). As part of the price-fixing conspiracy, Defendants often told customers they were on "order control" or "allocation" to create the illusion of supply constraints, ostensibly justifying the price increases (and bolstering the likelihood that the increases would succeed). Macartney Decl., ¶¶ 98-100. Thus, IPPs will rely on the same core evidence to prove their claims under the CCPA as well as their state antitrust claims. Any purported differences in the elements required by the CCPA "can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one." *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO,, 2017 WL 679367, at *27 (N.D. Cal. Feb. 21, 2017); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 18-MD-2836, 2020 WL 5778756, at *27 (E.D. Va. Aug. 13, 2020) (explaining that the variations in state laws identified by defendants are "immaterial and pose no risk of overtaking the overwhelming common evidence expected to be presented in this case" and can be "easily addressed through the use of a special verdict form"). As reflected in IPPs' Proposed Verdict Form, Hart Decl. Appendix D, the proof necessary to

establish a CCPA claim (as compared to the state antitrust claims) can be easily delineated and will pose no risk of individual issues overtaking the common evidence.

### 3.   IPPs will demonstrate impact with common proof using a standard methodology.

The impact element of IPPs' and the Classes' claims "focuses on how [they] were harmed." *Namenda*, 338 F.R.D. at 551.[12] IPPs allege that members of the Classes were injured in the form of the overcharges they paid for caustic soda.[13] "Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show – as a legal and factual matter – impact or fact of damage." *Namenda*, 338 F.R.D. at 557 (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)). At the class certification stage, IPPs merely need to offer common proof *capable* of showing widespread harm; they do not need to *prove* class-wide harm. *Amgen*, 568 U.S. at 459; *Air Cargo*, 2014 WL 7882100, at *41 ("[T]he question is 'whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact." (quoting *In re Magnetic Audiotape Antitrust Litig.*, No. 99-CV-1580, 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001)). Class-wide impact is established when the evidence can show, as it does here, that the defendant's conduct caused injury that is widespread, even if not universal, across class members. *Air Cargo*, 2014 WL 7882100, at *44 (it is "an unrealistic burden" to "require[] that every single class member suffer an impact or damages"). "Under the prevailing view, price-fixing affects all market participants, creating an

---

[12] The injury element invokes not only the factual question of whether class members suffered injury-in-fact but also the "legal question of whether [the] injury [suffered by class members was] 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Cordes*, 502 F.3d at 107 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The legal question is common to the Classes.

[13] IPPs seek to recover overcharges on behalf of both the State Antitrust Class and the Colorado Consumer Protection Class. *See* Consolidated Amended Complaint, Dkt. No. 335, at ¶¶ 125-26.

inference of class-wide impact even when prices are individually negotiated." *Urethane*, 768 F.3d at 1254; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486-PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006) (collecting cases); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) (recognizing presumption of impact in *per se* cases).

Relying on common evidence, Dr. Macartney undertakes a comprehensive analysis of the caustic soda industry and the effect Defendants' anticompetitive conduct had on indirect purchasers of caustic soda. Macartney Decl., ¶¶ 9, 12-23. Dr. Macartney first explains that successful collusion is likely when a product is homogenous (i.e., interchangeable across sellers), customer demand is inelastic (i.e., unresponsive to price), and the industry is dominated by a small number of suppliers protected by high entry barriers. *Id*. at ¶¶ 24-31. The caustic soda industry exhibits all the hallmarks of an industry vulnerable to anticompetitive collusion: it is dominated by a handful of suppliers selling a homogenous and interchangeable product; protected by high barriers to entry and expansion by would-be competitors; and replete with opportunities for suppliers to exchange competitively sensitive information and communications. *Id.* at ¶¶ 32, 54-72, 75-83.

Dr. Macartney then demonstrates that Defendants leveraged these institutional features of the caustic soda industry in a collusive scheme to increase prices. *Id.* at ¶¶ 73-74, 84-85. Defendants raised prices in part through coordinated price increases announcements (in both timing and magnitude), which lacked any economic justification based on supply and demand factors. *Id.* at ¶¶ 86-97. In fact, the caustic soda industry was plagued by weak demand and excess capacity, both before and during the Class period. *Id*. The evidence also shows that Defendants refused to compete for business—foregoing opportunities to generate business from customers

17

who were under contract with other Defendants—and limited the amount of caustic soda available to customers to create the appearance of supply constraints. *Id.* at ¶¶ 98-100. Defendants sought to further bolster their price increase announcements by managing caustic soda supply through coordinated outages at production facilities. These coordinated shutdowns were at odds with each Defendant's competitive self-interest because one competitor's inability to supply customers is another competitor's opportunity to acquire new business—opportunities that Defendants decided to sacrifice in favor of the alleged price-fixing conspiracy. *Id.* at ¶¶ 101-103. This behavior was made possible by the highly consolidated nature of the caustic soda industry, the homogeneity and inelastic demand for caustic soda, and the high barriers to entry. These features insulated Defendants from any outside competitive pressure and fostered their anticompetitive behavior.

