# EXHIBIT 1

**DECLARATION**
**OF**
**GARETH MACARTNEY, Ph.D.**
**IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

**In the matter of**
*In re: Caustic Soda Antitrust Litigation*
**USDC, Western District of New York, Lead Case No. 1:19-CV-00385**
**(Indirect Purchaser Action)**



**Highly Confidential**
**Pursuant to Protective Order**

**September 26, 2022**

## Table of Contents

I. **Qualifications** .................................................................................................. 1

II. **Introduction** ................................................................................................... 2

III. **Summary of Conclusions** ........................................................................... 5

A. Conclusion #1: Common Evidence Demonstrates that the Caustic Soda Industry is Conducive to Anticompetitive Behavior ................................................................. 5

B. Conclusion #2: Common Evidence Demonstrates that the Defendants' Alleged Conduct is Consistent with Anticompetitive Behavior .............................................. 7

C. Conclusion #3: Common Evidence Demonstrates that the Defendants' Alleged Conduct Impacted Members of Each Class, Causing Them Economic Harm ......................... 8

D. Conclusion #4: A Common Methodology Can be Used to Calculate Class-wide Damages. 9

IV. **The Caustic Soda Industry is Conducive to Anticompetitive Behavior** ........................... 10

A. Industry Background ..................................................................................... 13

1. Production ............................................................................................. 13

2. Uses ...................................................................................................... 16

3. Manufacturers ....................................................................................... 20

4. Distributors ........................................................................................... 23

5. Plaintiffs ................................................................................................ 25

B. Inelastic Demand .......................................................................................... 25

C. Product Homogeneity .................................................................................... 27

D. Barriers to Entry and Expansion .................................................................... 30

E. Market Concentration and Market Power ....................................................... 32

1. Consolidation ........................................................................................ 33

2. Concentration and cartel market share .................................................. 34

3. Direct evidence of market power ........................................................... 35

F. Ease of Communication, Coordination, and Monitoring .................................. 36

G. Lack of Customer Bargaining Power .............................................................. 40

V. **Defendants' Alleged Conduct is Consistent with Anticompetitive Behavior** ...................... 41

A. Coordinated Price Increases .......................................................................... 42

1. Announcements in 2015 ......................................................................... 43

2. Announcements in 2016 ......................................................................... 47

3. Announcements in 2017 ......................................................................... 49

4. Announcements in 2018 ......................................................................... 50

5. Announcements in 2019 ......................................................................... 51

i

B. Customer Allocation ................................................................................................. 51

C. Communication of Planned Outages ....................................................................... 54

**VI. Common Evidence Demonstrates that the Defendants' Alleged Conduct Impacted Members of Each Class, Causing them Economic Harm** ...................................... **56**

A. Common Price Increases............................................................................................ 56

B. Price Increases Cannot be Justified by Normal Supply and Demand Factors .................... 68

**VII. A Common Methodology Can be Used to Calculate Class-wide Damages** ....................... **73**

A. Estimating the Direct Overcharge ........................................................................... 73

B. Estimating Pass-through ............................................................................................. 79

C. Computation of Class-wide Damages ....................................................................... 84

D. Computation of Unjust Enrichment Damages ....................................................... 85

**VIII. Conclusion** ..................................................................................................................... **86**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | |
| ) | |
| IN RE: CAUSTIC SODA ANTITRUST ) | **Case No. 19-CV-00385 EAW (MJR)** |
| LITIGATION ) | |
| ) | |
| ) | |

## DECLARATION OF GARETH MACARTNEY, Ph.D.
## IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

### I.  QUALIFICATIONS

1.  I am a Senior Economist, the Director of Competition, and Chief Executive Officer at OnPoint Analytics, Inc., an economic and statistical consulting firm. I hold a Ph.D. in Economics from University College London. In the course of my studies, I was awarded the W. M. Gorman scholarship and the Advanced Institute of Management scholarship. During my Ph.D. program, I worked at the Institute for Fiscal Studies, London's leading economic research institute. During that time, I also taught economics at University College London and lectured on competition and innovation at the University of Cambridge and Oxford University. I have presented my research at the European Policy on Intellectual Property Conference, the European Economics Association Congress, the Royal Economic Society Conference, the London School of Economics, the Research in Law and Economics Conference on Antitrust Class Actions, and the Bar Association of San Francisco.

2.  My research has been published in the *Review of Economics and Statistics*, the *Economic Journal*, *Research in Law and Economics*, *Antitrust Magazine*, and the *Journal of Business and Economics*. My article "Antitrust Class Proceedings – Then and Now," published

in *Research in Law and Economics*, won the Best Antitrust Academic Article Award in the

Private Enforcement Category of the Antitrust Writing Awards in 2015. My article "Economic

Principles for Class Certification Analysis in Antitrust Cases" was published in the Spring 2016

issue of *Antitrust Magazine*. I have also conducted peer reviews of academic articles for the

*European Economic Review*, the *Journal of Competition Law and Economics*, the *Economics of

Transition*, *Oxford Economic Papers*, and *Fiscal Studies*.

3.   I have experience analyzing market conduct, including price-fixing, monopolization,

market foreclosure and market allocation; patent infringement (including the estimation of

reasonable royalties); breach of contract; environmental damages; class certification; illegal

taxation; and wage and hour matters. I have analyzed a wide variety of industries, including

heavy industry (auto parts, steel, ready-mixed concrete, hard rock mining); electronic

manufacturing (liquid crystal displays, optical disk drives, lithium ion batteries, DRAM);

transport (rail freight, air cargo, trucks); energy (oil, natural gas, gasoline); food and agriculture

(packaged seafood, eggs, milk, poultry, fertilizers, fruits); consumer electronics (digital cameras,

smartphones, personal computers, network switches); retail (apparel, yoghurt, single-serve

coffee, protein bars); online advertising; cryptocurrencies; pharmaceuticals; water; real estate;

insurance; and education. I have testified as an expert witness in deposition, in arbitration, and at

trial. A true and correct copy of my *curriculum vitae* is attached as Exhibit A.

## II.  INTRODUCTION

4.   Plaintiffs The Tripp Plating Works, Inc. ("Tripp") and Finch Paper, LLC ("Finch

Paper") (collectively "Plaintiffs"), are indirect purchasers of sodium hydroxide or lye (commonly

known as "Caustic Soda").[1] Defendants are Caustic Soda manufacturers and related entities

consisting of Olin Corporation and K.A. Steel Chemicals, Inc. (together, "Olin"); Occidental

Petroleum Corporation and Occidental Chemical Corporation (together, "Oxy"); Westlake

Chemical Corporation ("Westlake"); Shin-Etsu Chemical Co. Ltd. and Shintech Incorporated

("Shintech"); and Formosa Plastics Corporation and Formosa Plastics Corporation U.S.A.

(together, "Formosa Plastics") (collectively, "Defendants").[2]

5.    Plaintiffs on behalf of themselves and proposed classes of similarly situated indirect

purchasers allege that the Defendants formed a cartel and colluded "to restrict domestic supply;

to fix, raise, maintain, and stabilize the price at which Caustic Soda was and continues to be sold;

and to allocate customers" in the United States from October 1, 2015, through December 31,

2019 ("the Class Period").[3] I understand Plaintiffs have proposed and are moving to certify the

following Classes:

> *State Antitrust Class:* All persons and entities who indirectly
> purchased from a distributor, and did not resell, liquid forms of
> membrane or diaphragm grade caustic soda in Arizona, California,
> Connecticut, Florida, Illinois, Iowa, Kansas, Maine, Maryland,
> Michigan, Minnesota, Mississippi, Nebraska, Nevada, New
> Hampshire, New Mexico, New York, North Carolina, North
> Dakota, Oregon, Rhode Island, South Dakota, Tennessee,
> Vermont, West Virginia, Wisconsin, and the District of Columbia[4]
> manufactured by one or more of the Defendants or their co-
> conspirators (or any of Defendants' or their co-conspirators'
> parents, predecessors, subsidiaries or affiliates) at any time
> between October 1, 2015 and December 31, 2019.
>
> *Colorado Consumer Protection Class:* All persons and entities
> who indirectly purchased from a distributor, and did not resell,
> liquid forms of membrane or diaphragm grade caustic soda in
> Colorado manufactured by one or more of the Defendants or their

---

[1] Amended Consolidated Class Action Complaint for Violation of the Federal Antitrust Laws ("Amended Complaint"), filed August 23, 2021, at ¶¶ 18-20.
[2] Amended Complaint, at ¶¶ 20-32.
[3] Amended Complaint, at ¶¶ 1, 3-4, 9.
[4] Referred to herein as the "Antitrust States."

3

co-conspirators (or any of Defendants' or their co-conspirators' parents, predecessors, subsidiaries or affiliates) at any time between October 1, 2015 and December 31, 2019.

*Unjust Enrichment Class:* All persons and entities who indirectly purchased from a distributor, and did not resell, liquid forms of membrane or diaphragm grade caustic soda in Arizona, Hawaii, Illinois, Iowa, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin manufactured by one or more of the Defendants or their co-conspirators (or any of Defendants' or their co-conspirators' parents, predecessors, subsidiaries or affiliates) at any time between October 1, 2015 and December 31, 2019.

6. Plaintiffs have excluded the following from all three Classes: Defendants, their co-conspirators, parents, predecessors, subsidiaries, and affiliates, and all federal government entities and instrumentalities of the federal government.

7. I have been retained by Plaintiffs' counsel to determine if economic evidence and methodologies common to the Classes can be used to analyze the following questions:

   a. Is the Caustic Soda industry conducive to anticompetitive behavior?

   b. Is the Defendants' alleged conduct consistent with anticompetitive behavior?

   c. Is common evidence available to show that Defendants' alleged conduct (if proven) impacted members of the proposed Classes, causing them economic harm?

   d. What is the quantum of Class-wide damages caused by the Defendants' alleged anticompetitive conduct for the State Antitrust Class and the Colorado Consumer Protection Class?

8. I have also been asked to calculate unjust enrichment damages for the Unjust Enrichment Class.[5]

---

[5] The States in the Unjust Enrichment Class are referred to herein as the "Unjust Enrichment States."

9.   To support my analysis, I have analyzed various materials produced in connection with this case, including a common and comprehensive database of Defendants' U.S. Caustic Soda sales transactions, transaction data produced by leading distributors of Caustic Soda in the U.S., deposition testimony, and contemporaneous business documents. I have also reviewed and analyzed numerous documents and data that are publicly available, including academic publications and industry reports. A list of the materials I reviewed and relied upon in the preparation of this Declaration is attached hereto as Exhibit B.

10. The rate charged for my time spent on this matter is $600 per hour. I was supported in my work by the staff of OnPoint Analytics, Inc., an economic and statistical analysis firm. Time spent by the staff of OnPoint Analytics, Inc. was billed at their standard hourly rates which vary from $125 to $550 per hour depending upon the experience and credentials of the individuals performing the services.

### III.   SUMMARY OF CONCLUSIONS

11. The analysis presented in this Declaration has led me to the following conclusions:

### A.   Conclusion #1: Common Evidence Demonstrates that the Caustic Soda Industry is Conducive to Anticompetitive Behavior

12. Caustic Soda is a product with few economically viable substitutes. Potential alternatives are considered inferior for the users of Caustic Soda and those users would have to suffer substantial switching costs in order to turn to an alternative. As a result, the demand for Caustic Soda is inelastic and its sellers, the Defendants, can increase prices without losing sufficient customers to make the endeavor unprofitable. The product is also homogenous, with only a small number of variations based on grade and concentration. Even considering those variations, however, the evidence in this matter shows that participants in the Caustic Soda

industry largely viewed Caustic Soda as interchangeable. In part, this is evidenced by the use of price indices consolidating multiple types of Caustic Soda under a single price and agreements between various manufacturers to sell their products on behalf of each other. Prices of homogenous products are easier to understand and therefore coordinate. Also, for homogenous products customers make their supplier decisions based on prices, which would result in fierce price competition absent collusion. This creates an incentive to collude, in order to avoid that competition.

13. There are substantial barriers to entering the Caustic Soda industry and for existing small suppliers to increase capacity. The product is made through a complex and capital-intensive production process and the products from that process, particularly chlorine, are hazardous. This creates barriers to entry in the form of capital requirements and regulation. As a result, the industry can be cartelized by the major producers without the threat of entry or expansion by small producers undermining that collusion through increased supply. Further, imports are small, because of inherent advantages that U.S. producers have in terms of low energy costs, thus reducing the threat that increased imports could undermine a cartel.

14. The Caustic Soda industry is characterized by a small number of producers dominating production in the U.S. Because it is a concentrated industry, it is easier to coordinate pricing because only a small number of firms need coordinate. Also, due to the small number of major manufacturers, Defendants held overwhelming market power meaning that they could increase prices without being undermined by non-Defendants. In contrast, the purchasers of Caustic Soda are numerous and diverse and therefore lacked bargaining power sufficient to undermine the Defendants' alleged price increases. Finally, the Defendants had significant

opportunity to communicate with each other in the form of trade association meetings and prevalent social interactions, which also serves to reduce the cost of coordination.

15. In light of these characteristics, I find the Caustic Soda industry is conducive to price-fixing. This both makes the alleged price-fixing more likely to have occurred and more likely to have successfully increased prices across the entire industry, to the benefit of the Defendants but to the common detriment of members of the Classes.

## B. *Conclusion #2: Common Evidence Demonstrates that the Defendants' Alleged Conduct is Consistent with Anticompetitive Behavior*

16. During the Class Period, Defendants engaged in coordinated price increases, both in terms of magnitude and timing, despite themselves viewing that such increases were not justified by supply and demand factors. The collusive nature of these actions is reinforced by the pretexts used by Defendants to justify their behavior to customers. In order to support their collusive price-fixing arrangements, Defendants engaged in other anticompetitive behavior, including refusing to make bids to customers contracted by other Defendants and by self-imposing limitations on the amount of product they were willing to sell to specific customers. There is also evidence that Defendants further supported their collusive price-fixing arrangements by communicating on planned plant shutdowns, which would serve to reduce supply to the market, even though they were warned internally that such communications could be considered anticompetitive.

17. The evidence suggests that Defendants' conduct was contrary to their unilateral self-interest and could only be explained if they were acting collectively, in a common interest. In times of flat or decreasing demand and flat or decreasing costs (as was the case here), firms engaged in competition would be more likely to follow a price increase by another supplier with a lower price increase, or no price increase at all, in order to win customers. Firms engaged in

competition would be more likely to attempt to steal a rival's customers, rather than refrain from competing for customers on contract with another supplier. Firms engaged in competition would be more likely to keep planned shutdowns to themselves, lest another supplier use the information as an opportunity to steal customers. But the common evidence I present in this Declaration demonstrates that the Defendants did not engage in competitive, self-interested behavior, but instead, engaged in conduct that only makes sense if they were acting collusively. Therefore, based on my review of the evidence of Defendants' conduct, I conclude that their behavior during the Class Period is consistent with collusion.

### C. Conclusion #3: Common Evidence Demonstrates that the Defendants' Alleged Conduct Impacted Members of Each Class, Causing Them Economic Harm

18. The prices of homogenous products tend to more up and down together, regardless of supplier, customer, or small variations in product characteristics. Thus, in an industry conducive to successful collusion (such as this one), where there is substantial evidence of widespread price-fixing behavior (such as in this case), economists expect that the entire industry is affected by collusive price increases. I demonstrate that Caustic Soda prices were decreasing in the run up to the Class Period and then that trend sharply reversed to substantial price increases. I also demonstrate that this pattern was common across the industry, regardless of grades (membrane or diaphragm), Defendant supplier, whether the customer was a distributor or not, and regardless of the distributor in question.

19. I also demonstrate that the price increases were not justified by what was happening to supply and demand at the time, something the Defendants internally acknowledged themselves. Demand was flat or decreasing and costs were flat or decreasing. Further, the demand for chlorine, the co-product of Caustic Soda manufacturing, was increasing which would

normally have meant *more chlorine*, *more Caustic Soda*, and therefore *lower Caustic Soda prices*. But *the opposite happened*. Caustic Soda prices were *higher* and substantially so.

20.  This analysis provides common evidence that members of each Class experienced price increases because of Defendants' alleged conduct.

### D.  Conclusion #4: A Common Methodology Can be Used to Calculate Class-wide Damages

21. The preceding conclusions are based on my use of common evidence to demonstrate that the Caustic Soda industry was conducive to successful collusion, that the Defendants' behavior was consistent with the operation of a price-fixing cartel, that this behavior had a common price increasing effect across the industry, and that the price increases were not justified by normal, competitive supply and demand factors, as the Defendants themselves admitted at the time. These analyses serve as foundation for an econometric estimation of Class-wide damages for the State Antitrust Class and Colorado Consumer Protection Class. I conduct such an estimation in this Declaration using methods and data common to each Class.

22. There are three steps to my analysis: *first*, I estimate the direct overcharge paid by distributors to the Defendants using the Defendants' transaction data; *second*, I estimate the percentage of that direct overcharge that was passed through by distributors to members of each Class using data produced by distributors; *third*, I apply the direct overcharge times the pass-through percentage to the relevant volume of commerce meeting the Class definitions, to calculate Class-wide damages. With this analysis, I estimate **Class-wide damages of $155 million for the State Antitrust Class** and **Class-wide damages of $2.4 million for the Colorado Consumer Protection Class**.

23. **Class-wide damages for the Unjust Enrichment Class** can also be calculated using common evidence. I do so in this Declaration, finding such damages in the amount of **$712**

*million in revenue terms*, *$355 million in gross profit terms*, and *$348 million in net profit*

*terms*, for sales in the Unjust Enrichment States.

## IV.   THE CAUSTIC SODA INDUSTRY IS CONDUCIVE TO ANTICOMPETITIVE BEHAVIOR

24. Economists typically begin an investigation of an alleged cartel with a study of whether the industry in question is conducive to such anticompetitive behavior. In economic terms, this involves ascertaining if the benefits of the alleged cartel from supra-competitive prices, would likely outweigh the costs of such behavior, in the form of potentially lost customers and the difficulties associated with collusion. If the industry is conducive to anticompetitive behavior in that the benefits would have outweighed the costs, this supports Plaintiffs' allegations that the Defendants engaged in cartel behavior, because it would have been economically rational for them to do so. Simply, Defendants would have had the economic motive and the opportunity to collude. It also supports Plaintiffs' claim of common economic harm because collusion in an industry conducive to it, is more likely to succeed in the form of sustained, high prices across the industry.

25. This part of my Declaration proceeds as follows. In Section IV.A, I provide a brief description of the Caustic Soda industry. I then consider industry characteristics that are considered by the academic literature on cartels to make an industry conducive to collusion, if those characteristics are present:

26. *First*, a cartel will only be profitable if its customers generally continue to buy the product even at elevated prices. This will happen if consumer demand is relatively inelastic (*i.e.*, unresponsive to price) and if there are few substitute products that customers can buy instead.

Therefore, industries with inelastic demand[6] and few substitutes are more prone to successful collusion.[7] In Section IV.B, I describe how the demand for Caustic Soda is inelastic.

27. ***Second***, successful collusion is more likely when the "product is homogeneous."[8] Pricing for homogenous products is easier to understand and, therefore, easier to coordinate. Homogeneity also increases the incentive to collude in the first place, because a homogenous product, unlike a fully differentiated product, is interchangeable across sellers. Therefore, purchasers make their procurement decisions based on price, which would lead to fierce competition (which sellers would rather avoid) in the absence of collusion. In Section IV.C, I describe how Caustic Soda is a homogenous and interchangeable product.

28. ***Third***, to be successful, a cartel must increase prices and keep them increased (above what they would be otherwise). However, higher prices can motivate increased supply from outsiders – either firms already in the industry which did not join the cartel or new firms that decide to enter the industry on observing the high pricing. Thus, an industry with high barriers to entry and expansion is more prone to successful collusion.[9] In Section IV.D, I describe how the Caustic Soda industry is prone to high barriers to entry and expansion.

29. ***Fourth***, collusion "is most likely to occur and endure when numbers are small [and] concentration is high."[10] Further, a large cartel industry share is associated with cartel success

---

[6] Hay, George A., and Daniel Kelly, "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law and Economics* 17, no. 1 (April 1974): 13-38, at p. 14.
[7] Levenstein, Margaret C., and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44, no.1 (March 2006): 43-95 ("Levenstein and Suslow, "What Determines Cartel Success?""), at p. 76.
[8] Hay, George A., and Daniel Kelly, "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law and Economics* 17, no. 1 (April 1974): 13-38, at pp. 26-27.
[9] Connor, John M., "Global Cartels Redux: The Amino Acid Lysine Antitrust Litigation (1996)": 1-36, at p. 7.
[10] Hay, George A., and Daniel Kelly, "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law and Economics* 17, no. 1 (April 1974): 13-38, at pp. 26-27.

and higher overcharges,[11] because the so-called "fringe"[12] producers do not have sufficient capacity to increase supply and challenge the cartel by winning market share. Instead, the fringe has a strong incentive to follow the cartel's high prices with their own. In Section IV.E, I describe how the Caustic Soda industry in the U.S. was concentrated and how the alleged cartel had an overwhelming share of the industry, as high as 93%.

