**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CAUSTIC SODA ANTITRUST LITIGATION | Lead Case No.: 1:19-cv-00385-EAW-MJR |
| THIS DOCUMENT RELATES TO:<br><br>INDIRECT PURCHASER ACTIONS | |

**INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
<u>CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

**Table of Contents**

Table of Contents ............................................................................................................... ii

Table of Authorities ........................................................................................................... iii

Definitions ............................................................................................................................ x

Introduction ......................................................................................................................... 1

The Mechanics of the Caustic Soda Industry Support Classwide Impact ....................... 4

   I.    Manufacturers and Distributors Raised Prices Nationally ...................................... 6

   II.   "Non-Standard" Markups and Other Price Dynamics Support Common Impact .............. 8

   III.   Common Evidence Proves Classwide Impact Despite Imports, Commingling, and "Non-Defendant" Caustic Soda ............................................................................ 10

   IV.   There is No Rule 23 "Tracing" Requirement for Class Members ................................. 13

Argument ............................................................................................................................ 14

   I.    IPPs' Minor Amendments of Their Class Definitions Are Appropriate and Timely ........ 14

   II.   Named IPPs Adequately Demonstrate Class Membership ................................................. 15

   III.  The Named Plaintiffs' Claims Are Typical ..................................................................... 20

   IV.  Dr. Macartney Demonstrates that All or Nearly All Distributors Were Impacted ........... 21

     A.  Dr. Macartney Included and Correctly Calibrated All Material Variables in His Overcharge Analysis ...................................................................................................... 21

     B.  Dr. Macartney's Overcharge and Pass Through Regressions Properly Average Data While Dr. Johnson Relies on Improper Sub-Regressions ................................................. 27

     C.  Common Evidence can be used to Estimate Aggregate Damages ............................... 40

     D.  Dr. Macartney's Market Characteristics Opinion is Supported and Admissible .......... 43

     E.  Defendants Invent Conspiracies Involving Distributors that Plaintiffs Do Not Allege. 45

     F.  Common Evidence Demonstrates Class Membership ................................................... 46

   V.   The Classes Are Ascertainable ....................................................................................... 48

   VI.  Minor State Law Variations Do Not Affect Predominance or Manageability ................. 49

     A.  The Antitrust Class is manageable despite minor variations in applicable state law ..... 50

     B.  The Unjust Enrichment Class is similarly manageable ................................................ 51

     C.  Different measures of unjust enrichment damages do not create individual issues ....... 54

Conclusion ......................................................................................................................... 55

## Table of Authorities

**Cases**                                                                                          **Page(s)**

*In re Air Cargo Shipping Services Antitrust Litig.*,
  No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)....................................29, 44

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06–MD–1775, 2010 WL 4916723 (E.D.N.Y. Nov. 24, 2010) .........................................51

*In re Aluminum Warehousing Antirust Litig*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ...........................................................................................31

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ......................................................................................16

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997).........................................................................................................44

*Arden Architectural Specialties, Inc. v. Wash. Mills Electro Minerals Corp.*,
  Nos. 95-cv-7574 CJS, 95-cv-7580 CJS, 2002 WL 31421915 (W.D.N.Y. Sep.
  17, 2002) .....................................................................................................................19, 37

*Baker v. Saint-Gobain Performance Plastics Corp.*,
  No. 1:16-cv-0917, 2022 WL 9515003 (N.D.N.Y 2022)......................................................49

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946)........................................................................................................40

*In re Broiler Chicken Antitrust Litig.*,
  2022 WL 1720468 (N.D. Ill. May 27, 2022) ...............................................................*passim*

*In re Capacitors Antitrust Litig.* (*No. III*),
  No. 17-md-02801, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)........................................28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. C–07–5944, 2013 WL 5391159 (N.D. Cal. Sept. 14, 2013).............................................2

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D 606 (N.D. Cal. 2015).........................................................................................28

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
  679 F. App'x 135 (3d Cir. 2017) ........................................................................................32

*Coates v. Johnson & Johnson*,
  756 F.2d 524 (7th Cir. 1985) .............................................................................................30

*Cook v. Rockwell Int'l Corp.*,
    580 F.Supp.2d 1071 (D. Colo. 2006) ............................................................22, 30

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ...........................................................................17, 34

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) .....................................................................6, 38

*In re Digital Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017) ......................................................................50, 51

*In re Domestic Drywall Antitrust Litig.*,
    163 F. Supp. 3d 175 (E.D. Pa. 2016) ...................................................................46

*In re: Domestic Drywall Antitrust Litig.*,
    322 F.R.D. 188 (E.D. Pa. 2017) .....................................................................22, 26

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ....................................................................13, 50

*In re Electronic Books Antitrust Litig.*,
    No. 11 MD 2293, 2014 WL 1282293(DLC), (S.D.N.Y. Mar. 28, 2014) ...................22, 26, 31

*Fero v. Excellus Health Plan, Inc.*,
    502 F. Supp. 3d 724 (W.D.N.Y. 2020) (Wolford, J.) ............................................53

*In re Flash Memory Antitrust Litig.*,
    2010 WL 2332081, *2-13 (N.D. Cal. June 9, 2010) .............................................45

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d. Cir. 2004) ...............................................................................45

*In re Flonase Antitrust Litig.*,
    284 F.R.D. 207 (E.D. Pa. 2012) ...........................................................................50

*Flores v. Anjost Corp.*,
    284 F.R.D. 112 (S.D.N.Y. 2012) ..........................................................................18

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13 CIV. 7789 (LGS), 2022 WL 3971006 (S.D.N.Y. Aug. 31, 2022) .................16

*Gordon v. Microsoft Corp.*,
    No. MC 00-5994, 2003 WL 23105550 (D. Minn. Dec. 15, 2003) .........................34

*In re High–Tech Employee Antitrust Litig.*,
    No 11–CV–02509–LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ...................30

*In re In Re: Celexa And Lexapro Marketing and Sales Practices Litigation*,
    915 F.3d 1 (1st Cir. 2019) ..................................................................47

*In re Indus. Diamonds Antitrust Litig.*,
    167 F.R.D. 374 (S.D.N.Y. 1996) ......................................................19

*Kleen Prods. LLC v. Int'l Paper Co.*,
    306 F.R.D. 585 (N.D. Ill. 2015) ........................................................40

*Kleen Prods. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) .................................................37, 43, 45

*In re Korean Ramen Antitrust Litig.*,
    13-cv-04115, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017)................1, 35

*Korn v. Franchard Corp.*,
    456 F.2d 1206 (2d Cir.1972)..............................................................19

*Kurtz v. Costco Wholesale Corp.*,
    818 F. App'x 57 (2d Cir. 2020) ......................................................3, 21

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) ......................................................20

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
    897 F.3d 88 (2d. Cir. 2018)..................................................................4

*Lazarek v. Ambit Energy Holdings, LLC*,
    No. 15-cv-6361-FPG, 2017 WL 4344557 (W.D.N.Y. Sept. 29, 2017) ...................52

*In re Lidoderm Antitrust Litig.*,
    No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..............49

*In re Linerboard Antitrust Litig.*,
    497 F. Supp. 2d 666 (E.D. Pa. 2007) ................................................45

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
    700 F.2d 785 (2d Cir. 1983)..............................................................42

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019).....................................................27

*In re Loestrin 24 Fe Antitrust Litig.*,
    No. 1:13-MD-2472, 2019 WL 3214257 (D.R.I. July 2, 2019) ..............40

*McDonough v. Toys R Us, Inc.*,
    638 F. Supp. 2d 461 (E.D. Pa. 2009) ...........................................20, 41

*Menking v. Daines*,
   287 F.R.D 174 (S.D.N.Y. 2012) ........................................................................14

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ......................................................................31, 44

*In re Methionine Antitrust Litig.*,
   204 F.R.D. 161 (N.D. Cal. 2001) ....................................................................35

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   319 F.R.D. 158 (E.D. Pa. 2016)........................................................................27

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018)..........................................................14, 15

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) ...............................................................*passim*

*In re NASDAQ Market-Maker Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................9, 37, 46

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008)..........................................................................35, 45

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)................................................................................35

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   297 F.R.D. 168 (D. Mass. 2013)............................................................19, 49, 53

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc) *cert denied* 143 S.Ct. 434 (2022)......................*passim*

*In re Optical Disk Drive Antitrust Litig.*,
   3:10-md-2143, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ...................................1, 21, 28, 30

*In re Packaged Seafood Prods. Antitrust Litig.*,
   332 F.R.D. 308 (S.D. Cal. 2019) ...............................................................*passim*

*In re Petrobras Sec.*,
   862 F.3d 250 (2d. 2017)..............................................................................48, 49

*In re Polyester Staple Antitrust Litig.*,
   No. MDL 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007) ...............................33

*In re Polyurethane Foam Antitrust Litig.*,
   314 F.R.D. 226 (N.D. Oh. 2014) ...............................................................*passim*

*In re Polyurethane Foam Antitrust Litig.*,
   No. 10–2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) ..........................37, 42

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995) .......................................................................37

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ...................32, 33

*In re Processed Egg Prod. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015) ........................................................................32

*In re Processed Egg Prods. Antitrust Litig.*,
   81 F. Supp. 3d 412 (E.D. Pa. 2015) ..............................................................37, 45

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ..........................................................................31

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
   338 F.R.D. 294 (D. Mass. 2021) .......................................................................27

*Resco Products, Inc. v. Bosai Minerals Grp.*,
   No. 06-235, 2015 WL 5521768 (W.D. Pa. Sept. 18, 2015) .....................................24

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   335 F.R.D. 1 (E.D.N.Y. 2020) ................................................................... *passim*

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ..........................................................................9, 42

*Russell v. Forster & Garbus*, LLP,
   No. 17-CV-4274(JS)(AYS), 2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) ....................18

*Savanna Grp., Inc. v. Trynex, Inc.*,
   No. 10-CV-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013) ......................................14

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) .......................................................................13

*Seijas v. Republic of Argentina*,
   606 F.3d 53 (2d. Cir. 2010) ...............................................................................9

*In re Smart Techs., Inc. S'holder Litig.*,
   295 F.R.D. 50 (S.D.N.Y. 2013) .........................................................................48

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   No. CV 14-MD-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) ...........49, 50, 53, 54

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009)..............................................................2, 6, 37, 47

*In re Suboxone Antitrust (Buprenorphine Hydrochlorine & Naloxone) Litig.*,
  967 F.3d 264 (3d Cir. 2020)...........................................................................27

*Sykes v. Mel S. Harris Assocs. LLC*,
  780 F.3d 70 (2d. Cir. 2015)............................................................................39

*In re Terazosin Hydrochloride Antitrust Litig.*,
  220 F.R.D. 672 (S.D. Fla. 2004)........................................................19, 50, 54

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981).......................................................................................12

*In re TFT-LCD Antitrust Litig.*,
  267 F.R.D. 583 (Mar. 28, N.D. Cal. 2010) ..............................................2, 38, 42

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012)......................36, 46

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)................................................................................. *passim*

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013).............................................................................4

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988)..........................................................................41

*U.S. v. Container Corp. of Am.*,
  393 U.S. 333 (1969)........................................................................................33

*In re Urethane Antitrust Litig.*,
  166 F. Supp. 3d 501 (D.N.J. 2016) ..................................................................29

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008).........................................................................9

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) .......................................................................37

*Vargas v. Howard*,
  324 F.R.D. 319 (S.D.N.Y. 2018) .....................................................................17

*Vincent v. Money Store*,
  304 F.R.D. 446 (S.D.N.Y. 2015) .....................................................................15

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d. Cir. 2017)....................................................................................39

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)............................................................................................37

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18-MD-2836, 2020 WL 5778756 (E.D. Va. Aug. 14, 2020).....................49, 50, 51, 53

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 20-2184, 2021 WL 3379035 (4th Cir. Aug. 4, 2021) ....................................27

## Other Authorities

F.R.E 702 .....................................................................................................................24

Fed. R. Civ. P. 23 ................................................................................................ *passim*

Fed. R. Civ. P. 23(a)(3)...........................................................................................37, 38

Fed. R. Civ. P. 23(b)(3).................................................................................................50

**Definitions**

| | |
|---|---|
| **Macartney Decl.** | The Declaration of Dr. Gareth Macartney, Ph.D., in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification dated September 26, 2022 (filed under seal). |
| **IPPs' Mem. of L.** | Indirect Purchaser Plaintiffs' Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel dated September 26, 2022 (redacted version Dkt. 514-6, unredacted version filed under seal). |
| **Hart Decl.** | Declaration of Barbara J. Hart in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Class Counsel dated September 26, 2022, at Dkt. 514-1. |
| **Hart R. Decl.** | Declaration of Barbara J. Hart in Support of Indirect Purchaser Plaintiffs' Reply Brief in Support of Motion for Class Certification, Appointment of Class Representatives and Class Counsel dated January 26, 2023. |
| **Ex. 1** | Exhibit 1 of the Hart R. Decl., attaching The Reply Declaration of Dr. Gareth Macartney, Ph.D., in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification Dated January 26, 2023 |
| **Ex. __** | Unless otherwise specified, exhibits accompanying the Hart. R. Decl. |
| **Opp.** | Defendants' Opposition to Indirect Purchaser Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel dated November 22, 2022 (redacted version at Dkt. 532, unredacted filed under seal) |
| **Johnson Rpt.** | [Corrected] Expert Report of Dr. John H. Johnson, IV, dated November 28, 2022 (filed under seal). |
| **DPPs' R. Br.** | Direct Purchaser Plaintiffs' Reply Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel dated August 25, 2022 (redacted version at Dkt. 499, unredacted filed under seal) |
| **Class Period** | October 1, 2015 to December 31, 2019. |

**Introduction**

Defendants fundamentally misconstrue Rule 23. They are wrong on the law, cite irrelevant facts, and, when all else fails, deny IPPs have a case. Cutting through the noise, IPPs clearly meet Rule 23's requirements. Defendants implicitly concede numerosity and commonality, and the common questions are exactly what IPPs pointed to in their opening brief: whether Defendants conspired to raise prices, whether those price increases caused harm, and whether the resulting damages are measurable on a classwide basis. IPPs will press their case by using the same evidence as any other class member, including concomitant price increase announcements,[1] interfirm communications,[2] threats to third parties,[3] and industry characteristics conducive to collusion.[4] Similarly, Dr. Macartney provides ample proof Defendants' price increases reached indirect purchasers and that those damages are measurable on classwide basis in the relevant states. Given that questions about liability, causation, and damages are typically common in antitrust cases, class certification is frequently granted in indirect purchaser cases, many with markets and distribution chains far more complex than here.[5]

---

[1] *See, e.g.,* Macartney Decl., ¶¶ 86-97 (describing evidence of coordinated price increase announcements and formulation of pretextual justifications).

[2] *See, e.g.,* Macartney Decl., ¶¶ 76-79; *see also* DPPs' Reply Br. at 13 (describing extensive phone data showing interfirm communications; ███████████████████████████████████████ ██████████████████████████████████████████████████ ); Ex. 3, PX 1792 at OCC_00368669 (stating that Defendant Formosa "is planning on announcing" a price increase and Shintech and Westlake to follow); Ex. 4, Evans Tr. 86: 13-16 (Defendants interactions included social connections scheduled around trade association meetings).

