**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CAUSTIC SODA ANTITRUST LITIGATION | Lead Case No.: 1:19-cv-00385-EAW-MJR |
| THIS DOCUMENT RELATES TO:<br><br>INDIRECT PURCHASER ACTIONS | |

**INDIRECT PURCHASER PLAINTIFFS' REPLY BRIEF ADDRESSING THE IMPACT OF THE COURT'S DIRECT PURCHASER PLAINTIFFS' CLASS CERTIFICATION DECISION ON INDIRECT PURCHASER PLAINTIFFS' PENDING MOTION FOR <u>CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

Page

I.     IPPs Have Consistently Maintained that Nothing in the DPP Class Ruling Precludes Certification of the IPP Class ............................................................................... 1

II.    The Court's Opinion Did Not Undermine Dr. Macartney's Overcharge and Pass-Through Regressions ........................................................................................................ 2

   A.    Dr. Macartney corrected Dr. Lamb's contract misclassifications........................ 2

   B.    Contract variation is not fatal to Dr. Macartney's model. ................................... 4

   C.    Minor classification errors—if any—would not undermine Dr. Macartney's model ........ 8

   D.    Dr. Macartney may use a single overcharge as evidence of injury. ................................. 10

   E.    Dr. Macartney's international demand variable is reliable. ............................................... 11

   F.    The Court's discussion of market characteristics in the DPP Opinion does not provide a reason to deny IPP class certification. .............................................................................. 12

III.   The Court's DPP Typicality Analysis Does Not Apply to IPPs. ....................................... 12

IV.    Defendants Remaining Redundant and Misleading Arguments Do Not Undermine Dr. Macartney's Model ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actos Antitrust Litig.*,
 No. 1:13-CV-09244 (RA) (SDA), 2024 WL 4251891 (S.D.N.Y. Aug. 9, 2024)...................22

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ...........................13

*In re Amaranth Natura Gas Commodities Litig.*,
 269 F.R.D. 366 (S.D.N.Y. 2010) ........................................................................................9

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 568 U.S. 455 (2013)............................................................................................................4

*In re Beacon Assocs. Litig.*,
 No. 09 CIV. 777 LBS AJP, 2012 WL 1569827 (S.D.N.Y. May 3, 2012)..............................14

*In re Broiler Chicken Antitrust Litig.*,
 No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) .................................................19

*City of Philadelphia v. Bank of Am. Corp.*,
 19-CV-1608, 2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023) ......................................... *passim*

*Cook v. Rockwell Int'l Corp.*,
 580 F.Supp.2d 1071 (D. Colo. 2006)...................................................................................17

*In re Electronic Books Antitrust Litig.*,
 No. 11-md-2293, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ..................................8, 9, 17

*Iowa Public Employees' Retirement Sys. v. Bank of Am. Corp.*,
 No.17-cv-6221, 2022 WL 2829880 (S.D.N.Y. June 30, 2022) ................................................4

*Kleen Prods. LLC v. Int'l Paper*,
 No. 10-cv-5711, 2017 WL 2362567 (N.D. Ill. May 31, 2017)................................................9

*Kurtz v. Costco Wholesale Corp.*,
 818 F. App'x 57 (2d Cir. 2020) ............................................................................................9

*Kurtz v. Kimberly-Clark Corp.*,
 321 F.R.D. 482 (E.D.N.Y. 2017).........................................................................................15

*Marisol A. by Forbes v. Giuliani*,
 126 F.3d 372 (2d Cir. 1997).................................................................................................12

*Messner v. Northshore University HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ..................................................................7

*Miami Products & Chemical Co. v. Olin Corp.*,
    No. 19-cv-385 EAW, 2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023) ..................................4, 5

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    338 F.R.D. 527 (S.D.N.Y. 2021) ..................................................................13, 20

*In re Polyurethane Foam Antitrust Litig.*,
    No. 1:10-md-2196, 2014 WL 6461355 (N.D. Oh. Nov. 17, 2014) ..........................4, 6, 9, 20

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015) ..................................................................20

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ..................................................................20

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008) ..................................................................21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ..........................20

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ..................................................................4

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ..................................................................18

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ..................................................................13

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
    No. 20-MD-02966-RS, 2023 WL 3440399 (N.D. Cal. May 12, 2023) ..................................20

**Other Authorities**

Fed. R. Civ. P. 23(a)(3) ..................................................................15

Fed. R. Civ. P. 23(b)(3) ..................................................................7, 8

**I.    IPPs Have Consistently Maintained that Nothing in the DPP Class Ruling Precludes Certification of the IPP Class**

Contrary to Defendants assertions, in each of their prior submissions addressing this subject, IPPs have consistently maintained that the Court's disposition of the DPP Class certification motion is not dispositive of the IPPs' pending motions. See Dkt. No. 732 at pp. 3-4 (Jan. 26, 2024 Ltr. Br.); Dkt. No. 759 at pp. 3-5; Dkt. No. 773 at pp. 3-12. As IPPs previously argued, the deficiencies the Court identified in the DPPs' economist's analysis are not present in the IPP economist's work. Second, unlike testimony in the DPP case, there is no evidence in the IPP record suggesting that absent class members did not care about obtaining lower prices for caustic soda. And last, unlike the DPPs, the IPPs did not define the IPP Classes by reference to subjective terms.

Notwithstanding these identified differences between the DPP and IPP classes, IPPs nevertheless urged the Court to stay further proceedings on the IPPs' class certification motion pending resolution of the DPP class certification motion because the DPPs' 23(f) Petition raised *legal* issues that could implicate proceedings on the IPPs' class motion, including, for example, this Court's resolution of a "battle of the experts" between Defendants' expert Dr. Johnson and DPPs' expert Dr. Lamb. *See, e.g.,* Dkt. No. 732 at 5 (identifying as a legal question "whether it is appropriate for a district court to substantively resolve merits disputes between experts when both are found to be admissible").

