UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

MIAMI PRODUCTS & CHEMICAL CO.,
On Behalf of Itself and All Others Similarly
Situated, et al.,

                    Plaintiffs,

          v.

OLIN CORPORATION, et al.,

                    Defendants.

———————————————————————

THE TRIPP PLATING WORKS, INC., On
Behalf of Itself and All Others Similarly
Situated, et al.,

                    Plaintiffs,

          v.

OLIN CORPORATION, et al.,

                    Defendants.

———————————————————————

**DECISION AND ORDER**

1:19-CV-00385 EAW

1:19-CV-00975 EAW

## INTRODUCTION

Plaintiffs The Tripp Plating Works, Inc. ("Tripp") and Finch Paper, LLC ("Finch") (collectively "Indirect Purchaser Plaintiffs" or "IPPs") allege that defendants Olin Corporation ("Olin"), K.A. Steel Chemicals, Inc. ("K.A. Steel"), Occidental Chemical Corporation ("OxyChem"), Westlake Chemical Corporation ("Westlake"), Shintech Incorporated ("Shintech"), and Formosa Plastics Corporation, U.S.A. ("Formosa USA")

(collectively, "Defendants") entered into a combination or conspiracy to artificially reduce or eliminate competition for the pricing of caustic soda sold to purchasers in the United States. (Dkt. 335 at ¶ 129). In IPPs' words, they "allege that Defendants conspired to fix the price of caustic soda in the United States, forcing them to pay supracompetitive prices." (Dkt. 623 at 7).[1]

IPPs ask the Court to certify two classes pursuant to Federal Rule of Civil Procedure 23. (*Id*.; *see* Dkt. 514; Dkt. 644 at 24 n.26). They have also moved to strike and exclude certain opinions offered by Defendants' expert witness, John H. Johnson IV, Ph.D. (Dkt. 592). Defendants argue that this matter is not suitable for class certification (Dkt. 532), and have jointly moved to exclude certain opinions offered by IPPs' expert witness, Gareth Macartney, Ph.D. (Dkt. 590). Shintech and Formosa USA have also separately moved to strike portions of Dr. Macartney's testimony. (Dkt. 588; Dkt. 594).

For the reasons below, the Court denies IPPs' motion for class certification. The Court resolves the parties' motions to strike expert testimony and opinions as needed to enable it to resolve the class certification motion, as described below, and otherwise denies those motions as moot.

---

[1]    When referencing the page number(s) of docket citations in this Decision and Order, the Court cites the CM/ECF-generated page numbers that appear in the upper righthand corner of each document and not to the original pagination. Unless otherwise noted, all docket references herein refer to Civil Action No. 1:19-cv-00385.

**BACKGROUND**

On December 28, 2023, the Court issued a Decision and Order denying a motion for class certification filed by plaintiffs Miami Products & Chemical Co., Amrex Chemical Co., Inc., Main Pool and Chemical Co., Inc., Midwest Renewable Energy, LLC, Perry's Ice Cream Company, Inc., and VanDeMark Chemical, Inc. (collectively "Direct Purchaser Plaintiffs" or "DPPs"). (Dkt. 724 (the "DPP Class Certification D&O"); *see also* Dkt. 729 (unredacted version)). Familiarity with the DPP Class Certification D&O and with the prior proceedings in this matter is assumed for purposes of this Decision and Order. The Court has summarized the most relevant information below.

**I.    Factual Background**

**A.    The Caustic Soda Market and Defendants' Alleged Anticompetitive Behavior**

In seeking class certification, IPPs "incorporate[d] the factual background set forth by the . . . [DPPs] in their motion for class certification." (Dkt. 623 at 9). That factual background is recounted at length in the DPP Class Certification D&O. (*See* Dkt. 729 at 4-8). The Court does not repeat it here, but incorporates by reference its prior discussion of the facts underlying both IPPs' and DPPs' theories of how Defendants allegedly manipulated the caustic soda market and caused their customers to pay supracompetitive prices.

**B.    Defendants**

Olin is a vertically integrated global manufacturer and distributor of chemical products and a leading U.S. manufacturer of ammunition. (*Id*. at 8). Olin acquired K.A.

Steel, a privately held distributor of caustic soda and other chemicals, in August 2012.  (*Id*.).

OxyChem is a wholly owned subsidiary of Occidental Petroleum Company, and produces and markets basic chemicals and vinyls.  (*Id*.).

Westlake is an international manufacturer and supplier of basic chemicals, vinyls, polymers, and building products.  (*Id*.).

Formosa USA is a vertically integrated supplier of plastic resins and petrochemicals. (*Id*.).

Shintech is a wholly owned subsidiary of Shin-Etsu Chemical Co., Ltd., the largest manufacturer of polyvinyl chloride in the world.  (*Id*.).

### C.    The Indirect Purchaser Plaintiffs

Tripp is "a family-owned business that provides electroplating services, which is a process used to deposit finished coats on certain metal products such as valves, bonnets, and other parts." (Dkt. 623 at 16).   Finch is "a company that produces paper products and uses membrane grade caustic soda for its manufacture of those paper products."  (*Id*.).   Both claim to have indirectly purchased caustic soda manufactured by one or more of Defendants. (Dkt. 335 at ¶ 12).