Dr. Macartney demonstrates that Defendants' anticompetitive conduct resulted in class-wide impact to indirect purchasers. His price analysis shows that prices increased commonly across membrane and diaphragm grades, Defendants, and distributors. After years of declining prices, the average net price of caustic soda from all Defendants increased sharply starting in late-2015. *Id.* at ¶¶ 104-107, Figs. 14-21. The increases are reflected in prices paid by the top 10 distributors of caustic soda, which collectively represent 80% of the Defendants' sales to the distribution channel. *Id.* at ¶ 108, Figs. 22-31. Prices to distributors accounting for the remaining 20% of sales to the distribution channel similarly follow the common pattern of declining prices before the Class period followed by a sharp increase thereafter. *Id.* at Fig. 32. Dr. Macartney's analysis demonstrates that the trend of increasing caustic soda prices was not driven by supply and demand factors. For example, chemical production – representing 61% of caustic soda usage – remained lower during the Class period than before it. *Id.* at ¶ 109. Pulp and paper production – representing 21% of caustic soda usage – was lower in the first part of the Class period before

rebounding to roughly pre-Class period levels. *Id.* at ¶¶ 109-10. Nor can the price increases be attributed to the cost of production, changes in demand for the co-product chlorine, or environmental factors. *Id.* at ¶¶ 111-14.

Using common econometric techniques that control for supply and demand factors, Dr. Macartney uses Defendants' transactional data to estimate the overcharges paid by distributors. Specifically, Dr. Macartney uses a "reduced-form pricing regression," which allows him to calculate the relationship between a dependent variable (*i.e.*, caustic soda prices) and changes in multiple independent variables (*i.e.*, supply and demand factors). Importantly, the model does not assume that an overcharge exists but instead tests for the existence of an overcharge (and, if one exists, the extent of the overcharge). *Id.* at ¶¶ 117-18. The model compares prices in the period when anticompetitive behavior occurred against a competitive benchmark period when such behavior did not occur. Backing out the effect of any changes in supply and demand between the two periods, Dr. Macartney's model estimates the extent to which prices were higher because of the anticompetitive conduct. *Id.* Controlling for several independent variables,[14] Dr. Macartney's analysis shows a 16.37% overcharge to distributors during the Class period. *Id.* at ¶¶ 119-128. Then, using data produced by the distributors ███████████████████ (accounting for 36% of Defendants' sales to distributors), Dr. Macartney utilizes a regression analysis to determine the proportion of the overcharge that was passed through to indirect purchasers. His analysis shows pass-through percentage of 81%. *Id.* at ¶¶ 129-134.

Dr. Macartney's analysis demonstrates that Defendants' conduct forestalled price erosion and systematically raised caustic soda prices across the entire industry, thereby imposing

---

[14] Supply costs (natural gas and salt prices), demand (U.S. gross domestic product, chemical production, paper production, and plastic and rubber production), net exports, seasonality, product characteristics (grade and concentration), customer segment, contract type, and freight costs.

widespread overcharges. His analysis also establishes that overcharges were passed from distributors to members of the Classes, thus establishing class-wide impact.

### 4.    IPPs will establish aggregate damages with common proof.

"It has long been settled that Rule 23(b)(3) does not require common proof of damages in order for class certification to be appropriate." *Air Cargo*, 2014 WL 7882100, at *59. "Typically, common issues predominate when liability is determinable on a class-wide basis, *even where class members have individualized damages.*" *Namenda*, 338 F.R.D. at 551 (citation omitted) (emphasis in original). Nevertheless, Dr. Macartney has calculated aggregate damages for each Class using a well-accepted methodology. Courts in this Circuit, and in antitrust cases generally, widely accept aggregate damages models. *See, e.g., Hickory Sec. Ltd. v. Republic of Argentina*, 493 Fed. Appx. 156, 159 (2d. Cir. 2012) (collecting cases); *Air Cargo,* 2014 WL 7882100, at *61; *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 689 (N.D. Ga. 2016) ("'The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself.'") (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197–98 (1st Cir. 2009)); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 4459636, at *7 (N.D. Ohio July 21, 2015) (same).