30. **Fifth**, industries with active trade associations and repeated social interactions can facilitate successful collusion, as meetings at conferences and other engagements enable conspiratorial communications with ease and at relatively low cost.[13] In Section IV.F, I describe the prevalence of opportunities for the Defendants to communicate in the Caustic Soda industry.

31. **Sixth**, industries with a lack of customer concentration and, therefore, low customer bargaining power, are easier to cartelize. In Section IV.G, I describe how the Defendants' customers were not concentrated and were certainly much less concentrated than the Defendants.

32. In sum, the Caustic Soda industry is dominated by a handful of manufacturers selling a product that economists would consider homogenous and interchangeable. Would be challengers to the cartel, be they new entrants or existing small manufacturers, face high barriers to entry and expansion, given the sheer expense in creating or increasing manufacturing capacity and the various regulatory hurdles that need to be overcome. Combined with inelastic demand and the breadth of opportunities for Defendants to collude, the industry is conducive to the sort of successful collusion that would impact members of each Class through higher prices.

---

[11] Levenstein and Suslow, "What Determines Cartel Success?" at p. 61, Table 6; Bolotova, Yuliya.V., "Cartel overcharges: An empirical analysis," *Journal of Economic Behavior & Organization* 70, (2009): 321-341, at p. 321; Bolotova, Yuliya.V., Connor M. John, and Douglas J. Miller, "Factors Influencing the Magnitude of Cartel Overcharges: An Empirical Analysis of the U.S. Market," *Journal of Competition Law & Economics* 5, no. 2 (August 2008): 361-381, at p. 361.
[12] The "fringe" consists of competitors that are not part of the cartel. (Bolotova, Yuliya.V., "Cartel overcharges: An empirical analysis," *Journal of Economic Behavior & Organization* 70, (2009): 321-341, at p. 330).
[13] Levenstein and Suslow, "What Determines Cartel Success?" at pp. 69-70, Table 11.

### A. Industry Background

33. The Caustic Soda industry is a component of what is known as the chlor-alkali industry. In this section, I describe Caustic Soda's production and uses, the dominant manufacturers of Caustic Soda (*i.e.*, the Defendants), the distribution channel, and some of the product's end users.

### 1. Production

34. Caustic Soda is the chemical compound sodium hydroxide commonly known as lye.[14] Caustic Soda is produced through the electrolysis of brine (*i.e.*, salt and water) as shown in Figure 1 below. This process produces Caustic Soda, chlorine, and hydrogen.

*Figure 1. Caustic Soda Production Process[15]*



35. As shown in Figure 2, there are three "grades" of Caustic Soda, which correspond to three different methods of production: diaphragm, membrane, and mercury.

---

[14] Westlake, "Caustic Soda: A Key Ingredient for Everyday Life," accessed September 19, 2022, at https://www.westlake.com/caustic-soda-uses.

[15] IHS Markit, *Introduction to Chlor-Alkali Workshop*, September 11-12,2018, IHSM008271-8545 ("IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545"), at -008283.

*Figure 2. Electrolytic Processes for Production[16]*



36. All three grades produce Caustic Soda through the electrolysis of brine. The diaphragm process involves brine entering a compartment with a titanium-coated anode where chlorine is separated.[17] The solution is then passed through a diaphragm made of asbestos or fluoropolymer fibers into a separate compartment containing a cathode made from steel where the hydrogen and Caustic Soda are separated.[18] The membrane process is similar to the diaphragm process. Instead of an asbestos or fluoropolymer fiber diaphragm, the membrane process uses a semipermeable ion-exchange membrane to separate the anode and cathode.[19] The mercury process is the oldest method and involves using two separate vessels, one of which uses mercury as a cathode.[20] The mercury process has been largely eliminated from use in the U.S. and Europe.[21] Thus, the vast majority of Caustic Soda manufactured by the Defendants is membrane or diaphragm grade, as shown in Figure 3. As I shall describe in Section IV.C of this Declaration, the different grades are considered interchangeable and largely homogenous. I will

---

[16] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008284.
[17] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008302-303.
[18] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008302-303.
[19] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008297.
[20] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008305.
[21] OxyChem, *OxyChem Caustic Soda Overview*, OCC_00322416-00322440 ("OxyChem, *OxyChem Caustic Soda Overview*, OCC_00322416-00322440"), at -00322418.

also demonstrate in Section VI.A that the prices of the different grades rise and fall together, again supporting their homogeneity.



*Figure 3. Caustic Soda Grades Manufactured by the Defendants[22]*

37. Regardless of the grade, the primary costs for manufacturing Caustic Soda are electricity and brine. One source describes how electricity is the "dominant raw material cost" comprising approximately 68% of the variable cost of production (when using the diaphragm process, for example) with the cost of salt representing 22% of the variable cost of production, and all other inputs representing 10%.[23] Another source describes the main variable costs as

---

[22] Defendants' transaction data October 2015-December 2019.
[23] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008379, -008397.

electricity, steam, and salt/brine.[24] Labor is considered a fixed cost in the Caustic Soda

industry.[25]

### 2. Uses

38. Although Caustic Soda can be sold in solid form, it is predominantly sold as a liquid.

In fact, the Defendants sold 99% of their Caustic Soda in liquid form, as shown in Figure 4.

*Figure 4. Defendants' Sales of Solid versus Liquid Caustic Soda[26]*



39. Liquid Caustic Soda is simply Caustic Soda dissolved in water.[27] Although different

concentrations are available, it is predominantly sold at a Caustic Soda concentration level of

---

[24] OxyChem, Chlorovinyls Caustic Soda Manufacturing Cost, 2012-2019, US Dollars, OCC_00126170.
[25] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008402. *See also* OxyChem, Chlorovinyls Caustic Soda Manufacturing Cost, 2012-2019, US Dollars, OCC_00126170.
[26] Defendants' transaction data October 2015-December 2019.
[27] Westlake, *Product Stewardship Summary*, accessed September 19, 2022 at https://www.westlake.com/sites/default/files/Liquid%20Caustic%20Soda-DiaphragmMembrane-

50%, as shown in Figure 5. Regardless of the concentration, Caustic Soda quantities are standardized into "dry" units, expressed as either dry metric tons ("DMT") or dry short tons ("DST").[28] These units refer to the Caustic Soda being "dry" regardless of whether it is in solid or liquid form, requiring calculation to determine the amount of the product sold (*e.g.* 1 DMT=2 liquid metric tons of liquid caustic soda at 50% solution).[29] Prices can then be expressed in standardized dry terms, such as dollars per DST.[30]



*Figure 5. Defendants' Sales of Liquid Caustic Soda by Concentration Percentage[31]*

---

PS%20Summary%20-%20Ed1%20-%20Final_July2018_0.pdf, (Westlake, *Product Stewardship Summary*), at p. 1 "Westlake produces liquid caustic soda as 50% and 73% solutions in water."

[28] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008289.
[29] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008289.
[30] OxyChem, *OxyChem Caustic Soda Overview*, OCC_00322416-00322440, at -00322421 - 00322423.
[31] Defendants' transaction data October 2015-December 2019, diaphragm and membrane grade only.

40. Caustic Soda is used in a number of manufacturing industries, including: chemical production, where it is "produced as a basic reagent for a multitude of general industrial applications;"[32] pulp and paper, where it is used "as the initial treatment in de-inking secondary fibers" and used in removing lignin compounds;[33] alumina extraction, in which it "is used to digest bauxite ore" and used in "the finishing and chemical milling of aluminum products;"[34] and soapmaking, where it saponifies fats into water soluble sodium soaps.[35] The biggest use is chemical production which, as shown in Figure 6, represents around 61% of Caustic Soda usage (both inorganic, 26%, and organic, 14%, chemical production, propylene oxide production, 12%, and soaps & detergents production, 9%), with pulp and paper representing the next biggest at 21% of usage. As such, "[m]anufacturing activity sets caustic demand."[36]

---

[32] Westlake, *Product Stewardship Summary*, at p. 2.
[33] Westlake, *Product Stewardship Summary*, at p. 2.
[34] Westlake, *Product Stewardship Summary*, at p. 2.
[35] Westlake, *Product Stewardship Summary*, at p. 2.
[36] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008432.

*Figure 6. U.S. Caustic Soda Consumption by Use, 2019 Estimated[37]*

2019e Total US Demand = 11.6MM DST



41. As described above, chlorine is a co-product of Caustic Soda production. Chlorine has its own uses. The primary use of chlorine is the manufacture of vinyl products such as polyvinyl chloride ("PVC").[38] PVC is used for infrastructure and residential construction.[39] Other construction related uses are for flame retardants, furnishings, and paints and coatings.[40] Chlorine is also used for water purification, among other uses.[41]

42. Another product created by the Caustic Soda production process is hydrogen. Hydrogen is recovered and used as fuel or a raw material to produce hydrochloric acid.[42]

---

[37] OxyChem, *OxyChem Caustic Soda Overview*, OCC_00322416-00322440, at -00322425.
[38] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008525.
[39] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008431.
[40] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008431.
[41] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008446.
[42] World Chlorine Council, *Caustic Soda*, accessed at https://worldchlorine.org/wp-content/uploads/2016/05/FOLDER-SODA-ABICLOR-INGLES.pdf., at p. 2.

### 3. *Manufacturers*

43. The main manufacturers of Caustic Soda in the U.S. are the Defendants in this litigation, each of which is described in this section.

### a. *Olin*

44. Defendant Olin Corporation was founded in 1892 with its principal executive offices in Clayton, Missouri.[43] Olin is concentrated in three business segments, Chlor Alkali Products and Vinyls (manufacturing and selling chlorine, Caustic Soda, and other chemicals), Epoxy (producing and selling epoxy materials and precursors), and Winchester (manufacturing and selling ammunition and related components).[44] In 2015, Olin acquired Dow Chemicals' North American Chlor Alkali and Vinyl, Global Chlorinated Organics, and Global Epoxy businesses.[45] As of the end of 2021, Olin had chlorine/Caustic Soda plants and facilities in: Becancour, Canada; Charleston, Tennessee; Freeport, Texas; McIntosh, Alabama; Niagara Falls, New York; Plaquemine, Louisiana; and, St. Gabriel, Louisiana.[46] Defendant K.A. Steel Chemicals, Inc. is a wholly owned subsidiary of Olin.[47] K.A. Steel is a distributor of Caustic Soda in North America acquired by Olin on August 22, 2012.[48]

### b. *Oxy*

45. Defendant Occidental Petroleum Corporation ("Occidental") was incorporated in Delaware in 1986 and has its executive offices in Houston, Texas.[49] Occidental consists of three

---

[43] Olin Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 24, 2022 ("Olin 10-K for 2021"), at p. 3.
[44] Olin 10-K for 2021, at p. 3.
[45] Olin Corporation, "A Historical Look at Olin, a Globally Recognized Corporation," accessed September 19, 2022 at https://olin.com/about-olin/history/.
[46] Olin 10-K for 2021, at p. 5.
[47] Olin 10-K for 2021, at Exhibit 21.
[48] Olin Corporation, Form 10-K, for fiscal year ending December 31, 2014, filed February 25, 2015, at p. 2.
[49] Occidental Petroleum Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 24, 2022, at p. 2.

reporting segments: oil and gas, chemical, and midstream and marketing.[50] Defendant Occidental Chemical Corporation ("OxyChem") is a subsidiary of Occidental.[51] OxyChem is a manufacturer of Caustic Soda with eight facilities in North America.[52] OxyChem's North American Caustic Soda facilities are located in: Wichita, Kansas; Convent, Louisiana; Geismar, Louisiana; Taft, Louisiana; New Johnsonville, Tennessee; Battleground, Texas; Deer Park, Texas; and, Ingleside, Texas.[53]

### c. Westlake Corporation

46. Defendant Westlake Corporation ("Westlake") began operations in 1986 and is a vertically integrated global manufacturer and marketer of materials and housing and infrastructure products.[54] On August 31, 2016, Westlake announced the completion of its acquisition of Axiall Corporation, making Westlake the third-largest chlor-alkali producer.[55] As of February 16, 2022, Westlake had Caustic Soda manufacturing facilities in: Calvert City, Kentucky; Geismar, Louisiana; Lake Charles, Louisiana; Plaquemine, Louisiana; Natrium, West Virginia; and, Gendorf and Knapsack, Germany.[56]

---

[50] Occidental Petroleum Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 24, 2022, at p. 2.
[51] Occidental Petroleum Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 24, 2022, at p. 2.
[52] Occidental Petroleum Corporation, "Manufacturing Sites," accessed August 5, 2021 at https://www.oxy.com/operations/essential-chemistry/doing-business-with-oxychem/manufacturing-sites/.
[52] Occidental Petroleum Corporation, "Manufacturing Sites," accessed August 5, 2021 at https://www.oxy.com/operations/essential-chemistry/doing-business-with-oxychem/manufacturing-sites/.
[53] Occidental Petroleum Corporation, "Manufacturing Sites," accessed August 5, 2021 at https://www.oxy.com/operations/essential-chemistry/doing-business-with-oxychem/manufacturing-sites/.
[54] Westlake Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 23, 2022, at p. 1.
[55] Westlake, "Westlake Chemical Completes Acquisition of Axiall Corporation," press release, August 31, 2016, accessed April 19, 2022 at https://www.westlake.com/westlake-chemical-completes-acquisition-axiall-corporation.
[56] Westlake Corporation, Form 10-K, for the fiscal year ending December 31, 2021, filed February 23, 2022, at p. 3.

### d. *Shintech*

47. Defendant Shin-Etsu Chemical Co., Ltd. ("Shin-Etsu") is a Japanese corporation established in 1926, headquartered in Tokyo, Japan.[57] Shin-Etsu manufactures a wide range of products divided among four business segments, Infrastructure Materials, Functional Materials, Electronic Materials, and Processing & Specialized Services.[58] Shin-Etsu's Infrastructure Materials includes the manufacturing of Caustic Soda.[59] Defendant Shintech Inc. is a U.S. subsidiary of Shin-Etsu established in 1974, headquartered in Houston, Texas.[60] Shintech Inc. produces Caustic Soda at facilities located in Plaquemine, Louisiana.[61]

### e. *Formosa Plastics*

48. Defendant Formosa Plastics Corporation is a Taiwanese corporation founded in 1954, headquartered in Taipei City, Taiwan.[62] Formosa Plastics Corporation is part of the Formosa Plastics Group which consists of more than 50 other companies.[63] Defendant Formosa Plastics Corporation U.S.A. is a U.S. affiliate of the Formosa Plastics Group founded in 1978, headquartered in Livingston, New Jersey.[64] Formosa Plastics Corporation U.S.A. produces Caustic Soda at facilities located in Point Comfort, Texas.[65]

---

[57] Shin-Etsu Chemical Co. 2022 Annual Report, at pp. 2, 55.
[58] Shin-Etsu Chemical Co. 2022 Annual Report, at p. 27.
[59] Shin-Etsu Chemical Co. 2022 Annual Report, at p. 31.
[60] Shin-Etsu Chemical Co. 2022 Annual Report, at pp. 2, 10, 52.
[61] Shintech, Inc., "About Us>Plaquemine," accessed September 19, 2022 at https://www.shintech.com/cgi-bin/rtbin/sbpg/rt_hdln_dsply2.cgi?Autoincrement=000004&value_6=About%20Us.
[62] Formosa Plastics Group, *Introduction*, 2018, accessed September 19, 2022 at https://www.fpg.com.tw/uploads/images/media-center/ebook-top/FPG%20Introduction2018_en.pdf, at p. 1.
[63] Formosa Plastics Group, *Introduction*, 2018, accessed September 19, 2022 at https://www.fpg.com.tw/uploads/images/media-center/ebook-top/FPG%20Introduction2018_en.pdf, at p. 7.
[64] Formosa Plastics Corporation U.S.A., "About Formosa Plastics – An Overview," accessed September 19, 2022 at https://www.fpctx.com/about-us-main/overview.
[65] Formosa Plastics Corporation U.S.A., "About Formosa Plastics – An Overview," accessed September 19, 2022 at https://www.fpctx.com/about-us-main/overview.

### 4. *Distributors*

49. Although Caustic Soda is often sold by manufacturers directly to end users, 30% of Defendants' sales are through distributors, as shown in Figure 7.

*Figure 7. Defendants' Caustic Soda Sales Distribution versus non-Distribution[66]*



50. Among the largest distributors are ▮▮▮▮, ▮▮▮▮▮ and ▮▮▮▮s. ▮▮▮▮ describes itself as "the largest reseller of chlor-alkali based chemistry in North America" and is located in Illinois.[67] Among the end uses ▮▮▮▮ distributes Caustic Soda for are metal treatment, mineral recovery activator and modifier and/or dispersant for mining minerals and metals, and water

---

[66] Defendants' transaction data October 2015 – December 2019.
[67] Univar Solutions, "Our Perspective on the Chlor-alkali Market," accessed May 4, 2021 at https://www.univarsolutions.com/blog/perspective-chlor-alkali-market/; Univar Solutions, "Contact Us," accessed September 19, 2022 at https://www.univarsolutions.com/contact-us/.

treatment.[68] ████ distributes Caustic Soda to more than 12,000 customers in the U.S.[69] ████████████████████████████████████████ with more than 9,000 Caustic Soda customers in the U.S.[70] ████ is another large distributor with more than 2,000 Caustic Soda customers in the U.S.[71] ████ is headquartered in Roseville, Minnesota and offers Caustic Soda in varying sizes ranging from "5 gallon pails" to "bulk tank trucks."[72]

51. Figure 8 presents Defendants' sales to distributors, showing that 38% of sales were to ████████████████████████, and 80% were sold to the top 10 distributors. Members of each Class bought their Caustic Soda through distributors.



*Figure 8. Defendants' Caustic Soda Sales to Distributors*[73]

---

[68] ████████████████████████████████████████████████

[69] ████████████

[70] ████████████████████████████████

[73] Defendants' transaction data October 2015 – December 2019.