[3] *See, e.g.,* Ex. 5, Eisenhauer Tr. 31: 20-25, 32: 2-23 (testifying he felt pressured by Tim Hillsley, that Mr. Hillsley would take "his complaint up" the management chain, and that Occidental would stop supporting IHS if it did not publish certain prices); Ex. 6, OCC_00375970 (stating IHS needs to "fix" certain prices).

[4] *See, e.g.,* Macartney Decl., ¶¶ 75-81.

[5] *See, e.g., Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) *cert denied* 143 S.Ct. 434 (2022); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468 (N.D. Ill. May 27, 2022); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017); *In re Optical Disk Drive Antitrust Litig.*, 3:10-md-2143, 2016

Unable to deny that a conspiracy readily lends itself to classwide proof, Defendants bet the farm on excluding Dr. Macartney's overcharge and pass-through models. Yet, virtually every argument they make has been deemed insufficient to justify denial of class certification when offered by Dr. Johnson or defense experts in other cases.  Dr. Johnson, who does not offer an affirmative methodology to show lack of common impact, manipulates Dr. Macartney's existing models in an attempt to obscure overcharges and fabricate uninjured class members.

To demonstrate common impact,[6] Dr. Macartney conducted a three-step analysis using Defendants and distributors' transactional data. Meeting Defendants' so-called "double burden," he first uses a reduced-form regression model to measure the overcharge to direct purchasers and distributors; he then employs an *additional* regression model to estimate how much of that overcharge passed-through to IPPs; and lastly, Dr. Macartney calculates classwide damages by isolating the relevant volume of commerce and applying the direct overcharge and pass-through estimates. In doing so, Dr. Macartney considers the effect of the relevant independent variables in his direct overcharge and pass-through models (some with multiple sub-variables), including the supply costs for caustic soda, demand for chlorine and caustic soda, net exports, product characteristics (i.e., grade and concentration), customer type, contract type, freight costs, seasonality, and wages.

In line with the testimonial evidence demonstrating distributors had a near-perfect pass-through, Dr. Macartney finds a modest pass-through rate of 81%. Macartney Decl., ¶ 134. This

---

WL 467444 (N.D. Cal. Feb. 8, 2016); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226 (N.D. Oh. 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5391159 (N.D. Cal. Sept. 14, 2013); *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583 (Mar. 28, N.D. Cal. 2010); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009).

[6] Dr. Macartney's conclusion of common impact is also supported by his analysis of the caustic soda industry's characteristics, co-movement and commonality in price increases, and other aspects of his report. *See generally* Macartney Decl., ¶¶ 34-108.

number starkly contrasts with Dr. Johnson's conclusion, which, contradicting the record, appears to find no pass-through for "more than half of the largest distributors." *Compare* Opp. at 3 with *infra* at n. 16.

In addition to the other common questions, the admissibility of Dr. Macartney's model is itself a question common to the class, as are the myriad attacks pressed by Defendants against his report. Summed up, these concerns are essentially (1) whether Dr. Macartney has properly calibrated and included the correct independent variables and (2) whether Dr. Macartney has averaged the transactional data effectively. Even assuming Defendants' challenges have merit—they do not—these are not the type of attacks capable of defeating a bid for class certification in the Second Circuit. An expert's choice of variables "will affect the analysis' probativeness, not its admissibility." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part and joined by all members of the Court)); *In re Ethylene Propylene Diene Monomer* ("*EPDM*") *Antitrust Litig.*, 256 F.R.D. 82, 102 (D. Conn. 2009). "And the use of an aggregate model to estimate damages 'is well established in federal court and implied by the very existence of the class action mechanism itself.'" *In re Namenda Indirect Purchaser Antitrust Litig.* ("*Namenda IPP*"), 338 F.R.D. 527, 546 (S.D.N.Y. 2021) (citation omitted).

Defendants' remaining arguments against certification are inconsequential. For example, Defendants contend that named IPPs Tripp Plating Works, Inc. ("Tripp") and Finch Paper LLC ("Finch") (collectively, "named IPPs") cannot demonstrate class membership, but the record adequately establishes that both Tripp and Finch purchased Defendants' products, as would be expected in an industry where Defendants source 90% of the caustic soda sold in the US. *See* Ex. 1, Reply Declaration of Gareth Macartney, ¶ 8 ("Ex. 1"). To the extent that Defendants extend

this "tracing" requirement to other putative class members as a Rule 23 prerequisite for certification, Opp. at 12, 53, that burden is a complete fiction in the Second Circuit. And, as shown below, the probability that an IPP class member did not purchase *any* of Defendants' caustic soda is infinitesimal, approaching one in 100,000 for even the smallest purchasers. Ex. 1, ¶ 83.

Lastly, a large number of cases hold that the antitrust and unjust enrichment laws of different states are sufficiently similar for class certification.[7] Seeking to deny this reality, Defendants cite *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88 (2d. Cir. 2018), but they ignore *Langdon*'s actual holding which states, "[v]ariations in state laws *do not necessarily* prevent a class from satisfying the predominance requirement." *Id.* at 97 (emphasis added). *Langan* cited an earlier case *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013), which affirmed certification for contract claims under the laws of the 50 states and held predominance concerns "are lessened where the states' laws do not vary materially," as they do not here. *Id.* at 127.

### The Mechanics of the Caustic Soda Industry Support Classwide Impact

Nothing about caustic soda makes it too "complicated" for IPPs to prove common impact. Opp. at 9. Caustic soda is a homogeneous[8] compound created through the electrolysis of brine and primarily used in the manufacturing processes of other chemicals and paper. Ex. 8, WL_0000778822. IPPs only seek certification for one form, liquid, and 99% of liquid caustic soda manufactured by Defendants during the class period was membrane or diaphragm grade.[9] Although there are some minor differences between those grades, like purity, caustic soda is

---

[7] *See infra*, nn. 77, 78

[8] Macartney report at 57-67 (product homogeneity and fungibility); Ex. 7, IHSM008271-8545 at 8437 ("IHS describes caustic soda as a 'fully fungible commodity.'").

[9] Macartney Decl., ¶ 36, Fig. 3 (Caustic soda manufactured by Defendants was 58% membrane grade and 41% diaphragm grade).

interchangeable for most purposes and primarily distinguished by price, which stabilized and increased over the Class Period regardless of grade or other superfluous characteristics. Macartney Decl., ¶ 20.

The distribution chain is also relatively simple.[10] Defendants sell caustic soda to distributors or end users, and those distributors typically sell to other distributors or end users. Ten distributors purchased 80% of Defendants' caustic soda, and only two distributors account for nearly 40% of Defendants' total sales. Macartney Decl., ¶ 51, Figure 8. After purchasing caustic soda, distributors use their terminals for storage or ship directly from Defendants' facilities to their customers. ████████████████████████████. By definition, the Class excludes caustic soda purchased in the form of a new or different product. So, for purposes of IPPs' Motion, caustic soda remains the same unchanged chemical from producer to distributor to end purchaser. The value added by distributors, if any, primarily concerns their ability to move caustic soda from one location to another. *See* ██████████████████████████████.

Tellingly, Defendants are silent on their market share, which collectively represented 93% of the domestic manufacturing capacity and 90% of caustic soda sold in the United States. Ex. 1, ¶ 8. This alone overwhelmingly supports common impact. *See, e.g., Foam*, 314 F.R.D. at 245 ("[H]igh market concentration . . . increases the likelihood that a price-fixing conspiracy would have been successful, and increases the scope of the conspiracy's likely price effects."). Courts have granted class certification for IPPs in cases where defendants' market share was much less

---

[10] Defendants exaggerate the complexity of the distribution chain. Opp. at 10. For example, caustic soda sold by ████████████████████ back to Defendants represents only 3.5%. Ex. 1, ¶ 77. Caustic soda sold to non-defendant producers identified by Dr. Johnson represents only .6%. *Id.* Caustic soda sold from ██████████████████ to each other represents less than 2%. *Id.* Dr. Macartney discusses other problems with Dr. Johnson's conception of the distribution chain at length. Ex. 1, ¶¶ 78-81.

and in markets that "have the same [or more complicated] features" than the caustic soda industry. *See SRAM*, 264 F.R.D. at 614 (granting class certification where "Defendants possessed sixty to seventy percent" of the market); *see supra*, n. 4. As IPPs will show, Defendants injured class members by pushing prices higher regardless of any purported regional markets, individual purchasing dynamics, or imports. No practices or factors occurred on a scale large enough to change that all or nearly all class members incurred a pass-through injury.

## I.   Manufacturers and Distributors Raised Prices Nationally

Consistent with their view that the United States is an integrated market,[11] Defendants targeted the *national* market for caustic soda and aggressively implemented price increases across the board for both spot and contract customers.[12] Naturally, this resulted in *national* price increases and synchronistic pricing across different regions. Ex. 1, ¶ 92, Figs. 31-32. Despite issuing price increases for the *entire* U.S. market, Defendants now protest using a market-wide price to measure overcharge. Not only is this position counter to case law,[13] it also ignores the class certification standard for expert evidence. The only question that matters is whether Dr. Macartney is "capable" of using his model to show common proof of impact—i.e., whether he can show Defendants' national increases inflicted harm measurable on a national scale. *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 115 (S.D.N.Y. 2015); *EPDM*, 256 F.R.D. at 100 ("[T]he issue . . . is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that

---

[11] Ex. 12, Macartney Tr. 300:1-23 (explaining that viewing the United States as a single market is consistent with the way Defendants' viewed the market); an integrated national market is further confirmed by Defendants' ability to raise prices despite imports. Ex. 1, ¶ 25.

[12] *See, e.g.*, Ex. 13, OCC_00135175; Ex. 14, FPC-USA-DPP-00097321 (Olin); Ex. 15, FPC-USA-DPP-00000007 (Formosa); Ex. 16, FPC-USA-DPP-00109262 (Westlake) (all announcing increases for US price).

[13] *Foam*, 314 F.R.D. at 281 (favoring broad geographic market because "Defendants themselves did not distinguish between local markets when announcing price increases.").

there is a way to prove a class-wide measure of [impact].”). Of course Dr. Macartney can

demonstrate common impact, and Defendants’ transactional data bears this out.

Following Defendants’ increases, distributors raised their own prices, and the same pricing

patterns emerged regardless of region and distributor. Ex. 1, 84-93, Figs. 29-30.



*Sales by Region – Net Price Diaphragm*[14]

This makes sense. Pass-through is a commonly recognized economic phenomenon,[15] not

regionally dependent, and the rationales given by distributors follow this logic, with some

testifying to protecting margins and profitability through a perfect or near perfect pass-through of

increases.[16] Distributors’ margins are especially vulnerable when they do not add value to caustic

soda by using it as an input into new products, *see Broiler Chicken*, 2022 WL 1720468, at *18,

and given that demand among indirect purchasers is inelastic, distributors have sufficient cover to

---

[14] ███████████████████████████████████.

[15] Macartney Decl., ¶ 132.

[16] ████████████████████████████████████ ; *see also* Ex. 17, W. Rexer Tr. 85:2-12, 86:5-11 (explaining that Amrex’s price increases are justified when “cost of doing business” goes up); Ex. 18, O’Malley Tr. 69:18-23 (stating that “[d]ue to the price increase, [Main Pool] would increase” prices).

raise prices without losing customers. Macartney Decl., ¶ 132. Given their slim margins, if distributors failed to pass on their price increases, they "would quickly become unprofitable." *Broiler Chicken*, 2022 WL 1720468, at *18.

So-called "bargaining power" did not stem rising prices either.[17] Dr. Macartney calculated his pass-through rate relying on transactional data, in part, from the two largest domestic distributors that presumably would have the most power to avoid price increases, █████ and █████. █████████. Despite this, the prices they paid essentially matched smaller direct purchasers that were not distributors. Ex. 1, ¶¶ 27, 148, Figs. 2 & 53. Through testimony, █████ and █████ corporate representatives also demonstrated their bargaining *power* is anything but. █████████ testified that his company ████████████



; *see also* █████████

**II.    "Non-Standard" Markups and Other Price Dynamics Support Common Impact**

Similar to Dr. Lamb, Dr. Macartney analyzes the supply and demand characteristics of the caustic soda industry along with transactional data from Defendants and distributors to find that price increase announcements during Class Period had an industry-wide effect. *See, e.g.,*

---

[17] *See* Ex. 12, Macartney Tr. 88:7-17 (stating that because distribution is less concentrated than manufacturing, "customers have little bargaining power or less . . . than the defendants.").

Macartney Decl., ¶ 114.[18] "[P]ricing structures," such as the one here, establish "an artificially inflated baseline" for negotiated pricing, so even if some distributors or indirect purchasers obtained discounts or other benefits, there is still "generalized proof" of impact.[19]

On this, Defendants essentially make two points. First, recycling the same point raised against the Direct Purchaser Plaintiffs ("DPPs"), Defendants argue "caustic soda prices paid by distributors varied widely[.]" Opp. at 2. Their more muted variation for IPPs is that "markup[s]" were not "standard," which apparently concedes class members were injured if distributors were overcharged. In making both of these arguments, Defendants assume that price variation affects class certification—it doesn't. While *damages* can vary, *impact* is binary. A class member is either impacted or not. This is why "[n]either a variety of prices nor negotiated prices is an impediment" to class certification.[20] This is also why any overcharge "on a single purchase suffices to show— as a legal and factual matter—impact" and class membership. *Namenda IPP*, 338 F.R.D. at 557.

IPPs have readily demonstrated impact on direct and indirect purchasers despite individual purchasing dynamics. Dr. Macartney's overcharge model relies on the *actual* prices Defendants charged, accounting for any discounts, and he uses multiple variables in his overcharge analysis to control for Defendants' contractual variations with distributors. *See* Ex 1, ¶ 106; Macartney Decl., ¶ 125, Table 38. Dr. Macartney concludes distributors were overcharged regardless of their purchasing dynamics. *See* Macartney Decl., ¶ 18. His conclusion is supported by the fact that, overwhelmingly, contracts are formulaically tied to IHS indexes, which were influenced by

---

[18] Dr. Macartney received data from Dr. Lamb's firm. So, any argument made by DPPs equally applies to IPPs, as Dr. Macartney's model is *capable* of showing the same.

[19] *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 638 (D. Kan. 2008); *infra*, n. 65.