Indeed, it is Defendants who are inconsistent in insisting that the regression models constructed by DPPs' expert, Dr. Lamb, and IPPs' expert, Dr. Macartney, are so similar that rejection of one compels rejection of the other. Defendants' expert, Dr. Johnson, asserted the *opposite* in his expert report, claiming they were "in conflict with one another" because the "sets of explanatory variables in both models do not overlap." *See* Dkt. No. 681-5, ¶ 231. In fact, Dr.

Johnson created an exhibit highlighting the differences between the models. *Id.* at Dkt. No. 681-49.

In short, IPPs' position has remained consistent: this Court's reasoning in denying the DPPs' class certification motion does not justify denial of the IPP Classes and certification of the IPP Classes is warranted on the current record. Alternatively, further proceedings (if there are to be any) on the IPPs' class motion should await the outcome of the impending summary judgment proceedings, which may further narrow the issues to be considered by the Court.

## II.    The Court's Opinion Did Not Undermine Dr. Macartney's Overcharge and Pass-Through Regressions

Dr. Macartney's regression analysis stands on its own merits, and Defendants are wrong in asserting that the Court's DPP decision is fatal to their motion.

- ***Dr. Macartney corrected Dr. Lamb's contract misclassifications.*** Dr. Macartney corrected the incorrect classification examples Defendants highlighted in Dr. Lamb's model. Defendants have not pointed to any specific examples where Dr. Macartney otherwise misclassified contracts by type.

- ***Distributor-Focused Economic Data.*** IPPs have presented distributor-focused economic data, including specific correlation analyses and a distributor-specific overcharge. This narrowly tailored data is different than what Dr. Lamb presented.

### A.    Dr. Macartney corrected Dr. Lamb's contract misclassifications.

Defendants are wrong that Dr. Macartney incorporated Dr. Lamb's contract misclassifications into his model. *See* Dkt. No. 777 at 5. When Dr. Macartney was asked at his deposition whether he verified that Dr. Lamb had correctly assigned contract types, he testified that he "certainly did" and that Dr. Lamb's contract classifications had been assessed for their "reliability[,]" although he did not "fully replicate" all of the contract classification work done by Dr. Lamb. *See* Ex. A, Deposition of Gareth Macartney, Vol. III, March 6, 2023, 503:20-25.

Although the extent of Dr. Macartney's verification work was not explored further by Defendants in his deposition, had they done so, they would have realized that *Dr. Macartney corrected Dr. Lamb's contract misclassifications*. The examples cited by Dr. Johnson in paragraph 107 of his DPP report were corrected by Dr. Macartney. *Compare* Dkt. No. 487-3 (Johnson Report for DPPs' class certification motion) ¶ 107 *with* Dr. Macartney's backup materials.[1]



Having placed contract classification at the forefront of their supplemental briefing, it speaks volumes that Defendants did not provide any actual examples where Dr. Macartney misclassified contracts or where any given classification decision actually impacted Dr. Macartney's ultimate conclusions. Dr. Johnson would have been able to review this code in preparation of his report, so the absence of this classification argument from Dr. Johnson's report and Defendants' opposition demonstrates they did not find that Dr. Macartney committed the same errors as Dr. Lamb.

---

[1] The insert is a screenshot from the from the statistical software program STATA, showing contract classification changes in Dr. Macartney's model. These changes were reviewable by Defendants' expert in Dr. Macartney's backup materials, which were previously served on Defendants following service of Dr. Macartney's expert declaration.

**B.    Contract variation is not fatal to Dr. Macartney's model.**

Defendants have offered no evidence that Dr. Macartney misclassified *any* contracts, but they still insist that contractual variation means that IPP injury can only be established through a contract-by-contract review. At the outset, Defendants are applying the wrong standard; at class certification, IPPs do not have to prove on the merits that the class is in fact injured. *Iowa Public Employees' Retirement Sys. v. Bank of Am. Corp.*, No.17-cv-6221, 2022 WL 2829880, *25 (S.D.N.Y. June 30, 2022) (collecting cases); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (explaining that predominance does not require a plaintiff to "win the fray" on merits issues). Rather, IPPs only need to show that Dr. Macartney's model is "<u>capable</u> of showing class-wide impact[.]" *Id*. (emphasis in original). If the jury disagrees with Dr. Macartney's analysis and credits Defendants' argument that contract variation undermines IPPs' theory of injury, then IPPs lose on the merits. But binding Supreme Court law does not require the Court to decide which competing admissible evidence is most persuasive at this stage. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016) ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury[,]" and resolving expert disputes, once admissible, "is the near-exclusive province of the jury."); *see also Iowa Pub. Employees*, 2022 WL 2829880 at *25; *In re Polyurethane Foam Antitrust Litig.*, No. 1:10-md-2196, 2014 WL 6461355, at *32-33, 44 (N.D. Oh. Nov. 17, 2014) (describing defendants' attacks on expert's model as incorrectly assuming that plaintiffs must "*prove* impact *now*.") (emphasis in original).

The DPP Opinion[2] recognized this long-held rule but found that DPPs' "highly specific" class definition *required* the accurate classification of contracts as a "prerequisite to assessing

---

[2] For ease of reference, IPPs cite this Court's previous class certification decision as the "DPP Opinion." *See Miami Products & Chemical Co. v. Olin Corp.*, No. 19-cv-385 EAW, 2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023).

whether there has been classwide injury." 2023 WL 8946114, *11. Given that, the Court determined there could be no "reliable way" to determine the model's *capability* of proving common impact without correctly classifying the contracts (i.e., distinguishing between excluded and included transactions). *See id.*

Defendants seek to significantly broaden the scope of the Court's DPP Opinion and assert it imposes an even *higher* bar for IPPs. According to Defendants, the complexity of contracts at issue requires Dr. Macartney to know "whether a particular distributor may have been insulated . . . by virtue of a contract's specific pricing terms[.]" Dkt. No. 777 at 5. Notwithstanding that IPPs do not have to *prove* that direct purchasers or distributors *were injured*, Dr. Macartney amassed considerable evidence demonstrating such an injury. Because only distributors sell to indirect purchasers, Dr. Macartney also calculated a distributor-specific overcharge and offered other non-regression, distributor-specific evidence of economic injury—none of which was proffered by Dr. Lamb.[3]