### D.    Dr. Macartney

IPPs have engaged Dr. Macartney to provide expert testimony in this matter.   Dr. Macartney is a Senior Economist, the Director of Competition, and Chief Executive Officer at OnPoint Analytics, Inc., an economic and statistical consulting firm.  (Dkt. 629-7 at ¶ 1). Dr. Macartney holds a Ph.D. in economics from University College London.  (*Id*.).

Dr. Macartney has opined, among other things, that: (1) common evidence demonstrates that the structure of the caustic soda industry is conducive to anticompetitive behavior; (2) common evidence and methods demonstrate that Defendants engaged in collusive behavior that artificially increased the price of caustic soda; and (3) there is a common, reliable standard economic methodology that may be used to calculate damages on a classwide basis, and by applying that methodology, he has estimated "Class-wide damages of $155 million for the State Antitrust Class. . . ." (*See id*. at ¶¶ 12-22).[2]  Dr. Macartney has further opined that "Class-wide damages for the Unjust Enrichment Class can also be calculated using common evidence . . . in the amount of $712 million in revenue terms, $355 million in gross profit terms, and $348 million in net profit terms[.]"  (*Id*. at ¶ 23).

A key part of Dr. Macartney's opinion is his performance of a "reduced-form pricing regression" analysis[3] to purportedly demonstrate that caustic soda prices were artificially inflated during the alleged class period.  (*See id*. at ¶ 117).  To perform this analysis, Dr. Macartney used a "standardized database of Defendants' transaction data" he received from

---

[2]     The definitions of the proposed classes are set forth later in this Decision and Order.

[3]     "Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables.  Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable." (Dkt. 729 at 11 (citation omitted); *see also* Dkt. 629-7 at ¶ 117 ("The reduced-form pricing regression is the most common statistical method employed in antitrust litigation. It enables an economist to simultaneously calculate the relationship between changes in a dependent variable (e.g., Caustic Soda prices) and change in multiple independent variables (e.g., supply and demand factors)." (quotation and alteration omitted))).

Dr. Russell Lamb, DPPs' expert economist.  (*Id*. at ¶ 118 n.232).  Dr. Macartney's model purports to show an overcharge of 11.61% for all of Defendants' customers and a 16.37% overcharge for distributor customers.  (*Id*. at ¶ 128).  Dr. Macartney then used a regression model "to estimate the proportion of Defendants' price increases that were passed through into the distributors' prices to members of each [proposed] Class."  (*Id*. at ¶ 133).  This model "provides an estimate of passthrough at a rate of 81%[.]"  (*Id*. at ¶134).

### E.    Dr. Johnson

Defendants have engaged Dr. Johnson to provide expert testimony in this matter.  Dr. Johnson is the Chief Executive Office of Edgeworth Economics, LLC, a "consulting firm that provides clients with objective expert economic and financial analysis for complex litigation and public policy debates."  (Dkt. 630-5 at ¶ 22).  Dr. Johnson holds a B.A. in economics from the University of Rochester and a Ph.D. in economics from the Massachusetts Institute of Technology ("MIT").  (*Id*. at ¶ 23).  Dr. Johnson's areas of specialization at MIT were labor economics and econometrics (the application of statistics to economics).  (*Id*.).

Dr. Johnson has provided an expert report in which he responds to and critiques Dr. Macartney's opinions.  (Dkt. 633-5).  Dr. Johnson has argued, among other things, that: (1) Dr. Macartney's assessment of the impact of Defendants' price increase announcements is divorced from economic evidence, in part because "[p]ricing for caustic soda is individually negotiated between each supplier and distributor, and the pricing mechanisms and terms vary substantially across distributors, across Defendants, and over time"; (2) Dr.

Macartney's overcharge regression fails to account for global supply and demand conditions that impact the domestic price of caustic soda; (3) Dr. Macartney's overcharge regression improperly calculates an average overcharge for distributor and non-distributor purchasers, instead of customer-specific overcharges; (4) Dr. Macartney's pass-through model relies on data from only three distributors to estimate pass-through rates for 155 distributors, but he has provided no statistical tests to support the conclusion that "the purchases and sales associated with his three distributors are representative of the distributors excluded from his analysis"; and (5) Dr. Macartney's pass-through model otherwise oversimplifies the caustic soda supply chain.  (*Id*. at ¶¶ 7-21).

As part of his critique of Dr. Macartney's regression model, Dr. Johnson ran his own multiple regression analysis in which he added "various export price measures."  (*Id*. at ¶ 168).  Dr. Johnson ran six additional regressions, in each of which he added one measure of export prices (contemporaneous and three-month lagged).  (*Id*. at ¶ 169).  These additional tests "yield[ed] an estimate of the purported 'overcharge' that is negative or statistically insignificant."  (*Id*. at ¶ 170).

## II.    **Procedural Background**

The instant actions were referred for the handling of non-dispositive pretrial matters to United States Magistrate Judge Michael J. Roemer.  (*See* Dkt. 42; Civil Action No. 1:19-cv-00975, Dkt. 8).  Judge Roemer ordered consolidation of the two cases filed by IPPs and further ordered that IPPs' cases be coordinated with the consolidated DPP action and that all filings be made in Civil Action No. 1:19-cv-00385.  (Civil Action No. 1:19-cv-00975,

Dkt. 11).  Judge Roemer further appointed Barbara J. Hart of Loewey Dannenberg, P.C. and

Kenneth A. Wexler of Wexler Wallace LLP to serve as interim Co-Lead Class Counsel for

all IPPs in the consolidated action.  (*Id.*).  Ms. Hart later moved to the firm Grant &

Eisenhofer P.A.  (Dkt. 623 at 16 n.10).