Dr. Macartney calculates aggregate damages using a three-step methodology: *first*, using the Defendants' transactional data, he estimates the direct overcharge paid by distributors to the Defendants; *second*, using data produced by distributors, he estimates the percentage of the direct overcharge that was passed through by distributors to members of each Class; *third*, he applies the direct overcharge times the pass-through percentage to the relevant volume of commerce meeting the class definitions to calculate aggregate damages. Macartney Decl., ¶¶ 22, 116-136. His analysis shows that damages to the State Antirust Class amount to $154.6 million and damages to the Colorado Consumer Protection Class amount to $2.4 million. *Id*. at ¶¶ 135-136.

5.     **A class action is the superior method of adjudicating the claims of the Classes.**

The superiority requirement of Rule 23(b)(3) is "explicitly comparative in nature: courts must ask whether a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy." *Petrobras*, 862 F.3d at 268 (internal quotation marks omitted) (emphasis in original). The "importance of a comparative inquiry" is particularly acute in cases such as this one "'in which there may be no realistic alternative to class treatment.'" *Id.* (quoting *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1124, 1128 (9th Cir. 2017)). Courts examine four factors in making the superiority determination: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P.23(b)(3).

Superiority is satisfied here. To require members of each Class to file individual suits would be to impose significant burdens on judicial resources and create the risk of inconsistent rulings. Furthermore, members of each Class "have likely suffered relatively small damages that could not be remedied efficiently in an individual action" and there is no indication that they have any significant interest in individually prosecuting their claims. *Air Cargo*, 2014 WL 7882100, at *65; *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) ("In antitrust cases such as this, the damages of individual indirect purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress."). Indeed, no IPPs have initiated actions separate from these proceedings. Thus, certification will avoid congesting the courts with numerous individual suits, prevent inconsistent results, and allow class members with smaller claims an opportunity for

redress they might otherwise be denied. *See Restasis*, 335 F.R.D. at 39 ("[S]ubstituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130–31 (2nd Cir. 2013)). The interests of each Class are also promoted by continuing the litigation in this forum, given the Court's familiarity with the underlying allegations and the coordinated direct purchaser action.

The Classes' claims are also manageable. IPPs have demonstrated that common proof of Defendants' anticompetitive conduct will establish violations of state antitrust and consumer protection statutes. Hart Decl., Appendix A (State Law Antitrust Statutes and Harmonization Provisions). As explained *supra* (Section IV.C.1.), the statutes that IPPs assert on behalf of the State Antitrust Class are interpreted in harmony with the Sherman Act or recognize an antitrust violation as a violation of the applicable state statute, and thus require the same elements of proof. Indeed, IPPs and the direct purchasers could jointly resolve Defendants' liability for both federal and state antitrust violations in the first phase of trial using the same verdict form questions, as described in IPPs' proposed, multi-phase trial plan and as other courts have done in antitrust class actions. Hart Decl., Appendix D, Proposed Verdict Form; Appendix E, Proposed Trial Plan;  Ex. 16, Order, *In re Opana Antitrust Litig.*, 14-cv-10150 (N.D. Ill. April 21, 2022), ECF No. 793 ("[T]he Court finds that a traditional bifurcated trial with the first trial on liability [for direct purchaser plaintiffs, opt-out retailer plaintiffs, and indirect purchaser plaintiffs], the second, with the same jury after a brief recess, on damages, to be appropriate."); Hart Decl., Ex. 17, Civil Minutes, *In re Lidoderm Antitrust Litig.*, 14-md-2521-WHO (N.D. Cal. Nov. 13, 2017), ECF No. 912 (ordering single liability trial for both certified classes of direct purchasers and indirect

purchasers); *In re Nexium (Esomeprazole) Antitrust Litig.*, 309 F.R.D. 107, 110-11 (D. Mass. 2015) (all direct purchasers' federal claims and indirect purchasers' state law claims were tried together). Similarly, the claims of the Colorado Consumer Protection Class are based on the same anticompetitive by Defendants. Even assuming the Colorado consumer protection statute requires slightly different elements of proof for liability, such as finding that the Defendants' conduct was "deceptive," such minor variation in Colorado law is insignificant, manageable, and can be accommodated through jury instructions and special verdict form questions. *Lidoderm*, 2017 WL 679367, at *27; *Zetia*, 2020 WL 5778756 at *27; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-MD-02503, 2017 WL 4621777, at *20 (D. Mass. Oct. 16, 2017). "[G]iven the need to prove essentially identical facts, proceeding in a class action here is significantly more efficient than proceeding individually, which 'would waste judicial resources and leave all parties vulnerable to unfair inconsistences.'" *Zetia*, 2020 WL 5778756 at *27 (quoting *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 234 (E.D. Pa. 2012)). This class action is the superior method for resolving the claims of IPPs and the Classes.