### 5. *Plaintiffs*

52. I understand that there are two Named Plaintiffs in this case, each of which is an indirect purchaser and end user of Caustic Soda. Tripp was founded in 1922 and is located in Buffalo, New York.[74] Tripp provides commercial and industrial plating.[75] Finch Paper was founded in 1865 and is located in Glenn Falls, New York.[76] Finch Paper is a pulp and paper manufacturer, including the production of office paper goods.[77]

53. There are numerous members of each Class. I have analyzed distributor data produced by ███████████████████, which collectively represent 38% of Defendants' sales to distributors during the Class Period.[78] Based on that data, in the Antitrust States, ████ sold to 1,992 Class member customers, ███████████, and ███████████[79] In the Unjust Enrichment States, ██████ sold to 976 Class member customers, ███████████, and ████ to 868.[80] In Colorado, ██████ sold to 50 Class member customers, ███████████, and ████████ to 9.[81]

### B. *Inelastic Demand*

54. The elasticity of demand is a measure of how much the quantity of a product demanded changes due to a change in price: "[d]emand is said to be inelastic if the quantity demanded responds only slightly to changes in price."[82] For products where demand is inelastic, an increase in price does not significantly decrease the quantity of the product consumed. This means that a price-fixing cartel can successfully increase prices without losing so many

---

[74] Tripp Plating Works Inc., "Tripp Plating Works" accessed August 9, 2022 at http://www.trippplating.com/.
[75] Tripp Plating Works Inc., "Tripp Plating Works" accessed August 9, 2022 at http://www.trippplating.com/.
[76] Finch Paper, "History", accessed September 19, 2022 at http://www.finchpaper.com/history.
[77] Finch Paper, "History", accessed September 19, 2022 at http://www.finchpaper.com/history.
[78] *See* my workpapers.
[79] *See* my workpapers.
[80] *See* my workpapers.
[81] *See* my workpapers.
[82] Mankiw, Gregory N., "Principles of Economics", 8th edition, Boston: Cengage Learning, 2018 at p. 90.

customers as to make the endeavor unprofitable. The connection between inelastic demand and collusive behavior is recognized by antitrust authorities who have found that "coordinated interaction as more likely, the more the participants stand to gain from successful coordination" and "[c]oordination generally is more profitable, the lower is the market elasticity of demand."[83]

55. The demand for Caustic Soda is inelastic because it lacks adequate economically viable substitute products which customers could otherwise turn to in the face of a price increase in Caustic Soda. Although soda ash can in certain circumstances be used as a substitute for Caustic Soda, the ability of customers to switch to soda ash is constrained. For example, a switch by pulp mills, "requires an additional capital investment in materials handling equipment."[84] Further, Caustic Soda is a generally preferred product as it is "a stronger base and a faster reactant than soda ash," "much more soluble in water and can be economically stored and transported in aqueous form," and "does not form undesirable by-products such as carbon dioxide or insoluble carbonates."[85] Moreover, "the ability to switch [away from Caustic Soda] may be limited by purchase contracts, convenience, supply logistics and other issues."[86] In fact, when discussing the potential substitutability of soda ash for Caustic Soda, Olin Executive Vice President, James A. Varilek, stated in an earnings call that "[t]here's a large switch in cost and so forth. So we don't see any impact from soda ash."[87] Another potential substitute in the form of potassium hydroxide (also known as "caustic potash" or "potash lye") also has significant constraints as it is recognized as being "[n]ot interchangeable with caustic soda for all alkalinity

---

[83] United States Department of Justice, Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010, accessed at https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf, at p. 26.
[84] UBS Securities LLC, *North American Chemicals*, June 20, 2018, OLN-001196367-386 at -001196379.
[85] IHS Chemical, *Chemical Economics Handbook*, December 2014, OLN-000061877-000062080 at -000061908.
[86] IHS Chemical, *Chemical Economics Handbook*, December 2014, OLN-000061877-000062080 at -000061908-000061909.
[87] S&P Global, *Olin Corporation NYSE: OLN FQ2 2018 Earnings Call Transcripts*, August 1, 2018, FPC-USA-DPP-00182130-150 at -144.

requirements."[88] ██████████████████████████████████

███ █ ██████████████████████████████████████

████████████████████████████████ █

56. The inelasticity of demand for Caustic Soda is confirmed by the price and consumption patterns during the Class Period. Despite the continuous rise in spot and contract liquid Caustic Soda prices in 2016 and 2017, the consumption of Caustic Soda remained relatively unchanged during the same time period.[91]

### C. Product Homogeneity

57. Caustic Soda is a homogenous, interchangeable product that is primarily distinguished by price. While Caustic Soda comes in different grades and concentrations, these differences are minor given the actual practices in the industry. The interchangeability (or, "fungibility") of Caustic Soda is described by the Defendants themselves and by third-party analysts. Former Olin executive, Larry Kromidas, testified that Caustic Soda was fungible and any consideration of differences across diaphragm and membrane grades was likely "overkill" and even then limited to certain applications:[92]

> Q.     By that you mean [Caustic Soda] is fungible?
>
> A.     Yes. I mean, let me be really clear here and maybe this is overkill, but there are certain applications where you would want membrane-grade caustic as opposed to diaphragm-grade caustic; pharmaceuticals, as an example.

---

[88] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008292.

██ ██████████████████████████████████████
██████████████████████████████████████

[91] OxyChem, *Liquid Caustic Soda Market Fundamentals*, August 2018, VDM-CS-0012111-0012130 ("OxyChem, *Liquid Caustic Soda Market Fundamentals*, VDM-CS-0012111-0012130"), at -0012128, -0012129; IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008502; IHS, Caustic Soda Summary Data and Projections, 2005-2028, U.S. Dollars, OLN-000465142. Compare VDM-CS-0012111-0012130, at -0012129 and -0012128 with IHSM008271-8545, at -008502; OLN-000465142. Data from IHS shows total U.S. domestic consumption for Caustic Soda as 10,450,000 metric tons for 2015 and 10,331,000 metric tons for 2017 (a difference of less than one percent).

[92] Deposition of Larry Kromidas, December 1, 2021, at 164:6-23.

58. Further supporting the interchangeability of Caustic Soda is the testimony of Michael Jakovich of K.A. Steel (Olin) who testified that "we have customers, that if they buy diaphragm, they can purchase membrane."[93] Similarly, Philip Chen of Formosa Plastic testified that they would sell membrane Caustic Soda to fulfill orders for diaphragm:[94]

> Q.     FPC USA has some caustic soda customers that it sells diaphragm product to, is that right?
>
> A.     …We use one product to fit the two requirement. If a customer says, "We only need diaphragm," fine. We just put the diaphragm, but actually it's [membrane]."

59. Defendants' testimony that Caustic Soda is fungible is further supported by the testimony of Plaintiffs. █████████████████████████████████████

███████████████████████████████ █ ████████████████████

██████████████████████████████████ █ █████████████

████████████████████████████ █

60. The homogeneity and interchangeability of Caustic Soda is also supported by the business practices in the industry. Swap agreements (also known as exchange agreements) were commonly used by the Defendants. Under these agreements, one Defendant agreed to deliver its Caustic Soda to a customer of another Defendant, if the second Defendant had difficulty making supply, generally because of the location of the customer.[98] ██████████████████████

---

[93] Deposition of Michael Jakovich, January 13, 2022, at 151:12-152:8.

[94] Deposition of Phillip Chen, November 19, 2021 ("Chen Deposition"), at 30:23-31:7.

█
█
██████████████████████

[98] Deposition of Ashley Berryman, January 21, 2022 ("Berryman Deposition"), at 35:22- 36:2; Deposition of Edward Luick, September 9, 2021 ("Luick Deposition"), at 28:24-29:16; Deposition of Heath Langford, October 7,2021 ("Langford Deposition"), at 74:10-15; Chen Deposition at 31:19-33:10; Deposition of Erik Schoenman, October 6, 2021 ("Schoenman Deposition"), at 51:16-20; Email correspondence dated November 27, 2018 between Vickie J CHAS Ray, Lena Hope, Zack Luick, Kyle Wilson, et al., OLN-001512204-06 at -04; Deposition of Kelvin Wu, December 7, 202l ("Wu Deposition"), at 14:22-15:20; Email correspondence dated November 27-28, 2018, between Vickie Ray, Lena Hope, Zack Luick, Kyle Wilson, et al., OLN-001512204-06 at 05; Deposition of Burnis,

██████████████████████████████████████████████████████████

████████████████ ██ Defendants regularly engaged in such agreements with each other,

demonstrating that Caustic Soda was interchangeable across Defendants.[100]

61. Another business practice that demonstrates the homogenous nature of Caustic Soda,

is the common use of third-party indexes, such as the IHS index, for pricing Caustic Soda. IHS

prepares a Caustic Soda price index which it claims is "most representative of the month-to-

month caustic soda price movement for contract volumes of liquid 50% caustic soda…."[101]

Defendants regularly used the IHS index price when dealing with customers as a benchmark for

Caustic Soda pricing. Philip Chen of Formosa Plastics testified that "domestic customer, they

will request [that] they want to use IHS…index price at which a certain percentage it's coming

from there to start to initiate the contract price in the beginning."[102] Shintech's Dana West

testified that ████████████████████████████████████████████████ ██

██ ████████████████████████████████████████████████ ██

██ ████████████████████████████

J. Herbert, March 10, 2022, at 357:12-358:2 "Q. What roles does logistics savings play, if any, in the decision to make a swap, or do an exchange? A. It – it plays a significant role…[s]o freight was a key component…[a]nd swaps could be done for freight savings alone.".

[99] ████████████████████ Luick Deposition, at 28:24-29:16; Langford Deposition, at 74:10-15; Chen Deposition, at 31:19-33:10; Schoenman Deposition, at 51:16-20; Email correspondence dated November 27, 2018 between Vickie J CHAS Ray, Lena Hope, Zack Luick, Kyle Wilson, et al., OLN-001512204-06 at -04; Wu Deposition, at 14:22-15:20; Email correspondence dated November 27-28, 2018, between Vickie Ray, Lena Hope, Zack Luick, Kyle Wilson, et al., OLN-001512204-06 at 05.

[100] Luick Deposition, at 28:24-29:16; Deposition of Tim Hillsley, February 10, 2022, at 66:8-22, 67:21-68:17; Langford Deposition, at 74:10-15; Chen Deposition, at 31:19-33:10; Schoenman Deposition, at 51:16-20 Email correspondence dated November 27, 2018, between Vickie J CHAS Ray, Lena Hope, Zack Luick, Kyle Wilson, et al., OLN-001512204-06 at -04.

[101] Westlake, "Industry Product Pricing," accessed September 23, 2022 at https://www.westlake.com/industry-product-pricing.

[102] Chen Deposition, at 99:20-24.

[103] Deposition of Dana West, July 16, 2021, at 121:13-17.

62. The fact that such price indexes were used commonly by the Defendants to price their products further supports that those products were homogenous and interchangeable. In Section VI.A of this Declaration, I will provide further evidence that Caustic Soda is homogenous and interchangeable through pricing analysis that shows that prices for Caustic Soda move together, regardless of differences such as grade, manufacturer, or distributor customer.

### D. Barriers to Entry and Expansion

63. There are high barriers to new entry, and to expansion, in the Caustic Soda industry. Such barriers serve as a deterrent to potential market entrants, and they also serve to prevent significant expansion by small existing manufacturers of Caustic Soda that did not join the cartel, either of which could potentially serve as a competitive threat to a price-fixing cartel.

64. The barriers to entry include the cost to build a production plant, which is a significant undertaking. Indeed, just expanding a current plant's operations is very expensive. For example, OxyChem recently announced the expansion and modernization of a plant in Battleground, Texas, expected to commence in 2023.[104] The projected cost of the modernization and expansion of this plant was estimated by OxyChem to be approximately $1.1 billion.[105] The high cost of opening a new production facility is also supported by third-party analysts who estimate the cost of opening a new (*i.e.*, "greenfield") plant as ranging from $1,750 per ECU to $2,500 per ECU depending on the location of the plant, which translates into $560 million to $800 million total plant production cost, assuming a plant capacity of 320k ECUs.[106]

---

[104] Oxy, *Second Quarter Earnings Conference Call*, August 3, 2022, accessed September 16, 2022 at https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/oxy2q22conferencecallslides.pdf, at p. 7.
[105] Oxy, *Second Quarter Earnings Conference Call*, August 3, 2022, accessed September 16, 2022 at https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/oxy2q22conferencecallslides.pdf, at p. 7.
[106] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at 8407; Morgan Stanley, *Chlor-Alkali: Single-Digit IRRs = Limited Capacity on the Horizon*, May 22, 2018, OLN-000578678-8703 at -8678, -8681.

65. Production plants need raw material inputs. So, another barrier to entering or expanding in the Caustic Soda industry comes in the form of access to electricity and salt, which generally comes from long-term supply arrangements and manufacturers' own power operations and internal resources. For instance, Olin describes how:[107]

> [a]pproximately 74% of our electricity is generated from natural gas or hydroelectric sources. We have long-term power supply contracts with Dow in addition to utilizing our own power assets…A portion of our purchases of raw materials…are made under long-term supply agreements, while approximately 59% of the salt used in our Chlor Alkali Products…is produced from internal resources.

66. Further barriers include regulatory hurdles. For instance, the time needed for environmental or other regulatory permitting is estimated to be two to three years.[108] Therefore, even where a company "get[s] it right," the time from the initial decision making to plant commissioning is approximately seven years, or roughly the entire Class Period at issue in this matter.[109] Add to these factors the difficulty in obtaining substantial supply, distribution, and transportation arrangements, it is clear that there are substantial barriers to entering by new producers and to expansion by small producers, in the Caustic Soda industry. This is also evident from the lack of additional competitors in the Caustic Soda industry despite increased prices during the Class Period. Detailed later in this Declaration, the Caustic Soda industry underwent a series of price increases during the Class Period. But there were no significant new entrants into the market and the market was instead characterized by consolidation, as I describe in the next section.[110]

---

[107] Olin Corporation. Form 10-K for fiscal year ending December 31, 2020, filed February 24, 2020, at p. 12.
[108] IHS Chemical, *CAV, Just Another Cycle or Time to Invest?*, 2016, IHSM004257-004286, at -004276, -004278.
[109] IHS Chemical, *CAV, Just Another Cycle or Time to Invest?*, 2016, IHSM004257-004286, at -004276.
[110] Compare the largest U.S. Caustic Soda producers by capacity in 2009 with the largest Caustic Soda producers by capacity in 2018. OxyChem, *Liquid Caustic Soda Market Fundamentals*, VDM-CS-0012111-0012130, at -0012114; Chemical Market Associates, Inc., *World Chlor-Alkali Analysis*, November 2009, OCC_00256709 – 00257760, at -256815. In 2009, the largest U.S. Caustic Soda producers were Dow, OxyChem, Olin, PPG, Formosa Plastic,

67. Finally, there is little threat of substantial imports undermining a price-fixing cartel in the Caustic Soda industry in the U.S. As described in an Axiall presentation dated May 2016, "[i]mports do not play a significant role in serving North American demand, serving less than 10% of the market."[111] For the United States specifically, data from IHS shows imports meeting approximately 5% of U.S. Caustic Soda demand.[112] The primary reason for this is due to advantages held by U.S. producers of Caustic Soda related to lower energy costs.[113] As a result, the U.S. is a net exporter of Caustic Soda, and "25% of all Caustic produced in NAM [North America] is exported" with "98% of exports" departing from the U.S. Gulf Coast ("USGC").[114]

### E.  Market Concentration and Market Power

68. The Caustic Soda industry has undergone a period of consolidation and was concentrated during the Class Period. As noted above, the literature on cartels finds that they are more likely to occur and be successful when the industry can be controlled by relatively few companies. In addition, cartels are more successful at raising prices when they have a large share of the industry in question. The alleged cartel in this case had an overwhelming share of the Caustic Soda industry. Finally, there is direct evidence of the alleged cartel's market power, in that it successfully increased prices during the Class Period.

---

Georgia Gulf, and Shintech. By 2018, the largest U.S. Caustic Soda producers were Olin (which acquired Dow's Caustic Soda business), OxyChem, Westlake (which acquired Axiall, which previously acquired PPG and Georgia Gulf), Shintech, and Formosa Plastic.
[111] Trinity Associates, *Axiall Strategy*, May 2016, WL 0000478180-8258, at -8213.
[112] IHS, Caustic Soda Summary Data and Projections, 2005-2028, U.S. Dollars, OLN-000465142, see e.g. 2016 with total domestic demand of 10,280,000 metric tons and total imports of 502,000 metric tons.
[113] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008501 ("Low cost electricity provides a cost structure that enables USGC producers to compete for caustic soda export demand to most regions.").
[114] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008501.

1. *Consolidation*

69. By 2010, the chlor-alkali industry had already undergone significant consolidation. In 2010, an investor presentation by Olin claimed there were "favorable industry dynamics" due in part to "industry consolidation."[115] Specifically, Olin identified Oxy's acquisition of Vulcan in 2004 which Olin claimed was "[t]hen the #7 ranked producer in North America" with "5.5% of North American capacity."[116] Olin also identified its own acquisition of Pioneer in 2007 which Olin claimed was "[t]hen the #7 ranked producer in North America" with "4.7% of North American capacity."[117]

70. The chlor-alkali industry continued to consolidate during the Class Period. Dow's gulf coast chlor-alkali business was acquired by Olin in 2015, with Olin now marketing itself as the "No.1 global manufacturer of membrane Caustic Soda."[118] In 2016, Westlake acquired Axiall Corporation making it the "third-largest chlor-alkali producer" with Axiall itself having been the product of a merger completed in 2013 between Georgia Gulf Corporation and PPG Industries Inc.'s commodity chemicals business.[119]

---

[115] Olin, *Olin KeyBanc Capital Markets: Basic Materials & Packaging Conference*, September 14, 2010, accessed September 19, 2022 at https://www.sec.gov/Archives/edgar/data/74303/000007430310000048/keybancslides0914102.htm ("Olin, *Olin KeyBanc Capital Markets*"), at p. 13.
[116] Olin, *Olin KeyBanc Capital Markets*, at p. 13.
[117] Olin, *Olin KeyBanc Capital Markets*, at p. 13.
[118] Olin Corporation, "A Historical Look at Olin, a Globally Recognized Corporation," accessed September 19, 2022 at https://olin.com/about-olin/history/; Olin, "Sodium Hydroxide," accessed September 19, 2022 at https://olinchloralkali.com/products/sodium-hydroxide/.
[119] Westlake, "Westlake Chemical Completes Acquisition of Axiall Corporation," press release, August 31, 2016, accessed September 19, 2022 at https://www.westlake.com/westlake-chemical-completes-acquisition-axiall-corporation; Reuters, "Georgia Gulf doubles in size with PPG chlorine deal," press release, July 19, 2012, accessed September 19, 2022 at https://www.reuters.com/article/us-ppgindustries-georgiagulf/georgia-gulf-doubles-in-size-with-ppg-chlorine-deal-idUSBRE86I0IV20120719; Westlake, "Axiall Corporation Created as Merger of Georgia Gulf, PPG Commodity Chemicals Business Is Completed," press release, January 28, 2013, accessed September 19, 2022 at https://www.westlake.com/axiall-corporation-created-merger-georgia-gulf-ppg-commodity-chemicals-business-completed.

2. *Concentration and cartel market share*

71. Consolidation in the chlor-alkali industry resulted in further concentration of U.S. Caustic Soda capacity. A 2018 presentation by IHS described North American supply as having "[h]igh concentration developed through acquisitions" and being "[t]he most concentrated regional chlor-alkali market" with the top three producers (Olin, OxyChem, and Westlake) owning "over 70% of NAM capacity" and the top five producers (Olin, OxyChem, Westlake, Formosa Plastics, and Shintech) owning "over 85% of NAM capacity."[120] Similarly, a presentation by OxyChem relying on data from IHS identified the five largest producers of liquid Caustic Soda as representing 93% of total capacity. This is presented in Figure 9, showing that the top five U.S. producers of liquid Caustic Soda were Defendants with each holding the following percentage of U.S. capacity: Olin (36%), OxyChem (23%), Westlake (19%), Shintech (8%), and FPC (7%), for a total of 93%.

*Figure 9. 2018 U.S. Liquid Caustic Soda Capacity[121]*



---

[120] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008498.
[121] OxyChem, *Liquid Caustic Soda Market Fundamentals*, VDM-CS-0012111-0012130, at -0012114.

72. In addition, Defendants have a high share of the industry for chlorine, the co-product of Caustic Soda manufacturing. IBIS World reports that just three of the five Defendants accounted for 72% of the manufacture of chlorine in the U.S.: Olin at 34.5%, Oxy at 21.1%, and Westlake at 16.6%.[122]

### 3. *Direct evidence of market power*

73. Economists also often consider *direct* evidence of market power in the form of successfully elevated prices. The evidence shows that during the Class Period, Defendants implemented price increases, as I demonstrate in Sections V.A and VI.A-B of this Declaration. These price increases led to increased profits. For instance, Olin reported that "Caustic soda prices, the primary profitability driver, have increased by approximately 14% since the first quarter of 2017. This price improvement equates to $120 million in annualized cash flow improvement."[123] Another example is Oxy, which in 2017 saw its chemical division "earnings nearly triple on higher prices for caustic soda and vinyl."[124] Similarly, Westlake had a $183 million increase in income from operations for 2018.[125]

74. Figure 10 presents Oxy's Caustic Soda net profit margins from 2012 through 2019, which decreased leading up to the start of the Class Period (represented by the vertical red line in October 2015) and substantially increased thereafter, again providing direct evidence of the Defendants' ability to profitably sustain artificially high prices.

---

[122] IBIS World, *Chlorine Manufacturing*, November 2020, accessed October 25, 2021, at p. 8.
[123] Email dated November 3, 2011, from Drew Smith to Whatley et al., OLN-000632646-0632694, at - 0632650 (Exhibit 01583 to Deposition of Steven Keenan, January 11, 2022).
[124] Reuters, "Occidental Petroleum's profit beats as prices for chemicals jump," press release, August 2, 2017, accessed September 19 at https://www.reuters.com/article/occidental-results/update-1-occidental-petroleums-profit-beats-as-prices-for-chemicals-jump-idUSL1N1KO1YO.
[125] Westlake, "Westlake Chemical Corporation Reports Record 2018 Full-Year Results," press release, February 19, 2019, accessed September 19, 2022 at https://www.westlake.com/news/westlake-chemical-corporation-reports-record-2018-full-year-results-0.