[20] *In re NASDAQ Market-Maker Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996); *see also Seijas v. Republic of Argentina*, 606 F.3d 53, 57-58 (2d. Cir. 2010) ("[T]hat damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

Defendants' price increases, or consisted of market-negotiated price terms. Ex. 1, ¶¶ 71, 101-105. The factual record corroborates Defendants' overcharges reached all types of purchasing arrangements, as Defendants repeatedly boasted about increasing prices for large and small volumes customers[21] and those with purchasing contracts.[22]

Dr. Macartney's pass-through model likewise provides common evidence of impact in spite of some variation in prices paid by IPP class members. Dr. Macartney based his model on the net sales prices that distributors charged to customers, applying all price adjustments and discounts that might affect a customer's price. Macartney Decl., ¶¶ 105, 133.  Dr. Macartney then matched each distributor's sales to the Defendants, and further matched sales by month, grade, and concentration. Macartney Decl., ¶ 134. With this data, and controlling for the relevant variables, Dr. Macartney concluded all or nearly all class members were injured. *Id.*

### III. Common Evidence Proves Classwide Impact Despite Imports, Commingling, and "Non-Defendant" Caustic Soda

Defendants raise a variety of distractions in an attempt to escape the inevitable conclusion that their market dominance supports common impact. Dr. Macartney accounts for the issues they raise, and none of them are fatal.

---

[21] Ex. 19, OCC_00395780 (Oxychem able to "put through" a price increase on small accounts and that "bigger buyers have seen [increases] over the October/November timeframe."); Ex. 21, OCC_00266034 (large volume purchasers "have pricing . . .  reflective of what is transpiring in the spot market" and accepted price increases).