First, Dr. Macartney used *actual transaction prices*. Defendants fail to explain how IPPs' use of *transaction prices* for caustic soda injury analysis is insufficient as a matter of law or for Dr. Macartney's purposes. *See* Dkt. No. 692-2 ¶ 106; Deposition of G. Macartney Vol. III, 494:10-14 ("I analyzed . . . data about the contracts produced by the defendants themselves. That's contract

---

[3] Defendants' arguments seeking to analogize IPPs' analysis of DPP/distributor overcharges to DPPs' analysis of the same are unavailing; IPPs' expert, Dr. Macartney, did his own econometric analysis to explain why upstream distributors, regardless of contract variation, were overcharged: (1) Defendants' price increase letters targeted those with contracts and resulted in higher prices after the contract terms permitted or the contracts were updated, Dkt. No. 674-3 ¶ 87; (2) contracts with Defendants were frequently updated, including on monthly and quarterly bases, Dkt. No. 692-2 ¶¶ 103-06; (3) distributors purchased from different Defendants, so even if they had protection under one contract, that would not protect them from price increases from a different Defendant.

data."). To be clear, the transaction data relied upon by Dr. Macartney includes the *actual prices* paid under the contracts in question and shows whether distributors' contracts shielded them from injury. *See, e.g., In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355 at *32-33 (describing how transaction data would account for any transactions insulated from injury by a contract while also capturing injury on the same distributor from a different purchase). Not surprisingly, the data shows that contracts did not immunize distributors from paying higher prices. Defendants' arguments to the contrary rely on improperly substituting Dr. Johnson's variables into Dr. Macartney's model to generate manipulated numbers of uninjured class members. *Compare* Dkt. No. 681 *with* Dkt. No. 692 at 29-30; *see City of Philadelphia v. Bank of Am. Corp.*, 19-CV-1608, 2023 WL 6160534, at *5 (S.D.N.Y. Sept. 21, 2023) ("Defendants do not cite, and the Court has not found, any case in which a court *looked at something other than a model itself to determine whether the model impermissibly masked uninjured plaintiffs*.") (emphasis added). Despite floating hypothetical examples of potentially uninjured *direct purchasers*, Defendants failed to identify any specific uninjured distributor. *See* Dkt. No. 692 at 30-31 (rebutting Defendants' assertion that three *non-distributor* direct purchasers were uninjured). Over the course of his report and reply, Dr. Macartney has provided an in-depth analysis of various contract transactions data and explained how IPPs were overcharged.[4]

Second, unlike DPPs, IPPs have presented distributor-specific economic evidence showing injury, which provides additional confirmation that distributors were injured. The record includes:

> (1) a correlation analysis of the actual prices paid by the top 30 distributors, representing 94% of Defendants' sales, showing a common "pattern" of increasing prices during the class period. Dr. Macartney performed this analysis separate from his regression model, and it independently serves as confirmation of the regression model's finding of injury;[5]

---

[4] *See* Dkt. No. 692-2 ¶¶ 28-33, 100-106, n. 237; *see generally* 674-3 at ¶ 128.
[5] *See* Dkt. No. 692-2 ¶ 97, Appendix A. In his first declaration, Dr. Macartney performed the same analysis on the actual prices paid by the top 10 distributors, representing 80% of

(2) an examination of supposed flat-pricing transactions, where Dr. Macartney concludes those examples still experienced injury;[6]

(3) a demonstration of how Defendants' caustic soda prices both increased and moved together across different geographical regions, despite the existence of varied contracts and purported regional influences;[7]

(4) a demonstration of how average prices sold to three large distributors were "very similar" to prices sold to all other distributors; and, [8]

(5) an analysis that shows increases in caustic soda prices were not justified by normal supply and demand factors. Dr. Macartney demonstrated this both through his empirical analysis of supply and demand drivers and through his analysis of statements by Defendants' executives declaring that their price increases were not justified.[9]

Defendants' arguments about contract variation boil down to a complaint that damages vary across the IPP Class members. But nothing in the record rebuts the fact that the contract and transaction data shows price increases among distributors and indirect purchasers, even if those prices vary due to particular contract terms. It is black letter law that varied damages cannot serve as a basis to deny class certification. *See* Dkt. No. 692 at 9, n. 20; *see also Messner v. Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ("Under the district court's [incorrect] approach, Rule 23(b)(3) would require not only common evidence and methodology, but also common results for members of the class. That approach would come very close to requiring

---

Defendants' sales, and concluded those transaction prices exhibited a "common price pattern[.]" Dkt. No. 674-3 ¶¶ 104-114. Dr. Macartney performed this analysis before running his regression model.

[6] *See* Dkt. No. 692-2 ¶ 28-33 (undermining Defendants' examples of purchasers who purportedly "negotiated relatively flat pricing from Defendants" and emphasizing that these purchasers were not distributors); *see also id.* ¶ 102, n. 237. Analyzing data from Olin, Dr. Macartney determined that only two distributors had pricing "Fixed for Duration[.]" But, even for these two, the transaction data showed that the prices "increased substantially during the Class Period[.]"

[7] Dkt. No. 692-2 ¶ 84-93, Tbls. 21-22, Figs. 23-32. Further, while IPPs' do not address Defendants' arguments related to index-pricing, they do not waive those arguments. Rather, even if the Court find there is insufficient evidence to show the indices were influenced by Defendants' activities, IPPs contend that Dr. Macartney's transaction data accounts for purchases with index-based prices.

[8] Dkt. No. 692-2 ¶ 148.

[9] Dkt. No. 674-3 at Section VI.B.

common proof of damages for class members, which is not required. To put it another way, the district court asked not for a showing of common questions, but for a showing of common answers to those questions. Rule 23(b)(3) does not impose such a heavy burden.").