The operative  pleading is the amended consolidated complaint filed on August 23,

2021.  (Dkt. 335).  IPPs have moved for class certification under Federal Rule of Civil

Procedure 23(a) and (b)(3).  (Dkt. 514; Dkt. 623).  IPPs seek to certify two classes with the

following definitions:

> *State Antitrust Class*: All persons and entities who indirectly purchased from a
> distributor, and did not resell, liquid forms of membrane or diaphragm grade caustic
> soda in Arizona, California, Connecticut, Florida, Illinois, Iowa, Kansas, Maine,
> Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire,
> New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island,
> South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of
> Columbia manufactured by one or more of the Defendants or their co-conspirators
> (or any of Defendants' or their co-conspirators' parents, predecessors, subsidiaries or
> affiliates) at any time between October 1, 2015 and December 31, 2019.

> *Unjust Enrichment Class*: All persons and entities who indirectly purchased from a
> distributor, and did not resell, liquid forms of membrane or diaphragm grade caustic
> soda in Arizona, Hawaii, Illinois, Iowa, Maine, Michigan, Minnesota, Mississippi,
> Nebraska, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota,
> Utah, Vermont, West Virginia, and Wisconsin manufactured by one or more of the
> Defendants or their co-conspirators (or any of Defendants' or their co-conspirators'
> parents, predecessors, subsidiaries or affiliates) at any time between October 1, 2015
> and December 31, 2019.

(Dkt. 623 at 8-9).[4]  Excluded  from  the  proposed  classes  are  "Defendants,  their

coconspirators, parents, predecessors, subsidiaries, and affiliates, and all federal government

---

[4]      IPPs originally also sought certification of a third proposed class, which they referred
to as the Colorado Consumer Protection Class.  (Dkt. 623 at 8-9).  However, IPPs

entities and instrumentalities of the federal government." (*Id*. at 9). IPPs also ask the Court to appoint them as class representatives and to appoint Barbara J. Hart of Grant & Eisenhofer P.A. and Kenneth A. Wexler of Wexler Boley & Elgersma LLP to serve as Co-Lead Class Counsel, and Colucci & Gallaher to serve as Liaison Counsel. (Dkt. 623 at 30). Defendants oppose class certification. (Dkt. 532; Dkt. 633).

Defendants and IPPs have also moved to strike and/or exclude certain opinions offered by Drs. Macartney and Johnson, respectively. (Dkt. 590; Dkt. 592). These motions are opposed. (Dkt. 610; Dkt. 611). In addition to Defendants' joint motion, Shintech and Formosa USA have each filed individual motions to strike and/or exclude certain of Dr. Macartney's opinions. (Dkt. 588; Dkt. 594). IPPs also oppose these individual motions. (Dkt. 612; Dkt. 613).

On October 31, 2023, IPPs and Shintech entered into a settlement agreement. (*See* Dkt. 714-3) (the "Shintech Settlement Agreement"). The Shintech Settlement Agreement is between IPPs and two proposed classes: (1) the State Antitrust Class; and (2) the Unjust Enrichment Class. (*Id*. at 5). These proposed classes have the same definitions as in IPPs' class certification motion. (*Id*.). IPPs have moved for preliminary approval of the Shintech Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e). (Dkt. 714).

After the Court issued the DPP Class Certification D&O, it ordered the parties to file additional briefing addressing the effect of that decision on IPPs' class certification motion

---

subsequently withdrew their request for certification of this class. (*See* Dkt. 644 at 24 and n. 26 (stating that IPPs "seek certification of two classes" and "IPPs are no longer pursuing certification of the Colorado Class")).

and the pending motions for preliminary settlement approval.  (Dkt. 728).[5]  IPPs and Defendants filed supplemental briefs on January 26, 2024.  (Dkt. 731; Dkt. 732; Dkt. 733).

The Court entered an order (Dkt. 739) holding its consideration of IPPs' motion for class certification, the motions to strike Dr. Johnson's and Dr. Macartney's opinions, and the motion for preliminary approval of the Shintech Settlement Agreement in abeyance pending the Second Circuit's resolution of the DPPs' petition for permission to appeal the DPP Class Certification D&O.  The Second Circuit later denied DPPs' petition.  (Dkt. 746).

The Court afforded IPPs and Defendants two more opportunities to submit additional filings regarding IPPs' class certification motion and the parties' motions seeking to strike expert testimony and opinions.  (*See* Dkt. 753; Dkt. 758; Dkt. 759; Dkt. 760; Dkt. 762; Dkt. 766; Dkt. 773; Dkt. 775; Dkt. 777; Dkt. 778).

## DISCUSSION

### I.     Motions to Exclude Expert Testimony

#### A.     Legal Standard

Pursuant to Federal Rule of Evidence 702, a proposed expert witness must possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  In accordance with this rule, a court considering the admissibility of expert testimony must consider whether (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the

---

[5]     DPPs had filed motions seeking preliminary approval of settlement agreements they had entered into with Formosa USA, Westlake, and Shintech.  The Court later denied those motions.  (Dkt. 752).

product of reliable principles and methods"; and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), (d).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must ensure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.") (quotation and alteration omitted).