## V.   THE COURT SHOULD CERTIFY THE UNJUST ENRICHMENT CLASS

For similar reasons stated above, this Court should certify IPPs' Unjust Enrichment Class. IPPs easily meet Rule 23(a)—including numerosity, commonality, typicality, and adequacy. Common issues also predominate because the elements required for unjust enrichment are sufficiently similar across the states included in the Class. *See* Hart Decl., Appendix B, Elements of States' Unjust Enrichment Claims. For states in both the State Antitrust and Unjust Enrichment Classes, establishing an antitrust violation proves an unjust enrichment claim, so the same common evidence—including Dr. Macartney's report, transactional data, and deposition testimony—will be used across the Classes. *See* Hart Decl., Appendix C (Authority Holding that Antitrust Violations State a Claim for Unjust Enrichment).

## VI.    THE INDIRECT PURCHASER CLASS DEFINITIONS ARE BASED ON OBJECTIVE CRITERIA AND THE CLASSES ARE THEREFORE ASCERTAINABLE.

The Classes satisfy the implied ascertainability requirement. "Ascertainability is a 'modest threshold' and 'will only preclude certification if a proposed class definition is indeterminate in some fundamental way.'" *Namenda*, 338 F.R.D. 527, 543 (S.D.N.Y. 2021) (quoting *Petrobras*, 862 F.3d at 269). The ascertainability doctrine "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 264. There is no requirement in the Second Circuit that identifying class members must be "administratively feasible." *Id.* at 265; *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17-CV-02738 (MKB) (JO), 2021 WL 234550, at *19 (E.D.N.Y. Jan. 19, 2021) (noting that the Second Circuit has "explicitly rejected" a feasibility requirement).

Here, the Classes are defined by reference to objective criteria: (1) purchases of liquid membrane or diaphragm grade caustic soda from a distributor, (2) not for resale, (3) in certain states (4) during a specified time period. These are all objective criteria. Thus, the Classes are ascertainable. *Restasis*, 335 F.R.D. at 40.

## VII.    CONCLUSION

For the foregoing reasons, IPPs have satisfied Rule 23(a) and (b) and respectfully request that the Court certify the proposed Classes; appoint the IPPs as Class Representatives; and appoint Barbara J. Hart of Grant & Eisenhofer P.A. and Kenneth A. Wexler of Wexler Boley & Elgersma LLP to serve as Co-Lead Class Counsel, and Colucci & Gallaher to serve Liaison Counsel.

Dated: September 26, 2022                 Respectfully submitted,


By: */s/ Barbara J. Hart*

Barbara J. Hart
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8526
bhart@gelaw.com


Chad Holtzman (*pro hac vice*)
Nathan Reeder (*pro hac vice*)
**GRANT & EISENHOFER P.A.**
123 Justison Street
7th Floor
Wilmington, DE 19801
Tel: (302) 622-7154
choltzman@gelaw.com
nreeder@gelaw.com


**WEXLER BOLEY & ELGERSMA LLP**
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
312-346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com


Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Tel: 215-864-2800
emeriwether@caffertyclobes.com


Jennifer W. Sprengel (*pro hac vice*)
Kaitlin Naughton (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle St.
Suite 3210

Chicago, IL 60603
Tel: 312-782-4882
jsprengel@caffertyclobes.com
knaughton@caffertyclobes.com

Ryan L. Gellman
**COLUCCI & GALLAHER, P.C.**
2000 Liberty Building
424 Main Street
Buffalo, NY 14202
Tel.: 716-853-4080
rlg@cgbuffalo.com

*Attorneys for Indirect Purchaser Plaintiff*

## **CERTIFICATE OF SERVICE**

I, Barbara J. Hart, do hereby certify that on September 26, 2022, I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic mail and/or the Court's ECF/Pacer system.

*/s/ Barbara J. Hart*
Barbara J. Hart