***F.  Ease of Communication, Coordination, and Monitoring***

75. Communication between competitors facilitates the creation and maintenance of cartels.[127] Among other things, communications assist in "bargaining, to decide on the terms of the collusive agreement" and in the "monitoring [of] one another after an agreement is reached, to detect and deter cheating."[128] As antitrust enforcement agencies have recognized, "in some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables."[129] Similarly, antitrust authorities recognize that "[c]ollusion is more likely if the competitors know

---

[126] OxyChem, Oxy P&L w/o Elims, 2012-2019, US Dollars, OCC_00126171.
[127] Levenstein and Suslow, "What Determines Cartel Success?", pp. 43-44; Levenstein, Margaret C. and Valerie Y. Suslow, "Cartel bargaining and monitoring: The role of information sharing," *The Pros and Cons of Information Sharing* 43, 2006:43-81, at p. 43
[128] Levenstein Margaret C. and Valerie Y. Suslow, "Cartel bargaining and monitoring: The role of information sharing," *The Pros and Cons of Information Sharing* 43, 2006:43-81, at p. 43
[129] Federal Trade Commission and U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors*, April 2000, at p. 15.

each other well through [1] social connections, [2] trade associations, [3] legitimate business contacts, or [4] shifting employment from one company to another."[130]

76. Each of the factors identified by antitrust authorities as making collusion more likely is present here. Grant Evans, an executive vice president at OxyChem testified that Defendants' interactions were not limited to just business meetings but also included events involving the type of "social connections" warned of as leading to collusive behavior. Specifically, Mr. Evans testified that "golfing situations" would be scheduled around Vinyl Institute[131] meetings where competitors "would have been in attendance."[132]

77. In addition to the golf outings involving Defendants scheduled around trade association meetings, there were also the trading association meetings themselves. The evidence demonstrates Defendants regularly attended meetings such as those organized by the American Fuel and Petrochemical Manufacturers ("AFPM"), an industry trade group representing "makers of the fuels that keep Americans moving and the petrochemicals that are the essential building blocks of modern life."[133] For example, ███████████ of Axiall (acquired by Defendant Westlake during the Class Period) confirmed in his deposition that Axiall would "typically send executives" to AFPM and specifically identified ████████████████████████████ was at a table with employees from K.A. Steel, a subsidiary of Olin during the Class Period,

---

[130] Antitrust Division of the Department of Justice, *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, September 2005, Revised February 2021, at p. 6.
[131] The Vinyl Institute is an industry group which included as its board members individuals from OxyChem, Westlake, Shintech, and Formosa. Deposition of Grant Evans, January 14, 2021, at 20:20-22, 71:6-73:14.
[132] Deposition of Grant Evans, January 14, 2021, at 86:13-16.
[133] AFPM, "About AFPM," accessed September 19, 2022 at https://www.afpm.org/about-us/about-us; Deposition of Lisa Ballard, January 28, 2022, at 85:10-87:10; ████████████████████████████████████████ Email correspondence dated March 27, 2015, from John E Griffith, Albert Chao, et al., WL_0001709313-WL_00170923, at -WL_0001709323(Exhibit PX 01513 to Deposition of Bob Buesinger, January 7, 2022); Deposition of Bob Buesinger, January 7, 2022, at 53: 10-56:20; ███████████████████████████████████

███████████████████████████ [134] Deposition testimony further confirms executives from OxyChem, Olin, FPC, and Westlake also attended AFPM meetings, including ████████████ ██████████████████████.[135]

78. Highlighting the importance of AFPM meetings and the opportunities for the various competitors to communicate, Shintech traveled to the location of AFPM meetings and conducted meetings in conjunction with the AFPM meetings despite not itself being a member of AFPM.[136] Similarly, the evidence also demonstrates employees from Olin, FPC, and Westlake also regularly attended the IHS World Petrochemical Conference and employees from OxyChem, Olin, and Axiall also attended meetings organized by the American Chemistry Council ("ACC").[137] Other industry meetings include the Tecnon Orbichem World Chlor-Alkali Conference, which the evidence shows was attended by Olin, OxyChem, FPC, and Westlake.[138]

79. In addition to trade association meetings, Defendants also had "legitimate business contacts" in which they had the opportunity to communicate and share information with each other. Defendants directly interacted with each other or each other's subsidiaries as part of their

---

[134] Deposition of Wayne Gasior, September 29, 2021, at 75:9-78:16.
[135] Deposition of ████████████, January 28, 2022, at 85:10-87:10; ████████████████████████████████████████
[136] Deposition of ████████████ ██████████████████████████, et al., ST0000149202-001479203, at -001479202 (Exhibit PX 00006 to Deposition of DanaWest, July 16, 2021); █████████████████████████████████ ████████████████ July 16, 2021).
[137] Email correspondence dated October 1, 2015 between Janet Farbarik and Ashley Musselman, WL_0000496349-00496351, at- 00496349 (Exhibit PX 00315 to Deposition of Wayne Gasior, September 29, 2021); Deposition of Robert Peterson, November 11, 2021, at 50:2-51:18.
[138] Chen Deposition, at 43:13-45:23, 49:15-51:16; Deposition of Damian Gumpel, February 3, 2022, at 61:22-64:6; Deposition of Grant Evans, January 14, 2022, at 74: 1-21; Hillsley Deposition, at 461:20-462:7; Deposition of Michael S. Dye, December 16, 2021, at 92:5-25; Deposition of Scott Abel, November 3, 2021, at 69: 18-70:5; ICIS & Tecnon OrbiChem, *The 19th World Chlor-Alkali Conference*, September 11-12, 2015, OLN-000827477-000827492, at -000827488; Deposition of Paul Kowalski, December 10, 2021, at 218:11-221:8.

regular business operations. Defendants regularly interacted with each other as part of the

Caustic Soda industry's use of ▆▆▆▆▆▆ swap agreements, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[139]

80. The fourth and final factor identified by antitrust authorities, the shifting of

employment from one company to another, is also demonstrated by the evidence. Here, multiple

witnesses testified as having worked at one Defendant prior to moving to another Defendant.

Harry Thomas, a former executive at Oxy, testified that prior to his employment at Olin in 2014,

he had worked in "various roles at OxyChem from approximately 1996 until some point in

2014."[140] Similarly, Stephen Nedevsky, an executive at Olin, testified that he worked at Oxy

from approximately 1986 to 2012, prior to accepting a position at Olin in September 2012.[141]

Others also testified having previously worked at one Defendant before moving on to another

such as Roger Massey, a Production Manager at Shintech, who testified that prior to working at

Shintech he worked at Formosa Plastics and Georgia Gulf[142] (which as noted above, merged

with PPG Industries Inc.'s commodity chemicals business to form Axiall, which itself was

acquired by Defendant Westlake).[143]

---

[139] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆; Luick Deposition, at 28:24-29:16; Langford Deposition, at 74:10-15; Chen Deposition, at 31:19-33:10; Schoenman Deposition, at 51:16-20; Email dated November 14, 2016, between Tyler Meadows, Paul Linder, Erik Schoenman, WL_0000690628-00690629, at -0690629 (Exhibit PX00414 to Schoenman Deposition); Wu Deposition, at 14:22-15 :20; Email correspondence dated November 27, 2018 between Vickie J CHAS Ray, Lena Hope, Zack Luick, Kyle Wilson, et al., OLN-001512204-06 at -05.

[140] Deposition of Harry Thomas, February 18, 2022, at 25:22-26:2; 30:21-23.

[141] Deposition of Stephen Nedevsky, August 19, 2021, at 15:11-19, 17:9-17, 22:20-23:9.

[142] Deposition of Roger Massey, January 27, 2022, at 7:25-8:2, 14:3-5; 15:22-24.

[143] Westlake, *Westlake Chemical Completes Acquisition of Axiall Corporation*, press release, August 31, 2016, accessed September 19, 2022 at https://www.westlake.com/westlake-chemical-completes-acquisition-axiall-corporation; Scheyder, Ernest, "Georgia Gulf doubles in size with PPG chlorine deal," *Reuters*, July 19, 2012, accessed September 20, 2022 at https://www.reuters.com/article/us-ppgindustries-georgiagulf/georgia-gulf-doubles-in-size-with-ppg-chlorine-deal-idUSBRE86I0IV20120719; Westlake, *Axiall Corporation Created as Merger of Georgia Gulf, PPG Commodity Chemicals Business Is Completed*, press release, January 28, 2013, accessed September 19, 2022 at https://www.westlake.com/axiall-corporation-created-merger-georgia-gulf-ppg-commodity-chemicals-business-completed.

81. In short, there were substantial interactions among the Defendants, which would serve to lower the coordination cost of collusion and make it more likely to occur and to be successful at raising prices.

### G. Lack of Customer Bargaining Power

82. The large number of Caustic Soda buyers and the diversity of products they are involved in diminishes their bargaining power as the Defendants are not beholden to a single or handful of customers or even to a single industry. This is evident from Figure 11, which presents the Defendants' customers based on their transaction data.



*Figure 11. The Defendants' Customers[144]*

83. Moreover, in addition to the customers reflected in Figure 11, there are the distributors' customers, which number in the thousands, as discussed earlier in this Declaration.

---

[144] Defendants' transaction data October 2015-December 2019.

## V.  DEFENDANTS' ALLEGED CONDUCT IS CONSISTENT WITH ANTICOMPETITIVE BEHAVIOR

84. Having demonstrated that common evidence can be used to show that the Caustic Soda industry is conducive to anticompetitive behavior, the next step in my analysis is to determine whether common evidence can be used to show that the Defendants' conduct was consistent with collusive behavior. In this section, the evidence I present demonstrates that the Defendants engaged in conduct that economists consider to be consistent with collusion. Throughout the Class Period, Defendants coordinated announced price increases that were not only close in terms of timing and magnitude, but that were also made during a period in which there was flat demand and excess supply. At the time, the Defendants admitted internally that there was no actual economic justification for their price increases.[145] However, they said something very different to their customers, repeatedly using the same, or similar, pretexts to justify their price increases. This is not normal, competitive behavior. When firms are competing with one another, and one firm announces a $65/ton price increase in a period of flat demand and excess supply, it would be economically irrational for the second firm to announce the identical price increase the next day. Instead, a firm that is competing and following its unilateral self-

---

[145] For example, Axiall observed that "demand is just so-so, and there are concerns with pulp and paper and alumina." Email correspondence dated November 25-26, 2015, between Tim Mann, Wayne Gasior, Walk Sakowicz,et al., WL_0000494934 – WL_0000494936, at -0000494935.

Likewise, in 2016 various Defendants stated, "there is no tightness in the market," that "[c]austic isn't tight yet," and that "[i]nventories remain at a high level."  Email correspondence dated February 23, 2016, between Dana West, Toshiaki Ansai, Y Saitoh, ST0000105524- ST0000105524_CT0001, at ST0000105524 (Exhibit PX 03078 to Deposition of Toshiaki Ansai, March 11, 2022); Email correspondence dated April 17-18, 2016, between Mary Darwiche, Walt Sakowicz, Paul Kowalski, et al., WL_0000020824 – 0000020825, at -0000020824; Email dated November 14, 2016 from Lisa Ballard to Erik Schoenman, WL_0000243449- 00243450, at -00243449 (Exhibit PX 02175 to Deposition of Lisa Ballard, January 28, 2022).

Similar remarks were made in 2017, including a comment that "[o]ur sales remains [sic] below forecast" and mentioning efforts to "discreetly reduce caustic inventory…."[145] Email correspondence dated May 22, 2017, between Paul Kowalski, David Kokowsky,Walt Sakowicz, et al., WL_0000260840 – WL_0000260841, at -0000260841; Email correspondence dated May 22, 2017, between Paul Kowalski, David Kokowsky,Walt Sakowicz, et al., WL_0000260840 – WL_0000260841, at -000390633.

interest, would announce a lower price increase and steal customers from the first firm. Thus, the evidence of coordinated price announcements is consistent with the Defendants following a collective, cartel interest, restricting competition to the detriment of members of each Class.

85. Defendants also engaged in other acts to facilitate their price-fixing scheme, such as the allocation of customers, by refusing to bid into contracts (quoting a price to a potential customer who has already contracted for their Caustic Soda supply).[146] Similarly, they also placed customers on "order control," limiting the amount of Caustic Soda they could purchase. And they also communicated on planned plant closures which would reduce supply. The complementary nature of these actions in helping to ensure that Defendants' price-fixing scheme would be successful at achieving artificial price elevation for the benefit of the cartel, provides common evidence that the Defendants were engaged in cartel behavior, as alleged.

### A. Coordinated Price Increases

86. In this section, I present evidence of the Defendants' coordinated price increases which they announced each year of the Class Period. As I describe each announcement, I record the Defendants internal statements at the time, which show their understanding that the price increases lacked normal economic justification based on supply and demand. But publicly and to their customers, Defendants formulated pretextual talking points to justify the price increases. For the August 2015 price announcements Olin's talking points informed customers that "GDP is expected to pick up…caustic demand will follow," and "caustic inventory levels are balanced for Commercial Grade…and balanced to tight for Membrane Grade…."[147] Axiall justified its August 2015 price increases by telling customers it was "necessitated by a tightening of the

---

[146] Deposition of James Paulsen October 26, 2021 ("Paulsen Deposition"), at 270:4-13.
[147] Email correspondence dated August 21, 2015, between Leslie Whigham, Olivia McLaurine, et al., OLN-000372800-802, at -801 (Exhibit PX 00313 to Deposition of Leslie Whigham, December 8, 2021).

supply/demand balance for liquid caustic."[148] At the same time Defendants were communicating internally with their employees that "supply and demand was not in our favor."[149] Likewise in 2016, Axiall justified its price increase on November 1, 2016, due in part because "[l]iquid caustic soda inventory levels remain at critically low levels with increased backlog levels."[150] Moreover, Axiall claimed that there was continued "strength in the export market with limited product to export."[151] But, Paul Kowalski, the Senior Product Manager at Axiall who signed the letter providing these justifications received an email roughly two weeks later informing him that "[i]nventories remain at a high level."[152] Similar pretextual justifications were made for the price increases in other years, but as demonstrated below, Defendants internally described a completely different situation.

### 1. *Announcements in 2015*

87. As I will show in Section VI, prices were on a downward trajectory going into the Class Period. I will also show that no supply or demand factors justified a reversal of that situation. Nevertheless, Defendants all announced price increases just prior to the start of the Class Period effective "immediately or as contract terms permit."[153] This meant that for spot

---

[148] Email dated August 18, 2015, from Janet Farbarik to Axiall Chem Sales et al., WL0000178709-8710, at -8710 (Exhibit PX 01098 to Deposition of Wayne Gasior, September 29, 2021).

[149] Email correspondence dated January 4-5, 2016, between B.J. Herbert, BC-Sales, et al., OCC_00247217–0247218, at -0247218.

[150] Letter dated November 1, 2016, from Paul Kowalski to Customer, WL_0001484545–0001484551, at -0001484551 (Exhibit PX 01323 to Deposition of Paul Kowalski, December 10, 2021).

[151] Letter dated November 1, 2016, from Paul Kowalski to Customer, WL_0001484545–0001484551, at -0001484551 (Exhibit PX 01232 to Deposition of Paul Kowalski, December 10, 2021).

[152] Email dated November 14, 2016, from Lisa Ballard to Erik Schoenman, WL_0000243449-3450, at -3449 (Exhibit PX 02175 to Deposition of Lisa Ballard, January 28, 2022).

[153] Letter dated August 17, 2015, from Vice President - Sales to Customer, OCC_00727461-00727465, at -00727465 (Exhibit PX 02851to Hillsey Deposition); Letter dated August 21, 2015 from Rene Whigham to Customer, OLN-000065987-066006, at -065987 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021); Letter dated August 21, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00451 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated August 18, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484546 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall); Letter dated August 31, 2015, from Dana West to ████████, ST0000002535 (Exhibit PX 03057 to Deposition of Toshiaki Ansai, March 11, 2022) (Shintech); Letter dated

sales the price increases would be immediate and for those under contract typically the prices would be effective October 1.[154] As shown in Table 12, each of Defendants' price increase announcements came within two weeks of each other, with Oxy, Axiall, and Dow's in the space of 3 days, and with Olin and Westlake's both on the same day, just two days later.[155] Further, all of the price increases were for $65/DST and only one Defendant had a different price increase, of $75/DST.[156]

---

August 27, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000005 (Formosa Plastic); Letter dated August 19, 2015, from Damian Gumpel to Valued Customer, OCC_00366348 (Dow).

[154] Letter dated August 17, 2015, from Vice President - Sales to Customer, OCC_00727461-00727465, at -00727465 (Exhibit PX 02851to Hillsey Deposition); Letter dated August 21, 2015 from Rene Whigham to Customer, OLN-000065987-066006, at -065987 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021); Letter dated August 21, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00451 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated August 18, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484546 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall); Letter dated August 31, 2015, from Dana West to ███████████, ST0000002535 (Exhibit PX 03057 to Deposition of Toshiaki Ansai, March 11, 2022) (Shintech); Letter dated August 27, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000005 (Formosa Plastic); Letter dated August 19, 2015, from Damian Gumpel to Valued Customer, OCC_00366348 (Dow).

[155] Letter dated August 17, 2015, from Vice President - Sales to Customer, OCC_00727461-00727465, at -00727465 (Exhibit PX 02851to Hillsey Deposition); Letter dated August 21, 2015 from Rene Whigham to Customer, OLN-000065987-066006, at -065987 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021); Letter dated August 21, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00451 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated August 18, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484546 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall); Letter dated August 31, 2015, from Dana West to ███████████, ST0000002535 (Exhibit PX 03057 to Deposition of Toshiaki Ansai, March 11, 2022) (Shintech); Letter dated August 27, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000005 (Formosa Plastic); Letter dated August 19, 2015, from Damian Gumpel to Valued Customer, OCC_00366348 (Dow).

[156] Letter dated August 17, 2015, from Vice President - Sales to Customer, OCC_00727461-00727465, at -00727465 (Exhibit PX 02851to Hillsey Deposition); Letter dated August 21, 2015 from Rene Whigham to Customer, OLN-000065987-066006, at -065987 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021); Letter dated August 21, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00451 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated August 18, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484546 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall); Letter dated August 31, 2015, from Dana West to ███████████, ST0000002535 (Exhibit PX 03057 to Deposition of Toshiaki Ansai, March 11, 2022) (Shintech); Letter dated August 27, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000005 (Formosa Plastic); Letter dated August 19, 2015, from Damian Gumpel to Valued Customer, OCC_00366348 (Dow).

*Table 12. Price Increase Announcements Effective October 1, 2015[157]*

| Company | Date | Price Increase ($/DST) |
|---|---|---|
| Oxy | August 17, 2015 | $65 |
| Axiall | August 18, 2015 | $65 |
| Dow | August 19, 2015 | $65 |
| Olin | August 21, 2015 | $65 |
| Westlake | August 21, 2015 | $75 |
| Formosa Plastic | August 27, 2015 | $65 |
| Shintech | August 31, 2015 | $65 |

88. This pattern then repeated itself in November 2015 with Defendants again all announcing price increases, some in letters with identical dates, with virtually all price increases being the same, as shown in Table 13.[158]

[157] Letter dated August 17, 2015, from Vice President - Sales to Customer, OCC_00727461-00727465, at -00727465 (Exhibit PX 02851to Hillsey Deposition); Letter dated August 21, 2015 from Rene Whigham to Customer, OLN-000065987-066006, at -065987 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021); Letter dated August 21, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00451 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated August 18, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484546 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall); Letter dated August 31, 2015, from Dana West to Jacques Byrd, ST0000002535 (Exhibit PX 03057 to Deposition of Toshiaki Ansai, March 11, 2022) (Shintech); Letter dated August 27, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000005 (Formosa Plastic); Letter dated August 19, 2015, from Damian Gumpel to Valued Customer, OCC_00366348 (Dow).

[158] Letter dated November 19, 2015, from Rene Whigham to Customer, OCC_00364743 (Olin); Letter dated November 23, 2015, from Toshiaki Ansai to ████████, ST0000000001 (Shintech); Letter dated from November 24, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000006 (Formosa Plastic); Letter dated August 18, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484547 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall);  Letter dated August 21, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00450 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated November 20, 2015, from Rick Williams to Rob Roberts, OCC_00412245 (Oxy).