[22] Ex. 22, OCC_00196475-77 at 75 ("Domestic contract prices increased in September by $20/DST per IHS against [price increase] announcements ranging from $75-$100/DST, but further improvement is expected in October as these increases are implemented to a larger portion of the contract market[.]"); Ex. 23, OCC_00203166-68 at 67 ("Contract prices in the US increased by $30 per DST ~~as reported by IHS after producers announced contract increases of $75 to $105/DST[.]");~~

~~~~).

**Imports.** During the Class Period, total imports only accounted for a meager 5% of caustic soda sold in the U.S., Ex. 1, ¶ 25, while imports from Northeast Asia represented only 2.8% of caustic soda sold in the U.S. and imports from Europe were a mere .73%. *Id.* These percentages are far too low to affect cartel prices. *Id.* at ¶ 22. Despite their diminished relevance to the U.S. market, Dr. Macartney still accounted for both imports and exports with his net exports demand variable. Macartney Decl., ¶ 127, Ex. 12, Macartney Tr. 146:18-25, 279:14-25, 280:1-5 (stating the market is national and that he controlled for imports with a variable). But, even assuming Dr. Macartney miscalculated the percentage of imports *and* his model wholly failed to control for them, Defendants are still mistaken about the outsized role imports played in purportedly regional pricing, including the West Coast. ███████   ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. Ex. 25, Chen Tr. 159:9-12.[23] ███████ purchased only a small amount of imports, predominantly from an entity selling caustic soda manufactured by Shintech's parent company, Shin-Etsu. ██████   ██████████████████████ ██████. ████████████████████████████████████████████████████ ████████████████████████[24]

**Distributor-to-Distributor Purchases.** Defendants try to hide the fact that "caustic soda [sold] from non-Defendants," Opp. at 12, includes caustic soda manufactured *by* Defendants and transferred down the distribution chain. Dr. Macartney matched distributor prices to Defendants'

---

[23] *See also* Ex. 27, FPC-USA-DPP-00023178 (██████  █████████████████████████.
[24] ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████████.

prices in his overcharge model to estimate the extent to which Defendants' price increases *caused* price increases for indirect purchasers. His modeling also accounts for any distributor-to-distributor sales that could have occurred before caustic soda reached indirect purchasers. *See*, Macartney Decl., ¶ 134; Ex. 1, ¶ 140; Ex. 26, Macartney Tr. Vol. II, 367:7-25, 368:1. Distributor-to-distributor sales also represent a small proportion of the data anyway. Ex. 1, ¶ 141.

*Comingling*. Since co-conspirators are joint and severally liable for damages resulting from their conspiracy, commingling among Defendants' caustic soda does not affect impact or damages. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981). Likewise, commingling between Defendant caustic soda and the remaining 10% of the non-Defendant supplier market is irrelevant. Dr. Macartney's model accounts for the small amount of non-Defendant caustic soda in the market, which does not undermine common evidence of impact. Ex. 1, ¶¶ 73, 142. His calculations also capture "the effects of non-Defendant competition" because distributors' ability to substitute lower priced non-Defendant alternatives would be reflected in their transactional data. *See* Ex. 1, ¶¶ 75-76; *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 340 (S.D. Cal. 2019). And, the presence of such small amounts of non-defendant caustic soda in the stream of commerce does not implicate class membership because the likelihood that an indirect purchaser did not purchase at least some caustic soda manufactured by a Defendant is next to zero. *See* Ex. 1, ¶¶ 16, 82.

Moreover, because Macartney's aggregate damages calculation is based on the volume of caustic soda purchased from *Defendants*, it excludes any transactions involving distributor purchases from non-defendant sources. Macartney Decl., ¶ 135; *see also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 16 (E.D.N.Y. 2020) (when

aggregate damages can exclude non-qualifying purchases, defendant "will not be forced to pay a penny more than the damages the jury determines it caused, protecting its due process rights.").[25]

## IV.     There is No Rule 23 "Tracing" Requirement for Class Members

As demonstrated *infra*, Tripp and Finch establish class membership based on their transactional and deposition evidence, and common evidence demonstrates that IPP class members purchased caustic soda manufactured by Defendants. There is no further Rule 23 requirement that IPPs must establish a "method" for purchasers to "trac[e]" caustic soda back to Defendants.  Opp. at 12, 26. To ensure due process, a damages model only needs to roughly reflect classwide harm, *infra* at 41, and the Second Circuit has repeatedly stated that issues of damages allocation do not defeat predominance. *See supra*, n. 20. The Supreme Court made a similar point in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 461 (2016) when it called concerns over identifying uninjured class members "premature" and best reserved for challenging the "proposed method of allocation when the case returns to the District Court for disbursal of the award." 577 U.S. at 461. Similarly, courts in this circuit have repeatedly emphasized that declining "to certify classes when [some] consumers are likely to lack proof of purchase 'would [wrongly] render class actions against producers almost impossible to bring.'" *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 404 (S.D.N.Y. 2015) (quoting *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014)).

---

[25] Defendants make several additional throw-away arguments. For example, Defendants offer *nothing* in the record suggesting that small-scale dilution or varying storage tank times undercuts Dr. Macartney's analysis. *Compare* Opp. at 13-14 with Ex. 1, at 152, n. 204. And, obviously, IPPs did not incorporate by reference DPPs' Class Period; nor did DPPs ever state that anticompetitive effects suddenly ceased in 2019. Opp. 16-17. IPPs' Class Period extends to 2019 because transactional data demonstrates elevated pricing *for IPPs* continued through the distribution chain into that period. Ex. 26, Macartney, Vol. II, 336:12-25, 337:1-2. IPPs also have not asserted a "supply restraint conspiracy" for the same reasons articulated in DPPs' Reply Brief, *see* DPPs' R. Br. 5-9, Dkt. 500-2, and Defendants' so-called "uncontested" facts will be appropriately addressed at summary judgment. Opp. at 17.

<u>Argument</u>

Plaintiffs seek certification of two classes:[26] (1) a State Antitrust Class asserting violations of the antitrust laws for 27 states, and; (2) an Unjust Enrichment Class asserting violations of the laws for 19 states.[27] Both classes satisfy the pre-requisites for certification.

## I.   IPPs' Minor Amendments of Their Class Definitions Are Appropriate and Timely

This court "is not bound by the class definition proposed in [IPPs'] complaint," and courts routinely allow plaintiffs to change their class definitions at the class certification stage. *In re Namenda Direct Purchaser Antitrust Litig.* ("*Namenda DPP*"), 331 F. Supp. 3d 152, 212 (S.D.N.Y. 2018) (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir 1993)). [28]   Here, IPPs proposed minor changes to the class definition to include both residential and commercial end users of caustic soda. Defendants complain "it is 'unfair to defendants' and might necessitate additional discovery," *see* Opp. at 20, but they fail to explain how this minor, proposed change would be unfair or how discovery would have been any different if residential end users had been expressly identified. Indeed, vis-a-vis the challenged conduct and its effect, there is no distinction whatsoever between a class member purchasing caustic soda for use in a manufacturing process, and a class member purchasing caustic soda for household consumption purposes.

In this regard, *Namenda* is instructive.  There, plaintiffs sought to modify the class definition to expressly include certain purchasers of a generic drug who were not included in the

---

[26] IPPs are no longer pursuing certification of the Colorado Class.

[27] The states included in the Antitrust Class and Unjust Enrichment classes respectively are listed in IPPs' Mem. of L., 2-3. Where context permits, IPPs refer to both classes collectively as "the Class."

[28]*See also Menking v. Daines*, 287 F.R.D 174, 181 (S.D.N.Y. 2012) (allowing plaintiffs to expand class definition in the motion for class certification); *Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181, at *3 (N.D. Ill. Jan. 4, 2013) (change of the class definition at the class certification stage was "consistent with Rule 23[.]").

original class definition.   331 F. Supp. 3d at 210.  After reviewing the relevant case law, the court allowed the expansion because it was made with a timely motion for class certification, did not raise any notice issues and would not necessitate the reopening discovery.  The same is true here.

*Vincent v. Money Store*, 304 F.R.D. 446 (S.D.N.Y. 2015) is distinguishable.  There, plaintiffs attempted to change their class definition for both the time period and the precipitating event for class membership, which would have extended the class period an additional three years.  These changes are vastly different from the minor change proposed here, which does not alter the nature of the challenged conduct, extend the time period, or necessitate additional discovery.  This court should not "disregard" the class now proposed simply because it modifies an earlier non-binding definition. *Namenda DPP*, 331 F. Supp. 3d at 212.

## II.   Named IPPs Adequately Demonstrate Class Membership

The record establishes that Tripp and Finch meet the class definition:  each purchased caustic soda manufactured by at least one of the Defendants during the class period, from one or more distributors, and not for resale.[29] █████████████████████████████████

███████████████████████████████████████████████████████████████████[30]

Similarly, documents and testimony also demonstrate that Tripp purchased product manufactured at least by Olin and likely by other Defendants as well.[31] This is more than sufficient to establish

_____

[29] ████████████████████████████████; Ex. 42, Tybor Tr. 67: 23-25 (Finch Paper never resold caustic soda); Ex. 31, S. Jagielo Tr. 48:18-20 (Tripp did not resell caustic soda).

[30] █████████████████████████████████████████████████. Ex. 54, OLN-001246299; Ex. 55, OLN-0000701334.

[31] █████████████████████████████████████████████████████

██████████████. *See* Ex. 32, P. Rexer, Ex. 3. Given this, it is highly probable that Tripp's purchases in Fall 2016 and early 2017 contained caustic soda manufactured and sold by Olin. *See* Ex. 34, TRIPP0000003475, Ex. 35, TRIPP0000003481, Ex. 36, TRIPP0000003486. Amrex also frequently purchased from █████, *see generally* IPPs' Mem. of Law at 10, Ex. 32, P. Rexer, Ex.

class membership.  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 3971006, at *4 (S.D.N.Y. Aug. 31, 2022) (standing and class membership established where class includes only persons who suffered harm caused by defendants' conduct); *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379-81 (S.D.N.Y. 2010) (plaintiffs need not prove injury-in-fact to establish class membership).

Defendants do not cite contrary evidence.  Instead, they argue that neither Finch nor Tripp can establish class membership because IPPs do not have records of the manufacturer of the caustic soda bought from their distributors. Opp. at 21.  But even a *single purchase* of Defendants' caustic soda is sufficient to establish standing, class membership, and entitlement to relief. *Namenda IPP.*, 338 F.R.D. at 557. Thus, Defendants essentially ask this Court to deny class certification based on the *remote possibility* that every single purchase of caustic soda made by Finch and Tripp was comprised entirely of caustic soda sourced from a non-defendant supplier.[32]

Not only does the record belie this assertion, it is statistically nearly impossible.  As Dr. Macartney explains, given that Defendants manufactured nearly all of the caustic soda sold in the U.S. (90%), even if an IPP made *as few as five* random purchases, the simple probability than none of those purchases included Defendants' product is 0.001% (or 1 in 100,000).  ███████████████

---

3, which purchased from all Defendants during the class period. ███████████████
██ Tripp made other purchases in Class Period. *See, e.g.,* Ex. 37, TRIPP0000003484, Ex. 38, TRIPP0000003485; *see also* Ex. 39, AMREX007824 (excerpted page 93, original produced in native excel); *see also* Ex. 1, ¶ 82.

[32] Defendants' argument does not stop there.  According to the Defendants, *no class member* could determine the source of its caustic soda because that "cannot be determined for any particular sale." Opp. at 28. IPPs discuss this below. If accepted, Defendants' argument would preclude not only class certification, but also any individual recovery for the thousands of class members who paid overcharges because of Defendants' misconduct. This Court should view such an argument "with great skepticism."  *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. at 26 ("defendant's assertion that a small percentage of brand retainers should prevent over one million people and 30,000 to 40,000 TPPs from suing collectively runs afoul of Rule 23, as interpreted by the Supreme Court and Second Circuit").

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 1, ¶ 83.

### III.    The Named Plaintiffs are Adequate Representatives.

Adequacy tests whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 95, 99 (2d Cir. 2007). Defendants address neither prong under *Cordes*. Instead, they make unsupported factual assertions impugning named IPPs' interests in vigorously pursuing the litigation.

***First***, named IPPs have demonstrated their interest in vigorously pursuing this litigation by participating in discovery, producing documents, and sitting for depositions.  This is sufficient. *Vargas v. Howard*, 324 F.R.D. 319, 328 (S.D.N.Y. 2018) (finding class representatives adequate where they responded to discovery and sat for depositions); *Packaged Seafood Prod.*, 332 F.R.D. at 330 (similar). Here, Finch witnesses, sat for more than 17 hours of depositions, and conferred or met with counsel on numerous occasions in preparation for those depositions.[33]   In addition, Finch engaged in substantial discovery, answering interrogatories and producing a half a million pages of documents in numerous productions throughout the first half of 2022.[34]  Similarly, Tripp made several discovery productions, sat for depositions, kept independent records of the case, and frequently communicated with its attorneys during the course of litigation to discuss responses to

---

[33] Defendants falsely claim that Finch Paper's corporate representative prepared for his deposition for only an hour. Opp. at 22.  In fact, Mr. Tybor explained that in addition to a one hour in person meeting, he had numerous phone calls with counsel and also prepared independently. Ex. 42, Tybor Tr. 371:10-372:3.

[34] See Dkt. no. 493-2 Declaration of Jennifer W. Sprengel in Support of IPPs' Motion for a Protective Order and to Quash Defendants' Subpoena for the Deposition of Alex Rotolo, at p.2.

discovery requests. Ex. 41, C. Jagielo Tr. 13:9-13, 14:1-25, 15:1-3, 158:13-17. Further, Tripp authorized its attorneys to act on its behalf, including filing the initial action, and its corporate representative testified that she understands a class representative's responsibility, and takes it seriously. *Id.* at 153:14-16, 157:1-25, 158:18-23.

Defendants also try to embarrass named IPPs by emphasizing testimony that purportedly establishes they lack knowledge about details of the Complaint, the conspiracy, Defendants' names, or certain filings. Extensive knowledge of the Complaint and claims, however, is not required. *Flores v. Anjost Corp.*, 284 F.R.D. 112, 129 (S.D.N.Y. 2012) (lack of knowledge did not negate its ability to adequately represent the class because "[t]he bar for showing sufficient knowledge is quite low[,]" "[k]nowledge of all the intricacies of the litigation is not required[,]", and "plaintiffs are entitled to rely on their counsel for the legal underpinnings of their claims[.]"); *Mendez v. U.S. Nonwovens* Corp., 314 F.R.D. 30, 57 (E.D.N.Y. 2014) ("[T]he knowledge requirement for being a class representative [is] low and . . . satisfied by showing a general knowledge of the case and a willingness to pursue litigation on behalf of the class."); *Packaged Seafood Prod.*, 332 F.R.D. at 330 (similar).[35]

Defendants also assert that Tripp's stake in the litigation is too small to render it an adequate representative. Opp. at 22. That argument turns class action jurisprudence on its head.

---

[35] *Russell v. Forster & Garbus*, LLP, No. 17-CV-4274(JS)(AYS), 2020 WL 1244804, at *4–5 (E.D.N.Y. Mar. 16, 2020) is distinguishable because the court found that plaintiff had virtually no familiarity with the action, no understanding of his role as class representative, did not speak with his attorney before initiating the action, had not seen the complaint before his deposition, did not know the class he purports to represent and did not know if his counsel ever informed him of the existence of a class. *Id.* Those are not the facts here.

The class action device is designed with the small dollar claimant in mind, and courts resoundingly reject the notion that a small stake in the litigation disqualifies a class representative or member.[36]

Defendants also argue that because Finch made price increase announcements at approximately the same time and in the same amount as some of its competitors, it cannot adequately pursue a claim that is based on Defendants' parallel price increases here.  Opp. at 23.  This erroneous argument compounds Defendants' continuing mischaracterization of IPPs' claims.[37]   The antitrust violation here is not based solely on issuing parallel price increase announcements.  Rather, the antitrust violation is Defendants' agreement among themselves to increase prices, an agreement manifested and carried out by Defendants' near simultaneous price increases that were not justified by industry supply and demand factors. Ex. 1, at ¶ 37.

Finally, Defendants challenge named IPPs' adequacy to represent residential end user class members. Not only do Defendants fail to articulate a basis for a conflict between the interests of commercial buyers and residential end users, but courts routinely certify classes containing different types of end users over objection.  *Restasis*, 335 F.R.D. at 13 (rejecting argument that third-party payors could not adequately represent consumers); *In re Nexium (Esomeprazole)*

---

[36] *Arden Architectural Specialties, Inc. v. Wash. Mills Electro Minerals Corp.*, Nos. 95-cv-7574 CJS, 95-cv-7580 CJS, 2002 WL 31421915, *6-7 (W.D.N.Y. Sep. 17, 2002) (rejecting that plaintiff was not adequate representative because it purchased "small amounts" of product); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 380 (S.D.N.Y. 1996) (similar); *see also Korn v. Franchard Corp.*, 456 F.2d 1206, 1214 (2d Cir.1972) ("[O]ne of the chief goals of Rule 23 [is] to protect claimants whose 'individual claims would be too small to justify separate litigation[.]'") (quoting 3 B Moore, Fed. Practice 23.45[3] at 23802)*; In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 700 (S.D. Fla. 2004) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985)).

[37] Defendants also claim that Finch "unsuccessfully fought the deposition of its former CFO, wasting class resources in motion practice for its own benefit."  Opp. at 22.  To the contrary, Finch successfully foiled Defendants' attempt to harass it and its former CEO by engaging in a fishing expedition into its venture capital parent, Atlas Holdings and the business of sister companies*.  See* Dkt. no. 504, (Order limiting the Rotolo deposition to three hours, and prohibiting "questions about Atlas Holdings and other [non-party] entities[.]").