### C.    Minor classification errors—if any—would not undermine Dr. Macartney's model.

IPPs have established that Dr. Macartney did not rely upon the same misclassified contracts as DPPs. Nonetheless, even assuming Dr. Macartney relied on some contract classification errors made by Dr. Lamb, this would not render his model "so incomplete as to be inadmissible as irrelevant[.]" *City of Philadelphia*, 2023 WL 6160534 at *5 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (Brennan, J., concurring in part and joined by all members of the Court)).

Unlike Dr. Lamb, Dr. Macartney was not obligated to exclude certain contract types from his model altogether because IPPs' class definition does not contain the same contract exclusions as DPPs. This matters because even if a contract transaction is misclassified, that transaction is still rightly incorporated into Dr. Macartney's overall model. Even if its misclassification slightly affects a contract type coefficient, the contract types are reliably controlled for overall, and their precise coefficients are not the primary result of the model regardless.[10] *Cf. In re Electronic Books Antitrust Litig.*, No. 11-md-2293, 2014 WL 1282293, at *26 (S.D.N.Y. Mar. 28, 2014) (concluding that a model's overall reliability is not implicated by multicollinearity, where a variable's precise effect cannot be reliably isolated due to the variables' synergistic effects on each other). Moreover, the effect of any misclassification would be minimized because distributors have a narrower set of contract types compared to direct purchasers. *See* Dkt. No. 674-3 Table 38, n. 244 (stating that distributors had no "Other" contract types).

---

[10] Defendants' cite to the Court's DPP Opinion in an attempt to show that Dr. Macartney's coefficients varied, but they cannot explain the legal or econometric significance of this variance.

Courts have accepted models with greater sins. These include models that may mis-measure variables, omit certain variables altogether, or exhibit evidence of biased or flawed coefficients. *See, e.g., City of Philadelphia*, 2023 WL 6160534, at *5 (rejecting arguments that variables did not accurately measure supply and demand); *Kleen Prods. LLC v. Int'l Paper*, No. 10-cv-5711, 2017 WL 2362567, at *4 (N.D. Ill. May 31, 2017) (declining to strike methodology where synergistic effect of variables produced negative coefficients in model and expert's use of "forward selection" to create positive coefficient could have resulted in false positives); *In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *37 (declining to reject expert's model where coefficient estimates failed to conform to economic theory and defendants brought other criticisms against expert's choice of variables); *In re Electronic Books Antitrust Litig.*, 2014 WL 1282293, at *26 (rejecting that non-statistically significant coefficient created non-viable model); *In re Amaranth Natura Gas Commodities Litig.*, 269 F.R.D. 366, 384-85, n. 126, 130 (S.D.N.Y. 2010) (finding defendants' arguments were improper merits questions, where errors, including an "admitted" error could have affected statistical significance and expert allegedly used the wrong variable or omitted other correct variables in his analysis); *see also Kurtz v. Costco Wholesale Corp.,* 818 F. App'x 57, 62 (2d Cir. 2020) (explaining that omitting variables will affect the model's probativeness, not its admissibility).

"[N]o complex model is perfect." *City of Philadelphia*, 19-cv-1608, 2023 WL 6160534 at *5. And, "[a]t the end of the day, a regression model is meant to generate estimates for what the modeler is attempting to measure[,]" which is why "disputes about the accuracy of a model often go to weight, not admissibility." *See id.* Flawed models may be admitted, because the question is whether a jury **could** find that the expert's model works, "not whether plaintiffs' model actually

works[.]" *See id.* (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009)).

### D.    Dr. Macartney may use a single overcharge as evidence of injury.

Defendants ignore IPPs' arguments from their class certification reply brief on the propriety of data averaging and how Dr. Johnson's approach of sub-dividing distributor data creates unreliable models. *See* Dkt. No. 692 at 27-37. IPPs have responded to Defendants' claims of uninjured class members in *granular detail*, none of which is undermined by this Court's DPP Opinion or addressed by Defendants in their supplemental briefing.

Rather, leaning heavily on this Court's findings that direct purchaser contracts can vary, Defendants declare that a single flat overcharge is unworkable. But this Court never found single overcharge estimate was not capable of providing common proof for injury. Notwithstanding this, Defendants are also factually wrong that Dr. Macartney used only three distributors to create his distributor overcharge. Dr. Macartney used *all* distributor purchases to generate his overcharge and used the sample of three distributors to estimate his pass-through rate.

Defendants also argue that two distributors were not injured in the same manner as other direct purchasers, but IPPs have presented evidence that *distributors* were generally receptive to price increases because of demand inelasticity among indirect purchasers, that distributors generally passed-through price increases, and that prices paid by distributors generally moved together, notwithstanding the size of the distributor or the geographic region. *See* Dkt. No. 692 at 7-8; *see also supra* at Section II-B.  The Court's finding in the DPP Opinion does not undermine the IPPs' theory of injury.

E.          **Dr. Macartney's international demand variable is reliable.**

In ruling on DPPs' motion, this Court emphasized that Dr. Lamb's choice to use global alumina production as a proxy for international demand "would actually represent only 18.5 percent of total U.S. caustic soda exports." *See* Dkt. No. 729 at 15. In contrast, Dr. Macartney has offered a net exports variable that would account for *all* export demand. Unable to dispute that this variable reflects changes in demand for all the global events they view as significant,[11] Defendants argue it is impermissibly endogenous.

Defendants have no response to Dr. Macartney's explanation that his variable is a ratio of total monthly U.S. exports minus imports divided by U.S. domestic production, and, because it is a *ratio*, it avoids the endogeneity bias that Defendants assert relates to pure *quantity* variables.[12] *Compare* Dkt. No. 674-3 at ¶ 121; Dkt. No. 692-2 at ¶118, n. 290 *with* Dkt. No. 777 at 8-9, 16-18.