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *Id*. (quotation and alteration omitted). "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *M.B. ex rel. Scott v. CSX Transp., Inc*., 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

"The Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," but it has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013). "[C]ourts in the Second Circuit regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *Bowling v. Johnson & Johnson*, No. 17 Civ. 3982 (AJN), 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)).

In this case, the Court has relied in part on Dr. Johnson's opinions to resolve IPPs' class certification motion. It is therefore necessary for the Court to resolve IPPs' challenges to the admissibility of Dr. Johnson's opinions. But the Court need not resolve Defendants' challenges to the admissibility of Dr. Macartney's opinions, because the Court finds class certification unwarranted even assuming *arguendo* that all of his opinions are admissible under Rule 702 and *Daubert*. The Court therefore declines to resolve these challenges at this time, and instead denies Defendants' motions to strike Dr. Macartney's opinions and testimony as moot. *See, e.g.*, *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. ML132438PSGPLAX, 2017 WL 2559615, at *5 (C.D. Cal. June 7, 2017) ("Because the issue of whether [the plaintiffs' expert] has put forward a workable model to assess damages on a class-wide basis is closely intertwined with the Rule 23(b) predominance analysis, the Court declines to address the reliability of [the expert's] methodologies in a *Daubert* motion,

and instead accepts [the expert's] expert report and testimony for the limited purpose of deciding the predominance issue.").

## B.    Admissibility of Dr. Johnson's Opinions

IPPs argue that the Dr. Johnson's "overcharge regression analyses, and his opinions and testimony based on them," are unreliable, because they "are prone to endogeneity" and "unreliably control for global supply and demand for caustic soda." (Dkt. 630 at 4). More particularly, IPPs argue that Dr. Johnson has committed a "fundamental error" by using spot export prices as a variable. (*Id.* (arguing that "Dr. Johnson's use of spot export prices is true error that requires his analyses to be excluded because the spot export prices are not indicators of international prices or demand in their respective localities.")). As IPPs acknowledge, DPPs made a similar argument related to Dr. Johnson's opinions in connection with their class certification motion. (*Id.* at 5 (acknowledging that IPPs seek exclusion "for similar reasons discussed in the Direct Purchaser Plaintiffs' motion to exclude Dr. Johnson's spot export price analyses"); *see also id.* at 14 ("IPPs join with the DPPs and move to exclude Dr. Johnson's [specified opinions and testimony.]")).

In the DPP Class Certification D&O, the Court considered and rejected the argument that Dr. Johnson's use of spot export prices rendered his analysis and testimony unreliable. (*See* Dkt. 729 at 17-20). That analysis applies to and resolves IPPs' motion to strike Dr. Johnson's testimony and opinions. As the Court explained in the DPP Class Certification D&O, Dr. Johnson has explained his methodology in a way that the Court found both reasonable and persuasive. (*Id.* at 19-20). Nothing in IPPs' submissions causes the Court

to reconsider the correctness of its prior finding that "there is no basis for the Court to strike or exclude Dr. Johnson's opinions under Rule 702." (*Id*. at 20). The Court denies IPPs' motion to strike Dr. Johnson's opinions and testimony.

## II.    **Motion for Class Certification**

### A.    **Legal Standard**

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of [Federal] Rule [of Civil Procedure] 23(a). . . ." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008). Specifically, the Court must determine whether the proposed class meets the following requirements:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If all these requirements are met, the Court must then determine whether one of the scenarios set forth under Rule 23(b)(1)-(3) is satisfied. IPPs seek certification under Rule 23(b)(3) (*see* Dkt. 623 at 8), which provides that class certification is appropriate if: (i) common questions of law or fact predominate over questions affecting only individual class members; and (ii) class treatment is superior to other methods for adjudicating the controversy.

The Second Circuit has also "recognized an implied requirement of ascertainability

in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quotations omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015) (citation omitted).

Rule 23 "does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations and citations omitted). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445*, 546 F.3d at 202.

For the reasons below, the Court finds that IPPs have not satisfied their burden to show that their proposed classes should be certified under Rule 23 and accordingly denies IPPs' motion for class certification.

## B.    IPPs Cannot Satisfy the Predominance Requirement

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Determining whether common questions of law or fact predominate requires specifically evaluating the elements of the underlying cause of action." *In re Namenda Indirect*

*Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550 (S.D.N.Y. 2021) (quotation omitted). The general elements of an antitrust claim are "(1) a violation of the antitrust laws; (2) injury caused by that violation; and (3) measurable damages." *Id.*[6]

> In *Comcast*, the Supreme Court explained that:
>
> [A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation. And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so.

569 U.S. at 35 (quotations and citations omitted); *see also Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 432 (S.D.N.Y. 2023) ("The Supreme Court in *Comcast* . . . held that Rule 23(b)(3) requires that the proposed methodology for calculating damages be consistent with the class's theory of liability and capable of measuring these damages on a classwide basis.").