*Table 13. Price Increase Announcements Effective January 1, 2016[159]*

| Company | Date | Price Increase ($/DST) |
|---------|------|------------------------|
| Olin | November 19, 2015 | $40 |
| Oxy | November 20, 2015 | $40 |
| Shintech | November 23, 2015 | $40 |
| Westlake | November 23, 2015 | $50 |
| Formosa Plastic | November 24, 2015 | $40 |
| Axiall | November 30, 2015 | Full Implementation of the $65 August 2015 Increase. |

89. Although Defendants made multiple price increases in 2015, the evidence shows that the issues causing the stagnant (or in some cases declining) prices prior to the Class Period were ongoing. This suggests that the only change in the environment pushing prices up was the coordinated efforts of Defendants. In an internal Oxy email discussing the August 2015 price increases, B.J. Herbert of Oxy told sales personnel at Oxy that "[e]ven though supply and demand was not in our favor, we changed the dialogue from over supply and price weakness to one based on the fact that we can't continue to maintain billions of dollars of assets … and not making a fair return on our invested capital."[160] Moreover, highlighting the coordinated nature of the price increases, Mr. Herbert went on to state "[t]he price appreciation in Q4 and through January would not have been possible without Oxy's leadership and your commitment and conviction to drive the price."[161]

---

[159] Letter dated November 19, 2015, from Rene Whigham to Customer, OCC_00364743 (Olin); Letter dated November 23, 2015, from Toshiaki Ansai to ███████, ST0000000001 (Shintech); Letter dated from November 24, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000006 (Formosa Plastic);  Letter dated November 30, 2015 from Walter Sakowicz to Customer, WL_0001484545-00001484551, at -WL_0001484547 (Exhibit PX 01232 to Deposition of Paul Kowalski,December 10, 2021)(Axiall);  Letter dated November 23, 2015 from Lisa Ballard to Mr. DePasquale, WL-00020000430-00461, at -00450 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated November 20, 2015, from Rick Williams to Rob Roberts, OCC_00412245 (Oxy).
[160] Email correspondence dated January 4, 2016, between B.J. Hebert, BC-Sales, et al., OCC_00247217 – 0247218, at 0247218.
[161] Email correspondence dated January 4, 2016, between B.J. Hebert, BC-Sales, et al., OCC_00247217 – 0247218, at 0247218.

90. Walt Sakowicz of Axiall further confirmed the artificial nature of the price increases in his comments regarding the November 2015 price increases stating "[t]his $40 announcement is baseless from a supply/demand point of view. In my view it is an attempt to reinforce the $65 price increase that wasn't implemented in full."[162] Mr. Sakowicz further commented that "[m]ore importantly, on an objective basis, the dynamics are simply not there to support an increase…demand is just so-so, and there are concerns with pulp and paper and alumina."[163] Despite finding the price increases to not be justified, Axiall's compliance with the price increases is unsurprising. Earlier in 2015, Axiall failed to increase prices along with other producers creating a negative reaction in the industry and possibly punishment from competitors.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

### 2. *Announcements in 2016*

91. A similar pattern of price increase announcements occurred throughout 2016 in which Defendants made announcements in close proximity, at times the same day, with similar or identical price increases. For example, Olin, Oxy, Westlake, Axiall, Formosa Plastic, and Shintech all announced price increases between May 23 and May 31, effective immediately or July 1 (depending on spot or contract sales), and with the exception of Axiall, all with an

---

[162] Email correspondence dated November 25-26, 2015, between Tim Mann, Wayne Gasior, Walk Sakowicz,et al., WL_0000494934–WL_0000494936, at -0000494935.
[163] Email correspondence dated November 25-26, 2015, between Tim Mann, Wayne Gasior, Walk Sakowicz,et al., WL_0000494934–WL_0000494936, at -0000494935.
[164] Email correspondence dated March 11-19, 2015, between Erik Schoenman, Bill Milligan, et al., OCC_00038790 -0038791, at -0038790 (Exhibit PX 02839 to Hillsley Deposition).

increase of $40 (Axiall increased its price by $45).[165] Similarly, Olin, Oxy, Westlake, Axiall, Formosa Plastic, and Shintech again all made price announcements between June 21 and July 8, all with a price increase of $50.[166] This was followed by another round of price increases beginning August 22, with Olin, Oxy, Westlake, Axiall, Formosa Plastic, and Shintech all making announcements within roughly a week of each other with Olin, Oxy, and Shintech announcing price increases of $80, Westlake and Axiall of $75, and Formosa Plastic announcing an increase of $60.[167]

92. Like the 2015 price increases, the evidence shows that the 2016 increases were not based on market forces but instead on the coordinated efforts of Defendants. Amidst a series of price increases in February of 2016, Yasuhiko Saitoh of Shintech sent an internal email commenting that "[a]s usual, even though there is no tightness in the market, there is another outburst of announcements."[168] In April of 2016, Axiall was communicating internally that

---

[165] Letter dated May 23,2016, from Lisa Ballard to Lou DePasquale, WL-00020000430-00461, at -00447 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated May 20, 2016, from Rene Whigham to Customer, OLN-000065987-0066006, at –0065992 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021)(Olin); Letter dated May 26, 2016, from Paul Kowalski to Michael Brunner, OCC_00200831 (Axiall); Letter dated May 27, 2016, from Kelvin Wu to Customer, FPC-USA-DPP-00000009 (Formosa Plastic); Letter dated May 31, 2016, from Toshiaki Ansai to ▮▮▮▮▮, ST0000000005 (Shintech); ECU North America, *Market Update #17*, June 21, 2016, OCC_00031855 (Exhibit PX 3095 to Deposition of Toshiaki Ansai, March 11, 2022)(Oxy).

[166] Letter dated June 22, 2016, from Lisa Ballard to Lou DePasquale, WL-00020000430-00461, at -0046 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022); Letter dated July 6, 2016, from Kelvin Wu to Customer, FPC-USA-DPP-00000010; Letter dated June 22, 2016, from Lisa Ballard to Tom Harris, OCC_00266624; Letter dated July 8, 2016, from Dana West to ▮▮▮▮▮, ST0000002277; Letter dated July 6, 2016 from Kelvin Wu to Customer, FPC-USA-DPP-00105123; Letter dated June 29, 2016, from Paul Kowalski to Customer, WL_0000561441-0056442, at -0056442;  ECU North America, *Market Update #17*, June 21, 2016, OCC_00031855 (Exhibit PX 3095 to Deposition of Toshiaki Ansai, March 11, 2022); Letter dated June 27, 2016, from Rene Whigham to Customer, OLN-000065987-066006, at -065993 ((Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021).

[167] Letter dated September 1, 2016, from Walt Sakowicz to Lou DePasquale,WL-00020000430-00461, at -00445 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022)(Westlake); Letter dated August 22, 2016, from Rene Whigham to Customer, OLN-000065987-066006, at -065994 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021)(Olin); Letter dated August 23, 2016, from Paul Kowalski to Customer, OCC_00205031 (Axiall); Letter dated August 26, 2016, from Kevin Joyce to Jeremy Detwiler, OCC_00266788 (Shintech); Letter dated August 29, 2016, from Kelvin Wu to Customer, FPC-USA-DPP-00000011 (Formosa Plastic); Letter dated August 23, 2016, from Mike Jakovich to Customer, OCC_00287345 (Oxy).

[168] Email correspondence dated February 23, 2016, between Dana West, Toshiaki Ansai, Y Saitoh, ST0000105524-ST0000105524_CT0001, at ST0000105524 (Exhibit PX 03078 to Deposition of Toshiaki Ansai, March 11, 2022).

"[c]austic isn't tight yet."[169] Even by November 2016, following a series of price announcements throughout the year, including November, Westlake/Axiall was communicating internally that "[i]nventories remain at a high level."[170]

### 3. Announcements in 2017

93. Continuing into 2017, Defendants again engaged in multiple rounds of price increase announcements, all within days or little more than a week of each other. Within roughly a one-week period, Olin, Oxy, Westlake, Formosa Plastic, and Shintech all announced price increases.[171] This was repeated in May, again in August/September, and yet again in November.[172]

94. The discrepancy between Defendants raising prices and their internal discussions regarding the supply and demand situation continued in 2017. In May 2017, Paul Kowalski of Westlake communicated internally that "[o]ur sales remains [sic] below forecast, so we are going to have to do a really good job of talking out of both sides of our mouth. Our plants are showing

---

[169] Email correspondence dated April 17-18, 2016, between Mary Darwiche, Walt Sakowicz, Paul Kowalski, et al., WL_0000020824–0000020825, at -0000020824.

[170] Email dated November 14, 2016, from Lisa Ballard to Erik Schoenman et al., WL_0000243449-00253450, at -00253449 (Exhibit PX 02175 to Deposition of Lisa Ballard, January 28, 2022).

[171] Letter dated February 15, 2017, from Paul Kowalksi to Lou DePasquale, WL-00020000430-00461, at -00443 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022) (Westlake); ); Letter dated February 15, 2017, from Rene Whigham to Customer, OLN-000065987-066006, at -065996 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021) (Olin); Letter dated February 17, 2017, from Kelvin Wu to Customer, FPC-USA-DPP-00000013 (Formosa Plastic); Letter dated February 23, 2017, from Toshiaki Annsai to ▇▇▇▇▇▇▇, ST0000000004 (Shintech); Letter dated May 11, 2017, from Rene Whigham to Customer, OCC_00248135 (Oxy).

[172] Letter dated May 22, 2017, from Paul Kowalski to Lou DePasquale, WL-00020000430-00461, at -00442 (Exhibit PX 01548 to Deposition of Bob Buesinger, January 7, 2022) (Westlake); Letter dated May 11, 2017, from Rene Whigham to Customer, OLN-000065987-066006, at -065998 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021) (Olin); Letter dated May 24, 2017, from Kelvin Wu to Customer, FPC-USA-DPP-00000014 (Formosa Plastic); Letter dated September 13, 2017, from Kelvin Wu to Customer, FPC-USA-DPP-00123109 (Formosa Plastic); Letter dated November 27, 2017, from Kelvin Wu to Customer, FPC-USA-DPP-00000015 (Formosa Plastic); Letter dated May 26, 2017, from Dana West to ▇▇▇▇▇▇▇, ST0000000007 (Shintech); Letter dated September 1, 2017, from Kevin Joyce to Jeremy Detwiller, OCC_00462192(Shintech); Letter dated November 28, 2017, from Kevin Joyce to ▇▇▇▇▇▇, ST0000000003 (Shintech); Letter dated May 27, 2017, from Vice President – Sales to Customer, OCC_00444653-004659, at -004655; Letter dated August 30, 2017, from Timothy Hillsley to Customer, OCC_0033180-0033186, at -0033181(Oxy); Letter dated November 21, 2017, from Vice President – Sales to Customer, OCC_00929383-00929392, at -00929386(Oxy).

signs of running well. We have product to sell."[173] Further, Mr. Sakowicz of Westlake remarked that to the extent there was any tightness in the market, such tightness was likely temporary, stating "I tempered the enthusiasm below a bit and told the sales people that we are tight right now, but the operating rates moving forward will likely be higher and we need to watch out."[174]

### 4. *Announcements in 2018*

95. The year 2018 also saw a series of price increase announcements with Defendants announcing such increases close together. The timing and similarity of the price increases is perhaps most apparent with the price increases during the month of August. Within less than a week, from August 28 to August 31, Olin, Oxy, Westlake, Formosa Plastic, and Shintech all announced price increases of $50.[175]

96. Consistent with prior years, internal communications offer a different picture than what would be suggested by Defendants' ongoing price increases. While the repeated price increases through 2018 would, under normal competitive circumstances, indicate limited supply and skyrocketing demand, an internal Olin email shows Defendants still had inventory that needed to be sold stating "appreciate the extra effort to discreetly reduce caustic inventory over the course of the quarter."[176]

---

[173] Email correspondence dated May 22, 2017, between Paul Kowalski, David Kokowsky,Walt Sakowicz, et al., WL_0000260840–WL_0000260841, at -0000260841.
[174] Email correspondence dated May 22, 2017, between Paul Kowalski, David Kokowsky,Walt Sakowicz, et al., WL_0000260840–WL_0000260841, at -0000260840.
[175] Letter dated August 31, 2018, from David Kobowsky to Lou, WL-00020000430-00461, at -002000436(Westlake); Letter dated August 30, 2018, from Rene Whigham to Customer, OLN-000065987-066006, at -066004 (Exhibit PX 01096 to Deposition of Leslie Whigham, December 8, 2021)(Olin); Letter dated August 31, 2018, from Kelvin Wu to Customer, FPC-USA-DPP-00000018 (Formosa Plastic); Letter dated August 31, 2018, from Dana West to ▮▮▮▮▮▮▮, ST000000593 (Shintech); Letter dated August 30, 2017, from Timothy Hillsley to Customer, OCC_00033180-00033186, at -00033181(Oxy).
[176] Email dated October 14, 2018 from James Varilek to Rene CLEV Whigham, OLN-000390633–000390635, at -000390633.

### 5. *Announcements in 2019*

97. The close timing and size of Defendants' price increases continued in 2019. On February 20, 2019, Olin announced a Caustic Soda price increase of $50.[177] This was shortly followed by Oxy which announced an $80 price increase on February 21, 2019.[178] These announcements were later joined by Formosa Plastics on February 22, 2019, announcing a price increase of $70, Westlake announcing a $70 price increase on February 26, 2019, and Shintech announcing an $80 price increase on March 1, 2019.[179] On May 21, 2019, Olin and Oxy kicked off another round of price increases by announcing price increases of $60 and $90.[180] This was followed by announcements from Formosa Plastic on May 29 in the amount of $60 and from Westlake on May 30 in the amount of $65, with Shintech announcing a price increase of $70 on June 3, 2019.[181] Further rounds of price increase announcements were started in August[182] and November[183] 2019.

### B. *Customer Allocation*

98. Further evidence that Defendants' behavior is consistent with collusion, rather than competition, comes in the form of documents that record Defendants engaging in customer allocation, which would serve to support the Defendants' price-fixing by ensuring that it was not

---

[177] Letter dated February 20, 2019, from Rene Whigham to Customer, OLN-000568979.

[178] Letter dated February 21, 2019, from Jason Welch to Customer, OCC_00021698.

[179] Letter dated February 22, 2019, from Kelvin Wu to Customer, FPC-USA-DPP-00000020; Letter dated February 26, 2019, from David Kokowsky to Rhonda,WL_0000650655; Letter dated March 1, 2019, from Dana West, OCC_00298901.

[180] Letter dated May 21, 2019, from Jason Welch to Customer, OCC_00021383 (Oxy); Letter dated May 21, 2019, from Tod Tessier to Customer, OLN-000066007 (Olin).

[181] Letter dated May 29, 2019, from Kelvin Wu to Customer, FPC-USA-DPP-00152159 (Formosa Plastic); Letter dated May 30, 2019, from David Kokowsky to Customer, WL_0000108759 (Westlake); Letter dated June 3, 2019 from Dana West to ███████, ST0000000831 (Shintech).

[182] Letter dated August 28, 2019, from Jason Welch to Customer, OCC_00008546 (Oxy); Letter dated August 30, 2019, from David Kokowsky, WL_0000096274 (Westlake); Letter dated September 11, 2019, from Dana West to ███████, ST0000000914 (Shintech).

[183] Letter dated November 12, 2019, from Jason Welch to Customer, OCC_00026211 (Oxy); Letter dated November 25, 2019, from Kelvin Wu to Customer, FPC-USA-DPP-00000035 (Formosa Plastic); Letter dated November 27, 2019, from David Kokowsky to Customer, WL_0001301832 (Westlake); Letter dated September 11, 2019, from Kevin Joyce to ███████, ST0000000984 (Shintech).

undermined by competition for customers. This behavior included refusing to "bid into a contract," meaning quoting a price to a potential customer who is already in a contract with another supplier for Caustic Soda.[184] ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Such behavior was not limited to OxyChem. An internal email from Axiall regarding a proposal from a potential customer states "IN an up market you should never steal someone's business – cardinal rule of caustic."[186] An internal Westlake email also shows Defendants' refusal to bid into contracts with a Westlake Product Manager stating "[i]f Southern Ionics has a contract with Olin, I don't want to bid into the contract."[187] In any price-fixing cartel, when prices are artificially elevated, there is an incentive for cartel members to cheat on the agreement and undercut each other slightly to win customers at what are still (even with the undercutting) supracompetitive prices. Undercutting, if left unchecked, can ultimately cause a cartel to unravel. Thus, behavior around customer allocation and refusing to compete for each other's customers, would have served to facilitate Defendants' price-fixing scheme by limiting undercutting and ensuring that their artificial price increases would be sustained.

99. Defendants conduct to avoid competing with each other also included placing customers on "allocation" or "order control." When a customer is placed on "order control," it means that "the amount of material that customers can order is limited – or limited or

---

[184] Paulsen Deposition, at 269:22-270:13.
[185] Paulsen Deposition, at 270:14-271:5.
[186] Email correspondence dated July 28, 2016, between Guillermo Campana, Joseph P Kovacs, et al., WL_0000137818-19 at 18.
[187] Email correspondence dated October 13-16, 2017, between Autumn Mullen, David Dunn, Paul Kowalski, et al., WL_0000138911 - 0000138913, at -0000138911.

controlled."[188] Defendants frequently included order control in their pricing announcements.

Formosa Plastics November 24, 2015, price increase announcement states "Formosa's 100%

order control program remains, enforced…."[189] Westlake similarly included order control as part

of its price announcements such as the one dated February 15, 2017, explaining "Westlake will

maintain our 100% order management program for liquid caustic soda."[190] Although ostensibly

due to limited supply, as noted above, during the Class Period, Caustic Soda supply was more

than adequate. The effect of this was to both limit the available supply of Caustic Soda generally

and limit competition with each other by capping the amount of Caustic Soda customers could

receive from a supplier. In any price-fixing cartel, artificially elevated pricing can be undermined

if too much supply is released into the market. This can happen intentionally, with a cartel

member cheating on the price-fixing agreement and selling more at the artificially high prices, or

it can happen unintentionally, with cartel members trying to sell excess supply or inventory.

Regardless, the risk for the cartel is the same: too much supply can lead to supracompetitive

prices being depressed. Thus, behavior around allocation and order control, would have served to

facilitate Defendants' price-fixing scheme by limiting the extent to which excess supply may

have otherwise undermined the scheme's supracompetitive prices.

100. Like Defendants' justifications for price increases, Defendants justified their

decisions to put customers on "order control" based on claims of limited supply. For example, in

April 2016, Olin was informing customers that their "order control program based on 100%

allocation remains in effect…"[191] Among Olin's talking points was the claim that they were

---

[188] Langford Deposition, at 128:3-9.
[189] Letter dated November 24, 2015, from Kelvin Wu to Customer, FPC-USA-DPP-00000006.
[190] Letter dated February 15, 2017, from Paul Kowalski to Customer, OCC_00334224.
[191] Email correspondence dated April 26, 2016, between Rene CLEV Whigham, Olivia McLaurine, et al., OLN-001540406–001540408, at OLN-001540408 (Exhibit 0181 to Luick Deposition).

"facing all time LOW inventory levels driven by our planned outages, strong export demand and increasing domestic demand."[192] But as shown by the communications of other producers, such claims of dire supply are contradicted by Axiall observing in the same month that "[c]austic isn't tight yet."[193]

### C. Communication of Planned Outages

101. The record evidence demonstrates that the Defendants communicated with each other regarding planned plant shutdowns. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████ █ ████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████ █ ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

---

[192] Email correspondence dated April 26, 2016, between Rene CLEV Whigham, Olivia McLaurine, et al., OLN-001540406–001540408, at OLN-001540407 (Exhibit PX 00181 to Luick Deposition).

[193] Email correspondence dated April 17-18, 2016, between Mary Darwiche, Walt Sakowicz, Paul Kowalski, et al., WL_0000020824–0000020825, at -0000020824.

[194] Email correspondence dated October 28-29, 2015, between Stephanie Brooks and Rick CLEV Irizarry, OCC_00025073–00025074, at -00025073.

[195] Email correspondence dated September 15-18, 2015, between Stephanie Brooks and Rick CLEV Irizarry OCC_00016348–00016349, at -00016348.

██████████████████████████████████████████████████████████

████████████████████████████

102. Communications regarding planned outages were made despite internal warnings of their anticompetitive nature. An internal email at Oxy by Robin Burns was distributed to supply chain personnel with a copy of Association of Corporate Counsel ("ACC") Antitrust Guidelines with the message that "I think everyone is clear that price and rates cannot be discussed with competitors, but also included are things like production rates, inventory levels and capacities."[197] But as an indicator of the pervasive nature of such communications, the internal warning was responded to by an unknown author stating ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ ██████████████████████████████

████████████████████

103. Under normal competitive circumstances, it is not in a firm's unilateral self-interest to forewarn its competitors that it will reduce supply, as it creates an opportunity for that competitor to step in and steal the firm's customers. But in the context of a cartel fixing prices, it is in the common interest to manage supply lest excess supply undermines the high prices of the cartel. Thus, these communications are consistent with the alleged cartel behavior of the Defendants.

---

[196] Email correspondence dated October 3-5, 2016, between William Ho and Stephanie Brooks, OCC_00007094 – 00007095, at -00007094; Deposition of Stephanie Brooks, October 5, 2021, at 192:5-195:16.
[197] Email correspondence dated between May 11-August 13,2015, between Robin A. Burns, Tom (Chemicals) Obrien, et al., OCC_00017034–00017036, at -00017034.
[198] Email correspondence dated between May 11-August 13,2015, between Robin A. Burns, Tom (Chemicals) Obrien, et al., OCC_00017034–00017036, at -00017034.