*Antitrust Litig.*, 297 F.R.D. 168, 172–73 (D. Mass. 2013) (rejecting defendants' argument that union plan sponsors were inadequate representatives for other types of indirect purchasers).

### III.     The Named Plaintiffs' Claims Are Typical

Disputing typicality, Defendants incorrectly argue there are "substantial differences" between the named IPPs' claims and defenses and those of absent class members. As for claims, Defendants point to only *one* difference in their brief—the fact that Connecticut allows recovery for only one year of the class period—so that "IPPs' claims would require argument and proof about different conduct and distract from the Connecticut claim's presentation at trial." Opp. at 24.  This is nonsense.  At trial, Plaintiffs will prove, with common evidence, the existence of the conspiracy, and its effect throughout the entire class period on all class members in the 30 states under which laws these claims are asserted.  The fact that Connecticut purchasers can only recover for purchases made after 2018 has absolutely no effect on the evidence that plaintiffs will submit to prove their claims. *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 533 (E.D.N.Y. 2017) (rejecting argument that difference in date of the conspiracy under Connecticut law renders plaintiffs' atypical"); *Namenda IPP*, 338 F.R.D. at 547 (typicality "requires only that each class member makes similar legal arguments, not identical ones") (citing cases).

As for their argument on "unique defenses," that named IPPs considered factors other than price in making caustic soda purchase decisions, Opp. at 24, Defendants cannot cite a ***single*** case to support the proposition that class members' purchasing preferences and their consideration of non-price factors is a defense to an antitrust claim, let alone one that is unique to these Plaintiffs. *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 476 (E.D. Pa. 2009) (rejecting defendants' unique defense argument that plaintiffs who valued non-price factors could not prove injury).

In any event, Defendants' characterization of the record is incorrect.  ███████████

████████████████████████████████████████████████████████████████

████████████████████████████. ██████████████████████████

██████████████████████████████████████████████████

████████████████████████ Ex. 43, Hall Tr. 186:11-189:5; Ex. 42, Tybor

Tr. 38:20-41:25. Similarly, Tripp's Steve Jagielo testified that in addition to convenience, Amrex

provided quality customer service and was reliable. Ex. 31, S. Jagielo Tr. 50:24; 51:5-6, 14-22;

52:7-8, 54:4-5. A supply's convenience is likely to be a factor in *every* purchaser's decision, and

Defendants cite ***nothing*** for the proposition this is idiosyncratic.

### IV.   Dr. Macartney Demonstrates that All or Nearly All Distributors Were Impacted

#### A.  Dr. Macartney Included and Correctly Calibrated All Material Variables in His Overcharge Analysis

Dr. Macartney included and properly calibrated all of the necessary variables in his initial

report. His overcharge conclusions are supported by the fact that Dr. Lamb, DPPs' expert,

produced similar results working independently with a slightly different model.[38] Ex 1, ¶¶ 137-38.

By contrast, Dr. Johnson's variable choices are often either demonstrably too narrow or produce

statistically unreliable results. As demonstrated below, Dr. Macartney's model is "capable" of

showing classwide injury, even if some variables remain in dispute. *See supra*, 6; *see also Kurtz*,

818 F. App'x at 62; *Optical Disk Drive*, 2016 WL 467444, at *7 (stating that "quarrels" about

proper "variables" do not show that an expert's model is "methodologically unsound.").

---

[38] While Macartney's overcharge model differs slightly from Dr. Lamb's, Dr. Lamb and Dr. Macartney relied on the same data to construct their models. So, any solution that Dr. Lamb offers could be equally applied by Dr. Macartney. *See* Ex. 12, Macartney Tr. at 89:21-25, 90:1-3.

### 1. Dr. Macartney's Direct Overcharge Model Appropriately Measures Chlorine Demand

Defendants complain that Dr. Macartney's chlorine demand variable is statistically insignificant. Opp. at 31. This reveals a "fundamental misunderstanding of econometrics."[39] Notwithstanding that Defendants mean to criticize the *coefficient* produced by the chlorine demand variable, because a coefficient is the variable's output,[40] "the statistical significance of each and every coefficient is not" relevant to the overall success or viability of an expert's regression model.[41] Multicollinearity, for example, can explain a statistically insignificant coefficient. This "occurs when several variables are correlated with each other," and their overlap may result in "a smaller coefficient (influence) for one variable and a greater coefficient for other correlated variables," while "the overall effect of these variables may be strongly statistically significant[.]"[42] Dr. Macartney provided this explanation in both his initial Declaration and deposition,[43] yet Defendants seem to whistle past it.

Defendants' production also belies their claim that PVC prices are a better metric for chlorine demand than rubber and plastics generally, which *includes* PVC demand. Ex. 1, ¶ 116; *see also* Ex. 12, Macartney Tr. 143:22-25, 144:1. In tables disaggregating chlorine demand, chemicals needed for non-PVC plastics are prominent.[44] In the first quarter of 2018, for instance,

---

[39] *In re Electronic Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293(DLC), at *26 (S.D.N.Y. Mar. 28, 2014); *Cook v. Rockwell Int'l Corp.*, 580 F.Supp.2d 1071, 1102 (D. Colo. 2006) ("Defendants nonetheless implied . . . that statistical significance is a threshold requirement. . . They failed, however, to cite any scientific or legal authority[.]").

[40] *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 212 (E.D. Pa. 2017) (citing Daniel L. Rubinfeld, Econometrics in the Courtroom, 85 Colum. L. Rev. 1048, 1065 (1985)).

[41] *Electronic Books Antitrust Litig.*, 2014 WL 1282293 at *26.

[42] *Id.* at *26, n. 34; *Foam*, 314 F.R.D. at 259 ("[M]ulticollinearity . . .not grounds for [exclusion].").

[43] Macartney Decl., ¶ 127; Ex. 12, Macartney Tr. 171:6-15; Ex. 1, ¶ 115. Defendants also argue removing Dr. Macartney's chlorine variable does not change his overcharge, but this is just variation on their statistical insignificance argument. Opp. at 31.

[44] Ex. 44, OLN-000022002 at 09; Ex. 45, OCC_00032335 at 43; Ex. 46, OLN-000157644.

propylene oxide, methylene diphenyl diisocyanate ("MDI"), and toluene diisocyanate ("TDI"), related to the manufacturing of polyurethane plastics,[45] are together the largest demand driver after ethylene dichloride (an input for PVC plastics). Ex. 45, OCC_00032335 at 43. Although Defendants claim PVC prices are the "industry-recognized" metric, Dr. Macartney's broader variable accounts for PVC demand *in addition* to other important chlorine drivers—a view undeniably supported by Defendants. Defendants common refrain is that Dr. McCartney's "failure" to account for nebulous "non-collusive factors" somehow disqualifies his analysis, Opp. at 30, but, especially here, filtered through their lingo, Dr. Macartney included *more* "non-collusive" factors than their own expert.

Further, even assuming Dr. Johnson's variable choice and calculations were correct, ***Dr. Johnson finds approximately an 11% overcharge for distributors when using PVC prices and a 10.6% overcharge when using lagged PVC prices***. Ex. 1, ¶ 117. Astonishingly, Dr. Johnson deems this statistically insignificant, but this is due to his erroneous clustering method. *Infra*, 29; *see id.* Undoing his error, Dr. Macartney finds them statistically significant. *See id.*

### 2. Dr. Macartney's Direct Overcharge Model Appropriately Measures International Demand

Defendants next attempt to stick Dr. Macartney with an error he obviously understands. As they point out, he co-authored a paper discussing model endogeneity bias *in antitrust class proceedings*. *See* Opp. at 32. Their objection is that Dr. Macartney's international demand variable, the net quantity of caustic soda exported, is endogenous to the domestic price of caustic soda,

---

[45]   Ex. 47, FPC-USA-DPP-00152993 at 2999 (Propylene Oxide, MDI/TDI: Building blocks for polyurethane); Ex. 48, WL_0000485349 at 5353 (MDI/TDI within polyurethanes); Dr. Macartney used NAICS classification 326 for his plastics and rubber variable. Sub-category 326150 describes polyurethane foam products manufacturing.
*See* https://www.census.gov/naics/?input=polyurethane&year=2022&details=326150.

because, apparently, domestic prices affect international consumption.[46] Even assuming Defendants demonstrated an endogenous relationship—they have not[47]—Defendants ignore that Dr. Macartney's variable accounts for global demand shifts even they deem significant, such as the EU mercury cell ban or increased Chinese environmental regulation. Ex. 1, ¶ 118. Dr. Johnson also magnifies any endogeneity bias by replacing net export quantity with export *prices*, which, as Dr. Macartney demonstrates, are driven by the U.S. domestic price of caustic soda.  *See* Ex 1, ¶¶ 50-54, 118, Fig. 12; *see also* DPPs' R. Br. at 23-24.

Even assuming *some* endogeneity in Dr. Macartney's net export variable, Dr. Macartney re-tested his model using a *narrower* control, global aluminum production. He still finds a positive and statistically significant overcharge. Ex. 1, ¶ 119, Table 41.  In any event, the risk of endogeneity is not a reason to omit an important variable from a model or for a court to exclude that expert's analysis under F.R.E 702. *See, e.g., Resco Products, Inc. v. Bosai Minerals Grp.*, No. 06-235, 2015 WL 5521768, at *8 (W.D. Pa. Sept. 18, 2015) ("The extent to which Chinese domestic RGB prices influenced . . . [prices for] exported Chinese RGB is a matter [for the fact finder.]")(citing *Bazemore*, 478 U.S. at 400).

### 3.  Dr. Macartney's Direct Overcharge Model Appropriately Measures Domestic Demand

Chemical and paper production represent an appropriate control given it accounts for 82% of caustic soda demand. Macartney Decl., ¶ 40; Ex. 1, ¶ 44; *see also* Ex. 8, WL_0000778822

---

[46] Dr. Johnson appears to make a slightly different argument than Defendants, labeling the denominator (U.S. production) Dr. Macartney used to calculate net exports as endogenous. Johnson Rpt., ¶ 172. The error here is that variable Dr. Macartney used was a ratio, not U.S. production by itself, which Dr. Johnson rejects with almost no explanation.
[47] While the "first test of endogeneity" is "intuition," endogeneity can be confirmed with certain specification tests. *Econometrics*, American Bar Association (2014), at 84. Beyond intuition, Dr. Johnson does not appear to have tested for endogeneity. Johnson Rpt., ¶¶ 171-72. The variable is also not endogenous because it is a ratio, not strictly a quantity variable. Ex. 1, ¶ 118, n. 290.

(accounts "for over 75%" of domestic demand). Defendants' response is baffling: most of the "many different purposes" they list for caustic soda fall within the categories of paper and chemical production. *See* Opp. at 34.

Additionally, Dr. Macartney's chemical and paper production data graphs show precisely what he concludes—that caustic demand during the class period was flat or decreasing. *See* Macartney Decl., ¶¶ 109-110, Figs. 33-34. Disputing this, Defendants seem to ignore the narrow, zoomed-in scale of his graphs and forget that charts, like any pricing pattern, do not necessarily move in a straight line. For chemical production, the data clearly shows a lower low and lower high in the Class Period compared to the benchmark period, evidence that "chemical production in the US remained substantially lower during the Class Period[.]" Macartney at ¶ 109, Fig. 33. For paper production, the data shows a lower low and erratic, marginally higher high. Macartney at 109, Figure 34. Both of these data sets are analyzed in support of Dr. Macartney's *overall* conclusion that demand was flat or decreasing, which is confirmed when appropriately weighting chemical production against paper production. Ex. 1, at ¶ 44. Dr. Johnson also points that GDP rose gently, but there is "no correspondence" between that increase and the rapid increase of caustic soda prices. *Id.*[48]

### 4.  Dr. Macartney's Direct Overcharge Model Appropriately Measures Supply Costs

Defendants' arguments are frivolous. They mock Dr. Macartney for weighting his cost ratio based on their production, and then assert he did not check to see if this ratio would have changed for a plant just five years later. *See* Opp. at 35. Defendants offer nothing to demonstrate that this cost structure "would have vary[ied] by plant, defendant, or time"—or that different

---

[48] Nor are Defendants' criticisms reasons to deny class certification. *See EPDM*, 256 F.R.D. at 98, 104 (granting certification despite criticisms of expert's supply and demand variables).

structures would have materially changed the supply coefficient or model's outcome. *See id.*; *Packaged Seafood Prods.*, 332 F.R.D. at 327 (rejecting similar criticism of cost index by Dr. Johnson). Moreover, as Dr. Johnson conceded at his deposition, costs were higher in the pre-class period than the Class Period. Ex. 1, ¶ 41.

### 5. Dr. Macartney's Direct Overcharge Model Accounts for Non-Conspiratorial Differences

Defendants next offer Dr. Johnson's Chow test to demonstrate that Dr. Macartney's overcharge regression fails to account for non-conspiratorial "differences" between the benchmark and Class Period. Opp. at 38.

Dr. Johnson's first major error is his test lacks any kind of theoretical foundation, as Chow tests are typically reserved for structural data breaks surrounding major macroeconomic changes, such as World War II, an example that Dr. Gregory Chow himself used in his paper introducing his test. Ex. 1, ¶¶ 121-22. Without knowing when a structural data break occurs, Chow tests are prone to erroneous results, especially with sample sizes as large as Dr. Macartney's 1.3 million data points. *Id.* at ¶ 123. Dr. Johnson's Chow test also leads to nonsensical results. Dr. Johnson's working papers demonstrate that five variables exhibit a positive relationship with price in one period and *negative relationship* in the other without explanation. This suggests contradictory findings, such as when demand increased, caustic prices rose in one period but dropped in the other. *Id.* at ¶ 124, Fig. 42.

Although no Chow test was involved, *In re Electronic Books Antitrust Litig.* quickly dismissed a similar argument that plaintiffs' expert had not accounted for non-conspiratorial factors in his model for similar reasons that apply here. 2014 WL 1282293 at *27-28. But, unlike Defendants, Apple actually offered examples of non-conspiratorial factors the expert purportedly

ignored. *Id.* Dr. Johnson's Chow tests have also been dismissed by other courts, and the same result should obtain here. *Olean*, 31 F.4th at 674, 675-7.

### 6. Dr. Macartney's Overcharge Model Accounts for Regional Differences in Pricing.

Dr. Macartney found market-wide impact in spite of regional differences and confirmed this in his Reply Declaration. Macartney Decl., ¶¶ 104-5; Ex. 1, ¶¶ 84-93; *see also In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 223 (E.D. Pa. 2017) ("[P]ricing variations depending on regions . . . would not necessarily impact [a finding of] antitrust injury on a nationwide class[.]"). Correlated pricing patterns within different regions support his conclusion of nationwide impact, and his view of an integrated market is supported by record evidence, including Defendants' own assessments. *Supra* at 6-7. Whether Dr. Macartney's overcharge model effectively accounts for any regional differences is itself a common question, which supports certification. *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 197 (E.D. Pa. 2016) (stating geographic market is a common question). Regardless, Defendants offer nothing to show how a small number of imports or other regional eccentricities create an unreliable overcharge. *See supra* at 6-7.

### B. Dr. Macartney's Overcharge and Pass Through Regressions Properly Average Data While Dr. Johnson Relies on Improper Sub-Regressions

There is no doubt that regression models may use average pricing to support class certification. Not only is average data routinely used in class antitrust cases, but often, it is "the only practicable means to collect and present relevant data." *Tyson Foods*, 577 U.S. at 455. Averaging data enables experts to determine common impact and aggregate class damages, and a panoply of cases validate this practice. *E.g.*, *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294 (D. Mass. 2021).[49]

---

[49] *See also Namenda IPP*, 338 F.R.D. at 546; *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 20-2184, 2021 WL 3379035, at *6 (4th Cir. Aug. 4, 2021); *Restasis*, 335 F.R.D. at 25; *In re Loestrin 24 FE*

Despite consistent legal support for data averaging, "attacking averaged data is a standard defense tactic [against class actions] in antitrust cases." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D 606, 625 (N.D. Cal. 2015). For Dr. Johnson in particular, his modus operandi is to undermine conclusions drawn from aggregate data by needlessly subdividing data sets into groups that are so small they are virtually guaranteed to show lack of injury or large variations where none would otherwise exist.[50] In his overcharge analysis, for example, Dr. Johnson estimates overcharge for *each* distributor, Ex. 1, ¶ 125, essentially creating "statistically unreliable" sub-regressions that mask the existence of injured class members.[51] Dr. Johnson's pass-through critique does not fare any better. Even accepting his regional and distributor subdivisions at face value, he fails to show the absence of statistically significant pass-through for any region or distributor. *Id.* at ¶ 19.

Contrasting with Dr. Johnson's approach, Dr. Macartney has effectively averaged data in both his overcharge and pass-through models to show classwide impact. Dr. Macartney "has presented theories that explain why, in his view, classwide impact would have existed, and he has offered means for testing the data to demonstrate that it did, and to calculate what he believes the

---

*Antitrust Litig.*, 410 F. Supp. 3d 352, 389-93 (D.R.I. 2019); *In re Suboxone Antitrust (Buprenorphine Hydrochlorine & Naloxone) Litig.*, 967 F.3d 264, 272 (3d Cir. 2020).

[50] *See, e.g., Packaged Seafood Prods.*, 332 F.R.D. at 323-28 (granting class certification over Dr. Johnson's objections, in part, because of Dr. Johnson's insufficient sample sizes); *In re Capacitors Antitrust Litig.* (*No. III*), No. 17-md-02801-JD, 2018 WL 5980139, at *8 n.4 (N.D. Cal. Nov. 14, 2018) (granting class certification where "Dr. Johnson's analysis appears to suffer from data sets that are too small"); *see also* Asher, Arenson & Lamb, Losing the Forest for the Trees: On the Loss of Economic Efficiency and Equity in Federal Price-Fixing Class Actions, 16 Va. L. & Bus. Rev. 293 (2022) (criticizing Dr. Johnson's approach in antitrust cases as incorrectly assuming that impact must be identical for all proposed class members).

[51] Asher, Arenson & Lamb, 16 Va. L. & Bus. Rev. at 318-19; *see also* Robert D. Liebenberg and Ellen Meriwether, Antitrust Class Certification: The Use of Statistical and Representative Evidence to Establish Predominance of Common Proof, 93 Temple L. R. 553, 566 (2021) ("As the transactions are divided into more and more subgroups, the number of observations per grouping declines, which makes a test of coefficient stability or robustness less reliable.").