Worse yet, Defendants' supplemental briefing defies the statement made in their *Daubert* opposition brief: "*Every federal court* that has ever been asked to exclude an expert report based on alleged endogeneity has declined to do so." Dkt. No. 688 at 1 (emphasis in original). While IPPs have made arguments about the endogeneity bias in Dr. Johnson's variable choices (should the Court decide to stand alone), the Court did not address the same arguments in the DPP Opinion. For example, IPPs demonstrated that the prices for exports out of Northwest Europe and Northeast Asia reflected U.S. domestic prices because a disproportionate percentage of exports from those regions were sold to purchasers in the United States. Consequently, Dr. Johnson's calculations

---

[11] Dkt. No. 692-2 ¶ 118; *see also* Dkt. No. 692 at 23-24
[12] Defendants briefly raise and mischaracterize Dr. Macartney's academic work in an effort to suggest he supports their arguments. But even in the passage Defendants' quote from Dr. Macartney's academic work, it is clear Dr. Macartney's previous criticism is confined to pure quantity variables. *See* Dkt. No. 777 at 17.

suffer from the fact that his independent variable (export prices) is being determined in large part by his dependent variable (the domestic price of caustic soda). *See generally* Dkt. No. 679.

### F. The Court's discussion of market characteristics in the DPP Opinion does not provide a reason to deny IPP class certification.

IPPs never suggested that common market characteristics alone provide sufficient proof of class-wide impact to satisfy Rule 23. But that does not mean market characteristics are wholly irrelevant to IPPs' motion. The Court should nevertheless consider market characteristics in conjunction with the other evidence IPPs presented because market characteristics can serve as common proof that Defendants' conspiracy was likely to result in injury to the IPP Class. *See* Dkt. No. 692 at 43-44.

## III. The Court's DPP Typicality Analysis Does Not Apply to IPPs

Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Named IPPs, like all putative class members, purchased caustic soda at prices that were allegedly inflated due to an illegal price-fixing conspiracy. IPPs' theory of harm is not limited to end-users who sought out the lowest possible price in all situations and ignored all non-price factors that could otherwise be pertinent to an end-user's business or caustic soda needs. *Contra* Dkt. No. 680 at 24 ("[DPPs'] central legal theory . . . assumes at a basic level that all caustic soda purchasers sought to pay the lowest price possible on every transaction."); Dkt. No. 729 at 48.[13] *All* IPP Class members experienced harm

---

[13] The Court found that the DPPs' theory turned on class members "universally s[eeking] to pay the lowest possible price" and that the "lowest possible price was artificially inflated by. . . [the] price increase announcements." Dkt. No. 729 at 48. While the price increase announcements impacted the reference point for prices paid by IPP Class members, the anticompetitive harm from Defendants' conduct did not only affect sales made at the announced prices. Rather, it was

because *all* caustic soda prices were artificially inflated. If Defendants persuade the jury otherwise, they will win at trial, but the issues in front of the Court, on both sides, are common issues. The claims and legal arguments brought by named IPPs are completely parallel to the claims brought by other class members, establishing typicality. *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 105 (E.D.N.Y. 2012).

Courts have advised that "minor variations" in purchasing patterns do not create typicality problems "so long as plaintiffs 'alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented.'" *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 547 (S.D.N.Y. 2021) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *32 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). Yet Defendants' focus entirely on "minor variations" in "purchasing practices," claiming the named IPPs are atypical because, like certain putative DPP class members, their purchasing practices accounted for non-price factors. Dkt. No. 777 at 11-12. They insist "greater typicality issues" exist here than in the DPP case because the end-users who have "inconsistent purchasing practices" are the named IPPs. *Id.* at 12. But they fail to explain how the named IPPs' "purchasing practices" are different from those of other end-users and similarly fail to establish that any purported defenses arising from IPPs' purchasing practices would be unique to them.

The named IPPs testified that price *is* an important factor, unlike certain putative DPP class members. For example, Finch Paper testified that at various times it negotiated price reductions

---

the combined effect of Defendants' conduct that increased caustic soda prices across the board. Dr. Macartney shows that prices at all price levels were higher than warranted by competitive conditions. Dkt. No. 692-2 at ¶¶ 104-128.

for caustic soda, elicited price competition among caustic soda suppliers, and enforced contractual provisions to limit suppliers' ability to increase caustic soda prices. Dkt. No. 681-30 at 209:2-24, 226:13-230:25, 233:2-25, 235:16-236:12, 239:11-19, 248:13-249:1, 262:5-23; *see also* Dkt. No. 692-42 at 39:3-14.[14]  There is no evidence that consideration of price and non-price factors was "in any way atypical" of the purchasing practices of the IPP Class as a whole. *In re Beacon Assocs. Litig.*, No. 09 CIV. 777 LBS AJP, 2012 WL 1569827, at *8 (S.D.N.Y. May 3, 2012). And there is no tension in finding that named IPPs and other end-users considered factors like supplier reliability when purchasing caustic soda—because, for example, business planning requires "supply security" (Dkt. No. 692 at 20-21; Dkt. No. 692-43 at 186:19-188:12)—*and* they paid more for caustic soda than they should have but-for the conspiracy. Even assuming IPPs' purchasing practices were different—and it has not been shown they were—price as *one* factor in a purchasing decision is not the same as price as a *non*-factor, like in the DPP action.[15]

Defendants have argued the named IPPs' consideration of non-price factors makes them vulnerable to causation and failure to mitigate defenses. Dkt. No. 681 at 24. The Court's typicality

---

[14] Finch Paper expressly testified that price was a factor that it considered in purchasing caustic soda. Price was not the most important factor because on-time delivery and adequate supply is required for Finch Paper to operate its business. Dkt. No. 532, Ex. 31, at 87:15-88:5; Dkt. No. 692-42, at 40:21-41:2. Although Finch Paper purportedly paid more on a small fraction of its caustic soda to maintain supply flexibility, its strategy led to significant cost savings. Dkt. No. 681-31 at 173:3-174:17. Further, Tripp Plating's Steve Jagielo testified that, in addition to being "competitive" on price, its supplier, Amrex, was convenient, provided quality customer service, and was reliable. Dkt. No. 692-31, S. Jagielo Tr. 50:24; 51:5-6, 14-22; 52:7-8, 54:4-5. Defendants seemingly insist that each named IPP—and every IPP Class member— must survey the entire marketplace and choose the supplier that offers the lowest price, no matter the associated transportation costs, wait times for delivery, or reliability of the supplier in delivering caustic soda. This is not the burden for typicality.