---

[6]    As discussed above, IPPs seek to certify both a State Antitrust Class and an Unjust Enrichment Class. As to the State Antitrust Class, IPPs concede that they must establish these three elements. (*See* Dkt. 623 at 18). As to the Unjust Enrichment Class, in its Decision and Order denying Defendants' motion to dismiss IPPs' unjust enrichment claims, the Court explained that the unjust enrichment claims in this case were "correctly categorized as parasitic of the state law statutory claims." (Dkt. 501 at 9). Such "parasitic unjust enrichment claims . . . merely provide a different form of remedy." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011). In other words, IPPs' unjust enrichment claims also necessarily require common proof of class-wide injury based on Defendants' alleged anticompetitive conduct. (*See* Dkt. 623 at 29 ("For states in both the State Antitrust and Unjust Enrichment Classes, establishing an antitrust violation proves an unjust enrichment claim, so the same common evidence—including Dr. Macartney's report, transactional data, and deposition testimony—will be used across the Classes.")).

In the DPP Class Certification D&O, the Court concluded for several reasons that DPPs had "failed to demonstrate by a preponderance of the evidence that common questions will predominate over individual questions with respect to their proposed class," and that they had "not come forward with common proof sufficient to allow a trier of fact to conclude that all or most members of the class suffered antitrust injury as a result of the alleged cartel." (Dkt. 729 at 46-47). For similar reasons, the Court reaches the same conclusion about IPPs' proposed classes.

To understand the Court's conclusion, it is helpful to recall certain facts about the caustic soda market and both DPPs' and IPPs' theories of this case. As the Court explained in the DPP Class Certification D&O:

> Caustic soda is generally sold pursuant to contract, with limited amounts sold under freely negotiated spot sales. Caustic soda contracts may employ different pricing mechanisms—for example, the parties may agree upon a fixed price and a volume target for a period of time, they may tie the price formulaically to a pricing index or indices, or they may enter into long-term contracts for fixed prices, linked to changes in underlying cost factors, priced on an ECU [electrochemical unit] basis, or based on a market basket. Contracts tied to a market basket are priced based on the average selling price realized from some other set of agreed-upon contracts.

(*Id*. at 5 (alteration in original and quotations and citations omitted); *see also* Dkt. 633-5 at ¶ 50 ("Contracts between caustic soda producers and distributors often involve detailed and complex terms.")). The diversity and complexity of the contracts between Defendants and their customers were primary drivers of the Court's finding that the predominance requirement had not been satisfied in connection with DPPs' class certification motion.

As the Court further explained in the DPP Class Certification D&O, "[d]uring the relevant time period, Defendants would periodically send out price increase announcements—that is, letters notifying their customers that they desired to increase the price of caustic soda." (Dkt. 729 at 5). These letters would not automatically result in an increase in the prices paid by customers, "but would instead trigger negotiations between the seller and the buyer." (*Id*.). In opposition to IPPs' class certification motion, Defendants, via Dr. Johnson, point out that certain of the relevant contracts were specifically "designed to prevent unilateral price changes via price increase announcements," including by using specific pricing mechanisms. (Dkt. 633 at 56-57).

Because of these characteristics of the caustic soda market, to prove class-wide injury, DPPs and IPPs both must present common proof of a plausible mechanism through which Defendants' alleged anticompetitive behavior—namely, agreeing to increase prices by issuing parallel price increase announcements unsupported by market conditions—could have caused customers with widely differing contract terms to pay inflated prices.[7] (*See id*. at 57 (Defendants arguing in opposition to IPPs' class certification motion that "price increase announcements cannot be used to raise prices on customers whose pricing is determined by an index since price increase announcements do not directly affect prices determined by index-based formulas in customer contracts")). The Court concluded that DPPs had not done so, and now reaches the same conclusion as to IPPs.

---

[7]    IPPs have the additional burden of demonstrating that Defendants' distributor customers then passed these artificially inflated prices onto IPPs.

The evidence proffered by IPPs in support of their class certification motion fails to address the economic realities of the caustic soda market. For example, Dr. Johnson has explained that Dr. Macartney offers no evidence of how Defendants allegedly manipulated price indices, to increase prices for customers whose contracts were formulaically tied to one or more of those indices. (*See* Dkt. 633-5 at ¶¶ 141-42). IPPs contend that "Defendants' price increases would have easily moved the . . . indexes in a relatively straightforward fashion." (Dkt. 644 at 48). But, as the Court explained in the DPP Class Certification D&O, the record is "devoid of any . . . evidence regarding the manner in which particular negotiated prices from particular customers are incorporated into the variety of indices" at issue here. (Dkt. 729 at 42). "There is no actual proof in the record—much less common proof—that any allegedly artificially inflated negotiated price was actually incorporated into an index, and that a . . . [caustic soda customer] then paid an artificially inflated price based on that index." (*Id*. at 43).

Like DPPs, IPPs have failed to present evidence from which a reasonable trier of fact could conclude that price increase announcements resulted in artificially inflated negotiated prices that were actually incorporated into an index. IPPs assert that Dr. Macartney has "readily demonstrate[d]" that this is the case. (Dkt. 644 at 48). But in support of this assertion, they cite to paragraph 57 of Dr. Macartney's reply declaration, which says nothing about price indices. (*Id*.; *see* Dkt. 644-2 at ¶ 57). Dr. Macartney does assert elsewhere in his reply declaration that "Defendants' price announcements would have been embedded in the IHS price indices in a straightforward fashion." (Dkt. 644-2 at ¶ 71). But Dr.