## VI.   COMMON EVIDENCE DEMONSTRATES THAT THE DEFENDANTS' ALLEGED CONDUCT IMPACTED MEMBERS OF EACH CLASS, CAUSING THEM ECONOMIC HARM

104. The preceding sections of this Declaration have investigated the characteristics of the Caustic Soda industry and the record evidence of anticompetitive behavior in this case. In so doing, I found that the Caustic Soda industry was conducive to successful collusion and that the Defendants' behavior was consistent with the operation of an anticompetitive, price-fixing cartel. In this section, I provide common evidence that the cartel impacted members of each Class. The first part of this section shows that Caustic Soda prices increased industry-wide across grades (membrane and diaphragm), and across Defendants and distributor purchasers. The second part of this section shows that Caustic Soda prices increased in the Class Period by more than can be justified by the normal, competitive supply and demand factors that drive prices.

### A.   *Common Price Increases*

105. Figure 14 presents the average net price (after deduction of discounts) by grade across all of the Defendants. The red line in this and subsequent charts indicates the start of the Class Period (unless otherwise noted). As the charts shows, prices were decreasing going into the Class Period. Cartels can be as much about stopping prices falling, as they are about making prices rise. This cartel appears to have done both. The decreasing price trend going into the Class Period was forestalled, then sharply reversed, with prices increasing substantially. Although prices decreased somewhat, they remained high throughout the Class Period, and certainly higher than the pre-Class Period trend would suggest. This price pattern was common across the diaphragm and membrane grades.

56



*Figure 14. All Defendants' - Net Price by Grade*[199]

106. The same common pricing pattern evident in the previous chart, is evident across Defendants. This is demonstrated in the next set of charts for each of the five Defendants, plotting net prices for 50% liquid diaphragm and 50% liquid membrane.[200]

---

[199] Defendants' Transaction Data. The correlation coefficient between the diaphragm and membrane series is 0.95 and it is statistically significant, indicating a close relationship between these two series. *See* my workpapers.
[200] 98% of the liquid Caustic Soda that Defendants sell is at the 50% concentration level. Correlation analysis shows that the series for diaphragm and membrane are statistically significantly correlated across the Defendants, with a median correlation of 0.84 for diaphragm and a median correlation of 0.74 for membrane. *See* my workpapers.

*Figure 15. Olin's Net Price by Grade* [201]



*Figure 16. Westlake's Net Price by Grade* [202]



---

[201] Defendants' Transaction Data.
[202] Defendants' Transaction Data.



---

[203] Defendants' Transaction Data. Shintech sells only membrane grade Caustic Soda.
[204] Defendants' Transaction Data.



107. The common price pattern evident in the preceding charts is evident for both distributor purchasers and non-distributor purchasers, again across diaphragm and membrane grades. This is demonstrated in Figure 20 for distributor purchasers and in Figure 21 for non-distributor purchasers.[206]

---

[205] Defendants' Transaction Data. The occasional spikes in the series for membrane are driven by seasonal pricing variation in transactions in the crop protection market segment. None of these transactions involve sales to distributors.

[206] Correlation analysis shows that the series for diaphragm and membrane are statistically significantly correlated across distributors and non-distributors, with correlation coefficients of 0.89 and 0.87 for diaphragm and membrane respectively. *See* my workpapers.



*Figure 20. Net Price Paid by Distributors by Grade*[207]

*Figure 21. Net Price Paid by Non-Distributors by Grade*[208]

108. The next set of figures presents the net prices paid for 50% liquid diaphragm and membrane to Defendants by the top 10 distributors of Caustic Soda, that collectively represent 80% of Defendants' sales to the distribution channel. The final chart in this set presents the

---

[207] Defendants' Transaction Data.
[208] Defendants' Transaction Data.

average net prices paid across the remaining distributors that make up the remaining 20% of Defendants' sales to the distribution channel. In all of these charts, the common price pattern of declining prices going into the Class Period followed shortly by sharply increasing prices is evident.[209]



___

[209] Correlation analysis shows that the series for diaphragm and membrane are statistically significantly correlated across the distributors in these charts, with a median correlation of 0.79 for diaphragm and a median correlation of 0.76 for membrane. *See* my workpapers.
[210] Defendants' Transaction Data.



---

[211] Defendants' Transaction Data.
[212] Defendants' Transaction Data.



---

[213] Defendants' Transaction Data.
[214] Defendants' Transaction Data.



---

[215] Defendants' Transaction Data.
[216] Defendants' Transaction Data.



---

[217] Defendants' Transaction Data.
[218] Defendants' Transaction Data.



---

[219] Defendants' Transaction Data. Old World has little pre-Class Period transactions, as is evident from the chart. Nevertheless, the common pricing pattern is evident.
[220] Defendants' Transaction Data.

### B.  Price Increases Cannot be Justified by Normal Supply and Demand Factors

109. The sharply increasing prices during the Class Period were not driven by the normal competitive supply and demand factors that determine Caustic Soda prices (in the absence of a cartel). As I described in Section IV.A.2 of this Declaration, the chief use for Caustic Soda is in chemical production, representing 61% of Caustic Soda usage (both inorganic, 26%, and organic, 14%, chemical production, propylene oxide production, 12%, and soaps & detergents production, 9%), with pulp and paper representing the next biggest at 21% of usage. In Figure 33, I present chemical production in the U.S.[221] As is evident from the chart, chemical production in the US remained substantially lower during the Class Period than it was in the pre-Class Period.



*Figure 33. Chemical Production[222]*

---

[221] This production measure covers all of inorganic, organic, propylene oxide, and soaps & detergents production, as well as other chemical production.

[222] U.S. Bureau of Economic Analysis, "Gross Output by Industry (TGO105-Q)".

110. Figure 34 presents paper production in the US. As is evident from the chart, pulp and paper production was substantially lower in the first part of the Class Period than before, and in the later part of the Class Period it was barely higher than it was in the pre-Class Period.



*Figure 34. Paper Production*[223]

111. ███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████[224] Electricity and

steam costs are driven by natural gas prices and salt/brine costs are driven by salt prices.[225]

Labor is considered a fixed cost in the Caustic Soda industry.[226] So, I have constructed a Caustic

Soda variable cost index as a weighted average of natural gas prices (████████████) and salt

[223] U.S. Bureau of Economic Analysis, "Gross Output by Industry (TGO105-Q)".
[224] OxyChem, Chlorovinyls Caustic Soda Manufacturing Cost, 2012-2019, US Dollars, OCC_00126170; *see also* my workpapers. These percentages are calculated for October 2015, the start of the Class Period.
[225] Olin Corporation. Form 10-K for fiscal year ending December 31, 2020, filed February 24, 2020, at p. 12.
[226] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008402. *See also* OxyChem, Chlorovinyls Caustic Soda Manufacturing Cost, 2012-2019, US Dollars, OCC_00126170.

prices ████████████). I present this index in Figure 35. The chart shows that costs were

lower in the Class Period compared to the pre-Class Period.



112. Chlorine is a co-product of Caustic Soda, and its demand is driven by plastic

production. If the demand for plastic were to decrease, the production of chlorine would

decrease, leading to less Caustic Soda and potentially higher Caustic Soda prices. But this did

not happen during the Class Period. Instead, plastic production increased during the Class Period,

as shown in Figure 36. This should have served to lead to more Caustic Soda production and

lower prices, not the higher prices that are actually observed.

---

227 U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity: Fuels and Related Products and Power: Industrial Natural Gas (WPS0553)," Monthly, Seasonally Adjusted; U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity: Chemicals and Allied Products: Rock Salt (WPU06130271)," Monthly, Not Seasonally Adjusted.



*Figure 36. Plastic and Rubber Production[228]*

113. Finally, increasing Caustic Soda prices in the Class Period were not caused by Hurricane Harvey, which was a transient event. As shown in Figure 37, Caustic Soda prices were already trending upward when Hurricane Harvey made landfall in August 2017 and merely continued on that trend.

---

[228] U.S. Bureau of Economic Analysis, "Gross Output by Industry (TGO105-Q)".



*Figure 37. Hurricane Harvey*[229]

114. In sum, not only did the Defendants dampen and then reverse a downward trend in Caustic Soda prices into a sharply upward trend, but that increase in Caustic Soda prices was industry-wide and was not justified by normal, competitive supply and demand factors. The Defendants admitted as much at the time of their price announcements as I described in Section V.A of this Declaration. In the next section, I use common econometric techniques that control for supply and demand factors to estimate how much prices were increased by the Defendants' anticompetitive conduct and how much of that price increase was passed-through the distribution channel to members of each Class. I use those estimates to provide a calculation of Class-wide damages for the State Antitrust Class and the Colorado Consumer Protection Class.

---

[229] Defendants' Transaction Data.

## VII.   A COMMON METHODOLOGY CAN BE USED TO CALCULATE CLASS-WIDE DAMAGES

115. The preceding sections of this Declaration showed that common evidence can be used to demonstrate that: the Caustic Soda industry was conducive to successful collusion; the Defendants' behavior was consistent with the operation of an anticompetitive, price-fixing cartel; their behavior had a common, price-increasing effect across the industry and therefore across the Classes; and that the price increases were not justified by normal, competitive supply and demand factors, as the Defendants themselves admitted at the time. These analyses serve as foundation for an econometric estimation of Class-wide damages. I conduct such an estimation in this section using methods and data common to the Classes.

116. There are three steps to the analysis: *first*, I estimate the direct overcharge paid by distributors to the Defendants using the Defendants' transaction data; *second*, I estimate the percentage of that direct overcharge that was passed through to members of each Class using data produced by distributors; *third*, I apply the direct overcharge times the pass-through percentage to the relevant volume of commerce to calculate Class-wide damages for the State Antitrust Class and Colorado Consumer Protection Class. I also calculate unjust enrichment damages, in the final part of this section.

### A.   *Estimating the Direct Overcharge*

117. To estimate the direct overcharge, I use what economists call a "reduced-form pricing regression." The reduced-form pricing regression is "[t]he most common statistical method employed in antitrust litigation."[230] It enables an economist to simultaneously calculate the relationship between changes in a *dependent* variable (*e.g.*, Caustic Soda prices) and changes

---

[230] Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy* 723 (2008): 723-742, at pp. 724-725.

in multiple *independent* variables (*e.g.*, supply and demand factors). The approach does not *assume* that an overcharge exists, but instead tests *if* an overcharge exists and measures the extent (if at all) that the actual prices paid were higher as a result of the conspiracy. The model compares prices in a period when cartel behavior occurred to a competitive benchmark period when such behavior did not occur. Backing out the effect of any changes in supply and demand factors between the two periods, the model estimates by how much prices were higher in the cartel period because of the cartel behavior. It does this using a Class Period indicator variable,[231] which takes the value one in the cartel period and the value zero in the competitive benchmark period.

118. In this case, Defendants have produced transaction data for the period January 2012 through December 2019.[232] Thus, the period January 2012 through September 2015 provides a reliable competitive benchmark period with which to compare prices in the Class Period, starting in October 2015, through to December 2019. The supply and demand factors that I control for in this model are as follows:

119. **Supply (*i.e., costs*)**, the main variable cost components in Caustic Soda production, as described in Section IV.A.1 of this Declaration, are electricity and steam (███████████████ ████████████████████) and salt/brine (████████████████████████████████).[233] Electricity and steam costs are driven by natural gas prices and salt/brine costs are driven by salt prices.[234] Labor is considered a fixed cost in the Caustic Soda industry.[235] So, I have constructed

---

[231] Also referred to as a "dummy variable."

[232] I received a standardized database of Defendants' transaction data from Monument Economics Group, which I understand is supporting Dr. Russell Lamb, plaintiffs' expert in the direct purchasers' class action. I have verified that this database is reliable, and I use it in my analysis.

[233] OxyChem, Chlorovinyls Caustic Soda Manufacturing Cost, 2012-2019, US Dollars, OCC_00126170; *see also* my workpapers. These percentages are calculated for October 2015, the start of the Class Period.

[234] Olin Corporation. Form 10-K for fiscal year ending December 31, 2020, filed February 24, 2020, at p. 12.

[235] IHS Markit, *Introduction to Chlor-Alkali Workshop*, IHSM008271-8545, at -008402. *See also*, OxyChem, Chlorovinyls Caustic Soda Manufacturing Cost, 2012-2019, US Dollars, OCC_00126170.

a Caustic Soda variable cost index as a weighted average of natural gas prices (██████████)
and salt prices (██████████). This variable is lagged one month, and smoothed using a
three-month average, to account for the lag that manufacturers face when making production
decisions.

120. **Demand**, drivers that are relevant for Caustic Soda and chlorine while covering the
major end uses of both co-products, lagged one month, and smoothed using a three-month
average whenever available as a monthly series, to account for the lag that manufacturers face in
making production decisions:

    a.   U.S. gross domestic product ("GDP") (*i.e.*, general economic activity).

    b.   chemical production (the biggest use of Caustic Soda).

    c.   paper production (the second biggest use of Caustic Soda).

    d.   plastic and rubber production (the primary use for Chlorine).

121.  **Net Exports**, measured as monthly (exports – imports)/domestic production for US
Caustic Soda, to account for international Caustic Soda demand.

122. **Seasonality**, indicator variables for each month of the year.

123. **Product characteristics**

    a.   grade: diaphragm or membrane.

    b.   concentration.

124. **Customer segment**, such as distribution, chemicals, pulp and paper, and customer.

125. **Contract type**, such as formula, negotiated, *etc.*

126. **Freight costs**, since the cost of freight was not available for all transactions and
could therefore only be deducted for a portion of the transactions, we control for the cost of
freight with:

    a.   quantity variables, the quantity in the transaction is split into tiers to roughly capture the capacity of various freight modes (truck, rail tanker, *etc.*).

    b.   freight indicator, set to equal one if the net price includes freight charges that cannot be removed.

    c.   indicator variables for each grouping of origin-destination-freight modes.

127. The direct overcharge results are presented in Table 38.[236,237] The overcharge indicators are highly statistically significant. The coefficient on the cost variable is positive, as one would expect, and statistically significant. The coefficients on the Caustic Soda demand variables (GDP, chemical, and paper production) are positive, as one would expect, and statistically significant. The coefficient on net exports is positive, as one would expect, and statistically significant. The coefficient on the demand for chlorine (*i.e.*, plastic and rubber production) is negative, as one would expect (more chlorine demand means more chlorine and Caustic Soda production and, all else equal, lower Caustic Soda prices through more supply), but it is statistically insignificant due to multicollinearity, which does not impugn the reliability of the model.[238] The model explains 65% of the variation in prices, as evidenced by the R-squared value, which is high by professional standards. Taken together, these results show that the model is reliable.

---

[236] I restrict the regression data to sales of diaphragm and membrane liquid Caustic Soda. The regression is weighted by transaction quantity and standard errors are robust (meaning that they control for heteroskedasticity). Prices are adjusted for general inflation. I also applied an outlier treatment to net prices exceeding three times higher or lower than the interquartile range.

[237] I conduct a sensitivity analysis applying an outlier treatment to net prices exceeding 1.5 times higher or lower than the interquartile range, which results in similar coefficient estimates and a slightly higher overcharge estimate, *see* my workpapers.

[238] In regression analysis, demand and supply factors may be correlated with each other. This can lead to reduced statistical significance in some coefficients. However, including such variables in the regression ensures that their collective effect on prices is fully accounted for. These principles are well recognized in the economics profession.

128. Column 1 presents results when the model is run to calculate an overcharge across all of the Defendants' customers. That overcharge is 11.61%. Column 2 presents results when the model is run to calculate a different overcharge for *distributor* customers, which is found to be 16.37%, and a different overcharge for *non-distributor* customers, which is found to be 10.29%.[239] As the Classes bought Caustic Soda through distributors, I use the 16.37% as the direct overcharge in my computation of Class-wide damages for the State Antitrust Class and the Colorado Consumer Protection Class.

---

[239] That the overcharge is higher for distribution is consistent with the fact that customers who are planning to resell a product and pass-through overcharges will accept higher prices than customers who will use the product themselves.

*Table 38. Direct Overcharge Model Results[240]*

| | (1) | (2) |
|---|---|---|
| | **All Customer Overcharge** | **Distributor & Non-Distributor Specific Overcharges** |
| *Dependent variable:* Log Real Net Price | | |
| Class Period indicator variable | 0.110** | |
| ***Overcharge Percent[241]*** | ***11.61%*** | |
| Class Period indicator variable (Distributors) | | 0.152** |
| ***Overcharge Percent (Distributors)*** | | ***16.37%*** |
| Class Period indicator variable (non-Distributors) | | 0.098** |
| ***Overcharge Percent (non-Distributors)*** | | ***10.29%*** |
| *Control Variables:[242]* | | |
| Seasonality | ✓ | ✓ |
| Quantity ≤15 DST | 0.013 | 0.017 |
| Quantity >15 and ≤45 DST | 0.005 | 0.007 |
| Quantity >45 and ≤60 DST | -0.045 | -0.044 |
| Customer's Market Segment | ✓ | ✓ |
| Customer | ✓ | ✓ |
| Grade Membrane versus Diaphragm | 0.019* | 0.018* |
| Concentration[243] | ✓ | ✓ |
| Indicator for Price Includes Freight | 0.022 | 0.024 |
| Lag Log Real GDP Smoothed | 0.718** | 0.717** |
| Lag Log Real Chemical Production | 0.602** | 0.593** |
| Lag Log Real Paper Production | 2.902** | 2.914** |
| Lag Log Real Plastic and Rubber Production | -0.132 | -0.130 |
| Log Net Exports | 0.083** | 0.083** |
| Lag Log Real Cost Index Smoothed | 0.458** | 0.460** |
| Contract Type Other[244] | -0.538** | -0.538** |
| Contract Type Formula | -0.011 | -0.009 |
| Contract Type Market Basket | -0.022 | -0.024 |
| Contract Type N/A | -0.036* | -0.036* |
| Constant | -45.231** | -45.252** |
| Observations | 1,287,771 | 1,287,771 |
| R-squared | 64% | 65% |

[240] Robust standard errors. * denotes 90% confidence level   ** denote 95% confidence level.

[241] To convert the estimated coefficient on the Class Period indicator variable I make the following standard mathematical transformation: $100*[\exp[(\text{coefficient value})-0.5(\text{coefficient standard error})^2]-1]$.

[242] The reference group for Quantity is >60 DST, the reference group for Grade is diaphragm, the reference group for Contract Type is negotiated. As these are the reference groups, coefficients are not presented for these categories.

[243] Concentration is included as a categorical variable.

[244] There are no "Other" contracts for distributors.

### B. *Estimating Pass-through*

129. To estimate how much of the direct overcharge was passed-through the distribution channel to members of each Class, I use data produced by three distributors: ████  ████ and ██████. Using these three distributors is sufficient for estimating the pass-through of overcharges to the Classes for three reasons.

130. *First*, these three distributors represent a sizeable percentage, specifically 38%, of Defendants' sales to distributors during the Class Period. These three distributors sold consistently throughout the Class Period, in every State in the U.S., and they sold both membrane and diaphragm grade liquid Caustic Soda. In short, these three distributors are representative of the distribution channel, in terms of time, geography, and product.

131. *Second*, as I demonstrated in Section VI.A of this Declaration, there was a high degree of similarity in the Defendants' pricing to distributors during the Class Period. Common evidence shows that distributors experienced a pattern of declining prices going into the Class Period followed shortly by sharply increasing prices. This supports that the direct overcharge was applied across the distribution channel, such that investigating the pass-through of that direct overcharge for three distributors that represent 38% of the channel is indicative of the common pricing experience of the Classes.

132. *Third*, economists recognize that pass-through is a common market-wide phenomenon, determined by competitive conditions in the market (in this case, Caustic Soda distribution) and the elasticity of demand for the product in question (in this case, the demand for Caustic Soda). To understand this, consider that economists categorize industries into *perfectly* competitive markets and *imperfectly* competitive markets. A perfectly competitive market is one in which there are many sellers, such that no individual seller can affect prices in any significant manner. Under the conditions of perfect competition, buyers can choose from multiple sellers,

and the resulting competition forces prices down to marginal cost.[245] As prices equal marginal cost, an increase in cost is automatically passed through to an increase in prices.[246] But even if a market is closer to *imperfectly* competitive, pass-through rates are high if the demand for the product is *inelastic*. Imperfectly competitive markets involve a limited number of sellers, and firms have sufficient market power to affect prices. Therefore, firms can choose whether or not to pass through cost increases. If they do, they will avoid incurring the cost increase themselves, but they may lose customers who do not want to pay the higher prices. However, if the demand for the product is *inelastic*, then sufficient customers will continue to buy their product such that the sellers can pass-through cost increases successfully. Thus, firms will pass-through more of a cost increase if demand is inelastic and less if demand is elastic, as found in the economics literature.[247] As I described in Section IV.B of this Declaration, the demand for Caustic Soda is *inelastic*, supporting a high degree of pass-through. Moreover, this inelasticity of demand is a common denominator for the Caustic Soda market, faced by all distributors, particularly given the homogenous nature of Caustic Soda (*see* Section IV.C of this Declaration). Thus, pass-through analysis based on 38% of the distribution channel is probative for, and applicable across, each Class as a whole.