overcharges were" and why they were passed through. *Optical Disk Drive*, 2016 WL 467444, at *7 (dismissing argument about the improper aggregation of data). Dr. Macartney's overcharge and pass-through models are "sufficiently reliable to merit the court's consideration of it as proof common to the class," *In re Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *59 (E.D.N.Y. Oct. 15, 2014), and "each class member could" rely on those models "to establish liability if he or she had brought an individual action." *Tyson Foods, Inc*, 577 U.S. at 455. At trial, "Defendants will be free to show why they think [Dr. Macartney] is wrong," but IPPs have satisfied Rule 23. *See id.*

### 1. Dr. Johnson's Overcharge Calculations Mask Injured Distributors

 Defendants claim Dr. Johnson demonstrates that "more than half of the largest distributors are uninjured," but, they appear to confuse statistical significance with injury. Opp at 37. Analyzing 49 distributors, Dr. Johnson only finds that ***two*** had ***negative*** overcharges. Ex. 1, ¶ 126. The remaining had positive overcharges, indicating that overcharges were likely paid. *See id.*

While Dr. Johnson claims that 27 distributors lack a statistically significant positive overcharge—including the two that had negative overcharges—he only arrives at this conclusion through a series of arbitrary and unsupported determinations about the way he manipulates his data. These include (1) clustering standard errors by month, without any justifiable theoretical basis and against warnings in academic literature cautioning against resulting data problems, Ex. 1, ¶¶ 110-114, 127; (2) incorporating distributors with insufficient data into his analysis (out of 49 total distributors, only 5% of volume was associated with a "negative or statistically insignificant" overcharge), *id.* at ¶ 128; and, (3) arbitrarily requiring a confidence level over 95% (multiple distributors had statistically significant overcharges at the 95%, 90%, 89%, or 88% confidence levels). *Id.* at ¶¶ 129-31. Contrary to Dr. Johnson's rigid view of statistical significance, Courts

have admitted models at lower levels,[52] and the ABA has said that "90 percent" confidence intervals "are also common[.]" *Id.* at ¶ 114, n. 273.

Correcting Dr. Johnson's errors, Dr. Macartney demonstrates that Dr. Johnson's distributor sub-regressions show that ***only four distributors***, representing ***1% of volume***, lack a statistically significant positive overcharge. *Id.* at ¶¶ 130-31, Figs. 45-47. And, this is only because large, uneven gaps and/or outliers appear in data for those distributors. This result illustrates precisely the critique other courts have made against Dr. Johnson's work: insufficient sample sizes yield unreliable results and spurious conclusions. *See supra*, n. 50; *Coates v. Johnson & Johnson*, 756 F.2d 524, 541 (7th Cir. 1985) (explaining that "statistical significance becomes harder to attain as the sample size shrinks.").

### 2. Dr. Johnson Incorrectly Identifies False Positives in Dr. Macartney's Overcharge Model

Attempting to demonstrate that Dr. Macartney's use of a single overcharge creates false positives, Defendants claim Dr. Johnson identifies exactly three *direct purchasers* who supposedly experienced no overcharge due to "flat price contract[s] the spanned the entire pre-period and class period[.]" Opp. at 36. Never mind that these three entities are not caustic soda distributors, which makes their contracts irrelevant for IPPs' burden to show common impact.[53] More importantly, Defendants ignore IPPs' theory of harm. Even assuming those three purchasers experienced flat pricing—two did not[54]— Defendants' stabilized prices to prevent further declines, Macartney

---

[52] *See, e.g., In re High–Tech Employee Antitrust Litig.*, No 11–CV–02509–LHK, 2014 WL 1351040, *14-15 (N.D. Cal. Apr. 4, 2014); *see also Cook*, 580 F.Supp.2d at 1102; *In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 508 (D.N.J. 2016).

[53] Ex. 1, ¶¶ 29-32.  Dr. Macartney uses a distributor-specific overcharge to calculate damages. Macartney Decl., ¶ 128.

[54] It is simply not true that Resolute Forest and Chemours had "flat" pricing contracts. Resolute Forest's contract was revised and subject to continuing negotiations during the Class Period, and Chemours entered a contract within the Class Period tied to the IHS index. Johnson Rpt., ¶¶ 83-

Decl., ¶¶ 108 114; Ex. 1, ¶ 134, so flat pricing *is the overcharge. See Optical Disk Drive*, 2016 WL 467444 at *8 ("IPPs' renewed motion . . . [successfully] makes the important point that the price-fixing in this case is alleged to have consisted of efforts to slow the decline [of prices].");  *see also* Ex. 49, Johnson Tr. 139:25-140:1-3.

Defendants citations to the *In re Rail Freight*[55] opinions are also inapposite. *Rail Freight I* relied on a concession by plaintiff's expert that his model "yielded false positives." *In re Electronic Books Antitrust Litig.*, 2014 WL 1282293 at *26. A similar problem persisted in *Rail Freight III*, where plaintiffs' expert's own calculations still showed thousands of uninjured class members. 934 F.3d at 624. Defendants attempt to use Dr. Johnson's calculations to prove, by analogy, what should be demonstrated *by Dr. Macartney's own calculations* to defeat class certification. *See id.* In any event, *Rail Freight* is not the law of this circuit. Even assuming Dr. Macartney's model showed some number of uninjured class members, "[t]he Supreme Court and Second Circuit . . . have never suggested that a certain percentage or number of uninjured plaintiffs would automatically bar class certification." *Restasis*, 335 F.R.D. at 17. To the contrary, at least the Seventh and Ninth Circuits have eschewed such an approach. *Olean*, 31 F.4th at 669, n. 13; *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

---

84. Dr. Johnson' own data also clearly show rising prices for both entities within the class period. Ex. 1 at 29-31, Figures 4-6.

[55] *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail Freight I*"), 725 F.3d 244, 252 (D.C. Cir. 2013); *Rail Freight II*, 292 F. Supp. 3d 14, 137 (D.D.C. 2017); *Rail Freight III*, 934 F.3d 619, 626-627 (D.C. Cir. 2019). *In re Aluminum Warehousing Antirust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020): Not only did plaintiffs have an "idiosyncratic" theory of harm based on a conspiracy to lengthen load-out "queues" for warehouses, 336 F.R.D. at 12, 62, but also, plaintiff's expert did not even model damages off of this peculiar theory of harm. 336 F.R.D. at 62. When defendants' expert re-ran the model "directly" measuring damages from plaintiffs' theory, he showed that over 50 percent of class members were uninjured. *Id.* at 62. No such mismatch exists here.

### 3. Dr. Macartney's Reliance on Distributor Data for His Pass-Through Model Supports a Finding of Widespread Impact

Unable to rebut Dr. Macartney's analysis that direct purchaser distributors were overcharged by the alleged cartel, Defendants turn their attention to his pass-through analysis. Defendants baselessly criticize Dr. Macartney for relying on "data from ██ distributors" in his pass-through analysis, suggesting that data from ██████████████   ████ may not be representative of data from other distributors. Opp. at 48-49. But Defendants do not explain why data from ████████████████ would be different from or in conflict with the purchase and sales data from other distributors for investigating pass-through. As Dr. Macartney explains, these ██ distributors accounted for 42% of Defendants' sales to the distribution channel. Ex. 1, ¶¶ 19, 145.[56] All ███ purchased caustic soda from Defendants in similar percentages of grade, concentration, and state of matter (*i.e.*, liquid versus solid state) as the remaining distributors, and all ██ sold caustic soda in virtually every state. *See id* at ¶¶ 147, 149-151 & Figs. 51-52, 55-58. The ███ distributors share not only similar purchase patterns and geographic scope as the remaining distributors, but they also paid prices to Defendants that were similar and highly correlated with the prices paid to Defendants by all other distributors. Ex. 1, ¶ 148 & Figs. 53-54. Dr. Macartney's pass-through model is based on sufficient and adequately representative data to investigate widespread impact to the State Antitrust Class. *See Broiler Chicken*, 2022 WL 1720468 at *19 (rejecting Dr. Johnson's criticism that plaintiffs' expert analyzed only a "small sample" of data and finding reliance on data from "22 of 540 direct purchasers" sufficient to prove impact.).[57]

---

[56] In his Reply Declaration, Dr. Macartney provides a slightly higher estimate of the distributors' share of Defendants' sales to the distribution channel – 42% versus his original estimate of 38%.

[57] Defendants' reliance on *Propane*, *Eggs*, and *In re Class 8* is unavailing. Those cases involved significantly smaller datasets than the data relied on by Dr. Macartney here. *See In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *12 (W.D. Mo. Nov. 9, 2021) (analysis based on data that "comprise[d] less than 10% of sales to the putative class."); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 158 (E.D. Pa. 2015) (analysis

As a fallback, Defendants challenge IPPs' evidence of pass-through by attempting to demonstrate that Dr. Macartney's averaged data conceals important differences in pass-through rates by distributor, region, and over time. *See* Opp. at 49-52.[58] The concern with averaged data is whether it conceals the existence of *uninjured* class members.[59] But notably, neither Defendants nor Dr. Johnson extend their criticisms of Dr. Macartney's pass-through model so far as to reach the conclusion that the State Antitrust Class contains some number of uninjured class members. That is because the relevant question is whether distributors passed through at least *some portion* of Defendants' overcharges to class members, not whether the pass-through rates were uniform.[60] For all their bluster over averages, the data still shows the sizable and statistically significant pass-through of overcharges to class members. Defendants have failed to demonstrate, estimate, or *even argue* that "a great many" class members suffered no injury at the hands of the alleged cartel, *Restasis*, 335 F.R.D. at 17 (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)), and the Court should reject Defendants' attacks on the use of averages here.

Defendants first argue that averaged data "cannot account for the fact that distributors individually negotiated prices with their customers and likely had different pass-through rates[.]" Opp. at 52 (citing Johnson Rpt., Exs. 32 & 33).[61] Nevertheless, Defendants fail to link their theory

---

based on a single retailer); *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 679 F. App'x 135, 141 (3d Cir. 2017) (analysis based on "less than one percent of total truck sales").

[58] Insofar as Defendants suggest that IPPs must demonstrate "uniform" pass through rates or price increases to class members, that requirement is nowhere to be found in Rule 23. *See infra* at 43.

[59] *See Pre-Filled Propane Tank*, 2021 WL 5632089, at *12 (rejecting analysis where "[t]he only evidence in the record . . . casts doubt on whether there was any pass-through at all.").

[60] *See Olean*, 31 F.4th at 679 (explaining that it is "irrelevant whether actual sales data shows a specific class member was overcharged by more or less than" the estimated rate because the focus is instead on "whether each member of the class can rely on [the] model to show antitrust impact of any amount.").

[61] Exhibits 32 and 33 purport to analyze how prices to indirect purchasers changed following price increase announcements by Olin, suggesting that the distributors' resale prices did not uniformly increase following each announcement. But the correct comparison for impact is not whether

about individual price negotiations to any evidence or analysis that distributors did not pass on overcharges to class members. *Compare with* Ex. 1, ¶¶ 107 & Figs. 39-40 (demonstrating that the top 10 customers for ███████ and ███████ followed same price increase trend as all other customers). Dr. Johnson's analysis shows that ████████████████ passed on sizable and statistically significant overcharges to class members, ranging from 58% for ███████ to 94% for ███████, disproving his own suggestion that variation by distributor undermines widespread impact. Ex. 1, ¶¶ 157-158; Johnson Rpt., ¶¶ 205-206 & Ex. 45; *Broiler Chicken*, 2022 WL 1720468, at *19 (rejecting Dr. Johnson's "unpool[ing]" analysis because the "lowest pass-through rate specifically identified by Johnson [of] 57%" was "still sufficiently significant to demonstrate damages."); *Gordon v. Microsoft Corp.*, No. MC 00-5994, 2003 WL 23105550, at *2-3 (D. Minn. Dec. 15, 2003) ("[T]he use of average pass through rates, even in combination with Microsoft's evidence that individual distributors sometimes absorbed specific cost increases, falls short of suggesting that any significant number of class members escaped injury.").[62] Furthermore, when Dr. Macartney calculates a weighted average using Dr. Johnson's individual pass-through estimates, he finds a weighted average pass-through rate of 85%, compared to the 81% rate estimated in his opening report, demonstrating that Dr. Macartney's estimated pass-through rate is reliable and *conservative*. Ex. 1, ¶ 158 & Table 60; *Olean*, 31 F.4th at 684 (affirming finding of

---

caustic soda prices uniformly increased following each price increase announcement, but instead whether prices were higher than they otherwise would have been based on market factors. *See U.S. v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("Stabilizing prices as well as raising them is within the ban of § 1 of the Sherman Act."); *Cordes*, 502 F.3d at, 107 ("If the fee paid were higher than the but-for fee, then the plaintiff suffered an injury-in-fact."); *In re Polyester Staple Antitrust Litig.*, No. MDL 3:03CV1516, 2007 WL 2111380, at *26 (W.D.N.C. July 19, 2007).

[62] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████; *see also Broiler Chicken*, 2022 WL 1720468 at *18 (explaining that "[d]irects profit by adding a mark-up to the price they pay [d]efendants.").

impact to indirect purchasers based on an "estimated pass-through rate of 100 percent for the entire class" despite variation that "ranged from 65.3 to 135 percent"). Defendants cite nothing in the record to show that the distributor data relied upon by Dr. Macartney or his estimated pass-through rate "create[] actual problems with his conclusions." *Korean Ramen*, 13-cv-04115, 2017 WL 235052 at *19 (rejecting challenge to experts' use of a 100% pass-through rate based on "an admittedly small sampling of [two] resellers").[63]

Defendants next contend that Dr. Macartney's model masks variation in pass-through by region. Opp. at 51 (citing Johnson Rpt., ¶ 207-209 & Ex. 46). But Dr. Johnson's analysis shows that, for all five regions of the United States, the distributors passed on sizable and statistically significant overcharges to class members. Ex. 1, ¶ 155; Johnson Rpt., Ex. 46. Building on Dr. Johnson's analysis, Dr. Macartney finds even higher, statistically significant pass-through rates, ranging from 63% in the Southeast region to 99% in the West region. *Id.* at ¶ 156 & Fig. 59. And when Dr. Macartney aggregates the regional pass-through rates, he finds that the result is virtually identical to the overall pass-through rate presented in his opening report. *Id.* Dr. Macartney's pass-through model is common evidence of impact to class members, regardless of the region.

Defendants' assertion that pass-through rates likely varied over time is equally as baseless. Opp. at 52. They appear to "incorrectly assume that a class member who is injured for only a part

---

[63] Defendants' reliance on *New Motor Vehicles* and *Methionine* is misplaced. Opp. at 52. First, contrary to Dr. Macartney's analysis here, the court in *New Motor Vehicles* discussed a "novel and complex" theory of impact that the plaintiffs' expert had not yet fully developed. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) (explaining that "[a]t the time of class certification, more work remained to be done in the building of plaintiffs' damages model and the filling out of all steps of plaintiffs' theory of impact."). Second, the *Methionine* court discussed a model that purported to analyze overcharges to indirect purchasers that included resellers, ultimate consumers, and those who were both. *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001). The court distinguished the *Methionine* case from other cases where indirect purchaser classes did not include resellers or products that had been incorporated as components into different products. *Id.* at 165-166.

of the class period did not suffer injury[.]" *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015). But Defendants provide no analysis to suggest that any distributor had a negative pass-through rate on all sales to class members during the class period. That is the showing Defendants must make to overcome the evidence of widespread impact here. *Foam*, 314 F.R.D. at 286 (explaining that examples of instances where a direct purchaser failed to pass-through an overcharge in the short term "cannot defeat an otherwise proper offer of generalized evidence of overcharge passthrough."); *see also Restasis*, 335 F.R.D. at 18 ("[A] consumer need incur only one overcharge to experience antitrust injury[.]").

Defendants also argue that Dr. Macartney's "model ignores complexities in the caustic soda supply chain" and cannot "trace" an overcharge from Defendants to a specific transaction by a class member. Opp. at 53-55.[64] This has been rejected elsewhere. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 555090, at *4 (N.D. Cal. Feb. 21, 2012) (concluding that plaintiffs "need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser."). Here, Dr. Macartney's pass-through model examines the relationship between the price at which Defendants sold their caustic soda and the price at which an end-user purchased it. By controlling for all relevant factors that could otherwise explain differences between prices, Dr. Macartney calculates the extent to which an increase in the price paid by a customer was *caused by* the alleged cartel. Ex. 1, ¶ 140 & n. 364. Therefore, his model *can* "assess

---

[64] Defendants point to Exhibit 41 from Dr. Johnson's report, which purports to illustrate the ███████ ████████████████████████████████ *Id.* But Dr. Johnson's analysis is devoid of any estimation as to the prevalence of caustic soda sales that *do not* travel from a Defendant to a distributor to Tripp Plating. Dr. Macartney, on the other hand, has analyzed the relatively flat supply chain for caustic soda, and he concludes that the scenarios envisioned by Dr. Johnson are highly uncommon. Ex. 1, ¶¶ 73-83.

the pass through of Olin's direct sales to ████, ████████████, or ████████ " that is "passed through to Amrex then to Tripp Plating." Opp. at 54.

Defendants offer no evidence, analysis, or argument that Dr. Macartney's pass-through model could result in false positive pass-through rates from distributors to class members. At most, Defendants' arguments can be summarized by the observation that class members may have suffered different degrees of impact. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n. 9 (1969) (Plaintiff satisfies burden by proof "of some damage flowing" from the conspiracy.). Thus, "the use of averaged and aggregated data is not fatal to [ ] Plaintiffs' econometric model[]." *SRAM*, 246 F.R.D. at 614.

### 4. Contracts and Negotiated Pricing for Distributors and Indirect Purchasers Demonstrate Common Impact

Rather than addressing the myriad cases rejecting their arguments,[65] Defendants focus on overstating the variability of the contracts for both distributors and indirect purchasers, which broadly include contracts based on fixed rates, formulaically tied to index pricing, or incorporating market-based pricing. Opp. at 44-45, 55; *see also* Johnson Rpt., Appendix G. All of these were impacted by Defendants' conspiracy. Ex. 1, ¶¶ 101-106, 154-59; *supra*, 9-10. Nearly all of Defendants' contract examples suffer from the same "inflated baseline" problem, and those that