[15] Defendants further contend that IPP Class members are "atypical" if the prices paid by their distributors "were not systematically raised in the same manner or for the same reasons as others in the industry." Dkt. No. 777 at 12. This is not a typicality issue. It is, if anything, a damages issue, which does not defeat class certification.

analysis in the DPP case did not turn on the presence of unique defenses arising from different "purchasing practices," and the purported differences here do not warrant a finding that the named IPPs are subject to unique defenses either. While Defendants raise the specter of such defenses, they say nothing more. The conclusory assertion that such defenses could apply does not establish that the defenses would be *unique* to the named IPPs or become the focus of the litigation. *See* Fed. R. Civ. P. 23(a)(3) ("[T]he claims *or defenses* of the representative parties are typical of the claims or defenses of the class." (emphasis added)); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 533 (E.D.N.Y. 2017) (explaining that "defenses unique to the named plaintiff may preclude class certification" only if they "threaten to become the focus of the litigation." (internal quotation marks omitted)). Several Defendants asserted causation and mitigation defenses against both the named and putative IPP Class members. *See* Dkt. No. 509 at 41-2 (OxyChem's Fourth, Tenth & Eleventh Additional Defenses); Dkt. No. 510 at 47 (Westlake's Eighth Defense); Dkt. No. 513 at 45 (defining "Plaintiffs" to include "alleged members of the alleged class"), 46-47 (Olin's Sixth & Eighth Defenses). The defenses asserted against the named IPPs would thus be *typical* of the defenses asserted against other IPP Class members.

The Court's typicality analysis in the DPP action is distinguishable. IPPs' claims and defenses are typical of the IPP Class.

## IV.    Defendants Remaining Redundant and Misleading Arguments Do Not Undermine Dr. Macartney's Model

Defendants improperly cut and paste remixed versions of their Opposition arguments. IPPs maintain these should not be considered because they do not relate to the DPP Opinion and the scope of the Court's request for supplemental briefing, *see* July 19, 2024 Hearing Tr. 26:16-23, but, to protect the record, IPPs respond below.

      ***First*, *Defendants are wrong that Dr. Macartney mismeasures demand and production costs.*** Chemical and paper production represent an appropriate control given it accounts for 82% of caustic soda demand. Dkt. No. 692 at 24-25. Defendants cite nothing suggesting how such an overwhelming sample of domestic demand is inadequate for Dr. Macartney's purposes. Defendants are also as wrong, as they were in their opposition to class certification, when they point to "isolated data points" to argue demand increased. Dkt. No. 692-2 40-45. After appropriately weighting the relative demand of chemical production to paper production, the overall pattern shows that caustic soda domestic demand was *flat or decreasing*. *See id*.

      With respect to Dr. Macartney's supply costs, Defendants again have no explanation for why their own expert conceded that costs were higher in the pre-class period than during the IPPs' Class Period, confirming Dr. Macartney's conclusions. *Compare* Dkt. No. 692 at 26 *with* Dkt. No. 777 at 13-17. Rather, they attempt to repeat their same ad hoc argument about plant fuel-efficiency without any basis in the record to support either this fact or why Dr. Macartney's reliance on Defendants' own data is inadequate. Even taking their argument at face value, 2020 is **outside the class period** and electricity costs that year would have been ***even lower*** due to gains in plant efficiency.

      ***Second, Dr. Macartney's chlorine variable is reliable and its coefficient is explained by multicollinearity.*** IPPs explained at length in their reply brief why Dr. Macartney's chlorine variable was superior to Dr. Johnson's—namely, that it accounts for PVC demand while also considering a wider range of products demanding chlorine. *See* Dkt. No. 692 at 22-23. Dr. Macartney similarly defended his variable by pointing to its exogenous qualities and how Dr. Johnson's variable substitutions do not result in a different outcome. Dkt. No. 692-2 ¶¶ 115-117. Further, the fact that a single coefficient may be statistically insignificant does not affect the overall

reliability of Dr. Macartney's model, because statistical insignificance is easily explained by multicollinearity, which may occur when multiple independent variables are correlated. *See id.* Multicollinearity does not demonstrate the wrong variable was chosen, nor does it undermine the effectiveness of the overall model. *See In re Electronic Books Antitrust Litig.*, 2014 WL 1282293, at *26 ("[T]he statistical significance of each and every coefficient is not" relevant to the overall success or viability of an expert's regression model.); *cf. Cook v. Rockwell Int'l Corp.,* 580 F.Supp.2d 1071, 1102 (D. Colo. 2006) ("Defendants nonetheless implied . . . that statistical significance is a threshold requirement. . . They failed, however, to cite any scientific or legal authority[.]").

*Third, Dr. Macartney's pass-through regression[16] is robust and not based on an unreliable sample.* Dr. Macartney's overcharge regression relies on robust and reliable distributor data from three distributions that account for 42% of Defendants' sales to the distribution channel. Dkt. No. 692-2 at ¶ 145. This is not an "extremely small" percentage by any reasonable measure, Dkt. No. 777 at 15, nor is reliance on three distributors "improper" when those distributors have significant market share. Dkt. No. 692 at 32. And troubling for Defendants, all three distributors had positive, statistically significant pass-through rates to IPP Class members (Dkt. No. 692 at 33-35; Dkt. No. 692-2 at ¶¶ 157-58 & Table 60) and are representative of other distributors:

- All experienced similar, highly correlated price increases from Defendants;[17]

---

[16] Defendants frame their critique as applying to Dr. Macartney's overcharge regression. Dkt. No. 777 at 15. However, Dr. Macartney used Defendants' transaction data reflecting sales to distributors in his overcharge regression, not distributor data reflecting sales to end-users. *See* Dkt. No. 674-3 at ¶¶ 22, 116. IPPs understand Defendants to be critiquing Dr. Macartney's pass-through regression, as they did in their original opposition to class certification. Dkt. No. 681 at 48-53.