Macartney's discussion in this paragraph is conclusory. Dr. Macartney does not purport to have performed any analysis "to determine whether the prices published by IHS, Argus, or ICIS accurately reflected actual negotiated prices for any month in the proposed class period." (Dkt. 729 at 42). To the contrary, he testified at his deposition that he had not conducted an economic analysis assessing Defendants' alleged manipulation of the IHS price index. (*See* Dkt. 633-5 at ¶ 141 and n. 328). Dr. Johnson has confirmed that Dr. Macartney performed no "analysis of the purported index manipulation by Defendants." (*See id*.).

IPPs also assert that "Defendants have already conceded that the IHS indexes are the 'most representative of the month-to-month caustic soda price movement for contract volumes of liquid' caustic soda." (Dkt. 644 at 48). But the quoted language in this sentence does not come from Defendants. It comes from a declaration prepared by Dr. Macartney, where he in turn is quoting from IHS's own description of one of its price indices. (*See* Dkt. 623-3 at ¶ 61 ("IHS prepares a Caustic Soda price index which **it claims** is 'most representative of the month-to month caustic soda price movement for contract volumes of liquid 50% caustic soda.'" (emphasis added and alteration omitted)). IHS's description of its price index is not a concession by Defendants.

In sum, IPPs' "theory for how price increase announcements caused injury to . . . [Defendants' customers] with index-based pricing relies entirely on assumption and conjecture." (Dkt. 729 at 42-43). "[T]heory is not sufficient to satisfy Rule 23(b)(3)'s requirements. [IPPs] must provide properly analyzed, reliable *evidence* that a common

method of proof exists to prove impact on a class-wide basis." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 570 (N.D. Cal. 2013) (quotation and citation omitted and emphasis in original); *see also In re Flash Memory Antitrust Litig*., No. C 07-0086 SBA, 2010 WL 2332081, at *8 (N.D. Cal. June 9, 2010) ("[A]ntitrust claims predicated on negotiated transactions, as opposed to purchases based on list prices, often entail consideration of individualized proof of impact.").   The Court agrees with Defendants that "IPPs and their expert . . . have no common method to trace price increase announcements to injury of index-based customers." (Dkt. 633 at 58).

The wide-variety of contract pricing mechanisms used in the caustic soda industry causes a second predominance problem for IPPs, as it also did for DPPs.  Again, it is helpful to recall some of the discussion from the DPP Class Certification D&O:

> [A]s part of the discovery in this action, Defendants provided "transaction data" containing "over 3.3 million observations containing information with regard to quantity, form of caustic soda sold, price, and customer." (Dkt. 624-2 at ¶ 190).  "In order to use Defendants' transaction data in [his] analysis," Dr. Lamb and "staff working under [his] direction" had to "first process and clean some of the fields included in the datasets produced." (*Id*. at ¶ 192).  Part of this processing and cleaning consisted of "identification and assignment of contract type to customers where data are available." (*Id*.).
>
> Specifically, Dr. Lamb and his staff assigned each transaction one of the following contract types: "FORMULA"; "NEGOTIATED"; "OTHER"; and "MARKET BASKET." (*Id*. at ¶ 192 n. 554).  Contracts designated "OTHER" included "long-term contracts under fixed prices, cost-based contracts, [and] ECU price contracts that do not have an index component to pricing." (*Id*.) Transactions that could not be assigned a contract type were designated as "N/A." "Contract types were able to be applied to approximately 65% of observations." (*Id*.).
>
> Dr. Lamb and his staff did not review individual contracts in order to make these designations—instead, Dr. Lamb's reply report indicated that they relied

on the following: (1) for Olin, "Olin customer-contract databases that contain contract and pricing detail"; (2) for OxyChem, "internal documents and databases that identified ECU customers and pricing terms for contracts"; (3) for Westlake, "internal documents and databases . . . that identified ECU customers and pricing terms for contracts"; (4) for Shintech, "internal databases that listed customers and pricing terms of contracts, as well as Shintech's interrogatory responses that identified contracted customers"; and (5) for Formosa USA, "internal documents that identify customers that purchase under contract and those that make spot purchases." (Dkt. 624-3 at ¶ 73).

(Dkt. 729 at 25-26). For reasons detailed in the DPP Class Certification D&O, the Court determined that this data processing was unreliable in accurately characterizing the relevant transactions and that "[t]he complexity of the contractual pricing mechanisms used in the caustic soda industry makes it infeasible to accurately categorize the transactional data without reviewing the individual contracts." (Dkt. 729 at 32).

This conclusion impacts the Court's assessment of Dr. Macartney's opinions, because Dr. Macartney "received a standardized database of Defendants' transaction data" from Dr. Lamb and Dr. Macartney used that database to perform his own analysis. (Dkt. 623-3 at 78 n. 232; *see also* Dkt. 644-2 at ¶ 137 (Dr. Macartney stating in his reply declaration that he and Dr. Lamb "use the same Defendant transaction dataset, processed in the same way"); Dkt. 633-32 at 9 (Dr. Macartney testifying at deposition that he used Dr. Lamb's transaction dataset with "certain modest modifications")).