133. My method for investigating pass-through in this case uses a regression model to estimate the proportion of Defendants' price increases that were passed through into the distributors' prices to members of each Class. First, I processed each distributor's Caustic Soda

---

[245] Carlton, D.W. and Perloff, J.M., *Modern Industrial Organization*, Pearson Addison Wesley, 4th Ed., at pp. 57-59.
[246] Yang, J., "Exchange Rate Pass-Through in U.S. Manufacturing Industries," *The Review of Economics and Statistics*, Vol. 79, No. 1 (Feb.1997): 95-104, at p. 95: "passthrough is larger the more competitive the industry (the smaller the markup of price over marginal cost)."
[247] Yang, J., "Exchange Rate Pass-Through in U.S. Manufacturing Industries," *The Review of Economics and Statistics*, Vol. 79, No. 1 (Feb. 1997): 95-104, at p. 95: "partial pass-through will occur if demand becomes more elastic as price increases."; Campa, J.M. and Goldberg, L.S., "Exchange Rate Pass-Through into Import Prices: A Macro or Micro Phenomenon?" NBER Working Paper 8934, (May 2002): 679-690, at p. 7: "[firms] facing highly elastic demand curves will pass-through a lower percentage."

sales data to apply price adjustments and returns, removed physical product swaps, removed sales made to Defendants or within the same distributor, removed sales exported outside of the U.S., and removed sales made to the federal government.[248] The following figures present the average net price per dry ton charged by each of the three distributors to their customers over time, with the vertical red line representing the start of the Class Period in October 2015. These price charts share the same pattern as the charts of Defendants' sales prices to distributors that I presented in Section VI.A of this Declaration, in that they decrease in the lead up to the Class Period, that decrease is then dampened and reversed, so that prices increase substantially. This provides initial support that distributors were passing through the higher prices they were charged by Defendants and therefore passing through the direct overcharge.



---

[248] I also applied an outlier treatment to net prices exceeding three times higher or lower than the interquartile range.
[249] ████ Transaction Data.



134. To precisely estimate the pass-through percentage, I perform a regression analysis. I match each of the distributor sales to customers during the Class Period, to the Defendants' sales to that distributor, aggregating the data and matching by month, grade, and concentration. I then

---

250 ▮▮▮ Transaction Data.
251 ▮▮▮ Transaction Data.

estimate a regression model on this matched data to estimate the relationship between Defendant

sales prices and distributor sales prices. This model includes controls for seasonality (indicator

variables for each month of the year), grade, concentration, and distributor. The results for the

pass-through model are presented in Table 42. Column (1) contains the results when using

nominal prices, column (2) repeats this analysis using real prices, *i.e.*, adjusted for inflation, and

column (3) controls for the costs associated with distributing manufactured Caustic Soda by

adding additional controls for wages and shipping. Column (3) provides an estimate of pass-

through at a rate of 81%, and I use this in my computation of Class-wide damages.[252]

*Table 42. Pass-Through Regression Results[253]*

| Model | (1) Nominal Prices | (2) Real Prices | (3) Real Prices, with Wage & Long-Distance Truck PPI Controls |
|---|---|---|---|
| ***Pass Through*** | ***96%*** | ***89%*** | ***81%*** |
| Log Defendant Net Price | 0.659** | 0.612** | 0.557** |
| *Control Variables* | | | |
| Seasonality | ✓ | ✓ | ✓ |
| Concentration | ✓ | ✓ | ✓ |
| Grade | ✓ | ✓ | ✓ |
| Distributor | ✓ | ✓ | ✓ |
| Wages of Wholesale Chemical Employees | | | 0.734** |
| Long-Distance Truck PPI | | | 0.274* |
| Constant | 2.531** | 2.844** | -0.740 |
| Observations | 806 | 806 | 806 |
| Adjusted R-squared | 77% | 78% | 81% |

[252] I conduct a sensitivity analysis including the same lagged chemical production, paper production, and smoothed GDP from the direct overcharge regression model to control for demand, which results in a pass-through percentage of 80% (*see* my workpapers).

[253] ███████ ████████ ██████ and Defendant Transaction Data; ** indicates 95% confidence level and * indicates 90% confidence level. To convert the coefficient on Defendant net price to the pass-through rate, I multiply the coefficient by the ratio of weighted average distributor net price to weighted average Defendant net price. The regression is weighted by transaction quantity and standard errors are robust (meaning that they control for heteroskedasticity). I also applied an outlier treatment to net prices exceeding three times higher or lower than the interquartile range. I conduct a sensitivity analysis applying an outlier treatment to net prices exceeding 1.5 times higher or lower than the interquartile range, which results in pass-through percentages of 98% for column (1), 91% for column (2) and 85% for column (3).

### C.  Computation of Class-wide Damages

135. I now proceed to estimate Class-wide damages for the State Antitrust Class and the Colorado Consumer Protection Class by isolating the relevant volume of commerce for each Class and by then applying my direct overcharge and pass-through estimates to that volume of commerce. The Defendants' transaction data identifies the dollar value of sales to distributors during the Class Period that were not exported overseas. This number is $3,625,547,857. I first take this number and isolate liquid Caustic Soda sales of grade diaphragm or membrane, to meet certain restrictions for Class definitions. The resulting number is $3,552,308,180. I then use distributor data (again, data produced by ████ ████ and ████) to make certain further exclusions for Class definitions. Specifically, I estimate the share of distributor sales to federal government entities, and I adjust the volume of commerce to remove such sales.[254] I also estimate the share of distributor sales that are identified as exports, to ensure that export sales are reliably identified in the Defendants' transaction data. If the share of exports in the Defendants' transaction data is lower than that share in the distributor data, I use the share from the distributor data to remove exports to be conservative.[255] I then estimate the share of distributor sales that are to the Antitrust States and Colorado, respectively, and I apply that percentage to the volume of commerce.[256] Finally, at the instruction of Plaintiffs' counsel I remove sales by distributors to entities in Connecticut before 2018 from the volume of commerce for the State Antitrust Class.

---

[254] Specifically, I estimate these percentages for ████████ and ████, and find them all to be less than 0.01%. I multiply one minus those respective percentages by Defendant sales to each of those three distributors. I use the ████ percentage for Defendant sales to Eunice, because I understand that Eunice sold its Caustic Soda to ████ for distribution. I then use the weighted average of these percentages for Defendant sales to all other distributors.

[255] The share of exports in the Defendants' transaction data is lower than the share in the distributor data for ████ which has a 0.2% share of exports in its distributor data and 0% in the Defendants' transaction data, and Tricon which has a 97.3% share of exports in its distributor data and 80.8% in the Defendants' transaction data.

[256] Specifically, for the State Antitrust Class, I estimate this percentage for ████ (33.9%), ████████, and ████████. I multiply those respective percentages by Defendant sales to each of those three distributors. I use the ████ percentage for Defendant sales to Eunice, because I understand that Eunice sold its Caustic Soda to ████ for distribution. I then use the weighted average of these percentages for Defendant sales to all other

136. The final volume of commerce number is $1,324,540,658 for the State Antitrust Class. Applying the direct overcharge and pass-through to this number results in ***Class-wide damages of $154,645,773 for the State Antitrust Class***.[257] The final volume of commerce number is $20,678,880 for the Colorado Consumer Protection Class. Applying the direct overcharge and pass-through to this number results in ***Class-wide damages of $2,414,348 for the Colorado Consumer Protection Class***.

### D.  Computation of Unjust Enrichment Damages

137. I have also been asked by Plaintiffs' counsel to compute unjust enrichment damages for sales into a collection of States (the Unjust Enrichment States) to compute ***Class-wide damages for the Unjust Enrichment Class***. I do so in the following way. First, using distributor data produced by ██████ ██████ and ██████, I estimate the percentage of sales made into the Unjust Enrichment States during the Class Period. Second, I apply that percentage to sales by the Defendants to distributors of Caustic Soda that meet the Class definition. This gives me unjust enrichment damages in the amount of $711,998,378 in revenue terms. Third, using available data on Defendants' profit margins, I calculate the Defendants' weighted average gross margin and net margin for the Class Period.[258] I find that the weighted average gross margin is 49.8% and the weighted average net margin is 48.8%. Fourth, I apply these two margins to ***unjust enrichment damages*** in the amount of ***$711,998,378 in revenue terms***, to obtain unjust enrichment damages of ***$354,503,842 in gross profit terms***, and unjust enrichment damages of ***$347,715,911 in net profit terms***.

---

distributors. I follow a similar approach for the Colorado Consumer Protection Class, finding the percent of sales to Colorado to be 0.7% for ██████ 0.6% for ██████, and 0.1% for ██████.

[257] Specifically, I calculate damages by multiplying the total dollar sales by OC/(1+OC), where OC is the 16.37% overcharge expressed as a proportion multiplied by the pass-through rate of 81%.

[258] Information on profit margins for Caustic Soda was available from Oxy, Formosa Plastics, and Westlake (OCC_00126171; FPC-USA-DPP-00098568; FPC-USA-DPP-00118873; FPC-USA-DPP-126690; FPC-USA-DPP-00152158; FPC-USA-DPP-00160994; WL_0001524932; WL_0001524942; WL_0001525119; WL_0001525148).

## VIII.  CONCLUSION

138. Inasmuch as discovery in this case is not yet complete, I reserve the right to revise or supplement my opinions as additional information becomes available. Exhibits to be used in support of the opinions stated in this Declaration include all of the tables, graphics and information contained herein as well as the Exhibits cited in or accompanying this Declaration. Additional demonstrative exhibits based upon this same information may be prepared for trial or hearings and used to support my opinions.

September 26, 2022                                            Respectfully submitted,

Gareth Macartney, Ph.D.

# Exhibit A

## Curriculum Vitae of
## Gareth Macartney, Ph.D.



**Gareth James Macartney, Ph.D.**
CEO, Senior Economist, Director of Competition Analytics

Direct: (510) 463-0168
gmacartney@onpointanalytics.com

# INDUSTRY EXPERIENCE

**Senior Economist, OnPoint Analytics, Inc., 2008 – Present:**
Dr. Gareth Macartney is the Chief Executive Officer and Director of Competition Analytics at OnPoint. He is a testifying economist with a particular emphasis on liability, impact, and damages analysis in the context of antitrust, intellectual property, breach of contract, and class action cases, among other types of complex litigation. As the Director of the firm's Competition practice, Dr. Macartney also manages work for affiliate experts, supervising staff and overseeing report and testimony preparation. As testifying expert and as manager, Dr. Macartney has analyzed a wide variety of industries, including heavy industry (auto parts, steel, ready-mixed concrete, hard rock mining); electronic manufacturing (liquid crystal displays, optical disk drives, lithium ion batteries, DRAM); transport (rail freight, air cargo, trucks); energy (oil, natural gas, gasoline); food and agriculture (packaged seafood, eggs, milk, poultry, fertilizers, fruits); consumer electronics (digital cameras, smartphones, personal computers, network switches); retail (apparel, yoghurt, single-serve coffee, protein bars); online advertising; cryptocurrencies; pharmaceuticals; water; real estate; insurance; and education.

# SELECTED CASES

**As Expert:**

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, et al.*
Robbins Geller Rudman & Dowd LLP (2017–)
- Class Action, Insurance
- One Declaration, One Deposition

*Nview Health, Inc. v. David V. Sheehan, M.D.*
Gunster (2022–)
- Breach of Contract, Healthcare Technology
- One Expert Report

*Jonathan Michel v. Yale University*
The Golan Firm (2022–)
- Class Action, Tuition Fees
- One Declaration, One Deposition

*Marantz Brothers, LLC v. Tate & Lyle Ingredients Americas LLC, et al.*
Enenstein, Pham & Glass LLP (2021–)
- Antitrust, Bar Fiber
- Two Expert Reports, One Deposition

*Cryptocurrency Patent Valuation*
Haug Partners, LLP (2020)
- Patent Valuation
- One Valuation Report

*Micron Technology, Inc. v. United Microelectronics Corporation, et al.*
Dan Johnson Law Group, LLP (2019–2021)
- Trade Secrets, DRAM
- Two Expert Reports

*In Re: Packaged Seafood Products Antitrust Litigation*
Ahern and Associates, P.C. (2019–)
- Antitrust, Packaged Seafood
- Two Expert Reports, Two Depositions

*JBR, Inc. (d/b/a Rogers Family Co.) v. Keurig Green Mountain, Inc.*
Dan Johnson Law Group, LLP (2018–)
- Antitrust, Single-Serve Coffee
- Four Expert Reports, One Deposition

*Ipsilium LLC v. Cisco Systems, Inc.*
Dan Johnson Law Group, LLP (2018–2019)
- Patent Damages, Network Switches
- Analysis for Preliminary Damages Contentions

*Engquist, et al. v. City of Los Angeles*
Wolf Haldenstein Adler Freeman & Herz LLP (2018–2020)
- Taxation Class Action, Gas Utility Taxes
- Two Expert Declarations

*Altela, Inc. v. Arizona Science and Technology Enterprises, et al.*
The Miller Law Firm, P.C. (2018)
- Breach of Contract, Water Treatment Technology
- One Expert Report, One Deposition, Arbitration Testimony

*Acer, Inc., et al. v. Lite-On IT Corp., et al.*
TechKnowledge Law Group, LLP (2015–2019)
- Antitrust, Optical Disk Drives
- Two Expert Reports, Two Depositions

*Fujifilm Corporation v. Motorola Mobility, LLC*
Morgan, Lewis & Bockius, LLP (2015–2016)
- Patent Damages, Smartphone Technology
- Two Expert Reports, One Deposition, Jury Trial Testimony

*Eastman Kodak Company v. Epson Imaging Devices Corporation, et al.*
Nixon Peabody, LLP (2011–2013)
- Antitrust, Liquid Crystal Display Panels
- Three Expert Reports, Two Depositions

*Attorney General of Mississippi v. Yazaki North America, Inc., et al.*
Hazzard Law, LLC (2015–2019)
- Antitrust, Automotive Wire Harnesses
- Two Declarations

*Acer Inc., et al. v. Samsung SDI Co., LTD., et al.*
TechKnowledge Law Group, LLP (2015–2018)
- Antitrust, Lithium-Ion Batteries

*Acer America Corp., et al. v. Hitachi, Ltd., et al.*
TechKnowledge Law Group, LLP (2014–2015)
- Antitrust, Liquid Crystal Display Panels

*Home Depot USA, Inc. v. AU Optronics Corp., et al.*
Bryan Cave, LLP (2015)
- Antitrust, Liquid Crystal Display Panels

*Teramura, et al. v. Walgreen Co., d/b/a Walgreens*
Sanford Law Firm, LLP (2014)
- Wage & Hour Class Action, Retail
- Two Expert Reports

*NextBus, Inc. v. NextBus Information Systems*
Wm. Kochenderfer, PC (2012)
- Breach of Contract, Real Time Passenger Information Technology & Advertising
- One Expert Report

## *As Manager:*

### Antitrust
*Ryder Limited and Hill Hire Limited v. Man SE et al.*
Ashurst, LLP (2018–)

*Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC v. Southeast Milk, Inc., et al.*
Ahern and Associates, P.C. (2016–2019)

*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*
Hausfeld, LLP, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP (2010–)

*In Re: Processed Egg Products Antitrust Litigation*
Hausfeld, LLP (2008–2018)

*In Re: Wholesale Grocery Products Antitrust Litigation*
Kotchen & Low, LLP (2016–2017)

*Fond du Lac Bumper Exchange, Inc., et al. v. Jui Li Enterprise Company, Ltd., et al.*
Karon, LLC (2014–2016)

*Reorganized Farmland Industries v. OneOk, Inc., et al.*
Sharp McQueen, P.A. (2015–2021)

*In Re: Pool Products Distribution Market Antitrust Litigation*
Kaplan, Fox & Kilsheimer, LLP (2013–2016)

*In Re: Northeastern Milk Antitrust Litigation*
Howrey, LLP (2011–2016)

*In Re: Air Cargo Shipping Services Antitrust Litigation*
Hausfeld, LLP (2012–2013)

*In Re: Southeastern Milk Antitrust Litigation*
Howrey, LLP (2010–2013)

*Stanislaus Food Products v. USS-POSCO Industries et al.*
Lieff, Cabraser, Haimann & Bernstein, LLP (2012)

*In Re: Potash Antitrust Litigation*
Pearson, Simon & Warshaw, LLP (2010–2011)

*In Re: Ready-Mixed Concrete Antitrust Litigation*
Cohen & Malad, LLP (2008–2010)

<u>Intellectual Property</u>
*Eli Lilly and Company v. Mayne Pharma USA, Inc. et al.* (Gemzar)
Winston & Strawn, LLP (2010)

*Impax Laboratories, Inc., v. Shire, LLC et al.* (Adderall XR)
Frommer, Lawrence & Haug, LLP (2010)

*Aspex Eyewear, Inc. and Contour Optik, Inc. v. Hardy Life, LLC, et al.*
Sheppard, Mullin, Richter & Hampton, LLP, Frommer, Lawrence & Haug, LLP (2010)

*Eli Lilly and Company v. Hospira, Inc., et al.* (Gemcitabine)
Winston & Strawn, LLP (2009)

*Santarus, Inc. and the Curators of the University of Missouri v. Par Pharmaceutical, Inc.* (Zegerid)
Arent Fox, LLP (2009)

*Forest Laboratories, Inc., et al. v. Caraco Pharmaceutical Laboratories, Ltd.* (Lexapro)
Winston & Strawn, LLP (2008–2009)

*Novo Nordisk A/S and Novo Nordisk Inc. v. Caraco Pharmaceutical Laboratories, Ltd. and Sun Pharmaceutical Industries, Ltd.* (Prandin)
Winston & Strawn, LLP (2008)

Breach of Contract
*Fowler Packing Company v. Sun Pacific Shippers, Paramount Citrus Association, et al.*
Gibson, Dunn & Crutcher, LLP (2016)

*Tula Foods, Inc. v. The Kroger Co.*
Vorys, Sater, Seymor, and Pease, LLP (2014)

*AgroSource, Inc. v. Sipcam Agro USA, Inc.*
Wiley Rein, LLP (2012)

*Frank K. Cooper Real Estate #1, Inc., et al. v. Cendant Corporation and Century 21 Real Estate Corporation*
Zwerling, Schachter & Zwerling, LLP (2009–2011)

*Road Ranger v. Citgo*
Stahl Cowen Crowley Addis, LLC (2009)

Environmental
*Freeport-McMoRan Inc., Comment Re: Proposed Rule for Financial Responsibility Requirements under CERCLA § 108(b) for Classes of Facilities in the Hardrock Mining Industry*
Vinson & Elkins, LLP (2010–2017)

*Roosevelt Irrigation District v. Salt River Project Agricultural Improvement and Power District, et al.*
Bonnett, Fairbourn, Friedman and Balint, P.C. (2015–2016)

*Clyde Litchfield, et al. v. Onstott Dusters, Inc. et al.*
McCormick, Barstow, Sheppard, Wayte & Carruth, LLP (2009)

*State of Oklahoma v. Tyson Foods, Inc. et al.*
Ryan, Whaley & Coldiron, LLP (2009)

Product Labelling
*Austin Rugg and Jennifer Fish, et al. v. Johnson & Johnson*
The Golan Firm (2019-2020)

*Siobhan Morrow, et al. v. Carter's, Inc, et al.*
Carlson Lynch Sweet Kilpela Carpenter, LLP (2017–2018)

*Leah Segedie, et al. v. the Hain Celestial Group, Inc.*
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP (2016–2018)

*Rosminah Brown, et al. v. the Hain Celestial Group, Inc.*
Lexington Law Group (2014)

Insurance
*Certain Underwriters at Lloyd's Severally Subscribing Policy Number DP359504 et al. v. Tyson Foods, Inc.*
Dickstein Shapiro, LLP (2009–2010)

Taxation
*Estuardo Ardon, et al. v. City of Los Angeles*
Wolf Haldenstein Adler Freeman & Herz, LLP (2013–2014)

*Carla Villa and Vanessa Garza, et al. v. City of Chula Vista*
Capretz & Associates (2012)

## EDUCATION

**University College London,** London, England
*Ph.D. Economics* | 2008 | Title: "Market Institutions and Firm Behavior: Output and Innovation in the Face of Reform"