---

[65] *See EPDM*, 256 F.R.D. at 89 (explaining the difference between impact and damages, collecting cases showing that negotiated prices do not undermine injury, and finding that "six across-the-board list price increases" demonstrated common impact in spite of "discounts" and "contract terms[.]"); *NASDAQ*, 169 F.R.D. at 523; *Arden*, 2002 WL 31421915, *1-11 (Plaintiff "would have paid an artificially high price regardless of whether or not it negotiated."); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1249 (10th Cir. 2014) ("[C]lass-wide impact is especially strong where . . . evidence [shows] the conspiracy artificially inflated the baseline for price negotiations."); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 928-29 (7th Cir. 2016) (similar); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 433 (E.D. Pa. 2015) (similar); *In re Polyurethane Foam Antitrust Litig.*, No. 10–2196, 2014 WL 6461355, at *33 (N.D. Ohio Nov. 17, 2014) (similar); *see also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 690-91 (D. Minn. 1995) ("Rule 23(a)(3) does not require that all members of a proposed class . . . use similar purchase methods[.]").

do not directly concede injury (e.g., delayed price increases) or are so nebulous that no response is warranted (e.g., "blend[ed]" pricing "mechanisms"). Of the few contracts that offer a flat or capped rate, *see* Opp. at 44-45, the examples Defendants reference are extremely time-limited and almost certainly negotiated within the Class Period given the referenced timeframes take place months (if not years) after the start of the Class Period. *See* Johnson Rpt, Appendix G.[66]

As a fallback, Defendants seem to argue the IHS index does not meaningfully reflect their prices. But, Defendants have already conceded that the IHS indexes are the "most representative of the month-to-month caustic soda price movement for contract volumes of liquid" caustic soda. Macartney Decl., ¶¶ 61, 71. And, given Defendants' collective market share, Dr. Macartney readily demonstrates that Defendants' price increases would have easily moved the IHS indexes in a relatively straightforward fashion. Ex. 1, ¶ 57.  Defendants pressure campaign against IHS also demonstrates the importance of indexes to maintaining elevated pricing.[67]

### 5. *Comcast* Does Not Bar Certification

Defendants inappropriately recast IPPs' allegation of a single price-fixing conspiracy into multiple theories of harm. *Compare* Opp. 40 *with* DPPs' Reply Br. at 20. While there may be

---

[66] Of all the contracts Dr. Johnson lists, *only one* appears to both take place at the beginning of the Class Period *and* establishes a price cap. *See* Johnson Rpt, Appendix G at 2 (referencing PVS Chemicals Solutions), but the same page demonstrates PVS purchased via contract at higher prices later within the Class Period. *See id.* Also, most indirect purchasers bought on a spot basis, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The indirect purchaser contracts cited by Defendants (i) do not span the entire Class Period, (ii) permit upward price adjustments based on increases to the applicable index, and/or (iii) specifically illustrate situations in which price increases would be passed-through to the customer. *See* Opp. at 55 (citing Ex. 62, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[67] Ex. 50, Paulson Ex. 577 at OCC_00654345 (James Paulson: "Good news for helping move IHS as well."); *see also id.* (explaining artificially inflated caustic soda prices would result inflated index prices); *see also supra* at n. 3.

multiple constituent acts, these serve a single conspiracy to raise prices. *See, e.g., Dial Corp.*, 314 F.R.D. at 117-18 (*Comcast* does not bar certification "because Plaintiffs present one theory of antitrust impact: Defendants agreed to fix prices[.]"); *TFT-LCD*, 267 F.R.D. at 303.

Defendants also "misstate the central holding of *Comcast*," *Sykes v. Mel S. Harris Assocs. LLC*, 780 F.3d 70, 88 (2d. Cir. 2015), which precluded certification "only . . . because the sole theory of liability that the district court determined was common in that antitrust action . . . was a theory of liability that the plaintiffs' model *indisputably failed* to measure when determining the damages for that injury." *Waggoner v. Barclays PLC*, 875 F.3d 79, 105-6 (2d. Cir. 2017) (emphasis added). This is a far cry from the granularity Defendants demand. Because "[t]his is not a case where" where Dr. Macartney's damages model fails to "track [plaintiffs'] theory of liability," *Comcast* does not bar certification. *Id.*

### 6. There is No Price Correlation Issue

Defendants' arguments are vacuous. They either repeat the same points raised earlier or make baffling statements about Dr. Macartney's model. For example, Defendants assert that Dr. Macartney "does not determine why any particular prices are correlated[.]" Opp. at 43 (emphasis in original). Maybe Defendants missed it, but Dr. Macartney's models are built precisely to demonstrate that Defendants' conspiratorial price increases caused classwide injury. Ex. 1, ¶¶ 98, 140. Defendants also assert that the "key question" is whether "one purchaser's prices likely results" in other purchasers' prices increasing. Opp. at 43. No, that is wrong. As Dr. Macartney points out, Defendants' increased prices for nearly all customers, not just on some to create a "spillover" effect, and Dr. Johnson's analysis on month-over-month price changes erroneously removes conspiracy-related price trends, despite his claim they are unrelated to the conspiracy. *Id.* at ¶ 99. As Dr. Macartney demonstrates in his Reply Declaration, he extends his analysis to cover the top 30 distributors, representing 94% of distributor purchases from Defendants, and confirms

the results in his initial declaration. *Id.* Dr. Johnson, on the other hand, muddles Dr. Macartney's results by repeatedly relying on tiny sample sizes and distributors with insufficient data. *See id.* at ¶¶ 96, 131.

### C.  Common Evidence can be used to Estimate Aggregate Damages

Defendants challenge Dr. Macartney's damages calculations with the same tired arguments about limited distributor data and the use of uniform overcharge and pass-through rates. Opp. at 56-60. These challenges do not prevent certification here. "[I]n a complicated antitrust case such as this, where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, 'plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.'" *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 605 (N.D. Ill. 2015) (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002)). As the Supreme Court has held, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

First, Dr. Macartney may properly rely on a weighted average overcharge and pass-through rates to estimate aggregate damages. The jury is permitted to "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow*, 327 U.S. at 264. Average overcharge and pass-through rates, by definition, incorporates rates that are both above and below the averages, thus providing a reasonable estimate of aggregate damages. *Cf. In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472, 2019 WL 3214257, at *14 (D.R.I. July 2, 2019).[68] And, as explained *supra*, Dr. Macartney's average pass-through rate accurately accounts

---

[68] A simple example illustrates the point: Customer A incurs a 5% overcharge on a $100 purchase (i.e., $5). Meanwhile, Customer B incurs a 10% overcharge on a $200 purchase ($20). Together, these customers paid $25 in overcharges. Dr. Macartney's method of multiplying the aggregate

for variation by distributor and region; a sign that his model is reliable. Thus, by formulaically applying the weighted average overcharge and pass-through rates to the relevant volume of commerce, Dr. Macartney arrives at a reliable estimate of total damages that "roughly reflects" the harm caused by the alleged cartel. Macartney Decl., ¶¶ 135-136; *Restasis*, 335 F.R.D. at 31 ("The Second Circuit has accepted the use of aggregate classwide damages so long as they 'roughly reflect' the harm caused to plaintiffs."); *McDonough*, 638 F. Supp. 2d at 490 (approving calculation based on "the average markup of a comparable distributor"). Dr. Macartney's methodology is consistent with the "considerable latitude" given to plaintiffs in proving antitrust damages. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988).

Second, Dr. Macartney's estimation of the relevant volume of commerce is reliable. Opp. at 57-58. Dr. Macartney starts with Defendants' sales data to identify the aggregate dollar value of sales to the distribution channel, which, by definition, limits the volume of commerce to Defendants' sales. Macartney Decl., ¶ 135; Ex. 1, ¶ 160. Then, to determine the relevant volume of commerce Dr. Macartney takes the sales data produced by ███████████████████ to determine the percentage of their sales to the Classes, which he then applies to the volume of commerce sold by Defendants to █████████████████. Ex. 1, ¶¶ 161-62. For the remaining distributors, Dr. Macartney calculates the weighted average of sales made by ██████ ███████████████ to the Classes, and then estimates their volume of commerce to the Classes by applying the weighted average to Defendants' remaining sales volume to the distribution channel (*i.e.*, minus the share sold to ████████████████████). *Id.* at ¶ 165. This is a reliable and representative proxy for determining the relevant volume of commerce to the Classes because

---

volume of commerce ($300) by the weighted average overcharge (8.33%) leads to the same result ($25). Macartney Reply ¶ 158 & n. 398.

these distributors account for nearly half of Defendants' sales to the distribution channel, and they sell to customers throughout the United States. *Id.* at ¶¶ 163-166 & Figs. 61-62. Defendants do not explain how this methodology is so fundamentally flawed as to grossly over or under-estimate the relevant volume of commerce for the Classes, such that Dr. Macartney's methodology "amounts to no method at all." *TFT-LCD*, 267 F.R.D. at 823-25; *see also Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 825 (2d Cir. 1983) (upholding antitrust damages verdict based in part on assumptions about market size and share derived from industry data and public sources).[69]

Finally, although issues related to individual damages allocation do not prevent class certification in the Second Circuit, *Roach*, 778 F.3d at 405, Plaintiffs have nonetheless proposed a procedure that would allocate damages based on class members' purchases of caustic soda. *See* Dkt. No. 514-2 at 8-9. Defendants raise the concern that class members may not be able to show that the caustic soda they purchased came from Defendants. Opp. at 58-59. To address these concerns, at the appropriate time *after judgment*, IPPs envision a process in which the claims administrator could require additional information from a claimant that (i) made fewer than 5 purchases of caustic soda during the class period or (ii) purchased caustic soda from a distributor that purchased caustic soda exclusively from non-Defendants over the entire class period. This process would limit recovery to claimants that more likely than not purchased caustic soda manufactured by Defendants, thus providing a "sufficient connection between an end-use consumer and a Defendant." *Foam*, 2014 WL 6461355 at *66. Eligible claimants would then be entitled to a *pro rata* share of the recovery, as approved by courts in other antitrust cases. *See, e.g.,*

---

[69] Defendants appear to make a related argument that Dr. Macartney's model calculates damages based on sales by non-Defendant suppliers. Opp. at 58-59. Not so. As explained *supra*, Dr. Macartney's damages model is based on *Defendants'* sales data to the distribution channel, not distributors' resale data. As such, his model only calculates damages based on sales by Defendants, which necessarily excludes sales that Defendants did not make. *See* Macartney Decl., ¶¶ 135-136.

Ex. 51, Plan of Allocation, *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, 2:17-md-02785 (D. Kan.), Dkt. No. 2590-9 (Feb. 28, 2022); Ex.52, Plan of Allocation, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation*, 1:18-md-02819 (E.D.N.Y.), Dkt. No. 715-6 (Dec. 12, 2021).

### D.  Dr. Macartney's Market Characteristics Opinion is Supported and Admissible

Dr. Macartney's opinion demonstrates the caustic soda market was conducive to successful collusion. He points to "the concentration of manufacturers," high barriers to entry, "weak competition from" imported caustic soda, the lack of economically viable substitutes, "low elasticity of demand," and a fungible, "standardized" product.[70] "These are all well accepted characteristics of a market that is subject to cartelization" and support "common proof" of antitrust injury.[71] Defendants ask this Court to make key factual determinations that should be reserved for the factfinder or simply ignore the law. Their arguments are addressed seriatim. Opp. at 40-43.

***First***, whether the caustic soda market was conducive to collusion is a predominating question that will be answered in the same way with the same evidence for all IPP class members. Nowhere do Defendants dispute this. Instead, Defendants attempt to create a straw man by asserting a "market characteristics assessment is insufficient by itself to show predominance as a matter of law." So what? Dr. Macartney's assessment is only piece of the predominance inquiry. The full context of Defendants' disingenuous quote from *Air Cargo* opinion says precisely that: "[T]he court agrees . . . that [plaintiffs' expert's] market analysis does not establish . . . impact 'on

---

[70] *Compare Kleen Prods.*, 831 F.3d at 927 *with* Macartney Decl., ¶¶ 54-56 (lack of economically viable substitutes), 55 (weak competition from imports), 57-62 (product homogeneity), 63 (high barriers to entry), and 68 (market concentration).

[71] *Kleen Prods.*, 831 F.3d at 927 (collecting cases); *see also EPDM Antitrust Litig.*, 256 F.R.D. at 91, 95 (considering similar characteristics as "conducive to a conspiracy[.]").

its own.' . . . ***It does not need to, however***. [His] analysis will have to be considered . . . as perhaps one weight on the scale ***favoring*** predominance."[72]

Defendants also argue the court cannot presume impact, but, as the Supreme Court has said, "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."[73] This rule equally applies to antitrust indirect purchaser cases, who, like direct purchasers rely on the same factual evidence to answer the same questions about liability and harm. *Namenda IPP*, 338 F.R.D. at 571 (collecting cases).

***Second***, Defendants waste this Court's time with a mid-brief rehash of their greatest hits, all of which are factual disputes that should not be resolved here. These points are obviated by Dr. Macartney's reliance on Defendants and distributors' transactional data, addressed elsewhere in this brief, or demonstrably false (e.g., Dr. Macartney addressing imports through his net exports variable). Defendants dispute the homogeneity of caustic soda, but Defendants surreptitiously labeled one grade as another and testified that caustic soda was predominantly fungible.[74]

***Third***, Defendants appear to be under the misimpression that price increases must be applied automatically and uniformly for IPPs to obtain class certification. This is not true for any industry, including caustic soda, and does not impede class certification. *See supra* at n. 19; *Messner*, 669 F.3d at 818 (vacating denial of class certification where district court made "uniformity of nominal price increases a condition for class certification."). The two cases cited by Defendants do not suggest a different rule, or, in any event, are not the law of this circuit. *In re*

---

[72] *Air Cargo*, 2014 WL 7882100, at *49 (emphasis added).
[73] *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).
[74] Ex. 25, Chen Tr. at 30:8-25, 31:1-7 (stating all caustic soda at one facility was labeled as diaphragm grade, even if it was membrane); ██████████████████████████████████ ████████████ ; *see also* Macartney Decl., 57-59.

*Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, *2-13 (N.D. Cal. June 9, 2010) is a component case where three direct purchasers bought 82% of over 2,000 different types of chips to incorporate them into a multitude of new and different products. *Id.* Apart from an obvious pass-through problem, a highly concentrated distributor market meant that each distributor's contract lacked *any* type of a pricing baseline, such as "a future price, pricing formula or reference-pricing method," all of which are present here. *Id.* at *8. *New Motor Vehicles*, 522 F.3d at 22-31 is even more off base, as plaintiffs relied on a "novel and complex" attenuated theory of harm involving the restriction of lower-priced imports. *Supra* at n. 63.

**Fourth**, Defendants do not seem to understand the difference between a market conducive to collusion and a conclusion that collusion is present. Ex. 1, ¶¶ 9, 12. No case holds an "oligopolistic market structure" is "meaningless" to the factual question of collusion, including the motion to dismiss opinion they cite, because it well-accepted that highly concentrated markets are vulnerable to collusion. *Kleen Prods. LLC*, 831 F.3d at 927; *In re Processed Egg Prods.*, 81 F. Supp. 3d at 421-25; *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d. Cir. 2004). IPPs are also under no obligation to show a benchmark period different in every respect from the Class Period. In fact, some overlap among anticompetitive characteristics between the benchmark and Class Period makes it *more likely* that Dr. Macartney's damages calculation conservatively estimates overcharge. *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007); Ex. 12, Macartney Tr. 44:23-25; 45:1-4.

### E. Defendants Invent Conspiracies Involving Distributors that Plaintiffs Do Not Allege

Defendants erroneously invoke the presence of "mini-conspiracies" involving Defendants and distributors in a transparent attempt to create individualized issues. Opp. at 60-61. But this is not what Plaintiffs allege, nor what their opening brief suggests. Plaintiffs simply reference the

legal theory that antitrust defendants may use third parties as "conduits" to facilitate price-fixing conspiracies, such as by "signaling" price increases between competitors, but that does not transform the conduits into co-conspirators. *See In re Domestic Drywall Antitrust Litig.,* 163 F. Supp. 3d 175, 241-243 (E.D. Pa. 2016). As such, Defendants cannot manufacture predominance concerns related to the role of distributors in *their* price-fixing conspiracy. *See also NASDAQ*, 169 F.R.D. at 518–19 (holding the complaint confirmed allegations of single conspiracy).

### F.  Common Evidence Demonstrates Class Membership

Defendants make the same argument in various iterations throughout their brief: class members have no way to prove, with either common or individualized evidence, that the caustic soda they purchased was manufactured by a Defendant.  *See* Opp. at 26-27, 53-54, 63. Thus, while claiming that individual inquiries are required to trace IPPs' purchases back to a Defendant, Defendants also argue such inquiries would be futile, because the "identity of the manufacturer from whom the indirect purchasers bought caustic soda . . . cannot be reliably determined."  *See* Opp. at 27, 53. These arguments must be rejected.[75]