[17] Dkt. No. 674-3 at ¶ 108 & Figures. 22-32; Dkt. No. 692-2 at ¶¶ 97,148, Figures 53-54 & Appendix A.

- All increased prices to the indirect purchasers along the similar trend;[18]

- All purchased similar percentages of caustic soda based on grade, concentration, and state of matter;[19] and

- All sold caustic soda over a similar geographic range.[20]

Defendants fail to substantively explain how the distributors used in Dr. Macartney's regression are qualitatively different from other distributors.[21]

**Fourth, Dr. Macartney's opinions do not violate Comcast.** IPPs allege Defendants engaged in a single price-fixing conspiracy that resulted in a single type of injury— paying more for caustic soda than they otherwise would have. Defendants employed various acts to carry out their conspiracy, but it is incorrect to frame these acts as constituting different conspiracies, invoking different liability theories, and causing different injuries. *See* Dkt. No. 777 at 15-16. Rather, all such acts furthered Defendants' *single* conspiracy to unlawfully increase caustic soda prices, resulting in the same overcharge injuries to IPP Class members. And that harm is precisely what Dr. Macartney measured. Dkt. No. 692 at 38-39. Dr. Macartney's damages model is "directly linked with [IPPs'] underlying theory of classwide liability" based on a Section 1 conspiracy to fix caustic soda prices and it measures only the harm attributable to that theory, satisfying *Comcast*. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n. 8 (2d Cir. 2013) (plaintiffs' model satisfied *Comcast* where the proposed measure of damages was "directly linked with their

---

[18] Dkt. No. 692-2 at ¶ 107, Figures 39-40 & Appendix B.
[19] Dkt. No. 692-2 at ¶ 149 & Figures 55-57.
[20] Dkt. No. 692-2 at ¶¶ 147, 149-51 & Figures 51-52, 55-58.
[21] Defendants also complain that the Dr. Macartney does not exclude various transactions from the dataset, such as distributor-to-distributor sales and sales to indirect purchasers who later resold caustic soda. Dkt. No. 777 at 15. But those transactions represent a less than one percent of the distributors' sales, and the caustic soda in those transactions ultimately ended up in hands of IPP Class members. Dkt. No. 692-2 at ¶¶ 77, 140-41 & nn. 364, 366.

underlying theory of classwide liability (that the misrepresentations on the invoices caused overpayments)[.]"). Despite Defendants' assertions, Dr. Macartney's regression *does* isolate price increases attributable to Defendants'—and not some other—conduct. Dkt. No. 692-2 at ¶ 140. That is not dispositive here, in any case, because *Comcast* does not require Dr. Macartney to disaggregate Defendants' anticompetitive conduct into its component parts or assess only the unlawful conduct and "control for the lawful conduct," as Defendants suggest. Dkt. No. 777 at 14-15; *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *10 (N.D. Ill. May 27, 2022) ("*Comcast* does not impose a requirement to 'disaggregate lawful and unlawful conduct.' Rather, it requires an expert's theory of harm to match the plaintiff's").

 **Fifth**, **there is no endogeneity in Dr. Macartney's international demand variable.** IPPs addressed Defendants' endogeneity arguments in Section II-E; *see also* Dkt. No. 692 at 23-24.

 **Sixth, Defendants recycle their arguments that class members cannot prove membership with common evidence.** Characterized varyingly as a standing issue, a predominance issue and/or an ascertainability issue, Defendants claim that IPPs cannot prove that class members purchased caustic soda 1) manufactured by a Defendant, and 2) did not resell it. Each of these assertions has been amply refuted in IPPs' Class Certification Reply (Dkt. No. 692 at 13, 46-48).

 In the latest version of this argument, Defendants state that if caustic soda cannot be traced to a Defendant manufacturer, then there is no passed-through overcharge, and without a method for tracing, injury can only be determined through individualized inquiry. Dkt. No. 777 at 18. Notwithstanding that Defendants' argument would make it impossible for any IPP to recover (not just in a class action) because they argue that *no individual class member* can trace their purchase back to a Defendant, *see* Dkt. No. 692 at 47-48, both of the cases Defendants cite are irrelevant to the second circuit standard, which specifically disclaims administrative feasibility as a requirement

of Rule 23. *City of Philadelphia*, 2023 WL 6160534 at \*12. *In re Polyurethane* makes comments that hint at something of administrative feasibility requirement, but any such requirement was specifically rejected by the Sixth Circuit a year after *Polyurethane* was decided. *Compare* 2014 WL 6461355 at \*66–67 *with Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015). The Third Circuit case Defendants cite comes from a jurisdiction where administrative feasibility is a *requirement* of Rule 23. *In re Processed Egg Prods. Antitrust Litig.,* 312 F.R.D. 124, 149 (E.D. Pa. 2015). While Defendants have argued at various points that their concerns relate to predominance and not administrative feasibility, courts in this circuit have rejected similar sly attempts to hide an administrative feasibility requirement in the predominance standard. *City of Philadelphia*, 2023 WL 6160534, at \*12 ("At bottom, the argument is an administrative feasibility argument dressed up in predominance clothing.").

Defendants also maintain that IPPs' *class definition* requires a method for tracing, but they are wrong. Notwithstanding that a class definition's ascertainability relates to clear and unambiguous meaning of the *words* used in that definition, Dkt. No. 692 at 48-49, Dr. Macartney mathematically demonstrated the astronomical odds of any given indirect purchaser not purchasing caustic soda manufactured by a Defendant. Dkt. No. 692, 46-48; *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 562 (in a generic delay case, "the likelihood that a third-party payor with ten independent claims for the drug [at issue] had no generic claims [and therefore suffered no injury] is 'approximately 1 in 1 billion'"); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-MD-02966-RS, 2023 WL 3440399, at \*5 (N.D. Cal. May 12, 2023) ("As a simple matter of mathematics, the more prescriptions a TPP fills, the less likely it becomes that *none* of those prescriptions would have been filled by the generic."); *cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 555090, at \*4 (N.D. Cal. Feb. 21, 2012) (concluding

that plaintiffs "need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser.").