IPPs have attempted to distinguish their class certification motion from DPPs' class certification motion on this issue by pointing out that their proposed class definitions—unlike the class proposed by DPPs—do not exclude particular purchases based on contract type. (*See* Dkt. 773 at 7-8). IPPs are correct that the nature of DPPs' proposed class

definition made Dr. Lamb's failure to accurately characterize the contract types particularly problematic. But the Court disagrees that this failure, which has been incorporated into Dr. Macartney's analysis, is excusable in the context of IPPs' class certification motion. Dr. Macartney's analysis begins by "estimat[ing] the direct overcharge paid by distributors to the Defendants using the Defendants' transaction data[.]" (Dkt. 623-3 at ¶ 22). One of the "supply and demand factors" that Dr. Macartney acknowledges his model must control for is "[c]ontract type, such as formula, negotiated, etc." (*Id*. at 78-79). And Dr. Macartney's regression model—like Dr. Lamb's model—has different coefficients for each category of contracts. (*See id.* at 78). In other words, Dr. Macartney's model operates in part on the assumption that Dr. Lamb's dataset accurately characterizes the contract types.

IPPs contend that "Dr. Macartney corrected Dr. Lamb's contract misclassifications." (Dkt. 778 at 7). As evidence for this argument, they point to discrete examples of misclassification cited by Dr. Johnson in his report served in connection with the DPPs' class certification motion, and assert that Dr. Macartney's backup materials show that he corrected these errors. (*Id*.). IPPs also fault Defendants for not having "provide[d] any actual examples where Dr. Macartney misclassified contracts or where any given classification decision actually impacted Dr. Macartney's ultimate conclusions." (*Id*.).

Like DPPs, IPPs misunderstand the significance of the failure to adequately account for and characterize the complex contracts at issue in this litigation by individually reviewing the relevant contracts. As the Court explained in the DPP Class Certification D&O, the databases that Dr. Lamb used to construct the dataset that he and Dr. Macartney

relied on in performing their analyses did not accurately record the relevant contract terms—indeed, "the record before the Court contains specific examples of cases in which the terms of contracts changed from what was recorded in the databases relied upon by Dr. Lamb and his staff." (Dkt. 729 at 30-31). A dataset compiled from inaccurate, incomplete databases is by definition also incomplete and inaccurate. The fact that Dr. Macartney may have incidentally identified and corrected a few errors does not change the fact that he, like Dr. Lamb, built his model on a dataset that does not reflect the actual facts of this case. And a regression model built on an incomplete, inaccurate dataset cannot demonstrate anything by a preponderance of the evidence.

IPPs also argue that "at class certification, [they] do not have to prove on the merits that the class is in fact injured." (Dkt. 778 at 8). This is correct. But what they do have to show at the class certification stage is "that they can prove, through common evidence, that all class members were injured by the alleged conspiracy." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (citation and alteration omitted). "Without such common evidence, the need to present evidence that varies from member to member to establish antitrust injury will almost inevitably make individual questions more prevalent or important than common ones." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 45 (S.D.N.Y. 2020) (quotation omitted).

And post-*Comcast*, the Court's assessment of whether the predominance requirement has been satisfied must involve a careful examination of "the soundness of an expert's model relied upon to establish classwide impact." *Id*. at 47; *see also In re Rail Freight Fuel*

*Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it."). "In sum: No damages model, no predominance, no class certification." *In re Aluminum Warehousing*, 336 F.R.D. at 48 (quotation omitted). The reliability of the model "may not be deferred or deflected to a trial on the merits" where it serves as the "central basis for establishing classwide injury and causation[.]" *Id.* at 49.

Dr. Macartney's model, like Dr. Lamb's model, is fundamentally unsound because it does not accurately reflect the complex and varied contracts that existed between Defendants and their customers during the relevant time period. It therefore cannot suffice to support a showing of predominance. And the Court has already determined, for reasons detailed in the DPP Class Certification D&O, that the other evidence of record about the characteristics of the domestic caustic soda market is not independently sufficient to prove classwide impact. (*See* Dkt. 729 at 39-47).

For these reasons, IPPs have failed to demonstrate by a preponderance of the evidence that common questions will predominate over individual questions with respect to their proposed class. The Court notes that Defendants have made several other arguments regarding predominance, including numerous additional attacks on the reliability of Dr. Macartney's overcharge model and Dr. Macartney's pass-through model. (*See* Dkt. 633 at 41-67). The Court need not and does not reach these arguments, on which it has not held an evidentiary hearing. But the Court does observe that some of these arguments appear to have merit.

In particular, Defendants are correct that courts have "consistently rejected" pass-through methodologies that use "averaging and sampling . . . without underlying evidentiary support," and thus "mask individualized questions that otherwise predominate." *In re Pre-Filled Propane Tank Antitrust Litig*., No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *12 (W.D. Mo. Nov. 9, 2021) (finding pass-through model fatally flawed where the defendants' direct customers "paid individually negotiated wholesale prices" and then "resold . . . propane exchange tanks at individually-set retail prices").  In this case, Dr. Macartney's pass-through model is based on data from only three distributors out of more than 155, and Dr. Johnson has offered persuasive evidence that the model ignores the complexity of the supply chain.  (*See* Dkt. 633-5 at ¶¶ 191-98).  Dr. Johnson also persuasively argues that the three distributors in question are not regionally representative of the full pool of distributors.  (*See id*. at ¶¶ 199-204).  While the Court would need to conduct an evidentiary hearing to finally resolve those issues, on the papers Defendants appear to have identified additional significant barriers to a finding of predominance with respect to IPPs' proposed classes.