**Royal Holloway College, University of London,** London, England
*M.Sc. Economics* | 2003 | Distinction

**Exeter College, Oxford University,** Oxford, England
*B.A. Physics* | 1996 | Class 2:1

## PUBLICATIONS

Economic Principles for Class Certification Analysis in Antitrust Cases (joint with Gordon Rausser), *Antitrust Magazine, Section of Antitrust Law, American Bar Association,* Spring 2016, vol. 30, no. 2, pp. 60-67

Rising Standards for Class Certification: Implications for Economic Analysis (joint with Gordon Rausser), *The Journal of Business and Economics,* March 2016, vol. 7, no. 3, pp. 836-870

Employment Protection Legislation, Multinational Enterprises and Innovation (joint with Rachel Griffith), *The Review of Economics and Statistics,* March 2014, vol. 96, no. 1, pp. 135-150

Antitrust Class Proceedings – Then And Now (joint with Michael Hausfeld, Gordon Rausser, Michael Lehmann and Sathya Gosselin), *The Law and Economics of Class Action*s, *Research in Law and Economics,* 2014, vol. 26, pp. 77-133

The Location of Innovative Activity in Europe (joint with Laura Abramovsky, Rachel Griffith and Helen Miller), *The Institute for Fiscal Studies,* July 2008, Working Paper 08/10

Product Market Reforms, Labour Market Institutions and Unemployment (joint with Rachel Griffith and Rupert Harrison), *The Economic Journal,* March 2007, vol. 117, no. 519, pp. C142-C166

## SCHOLARSHIPS AND AWARDS

- Best Academic Private Enforcement Article, 2015 Antitrust Writing Awards, Concurrences Journal and George Washington University's Competition Law Center

- Advanced Institute of Management Scholarship 2004–2007
- University College London, Department of Economics, W. M. Gorman Scholarship
- University College London, Department of Economics, Honorable Mention in Teaching Assistant Awards

# PRIOR EMPLOYMENT

**Ph.D. Scholar**, the Institute for Fiscal Studies, London, UK, 2004–2007
- Academic and industry research with the Productivity and Innovation team of a leading UK research institute
- Funded by the institute through Ph.D. program

**Teaching Assistant**, Department of Economics, University College London, 2003–2007
- Undergraduate courses in Industrial Organization, Macroeconomics, and Econometrics

**Consultant**, Corporate Banking and Financial Markets, Royal Bank of Scotland, PLC, 2002 (May to Oct)
- Managed reconciliation exercise between two departments of the bank, reporting to senior bank personnel

**Analyst**, Group Risk, Royal Bank of Scotland, PLC, 1999–2001
- Designed and managed creation of credit risk reporting software
- Passed financial regulator's exams in securities and derivatives

**IT Consultant**, Logica UK Ltd, 1997–1999
- Consultancy in energy, transportation, and defense sectors

# CONFERENCES AND PRESENTATIONS

From Estimation to Prediction in Economic Analysis at Class Certification, presented at:
    Festschrift in Honor of Gordon Rausser, University of California, Berkeley, October 2019

Law & Economics, Panel Participant at:
    Festschrift in Honor of Gordon Rausser, University of California, Berkeley, October 2019

Damage Analysis in Intellectual Property Litigation, presented at:
    Bar Association of San Francisco, Barristers Club, Continuing Legal Education, November 2016

Antitrust Class Proceedings – Then and Now, presented at:
    Class Action Landscape: Yesterday, Today and Tomorrow – Perspectives in Law and Economics, Research in Law and Economics Conference 2013, Boston

Firm Investment in Innovation and Fixed Assets: The Effect of US Tax Reforms that Reduced the Relative Price of Equity to Debt, presented at:
    Productivity, Innovation & Intellectual Property Series 2007, London School of Economics

Competition and Innovation, presented at:
    Oxford University and Cambridge University, Institute for Fiscal Studies, Public Economics Lecture Series, February 2007

Gareth James Macartney, Ph.D.
Page 8 of 8

Product Market Reforms, Labour Institutions and Unemployment, presented at:
      European Economics Association Congress 2006, Vienna University
      Royal Economic Society Conference 2006, Nottingham University

Matching Firm Accounts to Patents, presented at:
      European Policy on Intellectual Property Conference 2006, Bocconi University, Milan

## REFEREE ACTIVITY

The European Economic Review, the Journal of Competition Law and Economics, the Economics of Transition, Oxford Economic Papers, and Fiscal Studies

# Exhibit B

## Materials Reviewed and Relied Upon

**<u>Legal Documents and Pleadings</u>**

Amended Consolidated Class Action Complaint, filed August 23, 2021


**<u>Deposition and Hearing Testimony (*indicates with exhibits)</u>**

Deposition of Ashley Berryman, January 21, 2022

Deposition of Bob Buesinger, January 7,2022

Deposition of Burnis, J. Herbert, March 10, 2022

Deposition of Cherie Jagielo, August 5, 2022

Deposition of Damian Gumpel, February 3, 2022

Deposition of Dana West, July 16, 2021

Deposition of Edward Luick, September 9, 2021

Deposition of Erik Schoenman, October 6, 2021

Deposition of Grant Evans, January 14, 2021

Deposition of Harry Thomas, February 18, 2022

Deposition of Heath Langford, October 7,2022

Deposition of James Paulsen October 26, 2021

Deposition of Kelvin Wu, December 7, 202l

Deposition of Larry Kromidas, December 1, 2021

Deposition of Lisa Ballard, January 28, 2022

Deposition of Michael Jakovich, January 13, 2022

Deposition of Michael S. Dye, December 16, 2021

Deposition of Paul Kowalski, December 10, 2021

Deposition of Phillip Chen, November 19, 2021

Deposition of Robert Peterson, November 11, 2021

Deposition of Roger Massey, January 27, 2022

Deposition of Scott Abel, November 3, 2021

Deposition of Stephanie Brooks, October 5, 2021

Deposition of Stephen Nedvesky, August 19, 2021

Deposition of Steve Jagielo, August 4, 2022

Deposition of Tim Hillsley, February 10, 2022

Deposition of Toshiaki Ansai, March 11, 2022

Deposition of Wayne Gasior, September 29, 2021

## Declaration

Declaration of Richard Moskowitz, April 20, 2021

## Articles, Books, and Reports

Antitrust Division of the Department of Justice, *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, September 2005, Revised February 2021

Bolotova, Yuliya.V., Connor M. John, and Douglas J. Miller, "Factors Influencing the Magnitude of Cartel Overcharges: An Empirical Analysis of the U.S. Market," *Journal of Competition Law & Economics* 5, no. 2 (August 2008): 361-381

Bolotova, Yuliya.V., "Cartel overcharges: An empirical analysis," *Journal of Economic Behavior & Organization* 70, (2009): 321-341

Campa, J.M. and Linda S. Goldberg, "Exchange Rate Pass-Through into Import Prices: A Macro or Micro Phenomenon?" NBER Working Paper 8934, (May 2002): 679-690

Carlton, D.W. and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th edition, Pearson Addison Wesley, 2004

Connor, John M., "Global Cartels Redux: The Amino Acid Lysine Antitrust Litigation (1996)*"*: 1-36

Federal Trade Commission and U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors*, April 2000

Formosa Plastics Group, *Introduction*, 2018, accessed September 19, 2022 at https://www.fpg.com.tw/uploads/images/media-center/ebook-top/FPG%20Introduction2018_en.pdf

Hay, George A., and Daniel Kelly, "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law and Economics* 17, no. 1 (April 1974): 13-38

IBIS World, *Chlorine Manufacturing*, November 2020, accessed October 25, 2021

Levenstein, Margaret C., and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44, no.1 (March 2006): 43-95

Levenstein, Margaret C., and Valerie Y. Suslow, "Cartel bargaining and monitoring: The role of information sharing*," The Pros and Cons of Information Sharing* 43, 2006:43-81

Mankiw, Gregory N., "Principles of Economics", 8th edition, Boston: Cengage Learning, 2018

Olin, *Olin KeyBanc Capital Markets: Basic Materials & Packaging Conference*, September 14, 2010, accessed September 19, 2022 at

https://www.sec.gov/Archives/edgar/data/74303/000007430310000048/keybancslides0914102.htm

Oxy, *Second Quarter Earnings Conference Call*, August 3, 2022, accessed September 16, 2022 at https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/oxy2q22conferencecallslides.pdf

Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy* 723 (2008): 723-742

United States Department of Justice, Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010, accessed at https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf

Westlake, *Product Stewardship Summary*, accessed September 19, 2022 at https://www.westlake.com/sites/default/files/Liquid%20Caustic%20Soda-DiaphragmMembrane-PS%20Summary%20-%20Ed1%20-%20Final_July2018_0.pdf

World Chlorine Council, *Caustic Soda*, accessed at https://worldchlorine.org/wp-content/uploads/2016/05/FOLDER-SODA-ABICLOR-INGLES.pdf

Yang, J., "Exchange Rate Pass-Through in U.S. Manufacturing Industries," *The Review of Economics and Statistics,* Vol. 79, No. 1 (Feb.1997): 95-104

**Financial Statements**

Occidental Petroleum Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 24, 2022

Olin Corporation, Form 10-K, for fiscal year ending December 31, 2014, filed February 25, 2015

Olin Corporation. Form 10-K, for fiscal year ending December 31, 2020, filed February 24, 2020

Olin Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 24, 2022

Shin-Etsu Chemical Co. 2022 Annual Report

Westlake Corporation, Form 10-K, for fiscal year ending December 31, 2021, filed February 23, 2022

**Press Releases**

Reuters, "Georgia Gulf doubles in size with PPG chlorine deal," press release, July 19, 2012, accessed September 19, 2022 at https://www.reuters.com/article/us-ppgindustries-georgiagulf/georgia-gulf-doubles-in-size-with-ppg-chlorine-deal-idUSBRE86I0IV20120719

Reuters, "Occidental Petroleum's profit beats as prices for chemicals jump*,*" press release, August 2, 2017, accessed September 19 at https://www.reuters.com/article/occidental-results/update-1-occidental-petroleums-profit-beats-as-prices-for-chemicals-jump-idUSL1N1KO1YO

Westlake, "Axiall Corporation Created as Merger of Georgia Gulf, PPG Commodity Chemicals Business Is Completed," press release, January 28, 2013, accessed September 19, 2022 at https://www.westlake.com/axiall-corporation-created-merger-georgia-gulf-ppg-commodity-chemicals-business-completed

Westlake, "Westlake Chemical Completes Acquisition of Axiall Corporation," press release, August 31, 2016, accessed April 19, 2022 at https://www.westlake.com/westlake-chemical-completes-acquisition-axiall-corporation

Westlake, "Westlake Chemical Corporation Reports Record 2018 Full-Year Results," press release, February 19, 2019, accessed September 19, 2022 at https://www.westlake.com/news/westlake-chemical-corporation-reports-record-2018-full-year-results-0

### Websites

AFPM, "About AFPM," accessed September 19, 2022 at https://www.afpm.org/about-us/about-us

Brenntag, "Brenntag North America" accessed September 19, 2022 at https://www.brenntag.com/en-us/about/

Finch Paper, "History", accessed September 19, 2022 at http://www.finchpaper.com/history

Formosa Plastics Corporation U.S.A., "About Formosa Plastics – An Overview," accessed September 19, 2022 at https://www.fpctx.com/about-us-main/overview

Hawkins, "About Us," accessed September 19, 2022 at https://www.hawkinsinc.com/about-us/

Hawkins, "Sodium Hydroxide – Caustic Soda," accessed September 19, 2022 at https://www.hawkinsinc.com/groups/industrial/caustic-soda-sodium-hydroxide/

Occidental Petroleum Corporation, "Manufacturing Sites," accessed August 5, 2021 at https://www.oxy.com/operations/essential-chemistry/doing-business-with-oxychem/manufacturing-sites/

Olin Corporation, "A Historical Look at Olin, a Globally Recognized Corporation," accessed September 19, 2022 at https://olin.com/about-olin/history/

Olin, "Sodium Hydroxide," accessed September 19, 2022 at https://olinchloralkali.com/products/sodium-hydroxide/

Shintech, Inc., "About Us>Plaquemine," accessed September 19, 2022 at https://www.shintech.com/cgi-bin/rtbin/sbpg/rt_hdln_dsply2.cgi?Autoincrement=000004&value_6=About%20Us.

Tripp Plating Works Inc., "Tripp Plating Works" accessed August 9, 2022 at http://www.trippplating.com/

Univar Solutions, "Our Perspective on the Chlor-alkali Market," accessed May 4, 2021 at https://www.univarsolutions.com/blog/perspective-chlor-alkali-market/

Univar Solutions, "Contact Us," accessed September 19, 2022 at

> https://www.univarsolutions.com/contact-us/

Univar Solutions, "Metalworking Fluids," accessed September 19, 2022 at

> https://www.univarsolutions.com/industries/lubricants-metalworking/metalworking-fluids/

 Univar Solutions, "Products for Mining, Mineral and Metals," accessed September 19, 2022 at

> https://discover.univarsolutions.com/industries/mining/mining-mineral-metals-products/

Univar Solutions, "Industrial Water Treatment," accessed September 19, 2022 at

> https://www.univarsolutions.com/industries/water-treatment/industrial-water-treatment/

Westlake, "Industry Product Pricing," accessed September 23, 2022 at

> https://www.westlake.com/industry-product-pricing

Westlake, "Caustic Soda: A Key Ingredient for Everyday Life," accessed September 19, 2022, at

> https://www.westlake.com/caustic-soda-uses


### Data and Related Items

"Copy of Billing_UOM_Descriptions.xlsx"

Brenntag Sales Data

Defendants' Transaction Data

Hawkins Sales Data

IHS Markit, US Monthly GDP (MGDP) Index

Tricon Sales Data, "CSS -Supplier Origin USA sold in All Country - 2012 - 2021 - Final.xlsx"

U.S. Bureau of Economic Analysis, "Gross Output by Industry (TGO105-Q)"

U.S. Bureau of Labor Statistics, "Average Weekly Hours of All Employees, Wholesale Trade, Chemicals (CEU4142460003)," Monthly, Not Seasonally Adjusted

U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average (CPIAUCSL), Monthly, Seasonally Adjusted

U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity: Chemicals and Allied Products: Rock Salt (WPU06130271)," Monthly, Not Seasonally Adjusted

U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity: Fuels and Related Products and Power: Industrial Natural Gas (WPS0553)," Monthly, Seasonally Adjusted

U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: General Freight Trucking, Long-Distance Truckload (PCU484121484121)," Monthly, Not Seasonally Adjusted

United States Census Bureau, Standard Report – Exports [181511 – Sodium Hydroxide]

United States Census Bureau, Standard Report – Imports [181511 – Sodium Hydroxide]

Univar Sales Data

**Bates-Numbered Documents**

| | |
|---|---|
| BRENN-CS-SUB-0000065-070 | FPC-USA-DPP-00259657 |
| BRENN-CS-SUB-0054243 | FPC-USA-DPP-00259658 |
| FPC-USA-DPP-00000005 | FPC-USA-DPP-00259659 |
| FPC-USA-DPP-00000006 | FPC-USA-DPP-00259660 |
| FPC-USA-DPP-00000009 | FPC-USA-DPP-00259661 |
| FPC-USA-DPP-00000010 | FPC-USA-DPP-00259662 |
| FPC-USA-DPP-00000011 | FPC-USA-DPP-00259674 |
| FPC-USA-DPP-00000013 | FPC-USA-DPP-00259686 |
| FPC-USA-DPP-00000014 | FPC-USA-DPP-00268824 |
| FPC-USA-DPP-00000015 | HAWK-CS-SUB-000010 |
| FPC-USA-DPP-00000018 | IHSM004257 |
| FPC-USA-DPP-00000020 | IHSM008271 |
| FPC-USA-DPP-00000035 | IHSM035195 |
| FPC-USA-DPP-00098568 | OCC_00000811 |
| FPC-USA-DPP-00104254 | OCC_00000812 |
| FPC-USA-DPP-00105123 | OCC_00000813 |
| FPC-USA-DPP-00118873 | OCC_00000814 |
| FPC-USA-DPP-00123109 | OCC_00000815 |
| FPC-USA-DPP-00126690 | OCC_00000816 |
| FPC-USA-DPP-00152158 | OCC_00000817 |
| FPC-USA-DPP-00152159 | OCC_00000818 |
| FPC-USA-DPP-00160994 | OCC_00000819 |
| FPC-USA-DPP-00182130 | OCC_00000820 |
| FPC-USA-DPP-00258179 | OCC_00000821 |
| FPC-USA-DPP-00258191 | OCC_00000822 |
| FPC-USA-DPP-00258215 | OCC_00000823 |
| FPC-USA-DPP-00258227 | OCC_00000824 |
| FPC-USA-DPP-00258239 | OCC_00000825 |
| FPC-USA-DPP-00258240 | OCC_00000826 |
| FPC-USA-DPP-00259654 | OCC_00000827 |
| FPC-USA-DPP-00259655 | OCC_00000828 |
| FPC-USA-DPP-00259656 | OCC_00000829 |

| | |
|---|---|
| OCC_00000830 | OCC_00126171 |
| OCC_00000831 | OCC_00200831 |
| OCC_00000832 | OCC_00247217 |
| OCC_00000833 | OCC_00248135 |
| OCC_00000834 | OCC_00256709 |
| OCC_00000835 | OCC_00266624 |
| OCC_00000836 | OCC_00266788 |
| OCC_00000838 | OCC_00287345 |
| OCC_00000839 | OCC_00298901 |
| OCC_00000841 | OCC_00322416 |
| OCC_00000842 | OCC_00334224 |
| OCC_00000843 | OCC_00364743 |
| OCC_00000844 | OCC_00366348 |
| OCC_00000845 | OCC_00412245 |
| OCC_00000846 | OCC_00444653 |
| OCC_00000847 | OCC_00462192 |
| OCC_00000848 | OCC_00652049 |
| OCC_00000849 | OCC_00727461 |
| OCC_00000850 | OCC_00929383 |
| OCC_00000851 | OLN-000000588 |
| OCC_00000852 | OLN-000061877 |
| OCC_00007094 | OLN-000065987 |
| OCC_00008546 | OLN-000066007 |
| OCC_00016348 | OLN-000372800 |
| OCC_00017034 | OLN-000390633 |
| OCC_00021383 | OLN-000465142 |
| OCC_00021698 | OLN-000568979 |
| OCC_00025073 | OLN-000578678 |
| OCC_00026211 | OLN-000632646 |
| OCC_00031855 | OLN-000650027 |
| OCC_00033180 | OLN-000698311 |
| OCC_00038790 | OLN-000827477 |
| OCC_00051668 | OLN-000863482 |
| OCC_00126170 | OLN-000863483 |

| | |
|---|---|
| OLN-000863484 | STO000013061 |
| OLN-000863485 | UNIV-CS-SUB-0225491-498 |
| OLN-000863486 | VDM-CS-0012111 |
| OLN-001196367 | WL_0000000755 |
| OLN-001380083 | WL_0000000766 |
| OLN-001390126 | WL_0000000767 |
| OLN-001512204 | WL_0000000768 |
| OLN-001540406 | WL_0000000769 |
| ST0000000001 | WL_0000000770 |
| ST0000000003 | WL_0000020824 |
| ST0000000004 | WL_0000096274 |
| ST0000000005 | WL_0000108759 |
| ST0000000007 | WL_0000137818 |
| ST0000000012 | WL_0000138911 |
| ST0000000013 | WL_0000178709 |
| ST0000000014 | WL_0000243449 |
| ST0000000015 | WL_0000256619 |
| ST0000000016 | WL_0000260840 |
| ST0000000593 | WL_0000478180 |
| ST0000000831 | WL_0000494934 |
| ST0000000914 | WL_0000496349 |
| ST0000000984 | WL_0000561441 |
| ST0000001073 | WL_0000650655 |
| ST0000002277 | WL_0000690628 |
| ST0000002535 | WL_0000918471 |
| ST0000013005 | WL_0001301832 |
| ST0000013062 | WL_0001484545 |
| ST0000013063 | WL_0001488611 |
| ST0000105524 | WL_0001524932 |
| ST0000149202 | WL_0001524942 |
| ST0000406373 | WL_0001525119 |
| ST0000406374 | WL_0001525148 |
| ST0000406375 | WL_0001529143 |
| STO000013059 | WL_0001529144 |

8

WL_0001529145

WL_0001529169

WL_0001529170

WL_0001529171

WL_0001529172

WL_0001529173

WL_0001529174

WL_0001529175

WL_0001529176

WL_0001529177

WL_0001529178

WL_0001709313

WL_0001995935

WL_0002000430