First, common evidence may be used to demonstrate that IPP class members purchased Defendants' caustic soda.  As explained in Dr. Macartney's Reply Report, simple mathematics demonstrate to a near certainty that all IPP class members purchased at least some of Defendants' caustic soda.  Given Defendants' overwhelming share of the U.S. caustic soda market, if a class member made *just ten random purchases*, the probability that none of those purchases contained Caustic Soda manufactured by the Defendants *is 1 in 10 billion*. Ex. 1, ¶¶ 83-84. Simple math refutes Defendants' assertion that IPPs cannot prove they purchased caustic soda manufactured by

---

[75] Individual class members are not required to "trace" the overcharges down the chain of distribution as a pre-requisite to certification. Opp. at 53. *See* In re *TFT–LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at *3-4, 9 (rejecting similar burden); *see supra*, 12-13.

a Defendant.[76] *See Tyson Foods*, 577 U.S. at 454–55 (2016) (representative evidence that is relevant and reliable may be used to establish class member injury); *see also Restasis*, 335 F.R.D. at 31 (citation omitted) ("[T]he Second Circuit has accepted the use of representative evidence and statistical observations to prove classwide injury."); *cf., In re In Re: Celexa And Lexapro Marketing and Sales Practices Litigation,* 915 F.3d 1, 13 (1st Cir. 2019) (denying summary judgement on causation where there would be a 98% chance that at least one of the prescriptions was the result of off-label marketing); *SRAM*, No. 07-MD-01819, 2010 WL 5071694, at *11 (N.D. Cal. Dec. 7, 2010) (rejecting that plaintiffs "lack[ed] sufficient evidence" they purchased products containing Defendants' SRAM where they relied in part on the fact that Defendants' combined market share was over fifty percent).

Second, Defendants' argument, if accepted, would preclude not only a recovery by the class, but also any individual recovery as well.  A similar tactic was rejected in *Restasis*, 335 F.R.D. at 26. There, defendant contended that while it had the right to question every individual class member to determine if he or she would have purchased generic Restasis had one become available, "determining the hypothetical actions of a consumer is 'next to impossible'" because a generic equivalent of Restasis never entered the market. *Id.*  Citing *Tyson Foods*, 577 U.S. at 454-55, the *Restasis* court rejected that argument:

> [Defendants'] argument about the likely impossibility of individualized proof
> does not appear limited to class actions. . . . *Tyson Foods* accepted the plaintiffs'
> method of proving classwide liability in part because they could have relied on
> the same method to establish individual liability. . . By analogy, I view with great
> skepticism an argument against class certification that would prevent individual
> lawsuits as well.

---

[76] The fact that small amounts of non-defendant product are within the stream of commerce will not affect the damage calculations or result in Defendants being liable for purchases made from non-defendants.  Aggregate damages to the IPP class were calculated based on the volume of caustic soda purchased from the Defendants, and therefore already exclude any transactions involving distributor purchases from non-defendant sources. *See supra* at 12-13.

*Id*. at 26.

Here, as in *Restasi*s and *Tyson*, Defendants may not defeat class certification by insisting that individualized inquiries are required to establish that class members purchased Defendants' caustic soda, while also claiming that those inquiries would be futile.  Common evidence of the statistical probability that class members purchased at least some of Defendants' caustic soda is both relevant and reliable, especially in light of the purported lack of an alternative proof.

Third, even if some individualized inquiry may be required to establish a right to recovery in a small number of cases, such an inquiry will arise and can be managed within the context of a claims process; it will not overwhelm the predominantly common issues.  *Compare In re Smart Techs., Inc. S'holder Litig.,* 295 F.R.D. 50, 61–62 (S.D.N.Y. 2013) (finding tracing requirement under securities laws did not result in individual issues predominating); *see supra*, 43.

Defendants' final argument regarding proof of class membership—that IPPs "have no way of proving that purported class members did not resell the caustic soda they purchased"— may be easily dispatched.  Status as a "reseller" of caustic soda can be established with objective criteria. Neither of the named IPPs resell caustic soda, see supra at n. 29, and an affirmation to that effect on a claim form would be more than sufficient to satisfy the requirements for class certification. *Restasis*, 335 F.R.D. at 24 (in the second circuit, self-identifying affidavits may be used to establish proof of a product's purchase where such evidence does not otherwise exist.).

## V.   The Classes Are Ascertainable

Defendants challenge the ascertainability of the classes on the very same basis, arguing that mini-trials would be required to "determine whether a purchaser (1) purchased caustic soda 'manufactured' by Defendants and (2) did not 'resell' that product."  Opp. at 63. Ascertainability is a "modest" requirement that "will only preclude certification if a proposed *class definition* is

indeterminate in some fundamental way." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d. 2017) (emphasis added). Defendants make no such argument here, and their reliance on *Petrobas* is misplaced. *Petrobras* specifically distinguished the "mini-hearing" language from an earlier case as "not strictly a part of [its] holding" and clarified that the dicta really only applied where a class lacked "objective criteria," which would inefficiently require "a mini-hearing on the *merits* of each [plaintiff's] case." *In re Petrobras*, 862 F.3d at 266-67 (2d. 2017) (emphasis added) (quoting *Brecher v. Republic of Arg.*, 806 F.3d 22, 24 (2nd Cir. 2015)); *see also Baker v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-cv-0917 (LEK/DJS), 2022 WL 9515003 at *12 (N.D.N.Y 2022) (The Class . . . is defined by objective criteria . . . thus allowing the Court to readily identify Class members without needing to resolve the merits of Plaintiffs' claims.").

As demonstrated above, membership in the class is defined by objective criteria. Common evidence, along with self-identifying affidavits, if need be, are available and satisfy the requirements of Rule 23.

## VI.   Minor State Law Variations Do Not Affect Predominance or Manageability

Defendants contend that the classes cannot be certified because the application of the multiple states' laws defeats predominance and superiority. Numerous courts disagree. Courts routinely certify indirect purchaser antitrust classes under the laws of multiple states and resoundingly reject the very argument Defendants make here.[77] Courts also routinely certify state unjust enrichment claims under multiple states laws based on conduct that would violate antitrust

---

[77] *See e.g., Namenda IPP,* 338 F.R.D. at 542 (certifying class for 29 states and the District of Columbia); *Restasis,* 335 F.R.D. at 29–30 (similar, 30 states); *Nexium*, 297 F.R.D. at 176 (similar, 26 states); *In re Lidoderm Antitrust Litig*., No. 14-MD-02521-WHO, 2017 WL 679367, at *3 (N.D. Cal. Feb. 21, 2017) (similar, 17 states*); Foam*, 314 F.R.D. at 232 (similar, 29 states and D.C.); *Packaged Seafood Prods.*, 332 F.R.D. at 340 (similar, 30 states, D.C. and Guam).

statutes.[78]   Defendants ignore all of these cases. Importantly, the "Second Circuit has instructed that 'failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule.'" *Ebin*, 297 F.R.D. at 567 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).

### A.  The Antitrust Class is manageable despite minor variations in applicable state law.

In their opening brief, Plaintiffs demonstrated that the antitrust laws of the twenty-seven states that allow damages recoveries by indirect purchasers substantially mirror one another and submitted a state law chart demonstrating the same.   IPPs' Mem. of L. at 22-23; Hart Decl. Appendix A. Defendants complain this is "not enough," but this type of legal proof is typically accepted as sufficient in indirect purchaser class certification cases. *See Zetia*, 2020 WL 5778756, at *26–28 (applicable state antitrust statutes mirror federal antitrust laws, contain harmonization provisions, and/or has been interpreted in harmony with federal law); *see also Solodyn*, 2017 WL 4621777, at *20 ("EPPs have provided a compilation of state laws . . . and [there are] substantial similarities in the language among states and between state and federal antitrust provisions." (citation omitted)).   Here, IPPs have met their burden. *Zetia*, 2020 WL 5778756, at *26–28 ("Plaintiffs' burden is . . .  that variations among them can be dealt with in a manageable way[.]").

Relying on *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 99 (S.D.N.Y. 2017), Defendants point to purported differences among the states laws that create insurmountable

---

[78] *See Namenda IPP*, 338 F.R.D. at  574-75 (certifying claims under 14 states' unfair competition and unjust enrichment laws); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2020 WL 5778756 (E.D. Va. Aug. 14, 2020) report and recommendation adopted, No. 2:18MD2836, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021) (similar, 25 states and D.C.);  *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *11 (D. Mass. Oct. 16, 2017) (similar, 37 states, D.C. and Puerto Rico); *In re Terazosin Hydrochloride*, 220 F.R.D. at 702 (similar, 17 states); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 237 (E.D. Pa. 2012) (similar, 3 states).

manageability problems. Opp. at 62. First, they argue that the "'requisite proof of injury' under Florida's, Michigan's, and Minnesota's statutes require 'a somewhat stronger and more precise showing of individual impact' than do the laws of other states." Opp. at 62 (*quoting Digital Music*, 321 F.R.D. at 99). A nearly identical argument was rejected in *Restasis*, where court held instead that "the requirements for showing individual impact, and also damages, are essentially the same in all of the states under which plaintiffs sue [and] therefore there are no individualized issues regarding these three states." 335 F.R.D. at 36; *see also Zetia*, 2020 WL 5778756, at *27 (also rejecting analysis in *Digital Music* on Michigan and Minnesota).

Again citing *Digital Music*, Defendants assert that elements to establish the defense of unclean hands in California, Florida and South Dakota vary. See Opp. at 62. But Defendants point to no legal or factual basis for a conclusion that such a defense would apply to the claims asserted here. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06–MD–1775, 2010 WL 4916723, at *4 (E.D.N.Y. Nov. 24, 2010)("The Supreme Court has clearly expressed that an *in pari delicto* defense. . . may be asserted in an antitrust case only where, as a direct result of the claimant's conduct, the claimant bears at least substantially equal responsibility for the violations he seeks to redress.") (internal citation and quotation omitted).

### B. The Unjust Enrichment Class is similarly manageable.

Plaintiffs do not argue that the requirements for an unjust enrichment claim are identical in each of the relevant states. Nor do they need to. *Zetia*, 2020 WL 5778756, at *26. The issue is whether the differences can be managed within the context of the litigation, or whether those differences would overwhelm common proof relating to violation and impact. *Id.* IPPs' Appendix C in their opening brief demonstrates precisely this by showing that under the relevant states' laws, the common evidence sufficient to establish an antitrust violation also establishes a claim for unjust enrichment. *See* Dkt. no. 514-2 (Appendix C). Moreover, this Court has dismissed a number of

unjust enrichment claims, allowing to proceed only claims that can be established with proof of an antitrust violation. *See generally* Dkt. 50.

While Defendants point to differences among the laws of the states, they do not examine how the differences would actually matter in proving the elements of the claims, nor how those differences would overwhelm the common evidence relating to conspiracy, impact and aggregate damages. *See, supra*, n. 78; *Namenda IPP*, 338 F.R.D. at 542 ("Defendants fail to show . . . the statutes would be applied differently in antitrust cases like this one."); *cf. Lazarek v. Ambit Energy Holdings, LLC*, No. 15-cv-6361-FPG, 2017 WL 4344557, at *6 (W.D.N.Y. Sept. 29, 2017) ("The elements of unjust enrichment are [sufficiently] similar in every state[.]")).

For example, Defendants point to New York law and the requirement that the relationship among the parties is "not too attenuated" as a difference.  Opp. at 71.   In its dismissal decision, however, this Court held that the New York law's "not to attenuated" requirement is satisfied "where the indirect purchaser is asserting an unjust enrichment claim against the manufacturer of the product itself," which "is the case here[.]" *Id.*

The other so-called differences that Defendants point to are equally unimpressive. *See* Opp. at 71-72 (listing variations in state laws).  It is hard to imagine how a laches defense or unclean hands could be applicable in this case and Defendants do not explain how. *See In re Air Cargo* at *4 (explaining the limited application of the defense of unclean hands).  The statute of limitations is certainly not in issue, and the only claims that remain in the case are claims arising under state laws where the courts have concluded that conferring a "direct benefit" is not required.  See Dkt. no. 501 at pp. 5-8 (dismissing claims requiring a "direct benefit.").[79]  Similarly, Defendants argue

---

[79] Defendants also cite as one of the "varying" state law requirements "whether unjust enrichment is an independent cause of action."   Again, defendants make no effort to describe how this "variation" (if it exists) would actually matter.  Moreover, this Court already held that unjust

that the requirement of "unjustness" focuses on the "totality of the [factual] circumstances." Opp. at 70. But the point is that the state law unjust enrichment claims that remain in the case are provable with evidence that Defendants engaged in a conspiracy to fix prices, and that Defendants benefitted from that conduct at the expense of Plaintiffs. Thus, proof of the antitrust violation will sufficiently establish that Defendants' conduct was "unjust" under the state unjust enrichment claims that remain in the case. *Solodyn*, 2017 WL 4621777 at *20 (proof of anticompetitive conduct establishes a violation of each state's unjust enrichment laws."); *Namenda IPP*, 338 F.R.D. at 574-75 (acknowledging that IPPs' allegations of defendants' anticompetitive conduct established violations under each states' unfair competition and unjust enrichment laws).[80]

Defendants cite *Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 740–42 (W.D.N.Y. 2020) (Wolford, J.) for the blanket proposition that "[u]njust enrichment claims have 'individualized issues of causation that overwhelm the common questions of law and fact.'" *See* Opp. at 73-74. But, this Court did not make such an assertion. Rather, in that case, the viability of class members' unjust enrichment claims rested on the nature of each class member's relationship with the defendant. Because that inquiry was necessarily individualized, including involving whether a class member had a contract with the defendant and the terms of that contract, the court held that predominance could not be satisfied for those claims. *Id.* at 742.

Next, Defendants claim that differences in state law trigger a complex choice of law analysis creating additional individual issues. Opp. at 73. In fact, choice of law analyses are

---

enrichment claims pled here are "parasitic" of the state antitrust claims. Dkt. no. 501 at 9. If variation creates a  problem under a specific state's law, it should be addressed at summary judgment.

[80] Defendants contend that the proposed verdict form does not adequately account for the relevant variations. Even if true, there is no impediment to assessing the necessity of additions or changes to a verdict form as the case develops. *Nexium*, 297 F.R.D. at 183 ("management for trial is a dynamic process . . . [that] requires constant reevaluation and adjustment").

routinely handled in complex class action litigation and the application of different laws does not prevent class certification. *Zetia*, 2020 WL 5778756 at *26 (conducting a choice of law analysis on the EPPs' claims brought in 25 states, the District of Columbia and Puerto Rico).

But in any event, under New York conflicts laws, the domicile of the plaintiff will determine which state law to apply.[81] Defendants' contrary assertion, without any authority, that "different transactions by the same class member may be subject to different laws depending on which Defendant manufactured the caustic soda they purchased, where the parties entered into that transaction and where the alleged overcharge was paid[,]" Opp. at 73, must be rejected.

### C. Different measures of unjust enrichment damages do not create individual issues.

As demonstrated above, through Dr. Macartney's analysis, Plaintiffs can establish the unjust enrichment damages in the various states. Citing to their Appendix C, Defendants contend that the states vary in how they measure unjust enrichment damages. *See* Opp. at 74. The appended chart, however, shows a striking similarity in the laws relating to the measure of damages on an equitable claim for unjust enrichment—specifically, *the value of the benefit conferred or retained by the defendant. See* Opp. App. C. *See Solodyn*, 2017 WL 4621777, at *19 (finding EPPs' unjust enrichment damages calculation sufficient when based on the difference between actual profits and profits that would have been acquired without anticompetitive behavior); *Terazosin*, 220 F.R.D. at 699 (EPPs' damages methodology for unjust enrichment claims was sufficient because they "need only show that the proof they will utilize is sufficiently generalized."). Whether that benefit is measured by Defendants' entire gross profits on these sales, or by the excessive profits received in light of the overcharges – it is nevertheless a measure of

---

[81] *In re Restasis*, 335 F.R.D. at 34 (the state of purchase provides the appropriate substantive law for class members' claims.).

damages from the perspective of the Defendants, and is not individual to class members. Moreover, even if the method of calculation varies from state to state, there is no impediment to calculating damages on a state-by-state basis.

## **Conclusion**

For the foregoing reasons, the Court should grant Indirect Purchaser Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel.

Dated: January 26, 2023                          Respectfully submitted,


By: */s/ Barbara J. Hart*

Barbara J. Hart
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8526
bhart@gelaw.com

Chad Holtzman (*pro hac vice*)
Nathan Reeder (*pro hac vice)*
**GRANT & EISENHOFER P.A.**
123 Justison Street
7th Floor
Wilmington, DE 19801
Tel: (302) 622-7154
choltzman@gelaw.com
nreeder@gelaw.com

**WEXLER BOLEY & ELGERSMA LLP**
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
312-346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Tel: 215-864-2800
emeriwether@caffertyclobes.com

Jennifer W. Sprengel (*pro hac vice*)
Kaitlin Naughton (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle St.
Suite 3210
Chicago, IL 60603
Tel: 312-782-4882
jsprengel@caffertyclobes.com
knaughton@caffertyclobes.com

Ryan L. Gellman
**COLUCCI & GALLAHER, P.C.**
2000 Liberty Building
424 Main Street
Buffalo, NY 14202
Tel.: 716-853-4080
rlg@cgbuffalo.com

*Attorneys for Indirect Purchaser Plaintiffs*

## CERTIFICATE OF SERVICE

I, Barbara J. Hart, do hereby certify that on January 26, 2023, I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic mail and/or the Court's ECF/Pacer system.

<div align="right">

*/s/ Barbara J. Hart*
Barbara J. Hart

</div>