At class certification, Defendants only need to prove Rule 23 requirements by a "preponderance of the evidence" standard. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). Dr. Macartney's calculation could be relied on by any indirect purchaser to meet this standard and is also supported by the record: (1) Defendants manufacture the overwhelming amount of caustic soda sold in the United States (90%); (2) caustic soda is fungible; (3) product derived from multiple sources are often co-mingled in one barrel prior to resale. This combination of factors, and others more fully described in Dr Macartney's Report, render it highly likely, indeed almost certain, that at least some of Defendants' caustic soda was sold in each transaction down the distribution chain.[22]

Defendants' last half-baked argument is easily dispatched. Defendants claim that IPPs need "filters" to exclude caustic soda sold for resale, but after sale by Defendants, caustic soda remains in the stream of commerce until it eventually reaches the downstream end user. There is no need to "filter out" that commerce, particularly since Dr. Macartney matched the prices paid by indirect purchasers to the prices distributors paid to Defendants. *See generally* Dkt. No. 692 at 11-12; Dkt. No. 674-3 at ¶ 134.

***Seventh, IPPs' state law claims are manageable and can be proven with common evidence.*** IPPs submitted comprehensive legal authority establishing the overlapping elements required to prove their state law claims. Dkt. No. 674-2, Apps. A-C. That authority demonstrates

---

[22] The fact that small amounts of non-defendant product are within the stream of commerce will not affect the damage calculations or result in Defendants being liable for purchases made from non-defendants. Aggregate damages to the IPP class were calculated based on the volume of caustic soda purchased from the Defendants, and therefore already exclude any transactions involving distributor purchases from non-defendant sources. *See* Dkt. No. 692 at 41-42.

that the application of multiple state antitrust and unjust enrichment laws does not present any intractable manageability concerns. Dkt. No. 692 at 49-55. IPPs' state antitrust claims require the same essential elements and can be proven with the same common evidence. Courts in numerous cases have found the same analysis IPPs submitted here to assuage any concern about managing antitrust claims arising under multiple state laws. *See* Dkt. No. 674 at 12-14, 22-23; Dkt. No. 674-2, App. A; Dkt. No. 692 at 50-51; *see also In re Actos Antitrust Litig.*, No. 1:13-CV-09244 (RA) (SDA), 2024 WL 4251891, at *18 (S.D.N.Y. Aug. 9, 2024) ("EPPs have demonstrated that each of the relevant state antitrust statutes has similar language to the Sherman Act and/or has been effectively harmonized, such that the elements of a monopolization claim are effectively the same."), *report and recommendation adopted*, 2024 WL 4345568 at *9 n. 8 (S.D.N.Y. Sept. 30, 2024) ("[A]ided by the EPPs' chart of applicable state antitrust laws. . . the Court has reviewed the state provisions and case law supporting the conclusion in depth and agrees. . .").

Like their state antitrust claims, IPPs' unjust enrichment claims are sufficiently similar in their required elements.  Dkt. No. 674 at 23; Dkt. No. 674-2, App. B. IPPs only seek certification of claims under state laws that recognize an antitrust violation as establishing a claim for unjust enrichment. Dkt. No. 674 at 23 & Appendix C. Thus, the substantive elements of IPPs' antitrust and unjust enrichment claims can be proven with common evidence, further reducing any burden associated with managing these claims. As explained in their original reply, the purported state law differences in elements or defenses either do not apply in this action or do not present overwhelming manageability issues. Dkt. No. 692 at 51-55.

*Eighth,* unlike Defendants, IPPs do not feel the need to waste this Court's time with a half-baked, bullet-pointed list of their favorite buzz words. All of Defendants remaining arguments are either addressed in IPPs' class certification reply brief or elsewhere in this supplemental reply.

Dated: October 16, 2024                              Respectfully submitted,

                                        By: */s/ Barbara J. Hart*

                                            Barbara J. Hart
                                            **GRANT & EISENHOFER P.A.**
                                            485 Lexington Avenue, 29th Floor
                                            New York, NY 10017
                                            Tel: (646) 722-8526
                                            bhart@gelaw.com

                                            Chad Holtzman (*pro hac vice*)
                                            Nathan Reeder (*pro hac vice*)
                                            **GRANT & EISENHOFER P.A.**
                                            123 Justison Street
                                            7th Floor
                                            Wilmington, DE 19801
                                            Tel: (302) 622-7154
                                            choltzman@gelaw.com
                                            nreeder@gelaw.com

                                            **WEXLER BOLEY & ELGERSMA LLP**
                                            Kenneth A. Wexler
                                            Justin N. Boley
                                            Tyler J. Story
                                            311 S. Wacker Drive, Suite 5450
                                            Chicago, IL 60606
                                            312-346-2222
                                            kaw@wbe-llp.com
                                            jnb@wbe-llp.com
                                            tjs@wbe-llp.com

                                            Ellen Meriwether (*pro hac vice*)
                                            Jennifer W. Sprengel (*pro hac vice*)
                                            Kaitlin Naughton (*pro hac vice*)
                                            **CAFFERTY CLOBES MERIWETHER
                                            & SPRENGEL LLP**
                                            135 S. LaSalle St.
                                            Suite 3210
                                            Chicago, IL 60603
                                            Tel: 312-782-4882
                                            emeriwether@caffertyclobes.com
                                            jsprengel@caffertyclobes.com

23

knaughton@caffertyclobes.com

Ryan L. Gellman
**COLUCCI & GALLAHER, P.C.**
2000 Liberty Building
424 Main Street
Buffalo, NY 14202
Tel.: 716-853-4080
rlg@cgbuffalo.com

*Attorneys for Indirect Purchaser Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Barbara J. Hart, do hereby certify that on October 16, 2024, I caused a true and correct copy of the foregoing to be served upon all counsel of record via the Court's ECF/Pacer system.

*/s/ Barbara J. Hart*
Barbara J. Hart