## C.    Typicality

Defendants also argue that the Court's ruling on typicality in the DPP Class Certification D&O is fatal to IPPs' class certification motion.  (*See* Dkt. 777 at 14-15).  The Court disagrees with this argument.

In the DPP Class Certification D&O, the Court concluded that the named DPP plaintiffs were not typical of the proposed class, because the three largest members of the proposed class had testified that they used a different price negotiation strategy than the

named DPP plaintiffs, and specifically that price increase announcements played no role in their individual negotiations with Defendants.  (*See* Dkt. 729 at 47-48).  Because DPPs "failed to meaningfully address this argument," the Court found that they had not met their burden of showing typicality by a preponderance of the evidence.  (*Id*. at 48).

Defendants argue that a similar analysis applies here, because IPPs made "unique, non-price-related decisions in selecting their caustic soda suppliers."  (Dkt. 777 at 15).  But the evidence that Defendants cite with respect to IPPs is different in kind from the evidence the Court found dispositive in connection with DPPs' class certification motion.  The evidence about IPPs is that they "consider a number of factors—such as customer service and supplier convenience—in addition to price in making their purchase decisions."  (Dkt. 773 at 11 (citing relevant evidence)).  This evidence is not comparable to testimony from the three largest members of the proposed DPP class establishing that they did not fit within DPPs' theory of injury.  (*See* Dkt. 729 at 48).  Indeed, in the DPP Class Certification D&O, the Court made clear that the argument it found persuasive was <u>not</u> that "typicality is defeated . . . because some large class members may have factored into their purchasing decisions their need to preserve relations with their suppliers."  (*Id*. (citation omitted)).  Similarly, typicality is not defeated here because IPPs did not make their purchasing decisions based solely on price.

Defendants also argued in their opening opposition papers that IPPs' claims are not typical of the members of the proposed class whose claims arise under Connecticut antitrust law, because Connecticut antitrust law allows recovery for only one year of the proposed

class period. (*See* Dkt. 633 at 36). The Court is not persuaded by this argument, and agrees with IPPs that "[t]he fact that Connecticut purchasers can only recover for purchases made after 2018 has absolutely no effect on the evidence that plaintiffs will submit to prove their claims." (Dkt. 644 at 30). "Typicality . . . is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quotation omitted). Connecticut's unique limitation on the timeframe for recovery does not impact the Court's typicality analysis, and the Court does not deny class certification based on a failure to demonstrate typicality.

### D.    <u>Ascertainability</u>

In the DPP Class Certification D&O, the Court found that the class proposed by DPPs was not ascertainable, because it provided "no objective criteria for determining what constitutes a long-term, fixed-price contract that predates October 1, 2015." (Dkt. 729 at 49-50). Because that phrase was used but not defined in DPPs' proposed class definition, the Court determined that the proposed class was insufficiently ascertainable. (*Id*.).

Defendants have made an ascertainability argument here, contending that mini-trials would be required to determine whether a member of the proposed class purchased caustic soda manufactured by one of Defendants and did not resell it. (*See* Dkt. 633 at 40, 75; Dkt. 777 at 23). The Court does not find this argument persuasive. Unlike the term at issue in the DPP matter, none of the terms used in IPPs' proposed class definitions lack objective criteria. And ascertainability asks "whether the class [is] defined by objective criteria that

[makes] the class's membership sufficiently definite, not whether the class [is] administratively feasible." *In re Petrobras Sec.*, 862 F.3d at 266. The Court does not deny class certification on the basis of ascertainability.

### E.   Defendants' Other Arguments

Defendants made other arguments in opposition to IPPs' request for class certification, including that IPPs impermissibly expanded their proposed class definitions from those in the amended consolidated complaint, that (for reasons much like their ascertainability argument) the named IPP plaintiffs have not established their class membership, that the named plaintiffs are not adequate to serve the interests of the proposed classes, and that IPPs cannot establish superiority. (*See* Dkt. 633). These arguments are unrelated to the arguments the Court considered in the DPP Class Certification D&O, and the Court need not and does not resolve them to decide IPPs' motion for class certification. The Court's conclusion that IPPs have not shown predominance dictates that the class certification motion must be denied. *See Comcast*, 569 U.S. at 33-34.

### CONCLUSION

For the reasons set forth above, the Court denies IPPs' motion for class certification (Dkt. 514); denies as moot Shintech's motion to exclude certain of Dr. Macartney's opinions and proposed testimony (Dkt. 588); denies as moot Defendants' joint motion to exclude certain of Dr. Macartney's opinions and proposed testimony (Dkt. 590); denies IPPs' motion to strike and exclude certain of Dr. Johnson's opinions and proposed testimony (Dkt. 592); and denies as moot Formosa's motion to exclude certain of Dr. Macartney's opinions (Dkt.

594).  The Court's denial of the parties' motions to strike/exclude shall not preclude the parties from raising any issues related to the admissibility of expert testimony in connection with motions for summary judgment or at trial.

The Court will enter a separate Order setting a schedule for additional briefing on the impact of this Decision and Order on IPPs' motion for preliminary approval of the Shintech Settlement Agreement. (*See* Dkt. 714)  The Court will also enter a separate Order affording IPPs and Defendants an opportunity to be heard on a summary judgment briefing schedule and any further next steps they propose the Court take in connection with this litigation.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  December 16, 2024
        Rochester, New York

- 30 -